**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-2985

DENVER HOMELESS OUT LOUD,
CHARLES DAVIS,
MICHAEL LAMB,
SHARRON MEITZEN,
RICK MEITZEN, JR.,
TOMASA DOGTRAIL,
STEVE OLSEN,
GREGORY COSTIGAN,
SEAN MARTINEZ,
LISA MASARO,
NATHANIEL WARNER, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

DENVER, COLORADO,
MAYOR MICHAEL HANCOCK, in his individual capacity,
GOVERNOR JARED POLIS, in his individual and official capacities,
BOB MCDONALD, in his individual capacity,
MURPHY ROBINSON, in his individual and official capacities,
KRISTIN BRONSON, in her individual and official capacities,
ENVIRONMENTAL HAZMAT SERVICES,
LIEUTENANT MIKE CODY, in his individual capacity,
SERGEANT TONY MARTINEZ, in his individual capacity,
SERGEANT A. MARTINEZ, in her/his individual capacity,
SERGEANT. F/N/U CONOVER, in her/his individual capacity,
CORPORAL M. MOORE, in her/his individual capacity,
OFFICER T. PHUVHAPAISALKIJ, in her/his individual capacity,
OFFICER R. MONTHATHONG, in her/his individual capacity,
OFFICER C. RANDALL, in her/his individual capacity,
OFFICER D. HUNTER, in her/his individual capacity,
OFFICER R. MANZANARES, in her/his individual capacity,
OFFICER T. WILSON, in her/his individual capacity,
OFFICER J. UDLAND, in her/his individual capacity,
OFFICER D. MARTINEZ, in her/his individual capacity,
OFFICER SAM WALLACE, in his individual capacity,
OFFICER JAMES HARVEY, in his individual capacity,
OFFICERS DARREN ULRICH, in his individual capacity,
OFFICER MALLORY LUTKIN, in her individual capacity,
CORPORAL GASPAROVIC, in her/his individual capacity,

1

TROOPER F/N/U BURT, in her/his individual capacity,
TROOPER F/N/U DIRNBERGER, in her/his individual capacity,
TROOPER F/N/U WEIL, in her/his individual capacity,
TROOPER F/N/U CALDWELL, in her/his individual capacity,
TROOPER F/N/U RAE, in her/his individual capacity,
TROOPER F/N/U DAUGHERTY, in her/his individual capacity,
TROOPER F/N/U SARGENTI, in her/his individual capacity,
TROOPER F/N/U DINKEL, in her/his individual capacity,
TROOPER F/N/U KLINE, in her/his individual capacity,
TROOPER F/N/U DAVEY, in her/his individual capacity,
TROOPER F/N/U HARRINGTON, in her/his individual capacity,
TROOPER F/N/U GONZALES, in her/his individual capacity,
TROOPER F/N/U SANCHEZ, in her/his individual capacity,
TROOPER F/N/U WILLIAMS, in her/his individual capacity,
TROOPER F/N/U CLEVELAND, in her/his individual capacity,
TROOPER F/N/U CRENSHAW, in her/his individual capacity,
TROOPER F/N/U VOSS, in her/his individual capacity,
TROOPER F/N/U CHEEMA, in her/his individual capacity,
TROOPER F/N/U HARDY, in her/his individual capacity,
TROOPER F/N/U KEELING, in her/his individual capacity,
TROOPER F/N/U PRATT, in her/his individual capacity,
TROOPER F/N/U TRUJILLO, in her/his individual capacity,
TROOPER F/N/U SIMCOX, in her/his individual capacity,
TROOPER F/N/U MCCALL, in her/his individual capacity,
TROOPER F/N/U JEWETT, in her/his individual capacity,
TROOPER F/N/U NOVY, in her/his individual capacity,
TROOPER F/N/U ROSS, in her/his individual capacity,
TROOPER F/N/U BARKLEY, in her/his individual capacity,
TROOPER F/N/U LARREAU, in her/his individual capacity,
TROOPER F/N/U MAJOR, in her/his individual capacity,
TROOPER F/N/U STRICKLAND, in her/his individual capacity,
TROOPER F/N/U HOOD, in her/his individual capacity,
JOHN & JANES BOES 1-75, in their individual capacities
JOHN & JANES DOES 1-75, in their individual capacities,
JOHN & JANES FOES 1-75, in their individual capacities,
JOHN & JANES JOES 1-75, in their individual capacities,
JOHN & JANES LOES 1-75, in their individual capacities,
JOHN & JANES MOES 1-75, in their individual capacities,

    Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

    Plaintiffs, by and through counsel, Andy McNulty of KILLMER, LANE & NEWMAN, LLP,

respectfully allege for their Class Action Complaint and Jury Demand as follows:

**<u>INTRODUCTION</u>**

1.      Over the past year, and in a blatant effort to skirt a settlement agreement entered

into between Denver and a class of its homeless population, Denver officials have repeatedly

showed up at homeless encampments without notice, flatly told homeless residents to move

along ("to where?" is the obvious question to this nonsensical command), and seized their

property (often discarding it). That settlement agreement, which was approved by United States

District Court Judge William Martinez in September of 2019, required Denver to provide written

notice at least seven days prior to sweeping homeless individuals and store property seized

during sweeps.[1] Despite these requirements, Denver has customarily seized homeless

individuals' property without notice and trashed it.

2.      This custom and practice came to a head during two sweeps this summer.

3.      Rather than take the simple procedural steps that it had agreed to take less than a

year earlier in the *Lyall v. Denver* settlement agreement, Denver, at the urging of Governor Jared

Polis and with the assistance of Colorado State Patrol ("CSP") troopers, swept a stable

encampment of homeless residents that had been surviving for over a month at Denver's Lincoln

Park. Without any notice, Defendants descended at dawn and fenced off the entire park. Then,

they ordered the encampment's residents to immediately vacate the fenced perimeter and to not

return. When the residents attempted to retrieve the rest of their belongings, Denver Police

Department ("DPD") officers and park rangers (along with CSP troopers), by force, prevented

---

[1] A sweep is a multi-agency effort by government officials to displace homeless residents. They
are not effectuated for the benefit of homeless residents, but for political purposes. Sweeps do
nothing to ensure that homeless individuals obtain stable housing, or obtain any services that the
government claims that they need, but only seek to push them into dangerous shelters or less
visible parts of the city. In other words, the point is to push homeless individuals out of the
public eye.

them from re-entering the park. Some of the encampment's able-bodied residents were able to escape with, at most, one armful of their possessions. Those who were disabled or at work were not even that "lucky." Heavy machinery was then used to scoop up dumpsters full of Plaintiffs' unabandoned belongings at once and summarily trash them. Some officials laughed as they destroyed encampment residents' personal property without notice or process, kicking the encampment's residents while they were down.

4.     After the Lincoln Park sweep, Defendant Mayor Michael Hancock made clear that the reason Denver did not provide any notice was to prevent Denver citizens from showing up and voicing their displeasure with his treatment of our homeless neighbors. He took a shot at Councilwoman Candi CdeBaca in the process. The lack of notice was callously political. It was in no way tied to a legitimate public health and safety emergency. And, it flouted the requirements of the *Lyall* settlement agreement.

5.     Less than a week later, a similar scene would unfold near a middle school. Again, Denver failed to provide any advance notice and, instead, arrived in a show of force to seize and discard Plaintiffs' unabandoned property without any notice.

6.     Then, two months later, Denver would use the same tactics to sweep a stable encampment of residents along the South Platte River, who had been surviving in that location for months. Again, Denver provided no notice, descending on the camp in the dead of night this time, then seizing and discarding Plaintiff's unabandoned property without any notice.

7.     These sweeps happened in the middle of a pandemic and in direct contravention of public health guidelines issued by the Centers for Disease Control and Prevention ("CDC"). Those guidelines specifically state that "[u]nless individual housing units are available, do not clear encampments during community spread of COVID-19." The CDC issued this guidance

because conducting sweeps significantly increases the risk to homeless individuals, and the

community, of infection with COVID-19. Despite this clear warning, Defendants chose to act in

direct contravention of public health guidance and to violate the property and due process rights

of homeless individuals in a cruel and dangerous manner.

8.      These are not novel tactics by Denver. The sweeps are not new. Instead they are

part of an intricate and byzantine system of laws in Denver, enacted by Denver politicians at the

urging of Denver's Downtown Partnership, which criminalize homeless individuals because they

lack housing and access to amenities that housing provides, such as a place to store personal

property, to use the bathroom, and to receive trash services. Included in this scheme are a

Camping Ban that criminalizes unsheltered individuals for surviving outside and an

Encumbrance Removal Ordinance that gives unfettered discretion to city workers and police

officers to trash homeless residents' basic essentials of survival, and most treasured possessions

alike.

9.      The homeless sweeps make our homeless neighbors feel as though they are "not a

part of society any more."[2] Our homeless neighbors describe "the loss of all of [their]

possessions" as a part of the sweeps as the "final psychic blow" "when you lose your identity."

The harm done by Defendants' unrepentant, callous actions is irreparable. But, it cannot go

unvindicated. Plaintiffs bring this lawsuit to vindicate their constitutional rights, hard-earned

rights under the *Lyall* settlement agreement, and inalienable human dignity.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §

---

[2] Kevin Beaty, *Denver sweeps of homeless people often push campers to nearby blocks while continuing a cycle of trauma*, DENVERITE, (Aug. 7, 2020) available at:
https://denverite.com/2020/07/29/colorado-denver-authorities-sweep-people-camping-away-from-park-near-capitol/.

1331, and this case is brought pursuant to 42 U.S.C. § 1983 and C.R.S. § 13-21-131. Jurisdiction

supporting Plaintiffs' claims for attorneys' fees is conferred by and brought pursuant to 42

U.S.C. § 1988.

11.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All

the events alleged herein occurred within the State of Colorado, and all of the parties were

residents of the State of Colorado at all relevant times stated herein.

12.     Supplemental pendent jurisdiction for Plaintiffs' state law claims is based on 28

U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent state

law causes of action derive from a common nucleus of operative facts. Jurisdiction supporting

Plaintiffs' claims for attorneys' fees and costs related to Plaintiffs' state law claims is conferred

by and brought pursuant to C.R.S. § 13-21-131.

## **PARTIES**

13.     At all times pertinent to the subject matter of this litigation, Denver Homeless Out

Loud ("DHOL") was an unincorporated association of residents of Colorado, who work with and

for people who experience homelessness to help protect and advocate for dignity, rights, and

choices. DHOL members commit their efforts toward goals affirmed and raised by homeless

individuals, within its organization, and throughout the homeless community. DHOL members

strive to add the community's strengths together to expose the root causes of homelessness and

to create ways of living in which everyone has a safe place they can call home. Seventy-five

percent of DHOL's core membership are either currently homeless or formerly homeless.

14.     At all times pertinent to the subject matter of this litigation, Plaintiff Charles

Davis was a citizen of the United States of America and a resident of and domiciled in the State

of Colorado.

15.     At all times pertinent to the subject matter of this litigation, Plaintiff Michael
Lamb was a citizen of the United States of America and a resident of and domiciled in the State
of Colorado.

16.     At all times pertinent to the subject matter of this litigation, Plaintiff Sharron
Meitzen was a citizen of the United States of America and a resident of and domiciled in the
State of Colorado.

17.     At all times pertinent to the subject matter of this litigation, Plaintiff Rick
Meitzen, Jr. was a citizen of the United States of America and a resident of and domiciled in the
State of Colorado.

18.     At all times pertinent to the subject matter of this litigation, Plaintiff Tomasa
Dogtrail was a citizen of the United States of America and a resident of and domiciled in the
State of Colorado.

19.     At all times pertinent to the subject matter of this litigation, Plaintiff Steve Olsen
was a citizen of the United States of America and a resident of and domiciled in the State of
Colorado.

20.     At all times pertinent to the subject matter of this litigation, Plaintiff Gregory
Costigan was a citizen of the United States of America and a resident of and domiciled in the
State of Colorado.

21.     At all times pertinent to the subject matter of this litigation, Plaintiff Sean
Martinez was a citizen of the United States of America and a resident of and domiciled in the
State of Colorado.

22.     At all times pertinent to the subject matter of this litigation, Plaintiff Lisa Masaro
was a citizen of the United States of America and a resident of and domiciled in the State of

Colorado.

23.     At all times pertinent to the subject matter of this litigation, Plaintiff Nathaniel

Warner was a citizen of the United States of America and a resident of and domiciled in the State

of Colorado.

24.     Defendant City of Denver, Colorado ("Denver") is a Colorado municipal

corporation.

25.     At all times pertinent to the subject matter of this litigation, Defendant Michael

Hancock was a citizen of the United States and resident of and domiciled in Colorado. At all

times pertinent, Defendant Hancock was acting under color of state law in his capacity as Mayor

of Denver. Defendant Hancock was responsible for supervising Defendants John & Jane Boes 1-

75, John & Jane Does 1-75, John & Jane Foes 1-75, John & Jane Joes 1-75, and John & Jane

Moes 1-75, and directing their actions during the sweeps.

26.     At all times pertinent to the subject matter of this litigation, Defendant Bob

McDonald was a citizen of the United States and resident of and domiciled in Colorado. At all

times pertinent, Defendant McDonald was acting under color of state law in his capacity as

Director of the Denver Department of Public Health and Environment ("DDPHE"). Defendant

McDonald was responsible for supervising Defendants John & Jane Foes 1-75, and directing

their actions during the sweeps.

27.     At all times pertinent to the subject matter of this litigation, Defendant Murphy

Robinson was a citizen of the United States and resident of and domiciled in Colorado. At all

times pertinent, Defendant Robinson was acting under color of state law in his capacity as

Director of Public Safety for Denver. Defendant Robinson was responsible for supervising

Defendants John & Jane Boes 1-75, and directing their actions during the sweeps.

28.      At all times pertinent to the subject matter of this litigation, Defendant Kristin Bronson was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Bronson was acting under color of state law in her capacity as City Attorney for Denver. Defendant Bronson was responsible for supervising Defendants John & Jane Boes 1-75, John & Jane Does 1-75, John & Jane Foes 1-75, John & Jane Joes 1-75, and John & Jane Moes 1-75, and directing their actions during the sweeps.

29.      At all times pertinent to the subject matter of this litigation, Defendant Environmental Hazmat Services, Inc. ("EHS") is a privately-owned Colorado corporation with its principal address, and registered agent, located at 4745 Independence St., Wheat Ridge, CO 80033, United States. At all times relevant to the subject matter of this litigation, EHS contracted with Denver to assist with the sweeps, including the seizure, storage, and destruction of Plaintiffs property. At all relevant times, EHS was acting under color of state law and performing a central function of the state. EHS is a private corporation, and thus neither it nor any of its employees or contractors are entitled to any immunity under the Colorado Governmental Immunity Act on Colorado state law claims or qualified or any other immunity on the federal law claim. Defendant EHS was responsible for supervising Defendants John & Jane Loes 1-75 and directing their actions during the sweeps.

30.      At all times pertinent to the subject matter of this litigation, Defendant Jared Polis was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Polis was acting under color of state law in his capacity as the Governor of Colorado. Defendant Polis was responsible for supervising the Colorado State Patrol ("CSP") troopers, and directing their actions during the sweeps of Lincoln Park

31.      At all times pertinent to the subject matter of this litigation, Defendant Mike Cody

9

was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant Mike Cody was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD. Defendant was tasked with supervising the other DPD officers on-scene.

32.     At all times pertinent to the subject matter of this litigation, Defendant Tony Martinez was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD. Defendant was tasked with supervising the other DPD officers on-scene.

33.     At all times pertinent to the subject matter of this litigation, Defendant A. Martinez was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD. Defendant was tasked with supervising the other DPD officers on-scene.

34.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Conover was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD. Defendant was tasked with supervising the other DPD officers on-scene.

35.     At all times pertinent to the subject matter of this litigation, Defendant M. Moore was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

Defendant was tasked with supervising the other DPD officers on-scene.

36.     At all times pertinent to the subject matter of this litigation, Defendant T. Phuvhapaisalkij was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

37.     At all times pertinent to the subject matter of this litigation, Defendant R. Monthathong was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

38.     At all times pertinent to the subject matter of this litigation, Defendant C. Randall was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

39.     At all times pertinent to the subject matter of this litigation, Defendant D. Hunter was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

40.     At all times pertinent to the subject matter of this litigation, Defendant R. Manazanares was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer

employed by the DPD.

41.    At all times pertinent to the subject matter of this litigation, Defendant T. Wilson was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

42.    At all times pertinent to the subject matter of this litigation, Defendant J. Udland was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

43.    At all times pertinent to the subject matter of this litigation, Defendant D. Martinez was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

44.    At all times pertinent to the subject matter of this litigation, Defendant Sam Wallace was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer employed by the DPD.

45.    At all times pertinent to the subject matter of this litigation, Defendant James Harvey was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD.

46.     At all times pertinent to the subject matter of this litigation, Defendant Darren Ulrich was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD.

47.     At all times pertinent to the subject matter of this litigation, Defendant Mallory Lutkin was a citizen of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the DPD.

48.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Gasparovic was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer, as a member of the Colorado State Patrol, employed by the State of Colorado. Defendant was tasked with supervising the other CSP officers on-scene.

49.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Burt was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer, as a member of the Colorado State Patrol, employed by the State of Colorado. Defendant was tasked with supervising the other CSP officers on-scene.

50.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Dirnberger was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment

and under color of state law in her/his capacity as a law enforcement officer, as a member of the Colorado State Patrol, employed by the State of Colorado. Defendant was tasked with supervising the other CSP officers on-scene.

51.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Weil was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a law enforcement officer, as a member of the Colorado State Patrol, employed by the State of Colorado. Defendant was tasked with supervising the other CSP officers on-scene.

52.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Caldwell was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

53.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Rae was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

54.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Daugherty was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

55.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Sargenti was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

56.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Dinkel was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

57.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Kline was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

58.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Davey was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

59.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Harrington was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

60.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U

Gonzalez was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

61.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Sanchez was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

62.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Williams was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

63.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Cleveland was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

64.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Crenshaw was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of

Colorado.

65.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Voss was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

66.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Cheema was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

67.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Hardy was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

68.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Keeling was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

69.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Pratt was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

70.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Trujillo was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

71.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Simcox was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

72.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U McCall was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

73.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Jewett was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

74.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Novy was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

75.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Ross was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and

under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

76.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Barkley was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

77.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Larreau was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

78.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Major was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

79.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Strickland was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

80.     At all times pertinent to the subject matter of this litigation, Defendant F/N/U Hood was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant was acting within the scope of her/his official duties and employment and under color of state law in her/his capacity as a CSP trooper employed by the State of Colorado.

81.     At all times pertinent to the subject matter of this litigation, Defendants John & Jane Boes 1-75 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Boes 1-75 were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the DPD.

82.     At all times pertinent to the subject matter of this litigation, Defendants John & Jane Does 1-75 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Does 1-75 were acting within the scope of their official duties and employment and under color of state law in their capacities as parks and recreation officials employed by the Denver Department of Parks and Recreation ("DPR").

83.     At all times pertinent to the subject matter of this litigation, Defendants John & Jane Foes 1-75 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Foes 1-75 were acting within the scope of their official duties and employment and under color of state law in their capacities as public health officials employed by the DDPHE.

84.     At all times pertinent to the subject matter of this litigation, Defendants John & Jane Joes 1-75 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Joes 1-75 were acting within the scope of their official duties and employment and under color of state law in their capacities as public works officials employed by the Denver Department of Transportation and Infrastructure ("DOTI").

85.     At all times pertinent to the subject matter of this litigation, Defendants John & Jane Loes 1-75 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Loes 1-75 were acting within the scope of their

official employment, and under the color of state law, for EHS.

86.     At all times pertinent to the subject matter of this litigation, Defendants John &
Jane Moes 1-75 were citizens of the United States and residents of and domiciled in Colorado.
At all times pertinent, Defendants John & Jane Moes 1-75 were acting within the scope of their
official duties and employment and under color of state law in their capacities as public works
officials employed by the Denver Department of Solid Waste Management ("DSWM").

87.     Throughout this Complaint the moniker "Denver Defendants" refers to
Defendants Denver, Hancock, Bronson, and McDonald, and those Denver and EHS officials
under their control.

88.     Throughout this Complaint the moniker "State Defendants" refers to Defendant
Polis and those State of Colorado officials under his control.

89.     Throughout this Complaint the moniker "Defendant DPD Officers" refers to
Defendants Cody, Martinez, Martinez, Conover, Moore, Phuvhapaisalkij, Monthathong, Randall,
Hunter, Manzanares, Wilson, Udland, Martinez, Wallace, Harvey, Ulrich, Lutkin, and
Defendants John & Jane Boes 1-75.

90.     Throughout this Complaint the moniker "Defendant CSP Troopers" refers to
Defendants Gasparovic, Burt, Dirnberger, Weil, Caldwell, Rae, Daugherty, Sargenti, Dinkel,
Kilne, Davey, Harrington, Gonzales, Sanchez, Williams, Cleveland, Crenshaw, Voss, Cheema,
Hardy, Keeling, Pratt, Trujillo, Simcox, McCall, Jewett, Novy, Ross, Barkley, Larreau, Major,
Strickland, and Hood.

## **FACTUAL ALLEGATIONS**

### **The history of political, and actual, discrimination and marginalization suffered by homeless individuals in Denver, Colorado, and the United States.**

91.     Throughout United States history, laws have unconstitutionally criminalized people because of their identity or status. These laws were designed to, and did, force people of specific demographics out of communities. For example, Jim Crow laws marginalized and isolated people simply because of their racial identity. Laws criminalizing homelessness have existed from the outset of our republic, and have subjected homeless individuals to a long and unbroken history of discrimination and marginalization.

92.     During the colonial period of the United States, colonies imposed vagrancy laws that limited the movement of poor people from town to town. These laws gave local authorities the power to tell people who had recently moved to the town to leave. The majority of these laws were repealed or invalidated for being unconstitutionally vague and, thus, in violation of the Fourteenth Amendment's Due Process protections.

93.     America's first constitution, the Articles of Confederation, specifically exempted homeless individuals from the privileges and immunities of citizenship and relegated homeless individuals (then termed "vagabonds") to fugitive status.

94.     The United States Constitution exempted white non-landowners from a number of the privileges and immunities of citizenship, including (most importantly) the right to vote. It was not until 1792 that the first white non-landowners gained the franchise in the United States, when New Hampshire eliminated property requirements. It would be nearly one hundred years before all white non-landowners would be enfranchised and able to vote in this country. And, it would be even longer before non-landowning women and people of color would gain the franchise.

95.    After the Great Depression and with large-scale "dust bowl" migrations, Anti-

Okie laws[3] punished people who were transient as well as those who helped them. Again, these

laws sought to protect local communities from the economic burdens of supporting poor

strangers. In 1941, the United States Supreme Court found these statewide "Anti-Okie Laws"

unconstitutional for violating the Commerce Clause.

96.    Until at least 1949, every single state in the United States of America, and the

District of Columbia, criminalized "vagrancy." In essence, these laws made it a crime to be

homeless in public. Vagrancy laws remain on the books despite the fact that the United States

Supreme Court has struck them down as unconstitutionally vague. *Papachristou v. Jacksonville*,

405 U.S. 156 (1972).

97.    The above-described laws were passed through the majoritarian political process.

It was only through judicial intervention that they were invalidated, and homeless individuals

were no longer subjected to criminalization simply for existing.

98.    More recently, cities and states throughout the country, and particularly in

Denver, have enacted and enforced loitering bans to target homeless individuals. A number of

courts have concluded that these prohibitions violate Constitutional protections, including free

speech and prohibitions on vague laws. *City of Chicago v. Morales*, 527 U.S. 41 (1999). These

laws targeted and criminalized homeless individuals simply because they lacked housing.

99.    Rather than moving away from criminalization efforts in response to these

rulings, Colorado local officials, and particularly Denver officials, have come up with more

creative ways to criminalize homelessness—notably through camping bans, food-sharing

---

[3] Anti-Okie laws made it a misdemeanor to knowingly bring into a state any indigent person who
is not a resident of the state. The Supreme Court struck down these laws as unconstitutional in
*Edwards v. California*, 314 U.S. 160 (1941).

prohibitions, and stricter regulations in the most popular city areas. Loitering and vagrancy prohibitions were generally enacted prior to, and during the early, twentieth century, but over the past several decades, local lawmakers have trended toward a patchwork of other ordinances including camping bans, limited panhandling prohibitions, prohibitions on sitting and lying in public, and restrictions on the storage of property in public spaces. These laws are enforced, almost exclusively, against homeless individuals.

100.    These laws (that target specific activities that those who are homeless, and only those who are homeless, must conduct in public spaces) demonstrate that homeless individuals in Colorado, and Denver in particular, have been subjected to a history of purposeful unequal treatment and placed at a legal and societal disadvantage simply because they are homeless.

101.    As of 2019, the majority of U.S. cities have some form of camping ban. A similar percentage of cities have laws against storing belongings in public spaces and sitting and lying in public spaces.

102.    These laws have been enforced through mass sweeps of homeless individuals, during which homeless individuals are roused by law enforcement officers and told to pack up their things. Often, homeless individuals have their property seized and destroyed during these sweeps.

103.    The purpose and effect of these sweeps is to send the message to homeless individuals that they are not welcome in public space. Sweeps force a number of homeless residents to flee to the furthest (most dangerous) corners of the city, leave the city altogether, or be warehoused away from the eyes of the housed population in unsafe and degrading shelters.

**<u>Even before COVID-19, Denver had inadequate affordable housing and shelter space to safely house its homeless population, and the homeless population has sharply increased because of the COVID-19 pandemic.</u>**

104.    Denver does not have enough affordable housing, or shelter space, for the homeless population. There are not enough emergency shelter beds for everyone who is unsheltered in Denver.

105.    The Point-In-Time ("PIT") survey, conducted by the Metro Denver Homeless Initiative ("MDHI") is the leading numerical count of Denver's entire homeless population.

106.    The PIT count determined that there were at least 3,943 homeless individuals in Denver in January of 2019.

107.    The PIT count determined that there were at least 4,171 people experiencing homelessness in January of 2020 with 996 of those individuals experiencing unsheltered homelessness. Homelessness in Denver is disproportionate. It affects people of color and veterans more significantly than the rest of the population.

108.    Everyone agrees that the PIT is an undercount of Denver's homeless population, including MDHI itself. The PIT is conducted on a single day of the year in January, the coldest month in Denver, by volunteers. Volunteers look for people to interview but do not know where many of them are. While some people without homes staying in an overnight shelter may be counted, others will certainly be missed such as people staying temporarily at a hotel with a voucher, families doubling up in a home with another family, people living in vehicles, and people making their homes in camps that are not easily accessible.

109.    The Ninth Circuit Court of Appeals recently recognized that the PIT underestimates the number of homeless individuals:

> "It is widely recognized that a one-night point in time count will undercount the homeless population," as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.

*Martin v. City of Boise*, 902 F.3d 1031, 1036 (9th Cir. 2018).

110.    To try to adjust the PIT numbers for people who are inevitably overlooked by the count, some communities apply multipliers to better approximate actual numbers of people experiencing homelessness. A typically applied multiplier is 2.5x. Denver does not.

111.    However, Bennie Milliner, the former head of Denver's Road Home (the city agency charged with addressing homelessness) has estimated that the point-in-time count is a 30% undercount of Denver's homeless population.

112.    Denver Homeless Out Loud conducted its own survey of people living on the streets in July of 2020 and estimated that tents and vehicles were home to at least 1,328 unsheltered individuals in thirty encampments in Five Points, Capitol Hill, and other parts of central Denver.

113.    Regardless of the estimate one chooses, it is clear that if every unsheltered homeless person in Denver attempted to access shelter tonight, there would not be enough shelter beds to house him or her. The Executive Director of Denver's Road Home, Chris Conner, admitted as much under oath during a criminal proceeding that held Denver's Camping Ban unconstitutional, testifying that Denver lacks the housing, and shelter space, to house every unsheltered person in Denver.

114.    Even before the pandemic, there were many individuals in Denver who, because of their circumstances, did not have access to adequate shelter and were forced to sleep on the streets. These individuals include men with children, individuals who are intoxicated, individuals with serious mental illness, individuals who have been banned from shelters, unaccompanied homeless youth, individuals with documented conditions that cannot stay in shelters because of those conditions (i.e. claustrophobia), individuals with service animals, individuals with pets,

LGBT individuals, same-sex partners, and individuals with swing shift jobs. Individuals who hold swing shift jobs cannot stay at congregate homeless shelters within Denver because of the curfews imposed by shelters and have to choose between keeping their job and sleeping on the streets unsheltered. Individuals with ADA service animals have difficulty using Denver's shelter system and, often, shelters are inaccessible for those with service animals. There are no couple shelters in the City of Denver. Individuals with personal belongings cannot get into Denver shelters with their personal belongings. Individuals who do not win the lottery at certain shelters are barred from entering those shelters. Denver's homeless population can be barred from shelters, or not win the lottery to get into certain shelters, and be forced to sleep on the streets. After 10:00pm Denver shelters will not admit homeless individuals and, if an individual shows up to a shelter after that time, they cannot enter the shelter unless specifically escorted by a Denver police officer. 73% of Denver's homeless population has reported having been turned away from shelters at various times, and most reported frequent turn-aways.

115.    Defendants are also aware that the pandemic has slowed the economy, leading to job losses that have left people unable to afford housing. Colorado's unemployment rate is was recently at 10.2%. In February, before the pandemic, it was at 2.5%. Since the beginning of the pandemic, Coloradans have filed 540,506 unemployment claims.

116.    Defendant Polis has refused to extend a statewide eviction moratorium[4] that ended in June, even after approximately one hundred advocacy organizations, counties, and elected officials wrote him a letter outlining the perilous consequences of his failure to act. Between 300,000 and 400,000 Coloradans are at risk of eviction by the end of the year. The National Apartment Association believes that 25% of renters are at risk of nonpayment. Due to

---

[4] Even with the moratorium in place, renters were still obligated to pay their landlords rent.

historical and ongoing discrimination in the housing market, communities of color will be the most affected by this crisis.

117.    Denver itself anticipates a wave of evictions in the coming months as those who were already rent-burdened cannot pay for their housing. Nearly 420,000 Coloradans risk evictions in the coming months.

118.    On August 12, 2020, during a briefing given to Denver's City Council, Britta Fisher, the head of Denver's housing department, unequivocally stated that homelessness has dramatically risen since the COVID-19 pandemic hit. Mr. Fisher acknowledged "[t]here's not enough resources that you could house everybody right now."

**Denver is currently experiencing an affordable housing crisis.**

119.    More than 80% of low-income Denver renters have an unaffordable rent burden (paying more than 30% of their income for rent), and Denver needs an additional 25,647 low-income housing units to adequately shelter residents earning under $20,000 a year. Between 2015-2017, the City of Denver created less than two hundred new housing units affordable to people below 30% of Area Median Income, though the city has 31,854 renter households at that income level, plus thousands of homeless residents. Unfortunately, already inadequate low-income housing units are disappearing. Colorado housing units affordable to people making less than half of median income declined by more than 75% between 2010 and 2016 - one of the biggest decreases in the country. Across Colorado, there are only 26 affordable housing units available to every 100 very low-income households. Coloradans who make less than half of the median income have seen affordable housing choices decrease by 75% between 2010 and 2016, one of the steepest drops in the nation.

120.     While average wages have only increased 11.4% since 2011, Denver rents have increased over 50%, and are now 12.6% above national average. HUD data puts the Denver rental market in the top third of the priciest rental markets in America, and Colorado is among the top third of states for share of the workforce with a severe housing cost burden. As a result, in 2018, half of Denver's renters paid more than 30% of their income for housing; nearly a quarter paid more than 50% of their income for housing.

121.     When measuring average wage versus cost of housing, Denver is the fifth most expensive city in the country. By affordability based on average wage and housing cost, Denver is tens of thousands of housing units deficient of having adequate affordable housing for its population.

122.     Denver is the most expensive city to live in when judging affordability by median house prices. The median price of a one-bedroom apartment in Denver would require a minimum-wage worker to pay 80% of their paycheck toward housing. Denverites are uniquely rent-burdened. 109,639 Denver residents spent 30-49% of their income on rent and 97,955 Denver resident spent over 50% of their income on rent. In contrast, Denver has an affordable housing stock of just 23,855 and only plans on building 4,000 units of affordable housing in the next few years.

123.     Across Colorado, there are only 26 affordable housing units available for every 100 very-low-income households. Coloradans who make less than half of the median income have seen affordable housing choices decrease by 75% between 2010 and 2016--one of the steepest drops in the nation.

124. Denver spent $44 million on affordable housing and $27 million on homeless services of its annual budget in 2020. In contrast, it spent $435 million of its budget on the DPD and Denver Sheriff's department. Denver's budget priorities reflect its real-life priorities.

125. Given this reality, homelessness is not a choice in Denver. The vast majority of people become homeless through loss of job, medical bankruptcy, mental illness, or domestic violence.

126. Official HUD data also shows that Denver has the third highest rate in the nation of homeless families with children having to live without any shelter at all, sleeping in cars, abandoned buildings, or on the street. There are currently 247 homeless families in Denver. Children in Denver are born into homelessness. Homelessness is an involuntary condition.

**Denver's homeless residents are a discrete political minority and lack political power to protect themselves against the majoritarian housed population.**

127. Homeless individuals are a discrete political minority. The homeless population in Denver is .05% of the population. Homeless individuals are unable to represent themselves adequately in the political process because there are significant barriers to their participation in the political process, including the requirement that they have an address to register to vote. There is also a significant amount of majoritarian discrimination against homeless individuals through the use of fear unsupported by facts and the passage of legislation that targets homeless individuals.

128. Homeless individuals lack political power to adequately protect themselves from the whims of the public. There are a number of reasons why homeless individuals are politically powerless, including that homeless individuals lack resources that would allow them to access their rights. This includes monetary resources. It also includes access to representation.

Homeless individuals' inability to demonstrate that they provide tax resources to Denver makes them even more politically powerless.

129.    Three salient examples demonstrate homeless individuals political powerlessness. The first is the failure of 2019's Initiative 300, where proponents of the Initiative (which would have overturned the Camping Ban) were outspent significantly, and moneyed interests opposed to Initiative 300 spent $2,500,000 to defeat it. The second is the repeated failure of the Right to Rest act in the Colorado legislature, which would have outlawed criminal ordinances that target homeless individuals. The Camping Ban itself is evidence of homeless individuals' ability to adequately protect themselves in the political process, as it clearly targets them.

130.    Further demonstrating homeless individuals political powerlessness, they are not represented at any level of government. There is currently no elected or appointed official in Denver or the state of Colorado who is homeless.

**Denver Defendants, through a combination of ordinances, customs, and policies, has unconstitutionally swept Plaintiffs (and, accordingly, seized and discarded their property), exposed them to an increased risk of harm with deliberate indifference, and discriminated against them as homeless individuals.**

131.    Denver has used emergency public health orders (that are not, in fact, related to any public health emergency), D.R.M.C. 38-86.2 (the "Camping Ban"), and D.R.M.C. 49-246 (the "Encumbrance Removal Ordinance"), along with directives from the highest levels of Denver's government, to justify the sweeps, both before the COVID-19 pandemic and as it continues to rage.

132.    These ordinances have been used to discriminatorily target homeless individuals and have violated their due process rights, property rights, and equal protection rights.

**D.R.M.C. 38-86.2**

133.    Denver, through enforcement of the Camping Ban, has unconstitutionally swept Plaintiffs (and, accordingly, seized and discarded their property), exposed them to an increased risk of harm from infection with COVID-19, and discriminated against them as homeless individuals.

134.    D.R.M.C. 38-86.2 states "[i]t shall be unlawful for any person to camp upon any public property except in any location where camping has been expressly allowed by the officer or agency having the control, management and supervision of the public property in question." It defines "camp" as "to reside or dwell temporarily in a place, with shelter" and "shelter" to include "without limitation, any tent, tarpaulin, lean-to, sleeping bag, bedroll, blankets, or any form of cover or protection from the elements other than clothing." The Camping Ban further defines the term "reside or dwell" to include "without limitation, conducting such activities as eating, sleeping, or the storage of personal possessions." And, it defines "public property" as "[a]ny street, alley, sidewalk, pedestrian or transit mall, bike path, greenway, or any other structure or area encompassed within the public right-of-way; any park, parkway, mountain park, or other recreation facility; or any other grounds, buildings, or other facilities owned or leased by the city or by any other public owner, regardless of whether such public property is vacant or occupied and actively used for any public purpose."

135.    Denver enacted the Camping Ban in May of 2012. The history of its enactment demonstrates that it specifically targets and discriminates against homeless individuals.

136.    In July 2011, propelled by complaints about the homeless from his district, then-city councilman Albus Brooks made a trip to the 16th Street Mall at night; wearing a hoodie and walking with his wife, he counted over one hundred homeless individuals on the mall. This trip inspired the future ban. Later, at a meeting with the Inter-Neighborhood Cooperation, Mr.

Brooks would tell area representatives that he and his wife once discovered a homeless man

sleeping in their garage and that this also inspired him to seek passage of the Camping Ban. In

October 2011, Mayor Hancock and Mr. Brooks both pointed to Mr. Brooks' July trip to the 16th

Street Mall as the impetus for beginning the process of drafting and implementing the Camping

Ban, leaving no doubt about the Camping Ban's true purpose and target.

137.    On March 27, 2012, it was publicly announced that the Camping Ban would be

considered by the Denver City Council. Assistant City Attorney David Broadwell aided in

crafting the language of the Camping Ban, which was sponsored by city councilmembers Jeanne

Robb, Jeanne Faatz, Charlie Brown and Chris Nevitt (and lead by Mr. Brooks). In the days

leading up the City Council's final hearing on the Camping Ban, Mr. Brooks stated to *The

Denver Post* that "[i]f we don't do something now, we are going to have a worse spring and

summer than we have seen for a long time. . . I would hope we could do something strong

enough to prevent individuals from laying out in front of people's businesses and prevent this

tent city. . . We need to put a law in place to prevent that[.]" Councilman Charlie Brown, who

also supported passage of the Camping Ban, stated that the Camping Ban's purpose was "to get

[homeless individuals] off of our Main Street, and the 16th Street Mall is our Main Street… [w]e

have to stand up for our businesses downtown and our women and children who are afraid to go

downtown… [a]re we supposed to just give in?"

138.    On May 14, 2012, the Denver City Council held a final vote on the Camping Ban.

The entirety of the City Council meeting's discussion of the Camping Ban focused on the

Camping Ban's effect on the homeless population. During the meeting, those who voted in

support of the Camping Ban expressed the purpose of the Camping Ban in explicit terms.

Councilman Brooks stated that the City Council did not explicitly put provisions in the Camping

Ban that named Denver's homeless population because they were advised that they could not.
But, he made it clear that the Camping Ban was, in fact, specifically targeting Denver's homeless
population and that was clear based on the police training bulletins that were put into place to
accompany the Camping Ban. Councilman Chris Herndon, who voted for the bill, remarked
during the final vote that he supported the bill because Colorado Springs had a ban in place for
several years and had seen its homeless population decline.

139.    Later, Councilman Brown read letters from his constituents that demonstrated
their disdain for Denver's homeless population. One letter stated "it is a blemish on the city to
see camping on the 16th Street Mall. Do not let them [homeless individuals] continue to tarnish
the image of Denver." Another letter stated "the homeless activity is turning the Golden Triangle
into an open sewer." After reading the letters, Councilman Brown stated that he was voting for
the Camping Ban because "it is time we change the culture of chaos in this city." It was clear
from the hearing that the Camping Ban specifically targeted homeless individuals and that the
purpose of the Camping Ban was to drive homeless individuals from the City of Denver.

140.    Since its enactment, Denver, pursuant to its customs and practices, has vigorously
enforced the Camping Ban, but only against Denver's homeless residents. The Camping Ban has
been discriminatorily enforced only against homeless individuals.

141.    There were 12,000 camping ban contacts with homeless people between the
summer of 2012 and January of 2019.

142.    The homeless population in Denver is .05% of the population. However,
approximately 97% of the citations for the Camping Ban since its passage have been issued to
homeless individuals. Of the 31 citations given for violation of the Camping Ban, 30 were given
to homeless individuals.

143.    Police officers primarily enforce the Camping Ban against homeless individuals, even when there are similarly situated housed individuals who are violating the Camping Ban. For example, housed individuals who picnic in Civic Center Park are not given move along orders, pursuant to the Camping Ban, when they picnic in Civic Center Park, despite picnics being a violation of the Camping Ban. Additionally, housed individuals often violate the Camping Ban by using tents and canopies in the park, and by sun-bathing on blankets, but the Camping Ban is not enforced against them.

144.    Denver has used the Camping Ban as justification to displace homeless individuals during the COVID-19 pandemic. Despite the COVID-19 pandemic, and guidance from the CDC that homeless individuals should not be displaced, Denver police officers continue to use the Camping Ban to issue "move-along" orders to Denver's homeless residents and have done so since at least August 17, 2020.

145.    The move-along orders issued under the auspices of the Camping Ban have exposed Plaintiffs to danger they would not have otherwise faced both during COVID-19 and otherwise.

**D.R.M.C. 49-246**

146.    Denver, through enforcement of the Encumbrance Removal Ordinance, has unconstitutionally swept Plaintiffs (and, accordingly, seized and discarded their property), exposed them to an increased risk of harm from exposure to COVID-19, and discriminated against them as homeless individuals.

147.    D.R.M.C. 49-246 states, in relevant part, "[t]he manager of transportation and infrastructure or the manager's designee (hereinafter in this article, 'manager') is authorized to remove or to order the removal of any article, vehicle or thing whatsoever encumbering any

street, alley, sidewalk, parkway or other public way or place (any such thing hereinafter in this article to be called an 'encumbrance'). The manager may prescribe appropriate methods, specifications, placement and materials for encumbrances in the public right-of-way."

148.    The Encumbrance Removal Ordinance has been used as the justification for the sweeps and has resulted in the displacement of Denver's homeless population during the COVID-19 pandemic.

149.    The Encumbrance Removal Ordinance is vague and fully delegates to the discretion of the manager of transportation and infrastructure, or his designee, the unfettered ability to declare something an "encumbrance" without adequately defining what an "encumbrance" isseize and destroy homeless individuals' property.

150.    The Encumbrance Removal Ordinance is vague in that it does not define "encumbrance" and, instead, says anything that the manager of DOTI (or his designee) determines is an encumbrance is, indeed, an encumbrance.

151.    Pursuant to Denver's custom and practice, the authority to declare something an encumbrance has been delegated to the lowest level officials within the DOTI, DPD, and DSWM. These officials are given unfettered ability to determine what is an encumbrance and have used this law to seize and destroy Plaintiffs', and other homeless individuals', property.

152.    The only time the Encumbrance Removal Ordinance is enforced is against homeless individuals.

153.    The sweeps that have been conducted under the auspices of the Encumbrance Removal Ordinance have exposed Plaintiffs to danger they would not have otherwise faced, both during COVID-19 and otherwise.

**Denver's Actions Violate The Settlement Agreement From *Lyall, et al. v. Denver.***

154.    In February of 2019, Defendant Denver entered into a settlement agreement

("*Lyall v. Denver* settlement agreement") with a class of homeless individuals (which includes

Plaintiffs) including "[a]ll persons in the City and County of Denver whose personal belongings

may in the future be taken or destroyed without due process on account of the City and County

of Denver's alleged custom or practice (written or unwritten) of sending ten or more employees

or agents to clear away an encampment of multiple homeless persons by immediately seizing and

discarding the property found there[.]" The *Lyall v. Denver* settlement agreement was approved

by Judge William Martinez in September of 2019 and went into effect immediately. It was in

effect during the events outlined in this Complaint.

155.    In bargained for consideration of dismissal of the Plaintiff Class' meritorious

legal claims in *Lyall v. Denver*, Defendant Denver agreed, in the *Lyall v. Denver* settlement

agreement, that it would "give at least seven days' notice prior to a [sweep] and shall include

such language in its written protocol for [sweeps]" and that Denver "may conduct [sweeps] with

less than seven days' notice only if the City determines that a public health or safety risk exists

which requires it." Further, Denver agreed that "[i]f a [sweep] is conducted with less than seven

days' notice, the City shall provide reasonable notice of the [sweep], with the determination of

reasonableness based upon the nature of the public health and safety risk present in the area."

156.    Defendant Denver also agreed that (for any sweep) it would provide a "written

notice" including "[l]anguage indicating that stored property may be retrieved at no cost, without

fear of arrest; A phone number for individuals to call who may have questions regarding

property retrieval; The location and hours of the storage facility; The length of time that the

property shall be stored at the facility and the length of time that the City shall store the property

until it shall be disposed of. The City shall store any personal property that does not pose a
public health or safety risk for at least 60 days."

157.    Importantly, Defendant Denver agreed that "[p]ersonal property" seized by
Defendant Denver "shall be stored for sixty days unless the property is determined by a City
employee or contractor… to pose a public health or safety risk." Property that could be discarded
under the Settlement Agreement includes "illegal drugs, used syringes, medical waste, and
perishable food item" along with "[a]ny trash or litter, such as used napkins, dirty diapers, food
wrappers or used food containers, empty cans, used Styrofoam containers or paper cups,
cigarette butts" and "mattresses." However,"[a]ny items of personal property that could
reasonably be assumed to have value to any person will be collected and stored. These items
include: tents, sleeping bags, and any other camping equipment; backpacks, suitcases, duffle
bags, and any other containers of personal items; clothing; bicycles; phones, electronic devices,
and musical instruments; and other similar identifiable items of personal property, including
furniture."

158.    The *Lyall v. Denver* settlement agreement outlined that Denver's officials were
required to "take particular care to identify, collect and store sensitive personal items and
documents, such as wallets and purses, prescription drugs, birth certificates, identification cards,
drivers' licenses, and health care documents." And, the *Lyall v. Denver* settlement agreement
made sure to bind Defendant Denver to the presumption that "[i]f there is any question
concerning whether an item should be considered as trash or valuable property, the City will
assume the property has value and it should be stored."

159.    Defendant Denver has violated all of these provisions of the *Lyall v. Denver*
settlement agreement as explained *infra*.

160.    Defendant Denver, and its officials and representatives, failed to give any notice (written or otherwise) to Plaintiffs prior to these sweeps, let alone seven days' notice.

161.    There was no public health and safety reason for not providing notice. In fact, Denver, through public statements by Mayor Hancock, admitted as much. He stated that the reason for not providing notice was the risk of Denver residents to show up and voice their displeasure with the sweeps.

162.    Defendant Denver, and its officials and representatives, also seized and destroyed (and did not store for 60 days) Plaintiffs' property, including: tents, sleeping bags, and any other camping equipment; backpacks, suitcases, duffle bags, and any other containers of personal items; clothing; bicycles; phones, electronic devices, and musical instruments; and other similar identifiable items of personal property, including furniture." In total, Defendant Denver threw away dumpster-loads of personal property.

**Even before COVID-19, Denver Defendants customarily swept homeless individuals without notice, seized their property, and discarded it in violation of the Constitution and the *Lyall v. Denver* settlement agreement.**

**January 15, 2020 – Lincoln Park**

163.    On January 15, 2020, Denver Defendants, in a coordinated effort involving multiple agencies from Denver, conducted a sweep of an encampment of those experiencing homelessness who were surviving outside in Lincoln Park.

164.    Denver Defendants had been coordinating the Lincoln Park sweep for at least a week prior to the January 15, 2020 sweep.

165.    Despite this longstanding plan, no notice was provided to the residents of the Lincoln Park encampment prior to the sweep.

166.    In the early morning hours, Defendants began to stage near Lincoln Park.

167.    Officials from DDPHE, posted a written area restriction on the outskirts of Lincoln Park. Throughout the sweep, DDPHE officials, would coordinate, manage, and monitor the restriction. DDPHE officials also coordinated the cross-agency seizure and destruction of Plaintiffs' property.

168.    While these DDPHE officials were posting this notice, Defendants, including DPD officers, DPR rangers, other DDPHE officials, and DSWM officials began telling everyone in the park that they would need to move their belongings immediately.

169.    Seeing the park being cordoned off, and hearing this threat, the homeless residents at Lincoln Park began to frantically gather their belongings.

170.    While the homeless residents were transporting their belongings out of the park, DOTI officials, DPR rangers, DSWM officials began to seize the homeless residents' belongings and discard them while DPD officers watched and did nothing to intervene. In fact, DPD officers provided the security that allowed the other officials to seize and destroy the property.

171.    Denver officials seized and discarded a wide range of the homeless residents' belongings.

172.    It was obvious to Defendants that the homeless residents had not abandoned their property.

173.    A number of the homeless residents were not in Lincoln Park when the sweep began because they were at work, getting breakfast, or otherwise away from their campsite. Those the homeless residents who were not present, and returned after the park had been cordoned off, had all of their belongings seized and discarded by Denver officials.

174.    Defendants Hancock, Bronson, McDonald, and Robinson directed the actions of their respective agencies (and Defendant Hancock directed the actions of all of the Denver

Defendants) on July 29, 2020. Defendants directed, and knew that, the Denver officials on the ground had seized and discarded the homeless residents belongings without notice.

**Denver Defendants customarily sweep homeless individuals during COVID-19, despite the extreme risks that these sweeps presented to Plaintiffs.**

175.     On at least April 30th, May 7th, May 14th, May 19th, May 20th, May 27th, July 29th, August 5th, August 17th, August 18th, and August 19th, Denver Defendants instituted a sweep of homeless individuals who were surviving in Denver. These sweeps all happened during the COVID-19 pandemic and occurred in direct contravention of CDC guidance, which stated that such sweeps increase the risk of the spread of COVID-19.

176.     At the time all of these sweeps were conducted, individual housing options were not available to those swept.

177.     On April 30, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of approximately 150 homeless individuals who were surviving near the intersection of 22nd Street and Stout Street in Denver.

178.     On May 1, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of approximately 100 homeless individuals who were surviving near the intersection of 21st Street and California Street in Denver. Denver officials seized and discarded all of the property, including clearly unabandoned tents and other unabandoned property of apparent value, of any homeless individual who was not present during the sweep.

179.     On May 7, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of approximately 300 homeless individuals who were surviving near the intersection of 22nd Street and Stout Street in Denver. Denver officials seized

and discarded all of the property, including tents, of any homeless individual who was not present during the sweep.

180. On May 14, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of 150 homeless individuals who were surviving near Arkins Court in Denver. Denver officials seized and discarded all of the property, including tents, of any homeless individual who was not present during the sweep.

181. On May 19, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of 50 homeless individuals who were surviving near 21st and Glenarm Place in Denver. Denver officials seized and discarded all of the property, including tents, of any homeless individual who was not present during the sweep.

182. On May 20, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of 100 homeless individuals who were surviving near 13th Street and Washington Street in Denver. Denver officials seized and discarded all of the property, including tents, of any homeless individual who was not present during the sweep.

183. On May 27, 2020, Denver Defendants, in a coordinated effort involving multiple agencies from Denver, conducted a sweep of an encampment of those experiencing homelessness that were surviving outside near 21st Street and California Street. Denver Defendants had been coordinating the sweep for at least a week prior to the May 27, 2020 sweep. Despite this longstanding plan, no written notice was posted prior to the sweep. DDPHE officials did hand out notice to a few individuals a day before the sweep stating that, due to a public health and safety emergency, the area would be "closed." Officials from the DDPHE, Denver DOTI, and Denver SWM, along with DPD officers, conducted the sweep of 50 homeless

individuals. Denver officials seized and discarded all of the property, including tents, of any homeless individual who was not present during the sweep.

184.    As detailed, *supra*, on July 29, 2020, officials from the DDPHE, Denver DOTI and Denver SWM, along with DPD officers and DPR rangers, conducted a sweep of homeless individuals who were surviving in Lincoln Park in Denver.

185.    As detailed, *supra*, on August 5, 2020, officials from the DDPHE, Denver DOTI and Denver SWM, along with DPD officers and DPR rangers, conducted a sweep of homeless individuals who were surviving near Morey Middle School in Denver.

186.    On August 17, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of 80 homeless individuals who were surviving near 12th Street and Acoma Street in Denver.

187.    On August 18, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of 10 homeless individuals who were surviving near 13th Street and Washington Street in Denver.

188.    On August 18, 2020, officials from the Denver DOTI and Denver SWM, along with DPD officers, conducted a sweep of 4 homeless individuals who were surviving near 29th Street and Welton Street in Denver.

189.    On September 10, 2020, around 11:00am, at least five DPD officers, as well as DOTI and EHS officials, came to the area near 22nd Street, Stout Street, Champa Street, and Curtis Street, and told anyone present in a tent or tarp that they had to pack up and leave as they said the area was "closed." They proceeded to seize the property of anyone who was not present and trashed a substantial amount of that property. One man's tent and all his property was put directly in the trash. Prior to the seizure of property, there was no written notice posted. And,

there had been no prior warning at all that the area was "closed" and that property would be seized.

**Defendants plan a sweep of homeless individuals surviving in Denver's Lincoln Park on July 29, 2020.**

190. Defendant Polis held a news conference on July 23, 2020, during which he stated that he welcomed a sweep of the Lincoln Park encampment. In the wake of these comments, Defendants accelerated their timeline for sweeping the Lincoln Park encampment.

191. Defendants coordinated the Lincoln Park sweep for at least a week prior to the sweep, but without providing any indication or notice to encampment residents.

192. The Lincoln Park sweep was a multi-agency, coordinated effort that involved all Defendants.

193. The Lincoln Park sweep was primarily planned by the Denver Mayor's Office ("MO"), under the direction of Defendant Hancock, and the Denver City Attorney's Office ("CAO"), under the direction of Defendant Bronson. Both the MO and CAO directed, and advised those on the ground about, the execution of the Lincoln Park sweep.

194. DDPHE's role was to post the public health order at the outset of the sweep, along with coordinating, managing, and monitoring the sweep. DDPHE was also the main agency tasked with coordinating the cross-agency seizure of property. DPR assisted DDPHE with these actions, and helped to close the park.

195. DOTI, SWM, and EHS took on the role of actually seizing and discarding the homeless residents' property.

196. DPD's and CSP's role was to provide security for the entire operation, and arrest anyone who attempted to enter the park after it had been closed.

197.    Defendant Robinson stated after the sweep, during a news conference, that the sweep had been in the planning stages for over a week.

198.    A member of the Department of Public Safety told a *Denver Post* reporter that the sweep had been in the works for a month prior to July 29, 2020.

199.    Despite this longstanding plan, no notice was provided to the residents of the Lincoln Park encampment prior to the sweep.

200.    Mayor Hancock admitted in a news conference after the sweep that no notice was given for the Lincoln Park sweep because Councilwoman Candi CdeBaca had been notifying the public when and where prior sweeps were occurring. Denver did not provide notice because they did not want members of the public showing up to witness what was happening during the sweep at Lincoln Park, or showing any disapproval of the brutal tactics in the moment. Denver refused to provide notice for nakedly political reasons. There was no emergent public health and safety need that required Denver to forego its commitment to provide seven days advance notice prior to the sweep—this could not be clearer from the fact that Defendants had planned the sweep more than seven days prior to conducting it, with no emergent rush to get it done. Mayor Hancock also stated that no notice would be provided for future sweeps, including the Morey Middle School sweep and the South Platte River sweep. The reason provided by the Mayor did not relate to public health or safety, but rather to again avoiding public scrutiny of the sweep while it occurred.

201.    In a press release after the sweep, DDPHE reiterated that no notice was provided, not because a public health and safety emergency required no notice be required, but because of the concerns outlined by Mayor Hancock in his news conference: that there might be members of the public who would show up to scrutinize the sweep.

**Defendants sweep Plaintiffs, who were living at Denver's Lincoln Park, with no warning, and trash Plaintiffs' belongings on July 29, 2020.**

202.    On July 29, 2020, Defendants, in a coordinated effort involving multiple agencies from Denver and the State of Colorado, conducted a sweep of an encampment of those experiencing homelessness that were surviving outside in Lincoln Park. Lincoln Park is located directly across Lincoln Street from the Colorado State Capitol building, and is bounded on four sides by Lincoln Street, Broadway, Colfax Avenue, and 14th Avenue.

203.    At approximately 5:45 a.m., without providing any advance written notice, Defendants began to stage near Lincoln Park. Most of the encampment's residents were sleeping.

204.    Officials from DDPHE, including **John & Jane Foes 1-25,** posted a written area restriction on the outskirts of Lincoln Park stating that the park was being "closed" immediately due to a "public health and safety emergency." No specific emergency was identified, nor was there any clarity as to whether the emergency related to public health, public safety, or both. Throughout the sweep, DDPHE officials, including **John & Jane Foes 1-25 and Defendant McDonald,** would coordinate, manage, and monitor the restriction. DDPHE officials, including **John & Jane Foes 1-25 and Defendant McDonald,** also coordinated the cross-agency seizure and destruction of Plaintiffs' property.

205.    While some of **John & Jane Foes 1-25 (DDPHE officials) were posting this notice,** Defendants, including Defendant DPD Officers, **John & Jane Does 1-25 (DPR rangers), other John & Jane Foes 1-25 (DDPHE officials),** and CSP Defendants, began fencing off the entirety of Lincoln Park. They systematically set up a six-foot-tall chain-link fence along the entire perimeter of the park.

206.    Meanwhile, John & Jane Does 1-25 (DPD officers), **John & Jane Does 1-25 (DPR rangers), John & Jane Joes 1-25** (DOTI officials), and John & Jane Loes 1-25 (EHS employees)

began telling everyone in the park that they would need to move their belongings immediately or their property would be seized.

207.    Seeing the park being cordoned off, and hearing this threat, Plaintiffs began to frantically gather their belongings.

208.    While Plaintiffs were transporting their belongings out of the park, Defendants began to seize Plaintiffs' unabandoned belongings and summarily discard it.

209.    Specifically, John & Jane Joes 1-25 (DOTI officials), John & Jane Does 1-25 (DPR rangers), John & Jane Loes (EHS employees), and John & Jane Moes 1-25 (SWM officials) seized and discarded Plaintiffs' property while Defendant DPD Officers and Defendant CSP Troopers secured the fencing around Lincoln Park and prevented Plaintiffs from retrieving their property. Defendant DPD Officers and Defendant CSP Troopers watched and did nothing to intervene. In fact, Defendant DPD Officers and Defendant CSP Troopers provided the security that allowed the other officials to seize and destroy the property.

210.    Plaintiffs watched as an excavator, equipped with a claw, began grabbing their belongings, *en masse*, and throwing it into dumpsters and trash trucks. Defendants destroyed everything in the park that Plaintiffs were unable to immediately carry away after the initial order to vacate the area.

211.    Defendants seized and discarded a wide range of Plaintiffs' belongings.

212.    Defendants seized and discarded belongings necessary for survival outside, including tents, blankets, shades, umbrellas, tarps, clothing, and sleeping bags.

213.    Defendants seized and discarded irreplaceable belongings, including photographs, family heirlooms (such as jewelry), letters, and notes.

214.    Defendants seized and discarded Plaintiffs' only means of transportation, including bicycles, skateboards, and shoes.

215.    Defendants seized and discarded Plaintiffs' only means of communication: cell phones.

216.    Within a few hours of when they notified Plaintiffs that the park would be closed, at approximately 10 a.m., Defendants closed the park and would not allow Plaintiffs to re-enter to gather their belongings. Nearly every Plaintiff only had time to gather one armful of belongings, and transport those limited belongings out of the park, before the park was closed and they were not allowed to re-enter. The belongings that remained in the park were discarded.

217.    It was obvious to Defendants that Plaintiffs had not abandoned their property. In fact, Plaintiffs had explicitly attempted to reclaim their property, but were denied the opportunity to do so by Defendants.

218.    A number of Plaintiffs were not in Lincoln Park when the sweep began because they were at work, getting breakfast, or otherwise away from their campsite. Those Plaintiffs who were not present, and returned after approximately 10 a.m., had all of their belongings seized and discarded by Defendants.

219.    There were no offers by Defendants to store property. Defendants took no actions to safeguard property that was valuable to Plaintiffs.

220.    No property was stored during the sweep on July 29, 2020.[5]

221.    After the sweeps, Defendants provided buses to take Plaintiffs to Denver's congregate shelters. The purpose of the sweep was to force Plaintiffs into congregate shelters.

---

[5] *See* Denver: Housing Stability, *Property Storage*, available at:
https://www.denvergov.org/content/denvergov/en/housing-information/resident-resources/property-removal-and-storage.html.

Demonstrating this, Defendant Hancock said during a press conference after the sweep that the sweep's purpose was to drive Plaintiffs into congregate shelters.

222.    Defendant Polis directed the actions of the CSP troopers on July 29, 2020. During the sweep, Defendant Polis was in contact with those on the ground of the sweep. He directed, and knew that, the CSP troopers on the ground had locked Plaintiffs out of Lincoln Park and prevented Plaintiffs from retrieving their clearly unabandoned property.

223.    Defendants Hancock, Bronson, McDonald, and Robinson directed the actions of their respective agencies (and Defendant Hancock directed the actions of all of the Denver Defendants) on July 29, 2020. Defendants directed, and knew that, the Defendants on the ground had seized and discarded Plaintiffs belongings, locked Plaintiffs out of Lincoln Park, and prevented Plaintiffs from retrieving their clearly unabandoned property.

224.    As a result of the sweep, Plaintiffs were forced to scatter throughout Denver.

**Defendants seized and destroyed Plaintiff Charles Davis' property without notice.**

225.    Plaintiff Charles Davis was surviving at Lincoln Park in an encampment of homeless individuals on July 29, 2020.

226.    Mr. Davis was staying in the park because of his fear of being exposed to COVID-19 in Denver's congregate shelters. Prior to the COVID-19 pandemic, Mr. Davis had been staying in congregate shelters, including the Denver Rescue Mission. Mr. Davis had a friend who was staying at the Denver Western Complex congregate shelter that contracted COVID-19. This added to his desire to avoid the congregate shelters for fear of contracting COVID-19.

227.    Mr. Davis woke up around 6 a.m. on the morning of July 29, 2020.

228.    Upon waking, he walked over to Civic Center Station to use the restroom.

229.     When Mr. Davis returned to Lincoln Park, he was met with a wall of DPD officers and Defendant CSP troopers. These Defendants told Mr. Davis that they were closing the park and would be seizing individuals' belongings.

230.     Prior to that warning from Defendants, which occurred at approximately 6:30 a.m., Mr. Davis, and the other residents of the encampment at Lincoln Park, had not received any notice that Defendants would be closing the park and seizing property.

231.     Defendants had not posted any written notice near Lincoln Park warning Mr. Davis, and the other residents of the encampment at Lincoln Park, that Defendants would be closing the park and seizing property on July 29, 2020, starting at 5:45 a.m.

232.     Mr. Davis panicked and hurried back to his tent to warn his neighbors that Defendants were sweeping the park.

233.     After warning his neighbors of the sweep, Mr. Davis began to pack his things as quickly as possible.

234.     After packing everything that he could carry in one armful, Mr. Davis moved that property across Broadway to Civic Center Park. Mr. Davis was unable to break down his tent and carry it across the street, so he left it up and staked to the ground. He also left a number of belongings in the tent, including a vintage trunk, toothbrush, and contact lens case. He planned on returning to the tent, packing it up, and moving it across the street once he had found a safe place to put the belongings he could carry.

235.     By the time Mr. Davis had the chance to gather his things, move them across the street, and walk back to Lincoln Park it was approximately 10 a.m.

236.     When Mr. Davis arrived back at Lincoln Park, Defendants had erected a fence around almost the entire perimeter of the park.

237.    Mr. Davis crossed past this fence. However, when he returned to the spot where his tent had been, he found that Defendants had seized it.

238.    Defendants destroyed Mr. Davis' tent, and everything in it.

239.    It was clear that Mr. Davis' tent was not abandoned and that it had value. It was fully pitched and in good condition.

240.    Defendants did not leave a notice when they seized Mr. Davis' tent.

241.    Defendants provided Mr. Davis with no ticket or other notice that they had seized and stored his property, where they had stored his property, and/or how he could retrieve any property they had stored.

242.    Mr. Davis also witnessed Defendants seize and destroy property belonging to his neighbor, Adrian Diaz. Mr. Diaz had his skateboard seized and destroyed by Defendants, along with a backpack full of belongings.

243.    Mr. Davis describes the experience as extremely traumatic. DPD officers and CSP troopers were in riot gear throughout the incident, adding to the sense that the encampment was under attack.

244.    After the sweep, Mr. Davis was forced to sleep on the streets without a tent, which was his only available private shelter option during the COVID-19 pandemic. He slept unsheltered on the median of Colfax Avenue (near the intersection of Broadway) for multiple nights because he was afraid of being swept again.

245.    Mr. Davis knows that sleeping outside without a tent, and on the median, is more dangerous than sleeping outside with a tent in a park. But, he felt as though he had no choice but to sleep unsheltered on a median after the Lincoln Park sweep.

**Defendants seized and destroyed Plaintiff Michael Lamb's property without notice.**

246.    Plaintiff Michael Lamb was surviving at Lincoln Park in an encampment of other homeless individuals on July 29, 2020.

247.    Mr. Lamb woke up around 9 a.m. on July 29, 2020. When Mr. Lamb woke up, he realized that Defendants had already cordoned off most of the perimeter of the park and there were already a large number of trash trucks surrounding the park.

248.    The only notice Mr. Lamb received about the sweep from Defendants was waking up and seeing Defendants (and the trash trucks).

249.    Mr. Lamb immediately began packing up his belongings. He noticed that the park was in chaos, as many of the other homeless residents of the encampment were rushing around and trying to pack all of their belongings. A few of John & Janes Does 1-25 (DPR rangers) assisted Mr. Lamb while taking down his tent, but laughed at him, and others, while doing so. DPD officers also laughed at the residents of the encampment while seizing their belongings.

250.    Mr. Lamb was able to gather a small amount of his belongings. He moved these belongings a few blocks away from Lincoln Park, then attempted to return to the park to retrieve his tent, and the rest of his belongings (which included clothes, hygiene items, and other personal belongings).

251.    By the time Mr. Lamb was able to make it back to the park, Defendants had completely encircled the park with a six-foot high fence.

252.    DPD officers, John & Janes Does 1-25 (DPR rangers), and CSP troopers were preventing everyone from re-entering the park, including Mr. Lamb. Defendants refused to let those who had property remaining inside the park to re-enter the park to retrieve their property.

253.    Mr. Lamb watched from behind the fence as Defendants seized his property that remained in the park, threw it into a trash truck, and destroyed it. Mr. Lamb was only able to remove half of his belongings from the park.

254.    Defendants provided Mr. Lamb with no ticket or other notice that they had seized and stored his property, where they had stored his property (if they did in fact store it), and/or how he could retrieve any property they had stored.

255.    Mr. Lamb knew several residents of the encampment who were day laborers. Those members of the encampment had gone to work that morning before Defendants arrived and returned from work to find all of their property seized and destroyed.

256.    During his stay at the encampment within Lincoln Park, Mr. Lamb felt as though he had stability.

257.    Mr. Lamb moved only a few blocks away from Lincoln Park and continues to stay on the streets because he fears contracting COVID-19 in a congregate shelter.

**Defendants seized and destroyed Plaintiffs Sharron Meitzen's and Rick Meitzen Jr.'s property without notice.**

258.    Plaintiffs Sharron Meitzen and Rick Meitzen Jr., who are husband and wife, were surviving at Lincoln Park in an encampment of other homeless individuals on July 29, 2020.

259.    When Mr. and Ms. Meitzen woke up on July 29, 2020, they realized that Defendants had already cordoned off most of the perimeter of the park and there were already a large number of trash trucks surrounding the park.

260.    The only notice Mr. and Ms. Meitzen received about the sweep from Defendants was waking up and seeing Defendants (and the trash trucks).

261.    Mr. and Ms. Meitzen immediately began packing up their belongings. They were able to grab one armful of their belongings and transport them out of the park (a few blocks

away). Mr. and Ms. Meitzen then attempted to return toand retrieve the rest of their property (which included a tent, and other personal items).

262.     By the time Mr. and Ms. Meitzen were able to make it back to the park, Defendants had completely encircled the park with a six-foot high fence.

263.     DPD officers, John & Janes Does 1-25 (DPR rangers), and CSP troopers were preventing everyone from re-entering the park, including Mr. and Ms. Meitzen. Defendants refused to let those who had property remaining inside the park to re-enter the park to retrieve their property.

264.     Defendants provided Mr. and Ms. Meitzen with no ticket or other notice that they had seized and stored their property, where they had stored their property (if they did in fact store it), and/or how they could retrieve any property they had stored.

265.     Mr. and Ms. Meitzen moved only a few blocks away from Lincoln Park and continue to stay on the streets because they fear contracting COVID-19 in a congregate shelter.

**Denver's homeless service providers uniformly lambasted the Lincoln Park sweep.**

266.     John Parvensky, President and CEO of Colorado Coalition For The Homeless, wrote a scathing letter to both Mayor Hancock and Governor Polis in the wake of the Lincoln Park sweep. In the letter, Mr. Parvensky called the sweep "appalling" and condemned "the City's choice to evict those living in Civic Center Park without an adequate plan in place to address the needs of the people forced to living without housing in the area." Mr. Parvenky also "strongly" condemned "Governor Polis' support of this, both in words and contribution of state troopers to this appalling destruction of people's temporary homes."

267.     Stephanie Miller, CEO of Denver's Delores Project (which provides shelter and permanent housing where women and transgender individuals can get job and health counseling

and other support) issued a statement, in response to the Lincoln Park sweep, that noted "[c]ontinuing sweeps of homeless encampments without immediate alternative resources and safe locations for the displaced individuals is unacceptable and undignified." In her statement, Ms. Miller called for providing housing instead of persecuting "our homeless neighbors for seeking their own solutions to their immediate need of survival and shelter."

268.    Carl Clark, president and chief executive officer of the Mental Health Center of Denver, was quoted after the sweep as saying "You can't just sweep a place and not have options for people," Clark said. "There needs to be a better solution."

**Denver Defendants plan a sweep of Plaintiffs surviving near Morey Middle School.**

269.    In the hours after the sweep of Lincoln Park, Defendant Robinson, told reporters that administration officials were meeting about the encampment outside Morey Middle School and planned on dispersing that camp soon, too. As of July 30, 2020, at latest, Denver Defendants knew that they were going to sweep the encampment at Morey Middle School. Despite this, Denver Defendants provided no notice (written, oral, or otherwise) to the residents of the encampment at Morey Middle School of the sweep.

270.    The sweep near Morey Middle School was a multi-agency, coordinated effort that involved all Denver Defendants.

271.    Upon information and belief, the Morey Middle School sweep was primarily planned by the Denver Mayor's Office ("MO"), under the direction of Defendant Hancock, and the Denver City Attorney's Office ("CAO"), under the direction of Defendant Bronson. Both the MO and CAO directed, and advised those on the ground about, the execution of the Morey sweep.

272.    Despite this longstanding plan, no notice was provided to the residents of the
Morey Middle School encampment prior to the sweep.

**Denver Defendants sweep Plaintiffs surviving near Morey Middle School with no
warning, and trash their belongings, in the middle of a pandemic.**

273.    On August 5, 2020, Defendants, in a coordinated effort involving multiple
agencies from Denver, conducted a sweep of an encampment of those experiencing
homelessness that were surviving outside near Morey Middle School. Morey Middle School is
located at 840 E 14th Ave in Denver, CO.

274.    At approximately 5:45 a.m., Defendants began to stage near Morey Middle
School.

275.    Officials from DDPHE, including **John & Jane Foes 26-50,** posted a written
notice at the start of the sweep. The notice stated that the area was "closed" immediately due to a
"public health and safety emergency." Throughout the sweep, DDPHE officials, including **John
& Jane Foes 26-50 and Defendant McDonald,** would coordinate, manage, and monitor the
restriction. DDPHE officials, including **John & Jane Foes 1-25 and Defendant McDonald,** also
coordinated the cross-agency seizure and destruction of Plaintiffs' property.

276.    While some of **John & Jane Foes 26-50 (DDPHE officials) were posting this
notice,** John & Jane Does 26-50 (DPD officers), other **John & Jane Foes 26-50 (DDPHE
officials), and John & Jane Joes 26-50** (DOTI officials) began telling everyone that they would
need to move their belongings immediately. Some of these Defendants also began to cordon off
the area with police tape.

277.    Seeing the area being cordoned off, and hearing this threat, Plaintiffs began to
frantically gather their belongings.

278.    While Plaintiffs were transporting their belongings out of the area, Defendants began to seize Plaintiffs belongings and discard them.

279.    Specifically, **John & Jane Joes 26-50** (DOTI officials), **John & Jane Loes 26-50 (EHS employees), and John & Jane Moes 26-50 (DSWM officials)** seized and discarded Plaintiffs' property while John & Jane Does **26-50** (DPD officers) secured the area.

280.    Defendants seized and discarded a wide range of Plaintiffs belongings.

281.    It was obvious to Defendants that Plaintiffs had not abandoned their property.

282.    A number of Plaintiffs were not at Morey Middle School when the sweep began because they were at work, getting breakfast, or otherwise away from their campsite. Those Plaintiffs who were not present, and returned later in the day, had all of their belongings seized and/or discarded by Defendants.

283.    No property was stored during the sweep on August 5, 2020.[6]

284.    After the sweep, Defendants provided buses to take Plaintiffs to Denver's congregate shelters. The purpose of the sweep was to force Plaintiffs into congregate shelters.

285.    Defendants Hancock, Bronson, McDonald, Lee, and Robinson directed the actions of their respective agencies (and Defendant Hancock directed the actions of all of the Denver Defendants) on August 5, 2020. Defendants directed, and knew that, the Defendants on the ground had seized and discarded Plaintiffs belongings.

286.    As a result of the sweep, Plaintiffs were forced to scatter throughout Denver.

**Defendants seized and destroyed Plaintiff Tomasa Dogtrail's property without notice.**

---

[6] *See* Denver: Housing Stability, *Property Storage*, available at:
https://www.denvergov.org/content/denvergov/en/housing-information/resident-resources/property-removal-and-storage.html.

287.    Plaintiff Tomasa Dogtrail was surviving near Morey Middle School in an
encampment of other homeless individuals on August 5, 2020.

288.    Ms. Dogtrail is prevented from accessing Denver's congregate shelters because
she has both a pet (a small dog) and a partner. She cannot stay in a congregate shelter with both
her pet and her partner.

289.    Ms. Dogtrail is disabled and uses a wheelchair.

290.    Ms. Dogtrail was staying near the middle school, in part, because of her fear of
being exposed to COVID-19 in Denver's congregate shelters.

291.    Ms. Dogtrail was awakened around 6 a.m. on the morning of August 5, 2020.

292.    Ms. Dogtrail woke up because John & Jane Does 26-50 (DPD officers), **John &
Jane Foes** 26-50 (**DDPHE officials**), **John & Jane Joes** 26-50 (DOTI officials), **John & Jane Loes
(EHS employees),** and **John & Jane Moes** 26-50 (**DSWM officials**) arrived to begin the Morey
sweep.

293.    Other members of the encampment woke Ms. Dogtrail up and told her that
Denver Defendants were sweeping the encampment.

294.    Ms. Dogtrail received no notice, written or otherwise, from Defendants prior to
the Morey sweep.

295.    When Ms. Dogtrail realized a sweep was occurring, she began to attempt to pack
up her belongings.

296.    **John & Jane Joes** 26-50 (**DOTI officials**) assisted Ms. Dogtrail in packing up her
belongings and moving them a few blocks away. However, Ms. Dogtrail could not move all of
her belongings in one load.

297.    Ms. Dogtrail asked that John & Jane Does 26-50 (DPD officers), **John & Jane Foes 26-50 (DDPHE officials)**, John & Jane Joes 26-50 (DOTI officials), **John & Jane Loes 26-50 (EHS employees)**, and John & Jane Moes 26-50 (DSWM officials) not throw away her remaining belongings. Despite this, she witnessed Defendants throw away some of her belongings into black trash bins.

298.    As **Ms. Dogtrail transported her belongings to a nearby location, she left a note on her tent that asked** John & Jane Does 26-50 (DPD officers), **John & Jane Foes 26-50 (DDPHE officials)**, John & Jane Joes 26-50 (DOTI officials), **John & Jane Loes 26-50 (EHS employees)**, and **John & Jane Moes 26-50 (DSWM officials)** to not throw away her belongings, and that she would be moving her belongings to her brother's house.

299.    Despite this, when she returned, a large amount of her belongings were missing. Defendants seized a radio, DVD player, movies, bedding, cleaning supplies, and a backpack full of other electronics. Ms. Dogtrail is very handy and fixes broken electronics, which she then sells or trades for other goods.

300.    Later, after surveying her items at her new campsite, Ms. Dogtrail realized that Defendants also seized her tent poles (from the tent that they had helped her break down).

301.    Upon information and belief, John & Jane Does 26-50 (DPD officers), **John & Jane Foes 26-50 (DDPHE officials)**, John & Jane Joes 26-50 (DOTI officials), **John & Jane Loes 26-50 (EHS employees)**, and John & Jane Moes 26-50 (DSWM officials), under the direction of Denver Defendants, discarded and/or destroyed this property.

302.    It was clear and obvious that this property was not abandoned. Indeed, Ms. Dogtrail explicitly asked Defendants not to throw away her few belongings.

303.    Defendants provided Ms. Dogtrail with no ticket or other notice that they had seized and stored her property, where they had stored her property (if they did in fact store it), and/or how she could retrieve any property they had stored.

**Denver Defendants sweep Plaintiffs surviving near the South Platte River with no warning, and trash their belongings, in the middle of a pandemic.**

304.    On September 15, 2020, Defendants, in a coordinated effort involving multiple agencies from Denver, conducted a sweep of an encampment of those experiencing homelessness who were surviving outside near the South Platte River. The sweep took place adjacent to the intersection of West Dartmouth Avenue and South Platte River Drive and immediately next to 2800 S Platte River Dr., Englewood, CO 80110. However, this strip of land was in Denver, Colorado.

305.    Four days prior to the sweep, on September 11, 2020, DPD officers visited the encampment. The encampment consisted of a number of RVs, camping trailers ("campers"), and tents. The DPD officers who visited the encampment placed notices on all of the RVs and campers stating that their property would be seized 72 hours later. However, these DPD officers specifically told the RV and camper residents that the notices did not apply to the tents and that the tents were not subject to seizure. Upon seeing the DPD officers placing notices on the RVs and campers, a number of those staying in tents spoke to the DPD directly. Those DPD officers told the individuals staying in tents that the tents were not subject to the notice and would not be seized. DPD officers left and did not return to the encampment.

306.    Four days later, on September 15, 2020, at approximately 3:00 a.m., Defendants blocked off the area surrounding the encampment while its members were sleeping. After blocking off all entry points, Defendants restricted who could enter the area.

307.    Four hours later, at approximately 7:30 a.m. officials from DDPHE, including
John & Jane Foes 51-75, posted a written notice at the start of the sweep. The notice stated that
the area was "closed" immediately due to a "public health and safety emergency." Throughout
the sweep, DDPHE officials, including John & Jane Foes 51-75 and Defendant McDonald,
would coordinate, manage, and monitor the restriction. DDPHE officials, including John & Jane
Foes 51-75 and Defendant McDonald, also coordinated the cross-agency seizure and destruction
of Plaintiffs' property.

308.    While some of John & Jane Foes 51-75 (DDPHE officials) were posting this
notice, John & Jane Does 51-75 (DPD officers), other John & Jane Foes 51-75 (DDPHE
officials), and John & Jane Joes 51-75 (DOTI officials) began telling everyone that they would
need to move their belongings immediately.

309.    Hearing this threat, Plaintiffs began to frantically gather their belongings.

310.    While Plaintiffs were transporting their belongings out of the area, Defendants
began to seize Plaintiffs belongings and discard them.

311.    Specifically, John & Jane Joes 51-75 (DOTI officials), John & Jane Loes 51-75
(EHS employees), and John & Jane Moes 51-75 (DSWM officials) seized and discarded
Plaintiffs' property while John & Jane Does 51-75 (DPD officers) secured the area.

312.    Defendants seized and discarded a wide range of Plaintiffs belongings.

313.    This included items necessary for survival outside, including tents, tarps, cooking
supplies, and sleeping bags.

314.    No property was stored during the sweep on September 15, 2020.[7]

---

[7] See Denver: Housing Stability, *Property Storage*, available at:
https://www.denvergov.org/content/denvergov/en/housing-information/resident-
resources/property-removal-and-storage.html.

315.     It was obvious to Defendants that Plaintiffs had not abandoned their property.

316.     A number of Plaintiffs were not at the South Platte River encampment when the
sweep began because they were at work, looking for work, sleeping elsewhere for the night, or
otherwise away from their campsite. Those Plaintiffs who were not present, and returned later in
the day, had all of their belongings seized and/or discarded by Defendants.

317.     Defendants Hancock, Bronson, McDonald, Lee, and Robinson directed the
actions of their respective agencies (and Defendant Hancock directed the actions of all of the
Denver Defendants) on September 15, 2020. Defendants directed, and knew that, the Defendants
on the ground had seized and discarded Plaintiffs belongings.

318.     As a result of the sweep, Plaintiffs were forced to scatter throughout Denver and
Englewood.

**Defendants seized and destroyed Plaintiff Steven Olsen's property without notice.**

319.     Plaintiff Steve Olsen was surviving near the South Platte River in an encampment
of other homeless individuals on September 15, 2020. Mr. Olsen had been living in that
encampment for multiple months without issue.

320.     Mr. Olsen received no notice, written or otherwise, from Defendants prior to the
sweep.

321.     On September 15, 2020, Mr. Olsen left his tent, and belongings, early in the
morning. He went out to apply to two jobs he had seen posted in the hope of gaining meaningful
employment.

322.     When Mr. Olsen returned to the encampment at noon, he noticed that DPD
officers had blocked off the encampment. Mr. Olsen told the officers that he lived at the
encampment and, after theythe officers hassled him for a while, they let him through.

323.    When Mr. Olsen went to his campsite, everything was gone. He learned that John & Jane Joes 51-75 (DOTI officials), John & Jane Loes 51-75 (EHS employees), and John & Jane Moes 51-75 (DSWM officials) seized his property. He asked the on-scene John & Jane Does 51-75 (DPD officers) what happened to his property, if it had been stored, or if it had been discarded. They told him that they did not know.

324.    The next day, September 16, 2020, a Denver official told Mr. Olsen that his property might have been stored and gave him the address of a storage facility. Mr. Olsen went to that storage facility on September 17, 2020. When he arrived at the facility, an EHS employee told him that they had stored *no* property on September 15, 2020. A video recording of that interaction can be seen here: https://youtu.be/U2ooG4ukzEg.

325.    Mr. Olsen is 58 years old and, therefore, more vulnerable to catching, and the effects of, COVID-19.

**Defendants seized and destroyed Plaintiff Gregory Costigan's property without notice.**

326.    Plaintiff Gregory Costigan was surviving near the South Platte River in an encampment of other homeless individuals on September 15, 2020. Mr. Costigan had been living in that encampment for multiple months without issue.

327.    Four days before the sweep, Mr. Costigan noticed DPD officers going door-to-door and contacting residents of RVs and campers in the encampment. Mr. Costigan asked an RV owner what the DPD officers had said to him. The RV owner told Mr. Costigan that the officers told him that the RVs and campers needed to be gone in 72 hours, but that those who were in tents could remain in the encampment and were not subject to the notice. Mr. Costigan spent the next three nights in his tent in the encampment with no issues.

328.    Mr. Olsen received no notice, written or otherwise, from Defendants prior to the sweep.

329.    On September 14, 2020, Mr. Costigan spent the night at a motel. The next morning, he woke up and went straight back to his tent. When he arrived around 10:00 a.m., all of the roads into the encampment were blocked.

330.    When Mr. Costigan arrived back at the place where his tent was, it was gone.

331.    Mr. Costigan asked a few EHS employees on scene what happened to his property. The EHS employees told him that his property had been seized and discarded. They stated that no property that had been seized that morning had been stored.

332.    Mr. Costigan lost two tents, multiple sleeping bags, a bicycle, a bicycle pump, and his hygiene products.

333.    A video recording of Mr. Costigan describing what happened can be seen here: https://youtu.be/7-wVCOPS7yU.

**Defendants seized and destroyed Plaintiff Sean Martinez's property without notice.**

334.    Plaintiff Sean Martinez was surviving near the South Platte River in an encampment of other homeless individuals on September 15, 2020. Mr. Martinez had been living in that encampment for multiple months without issue.

335.    Mr. Martinez received no notice, written or otherwise, from Defendants prior to the sweep.

336.    On September 14, 2020, Mr. Martinez spent the night with his girlfriend away from the encampment. The next morning, he woke up and went straight back to his tent. When he arrived around 10:30 a.m., all of the roads into the encampment were blocked.

337.    Even though Mr. Martinez relayed to the officers that his property was behind the barrier, and in the encampment, they would not let him past the barrier. Mr. Martinez pleaded with them to let him retrieve his belongings, but the DPD officers on duty refused.

338.    In the evening, during a shift change, the new DPD officers on duty allowed Mr. Martinez into the encampment. When Mr. Martinez arrived back at the place where his tent was, it was gone.

339.    Mr. Martinez's property was seized and discarded by Defendants.

340.    Defendant seized and destroyed Mr. Martinez's tent, bedding, cooking utensils, wallet, government-issued identification card, social security card, drum set, and acoustic guitar.

341.    Because Mr. Martinez lost his identification card and social security card, he can no longer work.

342.    Mr. Martinez stayed nearby that night. The next day, Mr. Martinez returned to the encampment. While there, he watched as a bobcat scooped up people's property and throw it straight into a trash truck.

**Defendants swept Plaintiff Lisa Masaro and exposed her to a greater risk of COVID-19.**

343.    Plaintiff Lisa Masaro was surviving near the South Platte River in an encampment of other homeless individuals on September 15, 2020. Ms. Masaro had been living in that encampment for at least a month.

344.    Ms. Masaro has numerous health conditions that make her at greater risk to catching, and dying from, COVID-19. Ms. Masaro currently has, and is undergoing treatment for, cancer. She also has numerous nodules on her thyroid that may be cancerous and must have surgery to biopsy and remove these nodules in the next few months. At the time of the sweep, September 15, 2020, she had just gotten out of the hospital.

345.    Ms. Masaro resides in a camper. On the Friday before the sweep on Tuesday,
September 15, 2020, a Denver police officer came to the door of her trailer. The officers told her
that police officers would be back in 72 hours, on Monday, to conduct a sweep of the trailers and
RVs parked along the South Platte River. Ms. Masaro asked him where she, and the others, were
supposed to go. The officer replied "anywhere but Denver."

346.    Having nowhere else to go, Ms. Masaro waited until Monday. No one came on
Monday to conduct the sweep.

347.    The next morning, Ms. Masaro was walking her dog. She saw Defendants
erecting a fence around the South Platte encampment. Scared about what was going to happen,
Ms. Masaro got into her pickup truck and pulled her trailer out of the encampment before she
could be trapped within the fence.

348.    Because of this stroke of luck, Ms. Masaro did not have any of her property
seized. However, she was displaced from the encampment.

349.    In her new location, Ms. Masaro comes into contact with significantly more
people, exposing her to greater risk of COVID-19. The South Platte encampment was isolated
and there were no passersby because it was not near any residences or businesses frequented by
the public.

350.    Now that Ms. Masaro has been forced to flee the encampment, she has to move
every 72 hours. This further exposes her to a greater risk of exposure to new sources of COVID-
19.

351.    Ms. Masaro has avoided staying in Denver's congregate shelters because she fears
exposure to COVID-19.

**Plaintiff Nathaniel Warner caught COVID-19 while sleeping in Denver's congregate
shelters to avoid the sweeps and Camping Ban move-on orders.**

66

352.     Plaintiff Nathaniel Warner has been homeless for the past few years in Denver. Because of Camping Ban enforcement, sweeps, and harassment from DPD officers, and other Denver officials, which continuously chased him from block-to-block, Mr. Warner began staying in shelters earlier this year.

353.     Mr. Warner has Chronic Obstructive Pulmonary Disease ("COPD") and heart problems, including a heart murmur and inoperable valves, which he takes medications for. He is also a cigarette smoker. He is particularly vulnerable to contracting, and dying from, COVID-19, per the CDC's guidelines.

354.     Over the past year, Mr. Warner has been told to "move along" by Denver officials at least a dozen times. In March of 2020 alone Mr. Warner was threatened with the Camping Ban multiple times, and told to move on. In March, during a sweep near 24th Street and California Street, Mr. Warner had his property (including his tent, bedding, and other personal items) seized and destroyed by Denver officials.

355.     As a result of this harassment by Denver officials, Mr. Warner decided to enter the National Western Complex congregate shelter mid-April 2020.

356.     Upon arrival at the National Western Center congregate shelter, Mr. Warner noticed that, a large portion of the time, staff (including the security personnel who greeted every single person who entered the facility) were not wearing masks or were wearing them so as to render them ineffective (i.e. with their noses uncovered). He noticed that when employees would speak to each other, they would take off their masks and stand roughly two feet from one another. Mr. Warner also noticed that other residents of the shelter would not wear masks a large portion of the time. Mr. Warner, in that congregate shelter, was forced to share communal restrooms with other homeless individuals. When Mr. Warner would enter the shelter, security

staff would pat him down. The security staff would go as far as opening his cigarette package and running their fingers over the cigarettes in that container.

357.    Mr. Warner also noticed that the congregate shelters were very similar to a jail. Those in the shelter had a strict curfew of 8:30pm, and could not leave their designated area 6-foot by 9-foot area after this time. There were no walls or other barriers between each homeless individuals' 6-foot by 9-foot space, and everyone in the shelter breather the same re-circulated air.

358.    Mr. Warner was assaulted by other shelter attendees multiple times, but his complaints went unanswered because if he were to have been implicated in the assault in any way, he would have been kicked out of the shelter. The individuals who assaulted Mr. Warner were also allowed to continue to stay in the shelter. Demonstrating the extreme risk of violence Mr. Warner faced, he witnessed a man get stabbed to death within the National Western Center congregate shelter.

359.    After two weeks at the National Western Center congregate shelter, Mr. Warner noticed respiratory symptoms similar to a sinus infection. He immediately informed staff, who removed him from the shelter and tested him for COVID-19. Three days later, test results confirmed that Mr. Warner had contracted COVID-19.

360.    A few days later, complications from COVID-19 forced Mr. Warner into the hospital. He would spend the next six days recovering in a hospital bed.

361.    When Mr. Warner was released from the hospital, he returned to a congregate shelter, the 48th Street congregate shelter. He witnessed the same behaviors by staff at the 48th Street congregate shelter that he had witnessed at the National Western Center congregate shelter.

362.    Mr. Warner entered Denver's shelters and contracted COVID-19 because he feared the sweeps and enforcement of the Camping Ban. Despite being vulnerable to potentially catching, and dying from, COVID-19, he continues to stay in a congregate shelter.

**Defendants swept Plaintiffs in the middle of a pandemic in direct contravention of United States Center For Disease Control issued public health advisories.**

363.    In the early days of the recognition of the COVID-19 pandemic in the United States, and by at least May 10, 2020, the CDC, issued public health guidance on "Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials" that was meant to provide notice for, among other persons, "local and state health departments, … housing authorities, [and] emergency planners" as to how to treat those experiencing unsheltered homelessness during the pandemic.

364.    The CDC noted that "[p]eople experiencing unsheltered homelessness (those sleeping outside or in places not meant for human habitation) may be at risk for infection when there is community spread of COVID-19" however "the risks associated with sleeping outdoors or in an encampment setting are different than from staying indoors in a congregate setting such as an emergency shelter or other congregate living facility." For example, the CDC noted at the outset that "[o]utdoor settings may allow people to increase physical distance between themselves and others."

365.    The CDC went on to outline *specific guidance* for local officials in dealing with encampments of those experiencing homelessness during the COVID-19 pandemic.

366.    The CDC stated, unequivocally, that "[i]f individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are."

367.    Instead of clearing encampments, the CDC stated that state and local officials should use the large amount of resources that would be expended clearing encampments to

"[e]nsure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day." The CDC noted that, if this option was not available, that state and local officials should at least "[a]ssist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people" and stock these facilities "with hand sanitizer (containing at least 60% alcohol)."

368.    Additionally, the CDC recommended that state and local officials "[w]ork together with community coalition members to improve sanitation in encampments" and "[e]ncourage those staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual" without clearing encampments.

369.    Defendants were on notice of this guidance before the sweeps that occurred at Lincoln Park, Morey Middle School, and the South Platte River.

370.    Despite being on notice that sweeping the encampments at Lincoln Park, Morey Middle School, and the South Platte River during the COVID-19 pandemic presented a substantial risk to Plaintiffs, and others in the community (through the spread of COVID-19), Defendants consciously chose to expose Plaintiffs and the community to this risk and swept the encampments in direct contravention of CDC guidance.

371.    Despite CDC guidance and the growing threat of COVID-19, Defendants have not installed restroom facilities nearby to homeless encampments that have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day or provided access to portable latrines with handwashing facilities for encampments of more than 10 people that are stocked with hand sanitizer (containing at least 60% alcohol).

372.    Instead, Defendants used resources that could have provided these essential

services to Denver's homeless population to conduct sweeps.

**Defendants were on notice that forcing Plaintiffs into congregate shelters greatly increases their risk of exposure to COVID-19.**

373.    On Monday, June 8, 2020, the Colorado Coalition for the Homeless in partnership

with and DDPHE conducted a voluntary COVID-19 testing pilot for people experiencing

homelessness and living unsheltered in the downtown area around the CCH Stout Street Health

Center. Encampments were notified by Denver Street Outreach Collaborative (DSOC) members

a few days before that testing would take place on Monday morning at Stout and 22nd Streets.

Fifty people volunteered to be tested with tests obtained by DDPHE and administered by the

DPH team. The following day, June 9, 2020, testing results were returned and 29 people were

notified of their results with ongoing notification to the remaining volunteers. Of the fifty people

tested, no one tested positive for COVID-19. The individuals who were tested were also screened

for high-risk conditions including underlying medical conditions that could make them more

susceptible to COVID-19 complications if they were to contract to the virus. During testing,

eight individuals were identified as high-risk and eligible for referrals to protective action motel

rooms due to age or underlying medical conditions. Seven people were relocated with one person

declining. The most common high-risk conditions included Asthma, Chronic Obstructive

Pulmonary Disease (COPD), High Blood Pressure, and Diabetes.

374.    The prevalence rate of COVID-19 of those sheltering on the streets is much lower

than the prevalence rate of the general population, which is around seven percent.

375.    Importantly, the prevalence of COVID-19 among those sheltering on the streets is

also significantly lower than those confined in shelters. On Monday, May 4, 2020, Colorado

Coalition for the Homeless healthcare staff conducted a pilot study at St. Francis Center where

52 individuals utilizing the day shelter volunteered to be tested for COVID-19.[8] Fourteen of the 52 resulted in a positive diagnosis of COVID-19, or 26.9% of total people tested. Using these findings as the benchmark for COVID-19 cases within the homeless population, 538 people of the 2000 utilizing Denver shelters could have COVID-19.

376.    In a later round of testing, conducted between May 18, 2020 and June 22, 2020, by the Colorado Coalition for the Homeless in partnership with DDPHE found that out of 290 individuals tested who were accessing Denver's shelters, 20 were positive for COVID-19, or approximately 7%.[9] Using these findings as the benchmark for COVID-19 cases within the homeless population, 140 people of the 2000 utilizing Denver shelters could have COVID-19.

377.    There was also an outbreak among staff at the large shelter for men experiencing homelessness at Denver's National Western Complex. In May of this year, at least thirteen people working for the Denver Rescue Mission, which operates the men's shelter, tested positive for COVID-19.

378.    These testing results demonstrate that people experiencing homelessness are less likely to be in danger of having or contracting COVID-19 while living in encampments. This is because they are living in their own self-contained space with the opportunity to isolate themselves in their tents. Being outdoors, rather than in a confined, shared indoor space like a shelter also certainly helps.

---

[8] *Surveillance Testing Pilot To Establish Potential COVID-19 Prevalence Among People Experiencing Homelessness In Denver*, COLORADO COALITION FOR THE HOMELESS, available at: https://www.coloradocoalition.org/sites/default/files/2020-05/Prevalence%20of%20COVID-19.pdf.
[9] *Surveillance Testing Pilot To Establish Potential COVID-19 Prevalence Among People Experiencing Homelessness Who Utilize Denver Shelters*, COLORADO COALITION FOR THE HOMELESS, available at: https://www.coloradocoalition.org/sites/default/files/2020-06/shelter%20testing_final_0.pdf.

379.     Additionally, Defendants were aware that nearly all of the biggest known clusters of COVID-19 outbreak in America have been in nursing homes, food processing plants, and correctional facilities; in other words, all places, like Denver's congregate homeless shelters, where people are packed in close quarters with little opportunity for social distancing.[10]

380.     Despite this knowledge, Defendants explicitly conducted the sweeps to force Plaintiffs, and others similarly situated, into congregate facilities where they knew Plaintiffs were significantly more likely to contract COVID-19. The statements of Defendants, including Mayor Hancock, wherein Defendants explicitly said that the sweeps were meant to push Plaintiffs into shelters, evidence this. It is also evidenced by the fact that at the sweeps, buses were provided to take individuals to Denver's congregate shelters.

381.     Even when the City was unsuccessful in its deliberate attempts to force people from their outdoor private shelters into indoor congregate shelters, the City affirmatively created an elevated risk of serious harm to Plaintiffs by removing their only option for private shelter where they can isolate and practice social distancing. Without their private shelters, Plaintiffs were exposed to greater social contact – the primary risk factor for COVID-19 transmission – and exposure to the elements.

**Infection with COVID-19 presents a substantial risk of serious harm to Plaintiffs.**

382.     COVID-19 is a particularly contagious disease. Studies show that the virus can survive for up to three hours in the air, four hours on a copper surface, up to twenty-four hours on cardboard, and up to two to three days on plastic and stainless steel.[11] Indeed, a study of an

---

[10] *Coronavirus in the U.S.: Latest Map and Case Count*, THE NEW YORK TIMES, available at: https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[11] *Novel Coronavirus Can live on Some Surfaces for Up to 3 Days, New Tests Show,* TIME, available at https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/.

early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was a communal mall bathroom.[12] Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—people who are contagious but who exhibit no symptoms, rendering ineffective any screening tools dependent on identifying disease symptoms.[13]

383.    There is no known vaccine or cure for COVID-19. No one who has yet to contract the virus is immune, and there is growing evidence that, even among those who have contracted the virus, immunity does not last. Common symptoms of COVID-19 include fever, cough, and shortness of breath.[14] Other symptoms include congestion, sneezing, fatigue, or diarrhea.[15] Many individuals who become infected with COVID-19 may have mild or moderate symptoms; some may experience no symptoms at all. Other patients may experience severe symptoms requiring intensive medical intervention.[16] However, even with hospitalization and intensive treatment, hundreds of thousands of individuals have died as a result of this infection. Regardless of the type of severity of symptoms, all infected persons are contagious and can rapidly transmit the virus from person to person without proper public health interventions.[17] The virus is known to

---

[12] Cai J, Sun W, Huang J, Gamber M, Wu J, He G. Indirect virus transmission in cluster of COVlD-19 Cases, Wenzhou, China, 2020. Emerg Infect Dis. 2020 Jun., available at https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article.

[13] Johnny Milano, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, NEW YORK TIMES, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[14] Coronavirus Disease 2019 (COVID-19), Symptoms of Coronavirus, CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[15] Q&A on Coronaviruses (COVID-19), World Health Organization, https://www.who.int/newsroom/q-a-detail/q-a-coronaviruses.

[16] *Id.*

[17] Coronavirus Disease 2019 (COVID-19): How It Spreads, CDC,

spread from person to person through respiratory droplets, close personal contact, and from

contact with contaminated surfaces and objects.[18]

384.    The need for care, including intensive care, and the likelihood of death, is much

higher from COVID-19 infection than from other viruses, including common influenza.[19]

According to some estimates, the fatality rate of people infected with COVID-19 is about ten

times higher than a severe seasonal influenza, even in advanced countries with highly effective

health care systems. For people in the highest risk populations, the fatality rate of COVID-19

infection is about fifteen percent.

385.    People over the age of fifty-five face substantially increased risk of serious illness

or death from COVID-19. In one World Health Organization Report, mortality rate analyses

showed that individuals age 70-79 had an overall 8% mortality rate, individuals age 60-69 had a

3.6% mortality rate, and individuals age 50-59 had a 1.3% mortality rate.[20] People of any age

who suffer from certain underlying medical conditions are also at elevated risk, including people

with respiratory conditions including chronic lung disease or moderate to severe asthma; people

with heart disease or other heart conditions; people who are immunocompromised as a result of

cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people

with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients);

people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease),

---

[18] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covidspreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.

[18] *Id.*

[19] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://cutt.ly/itEmi8j.

[20] Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (date analysis based on WHO-China Joint Mission Report)

inherited metabolic disorders; and people who have had or are at risk of stroke.[21] The World

Health Organization Report indicates that the mortality rate for those with cardiovascular disease

was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and

7.6% for cancer.[22]

386.    For these vulnerable populations, the symptoms of COVID-19, particularly

shortness of breath, can be severe and complications can manifest at an alarming pace. Most

people in higher risk categories who develop serious illness will need advanced support. This

level of supportive care requires expensive and specialized equipment.[23]

387.    Increasingly, and in the United States in particular, even some younger and

healthier people who contract COVID-19 may require hospitalization for supportive care,

including intravenous fluids and supplemental oxygen.

388.    Even for those who survive COVID-19, recent clinical evidence indicates that, in

persons who suffer severe symptoms, the virus may also cause damage to organs such as the

heart, the liver, and the kidneys, as well as to organ systems such as the blood and the immune

system. This damage is so extensive and severe that it may be enduring. Among other things,

patients who suffer severe symptoms from COVID-19 end up with damage to the walls and air

sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken

so that they are less able to transfer oxygen going forward. Indeed studies of some recovered

---

[21] Coronavirus Disease 2019 (COVID-19): People Who Need Extra Precautions, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-
higherrisk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-
ncov%2Fspecific-groups%2Fhigh-risk-complications.html.
[22] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World
Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-
source/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf.
[23] Sarah, Kliff, et al., *There Aren't Enough Ventilators to Cope With the Coronavirus*, THE NEW
YORK TIMES (March 26, 2020), https://www.nytimes.com/2020/03/18/business/coronavirus-
ventilator-shortage.html.

patients in China and Hong Kong indicate a declined lung function of 20% to 30% after
recovery.[24]

389.    A recent study shows that even those who do not exhibit symptoms, so-called
asymptomatic carriers, exhibit potentially permanent heart damage from the disease.[25] In that
study, seventy-eight percent of those who contracted patients had ongoing heart abnormalities
and sixty percent had myocarditis, inflammation of the heart muscle. The risk of serious
permanent injury is not confined to those who exhibit symptoms, or who are in higher risk
categories.

### Sweeps, even before COVID-19, jeopardized Denver's homeless residents' health and safety.

390.    Droves of homeless individuals are forced to sleep outside because of the
inadequacy of Denver's affordable housing and congregate emergency shelters.

391.    Sweeps have contributed to increased vulnerability of homeless residents by
breaking up groups of homeless people living downtown. 83.7% of Denver's homeless
population noted that they sometimes sleep outside with a group and most do so because of
personal safety. 64% of Denver's homeless residents who commonly sleep outside have been
separated from their group, due to police telling the group to break up or move along. In

---

[24] Tianbing Wang, et al., *Comorbidities and Multi-Organ Injuries in the Treatment of COVID-19*, 395 Lancet 10228 (2020), available at
https://www.thelancet.com/journals/lancet/article/PIIS0140- 6736(20)30558-4/fulltext; George
Washington University Hospital, GW Hospital Uses Innovative VR Technology to Assess Its
First COVID-19 Patient, https://www.gwhospital.com/resources/podcasts/covid19-vr-technology.
[25] Valentina O. Puntmann, MD, PhD, et al., *Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19)*, JAMA
Cardiol. (July 27, 2020), available at:
https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916?referringSource=articleShare.

response to such orders, homeless residents commonly choose sleeping locations with an aim to avoiding contact with the police. Of all those who choose sleeping locations to avoid police contact (87%), most of those (69%) do so frequently.

392.    Denver's homeless residents who move often to avoid police contact experience much higher rates of sexual assault, physical assault, robbery and violent threats than those who do not feel forced to move. For example, women who feel forced to move often to avoid police are 60% more likely to be sexually assaulted, and 247% more likely to be physically assaulted, than women who do not move often.

393.    Additionally, the sweeps have devastating effects on Denver's homeless population's mental and physical health through the interruption of their sleep. Sleep deprivation is linked to a cascade of health problems, such as increased rates of mental illness, diabetes, hypertension, drug abuse, and violence. Schizophrenia-like symptoms are associated with lack of sleep, as are increases in anxiety, memory loss, and depression. And, police contact, and the fear of police contact, substantially undermines the sleeping-related health of Denver's homeless residents.

394.    Only 29% of Denver's homeless residents who sometimes sleep outside get more than 6 hours of sleep a night; fully 30% only get three hours or less of sleep each night. In addition to diminished hours of sleep, people experiencing homelessness typically sleep in short bursts, subject to frequent interruption. In Denver, 16% of homeless residents only sleep for 30 minutes on average before being awoken by an interruption; another 24% sleep 1-2 hours at a stretch before interruption.

395.    A large percentage of persons living outside, without adequate shelter have or are at serious risk of health problems. This risk is greatly increased by several factors, including lack

of shelter and warm clothing, especially during winter months when it is cold and rains, where individuals have preexisting health conditions, and for people of advanced age.

396.    The danger created for homeless individuals by the seizure and destruction of their property, including the most basic necessities like medications, clothing, shoes, tents, tarps, and blankets, is exacerbated by the weather. This summer, Denver has experienced the longest string of 90°F days in recent history. It has also experienced dangerous smoke from wildfires and massive temperature fluctuations (dropping from over 90°F one day to snowing the next). Seizure of homeless individuals' only means of protection from the sun and heat, like tents and other shelters, exposes homeless individuals to exposure-related conditions such as heat stroke and dehydration.

397.    Protection from the elements is a basic human need; exposure risks illness and death. Defendants are well aware of the dangers that individuals living outside face, yet they knowingly maintain a practice of seizing and destroying property critical to the health and shelter of homeless persons and exposing them to an elevated risk of serious harm as a result.

**EHS profits off the seizure, and destruction, of Plaintiffs' property.**

398.    On October 11, 2018, Denver and EHS signed a contract providing up to $6,000,000 for EHS to coordinate with Denver to conduct the sweeps over the next three years.

399.    From September 2017 until July 2019, Denver paid private contractors, including EHS, a total of $713,692 to conduct the sweeps. $313,692 of that went to EHS.

400.    EHS continues to make money from each sweep, and made thousands of dollars from the sweeps.

## CLASS ALLEGATIONS

401.    Class Definition, Rule 23(b)(2), Injunctive Relief Classes:

a. Injunctive Relief Subclass 1: This class is defined as all persons in Denver whose personal belongings may in the future be taken or destroyed without due process on account of Denver's, and/or its officials' and representatives', decision to clear away an encampment of homeless person(s) by seizing and/or discarding the property found there without adequate notice.

b. Injunctive Relief Subclass 2: This class is defined as all involuntarily homeless individuals living in Denver during the COVID-19 pandemic.

402. <u>Class Definition, Rule 23(b)(3), Damages Classes:</u>

a. Damages Subclass 1: This class is defined as all persons present at the Lincoln Park sweep on July 29, 2020 who had their property seized and destroyed.

b. Damages Subclass 2: This class is defined as all persons present at the South Platte River sweep on September 15, 2020 who had their property seized and destroyed.

403. Plaintiffs and the putative class were subjected to the constitutional violations described in this complaint. The legal and factual issues are common to the class and affect all class members.

404. Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

**The proposed classes have sufficient numerosity.**

405. All of the classes are inclusive of people present at the Lincoln Park sweep. The Rule 23(b)(2) Subclass 1 is inclusive of people present at sweeps that have occurred since the entry of the *Lyall v. Denver* settlement agreement, including, but not limited to, the Lincoln Park

sweep, the Morey Middle School sweep, and South Platte River sweep. The Rule 23(b)(2)

Subclass 2 is inclusive of the, at least, 4,171 homeless residents of Denver.

406.    Consistent with Federal Rule of Civil Procedure 23(a), the members of the class

are so numerous that joinder of all members is impracticable. Each Injunctive Relief Subclass is

composed of thousands of people. Each Rule 23(b)(3) subclass exceeds 100 people.

**Common issues of fact and law predominate and support certification.**

407.    All of the actions complained of in this Complaint, as to each Rule 23(b)(3)

subclass occurred, at the same times and locations. Defendants acted uniformly with respect to

each homeless individual at Lincoln Park and along the South Platte River in that they seized and

discarded Plaintiffs' property without notice. Defendants acted uniformly with respect to each

member of Rule 23(b)(2) Subclass 1 as they seized and discarded Plaintiffs' property without

notice at multiple sweeps. Defendants acted uniformly with respect to each member of Rule

23(b)(2) Subclass 2 as they have continually swept each individual during the COVID-19

pandemic and attempted to force each member into a congregate shelter during the COVID-19

pandemic despite the obvious risks posed by such actions.

408.    There are questions of law and fact common to the classes and they predominate

over individualized questions.

409.    Defendants seized and destroyed, without notice, the property of the putative

classes as a group and treated all similarly, acting on grounds applicable to the putative classes.

These common questions of fact and law include, but are not limited to, for the Rule 23(b)(3)

Subclasses and Rule 23(b)(2) Subclass 1:

        a.    Did Defendants unlawfully seize Plaintiffs' property in violation of the United
           States and Colorado constitutions?

b.  Did Defendants unlawfully discard Plaintiffs' property in violation of the United States and Colorado constitutions?

c.  Did Defendants provide notice to Plaintiffs prior to seizing their property?

d.  Did Plaintiffs have a possessory interest in their property?

e.  Did Defendants afford Plaintiffs any pre-deprivation process before seizing their property?

f.  Did Defendants afford Plaintiffs any post-deprivation process after seizing their property?

g.  Did Defendants expose Plaintiffs to a greater risk of contracting COVID-19 and/or suffering from exposure to the elements by conducting the sweeps?

h.  Were Defendants on notice that the sweeps would expose Plaintiffs to a greater risk of contracting COVID-19 and/or exposure?

i.  Were Defendants deliberately indifferent to the substantial risk that a sweep would result in Plaintiffs' being exposed to COVID-19 and/or exposure?

j.  Did Defendants' conduct shock the conscience?

k.  Are homeless individuals a suspect class under the Colorado Constitution?

l.  Were Denver Defendants actions in accordance with a custom or practice of Denver?

m.  Did a final policymaker for Denver authorize Denver Defendants' actions prior to the incident?

n.  Did Denver ratify Denver Defendants actions after the incident?

o.  Did Denver cause the Denver Defendants' violation of Plaintiffs' United States and Colorado constitutional rights?

p.  Were CSP Defendants actions in accordance with a custom or practice implemented by Defendant Polis?

q.  Did a Defendant Polis authorize CSP Defendants' actions prior to the incident?

r.  Did Defendant Polis ratify CSP Defendants' actions after the incident?

      s.  Did Defendant Polis cause CSP Defendants' violation of Plaintiffs' United States and Colorado constitutional rights?

      t.  Are there class wide damages available?

410.    These common questions of fact and law include, but are not limited to, for the

Rule 23(b)(2) Subclass 2:

      a.  Did Defendants expose Plaintiffs to a greater risk of contracting COVID-19 and/or suffering from exposure to the elements by conducting the sweeps?

      b.  Were Defendants on notice that the sweeps would expose Plaintiffs to a greater risk of contracting COVID-19 and/or exposure?

      c.  Were Defendants deliberately indifferent to the substantial risk that a sweep would result in Plaintiffs' being exposed to COVID-19 and/or exposure?

      d.  Did Defendants' conduct shock the conscience?

      e.  Were Denver Defendants actions in accordance with a custom or practice of Denver?

      f.  Did a final policymaker for Denver authorize Denver Defendants' actions prior to the incident?

      g.  Did Denver ratify Denver Defendants actions after the incident?

      h.  Did Denver cause the Denver Defendants' violation of Plaintiffs' United States and Colorado constitutional rights?

      i.  Were CSP Defendants' actions in accordance with a custom or practice implemented by Defendant Polis?

      j.  Did Defendant Polis authorize CSP Defendants' actions prior to the incident?

      k.  Did Defendant Polis ratify CSP Defendants' actions after the incident?

      l.  Did Defendant Polis cause CSP Defendants' violation of Plaintiffs' United States and Colorado constitutional rights?

411.    The named Plaintiffs claim that the violations of their, and the classes'

constitutional rights raise common questions of law and fact. Defendants have acted, threatened

to act, and will continue to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**The claims of each proposed class member are typical of each class.**

412.    Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the classes. Plaintiffs were all present at the Lincoln Park, Morey Middle School, and/or South Platte River sweeps; had their property seized and destroyed; were subjected to one or more of the violations previously enumerated; are at heightened risk of contracting COVID-19 because of Defendants' actions; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

413.    Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class.

414.    Each class member of the Rule 23(b)(3) Subclasses suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

415.    Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

**Plaintiffs' Counsel will provide adequate representation to the classes.**

416.    KILLMER, LANE & NEWMAN is well qualified to adequately represent the classes. KILLMER, LANE & NEWMAN has been selected as among the "Best Law Firms" by US News and World Report, both nationally and in Colorado, and its named partners, Darold Killmer, David

Lane, and Mari Newman, have each been selected by Peer Recognition as among Denver's Best Lawyers. KILLMER, LANE & NEWMAN has been recognized in multiple areas by US News & World Report's Best Law Firms survey: Civil Rights Law, Litigation – First Amendment; Media & First Amendment Law; Employment Law – Individuals; and Litigation – Labor & Employment. KILLMER, LANE & NEWMAN has been recognized as Colorado's "Lawyers of the Year" by Law Week Colorado. Both as a firm and individually, the three named partners of KILLMER, LANE & NEWMAN have received repeated recognition as leaders in civil rights litigation, including the American Civil Liberties Union ("ACLU") of Colorado's 2010 Carle E. Whitehead Civil Rights and Liberties Award for "dedication to defending civil liberties and the rule of law," the Frederick Douglass Human Rights Award by the Southern Center for Human Rights, and the 2010 Colorado Trial Lawyers Association's ("CTLA's") Access to Justice Award, honoring "perseverance, courage and character shown over and over in cases of extraordinary circumstances." KILLMER, LANE & NEWMAN has also been recognized by the Legal Aid Foundation of Colorado for its important contributions to improving access to justice in the State of Colorado, and has been consistently awarded for its outstanding contribution, service, and commitment to pro bono achievement.

417.    Not only is the firm of KILLMER, LANE & NEWMAN well-qualified to adequately represent the interests of the class, but Plaintiffs' lead counsel in this case, Andy McNulty, has dedicated his entire professional practice of law to representing plaintiffs in civil rights cases and fighting for the rights of homeless individuals.

418.    Plaintiffs' counsel, Andy McNulty, has represented clients in over one hundred cases involving the violation of constitutional rights throughout his career, with many of these cases involving the intersection of the Fourth and Fourteenth Amendments. In the past few years

alone, Mr. McNulty has tried civil rights cases and argued multiple others on appeal in both the Tenth Circuit and Colorado Supreme Court. He has secured significant settlements on behalf of indigent clients in cases where they suffered a violation of their constitutional rights.

419.    Mr. McNulty has experience litigating cases involving actions by government officials against homeless individuals. Mr. McNulty litigated, and ultimately was instrumental in the settlement of, a class action on behalf of Denver's homeless population. *Lyall v. Denver.* 1:16-cv-02155-WJM-SKC (D.Colo.). He also secured an order declaring Denver's Camping Ban unconstitutional, the first such decision in the state and region. *People v. Burton*, 2019CV034925 (Den. County Court).

420.    Mr. McNulty also has experience as class counsel. Andy McNulty is currently part of the team of lawyers litigating *Winston, et al. v. Polis, et al.*, on behalf of a class of Colorado Department of Corrections inmates who are vulnerable to the COVID-19 pandemic. 2020CV031823 (Colo. Dist. Ct.). Mr. McNulty is also currently litigating *Carranza, et al. v. Reams*, filed on behalf of a class of inmates at the Weld County Jail who are vulnerable to the COVID-19 pandemic. 1:20-cv-00977-PAB-SKC (D.Colo.). Mr. McNulty, with a team of lawyers, was successful in obtaining a preliminary injunction to ensure that those in the Weld County Jail are provided basic precautions against the transmission of COVID-19. Additionally, while working at the ACLU of Missouri, Mr. McNulty was class counsel in *Van Orden, et al. v. Healthlink, Inc. et al.*, an action on behalf of a class of sex offenders who were confined civilly under indefinite sentences. 4:09-cv-00971-AGF (E.D. Mo.).

421.    Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

**Issues relating to maintenance and superiority in this case support certification.**

422.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct.

423.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the classes to protect their interests.

424.    Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the classes.

425.    Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the classes predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Named Plaintiffs are informed and believe, and allege thereon, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Named Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Named Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in Denver. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

426.    Named Plaintiffs do not know the identities of most class members. Named Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that provide services to homeless individuals.

427.    Named Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Liability can be determined on a class-wide basis. General damages can also be determined on a class-wide basis.

428.    Consistent with Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

429.    Pursuant to Rule 23(c)(4), particular issues are appropriate for certification because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

**The damages caused by Defendants support certifying this as a class action.**

430.    As a direct and proximate cause of the conduct described herein, the named Plaintiffs and the class members have been denied their constitutional rights as stated herein, and have suffered damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

431.    Defendants' actions were done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' and class members' rights.

432.    Plaintiffs and class members have a reasonable fear of continued seizure and destruction of their property without notice and due process of law. Without intervention by this Court, the Injunctive Relief Class members, who are homeless, or will be homeless, in Denver are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The Injunctive Relief Class is represented by each of the individual class representatives.

433.    Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

434.    Defendant Denver's policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and class members intend to survive through use of shelter, store property, and generally exist in Denver. Absent injunctive relief, Plaintiffs fear their property being seized and destroyed without adequate notice or due process of law. Plaintiffs also fear they will continue to be subject to sweeps that expose them to greater risk of contracting COVID-19 by forcing them into congregate shelters and/or to dispersal throughout Denver.

435.    Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

## STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Unlawful Seizure**
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated, against Defendants)**

436.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

437.    Defendants acted under color of state law, and within the course and scope of their employment, at all times relevant to the allegations in this Complaint.

438.    Defendants are "persons" under 42 U.S.C. § 1983.

439.    Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Plaintiffs had a constitutionally protected right to be secure in their persons against unreasonable seizures.

440.    Plaintiffs' property was unabandoned and it was clear to Defendants that Plaintiffs property was unabandoned.

441.    By seizing and destroying Plaintiffs' property, Defendants meaningfully and permanently interfered with Plaintiffs' possessory interest in their property and unlawfully seized Plaintiffs' property.

442.    Defendants did not have a warrant to seize Plaintiffs' property and the community caretaking doctrine did not apply to their seizure of Plaintiffs' property.

443.    Plaintiffs' right to not have their property seized and destroyed was clearly established, and reasonable officials in Defendants' position would have known that summarily seizing and destroying Plaintiffs' property violates the Fourth Amendment.

444.    Defendants' actions were authorized (before and during the fact), and ratified

(after the fact), by final policymakers for Denver.

445.    Defendant Hancock directed every action of the Denver defendants, thereby

causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that his

directives would result in the violation of Plaintiffs' rights.

446.    Defendant Denver's customs, policies, and/or practices, and the decisions of its

final policymakers, were the moving force behind the Defendants' violation of Plaintiffs'

constitutional rights.

447.    Defendants' actions, as described herein, were motivated by malice and/or

involved reckless or callous indifference to Plaintiffs' federally protected rights, and Defendants

engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating

deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected

rights.

448.    As a direct and proximate cause and consequence of Defendants' unconstitutional

acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

449.    The herein described acts or omissions of Defendant are the moving force and the

legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to

non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs

suffered before and during the sweeps, and other compensatory and special damages.

450.    The intentional actions or inactions of Defendants as described herein

intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities

secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Unlawful Taking**
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated,**

**against Defendants)**

451.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

452.    Defendants acted under color of state law, and within the course and scope of their employment, at all times relevant to the allegations in this Complaint.

453.    Defendants are "persons" under 42 U.S.C. § 1983.

454.    Plaintiffs had a property interest in their possessions.

455.    By seizing and destroying Plaintiffs' property, Defendants meaningfully and permanently interfered with Plaintiffs' possessory interest in their property and destroyed Plaintiffs' property without just compensation.

456.    Plaintiffs' right to not have their property unlawfully destroyed without just compensation was clearly established, and reasonable officials in Defendants' position would have known that seizing and destroying Plaintiffs' property violates the Fourteenth Amendment.

457.    Defendants' actions were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Denver.

458.    Defendant Hancock directed every action of the Denver defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that his directives would result in the violation of Plaintiffs' rights.

459.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Defendants' violation of Plaintiffs' constitutional rights.

460.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' federally protected rights, and Defendant

engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

461.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

462.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

463.    The intentional actions or inactions of Defendants as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
**Fourteenth Amendment Violation — Deprivation Of Property Without Due Process
(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated,
against Defendants)**

464.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

465.    Defendants acted under color of state law, and within the course and scope of their employment, at all times relevant to the allegations in this Complaint.

466.    Defendants are "persons" under 42 U.S.C. § 1983.

467.    Plaintiffs had a property interest in their possessions.

468.    Plaintiffs had a property interest in their property, and an interest in being afforded notice prior to the seizure of their property, pursuant to the Settlement Agreement. Even

regarding property that may have been seized and stored, Plaintiffs, pursuant to the contract

entered into between Denver and Plaintiffs, had a right to due process, including notice, prior to

the seizure and storage of their property.

469.    Defendants seized and destroyed Plaintiffs property without affording them

adequate notice that their property would be seized and/or destroyed.

470.    Defendants seized and destroyed Plaintiffs property without affording them a pre-

deprivation process for challenging the seizure of their property.

471.    Defendants seized and destroyed Plaintiffs property without affording them a

post-deprivation process for challenging the seizure of their property.

472.    Defendants did not seize Plaintiffs property in connection with prosecution or

investigation of any crime.

473.    By seizing and destroying Plaintiffs' property, Defendants meaningfully and

permanently interfered with Plaintiffs' possessory interest in their property and destroyed

Plaintiffs' property without due process of law.

474.    Plaintiffs' right to not have their property unlawfully seized and destroyed

without due process of law was clearly established, and a reasonable official in Defendants'

position would have known that seizing and destroying property without due process of law

violates the Fourteenth Amendment.

475.    Defendants' actions were authorized (before and during the fact), and ratified

(after the fact), by final policymakers for Denver.

476.    Defendant Hancock directed every action of the Denver defendants, thereby

causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that his

directives would result in the violation of Plaintiffs' rights.

477.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Defendants' violation of Plaintiffs' constitutional rights.

478.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' federally protected rights, and Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

479.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

480.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

481.    The intentional actions or inactions of Defendants as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Danger Creation**
**(Plaintiffs, on behalf of themselves and those similarly situated, against Defendants)**

482.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

483.    Defendants acted under color of state law, and within the course and scope of their employment, at all times relevant to the allegations in this Complaint.

484.    Defendants are "persons" under 42 U.S.C. § 1983.

485.    Defendants created a danger to Plaintiffs of greater exposure to COVID-19 and/or exposure to the elements by conducting the sweeps.

486.    Plaintiffs are members of a specifically definable group of homeless individuals.

487.    Defendants' actions put Plaintiffs at a substantial risk of serious, immediate, and proximate harm.

488.    The risk of greater exposure to COVID-19 and/or exposure to the elements was obvious and known to Defendants.

489.    Defendants acted recklessly in conscious disregard of the risk of greater exposure to COVID-19 and/or exposure to the elements.

490.    Defendants' conduct, when viewed in total, shocks the conscience.

491.    Plaintiffs' right to not be exposed to greater danger by affirmative actions by public officials was clearly established, and a reasonable official in Defendants' position would have known that creating such danger violates the Fourteenth Amendment.

492.    Defendants' actions were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Denver.

493.    Defendant Hancock directed every action of the Denver defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that his directives would result in the violation of Plaintiffs' rights.

494.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Defendants' violation of Plaintiffs' constitutional rights.

495.    Defendants' actions, as described herein, were motivated by malice and/or

involved reckless or callous indifference to Plaintiffs' federally protected rights, and Defendants

engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating

deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected

rights.

496.    As a direct and proximate cause and consequence of Defendants' unconstitutional

acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

497.    The herein described acts or omissions of Defendants were the moving force and

the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited

to non-economic damages, economic damages, the physical and mental pain and anguish

Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

498.    The intentional actions or inactions of Defendants as described herein

intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities

secured by the Constitution of the United States of America.

**SIXTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Void-For-Vagueness**
**(Plaintiffs against Defendant Denver)**

499.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

500.    Defendant is a "person" under 42 U.S.C. § 1983.

501.    D.R.M.C. 49-246, Denver's "Encumbrance Removal Ordinance," is vague and

not clearly defined.

502.    D.R.M.C. 49-246 offers no clear and measurable standard by which Plaintiffs and

others could act lawfully.

503.    D.R.M.C. 49-246 fails to provide people of ordinary intelligence a reasonable

opportunity to understand what conduct they prohibited, and authorizes or encourages arbitrary

and discriminatory enforcement, or both.

504.    D.R.M.C. 49-246, as a duly enacted law, represents Defendant Denver's official

policy.

505.    As a direct and proximate cause and consequence of Defendants' unconstitutional

acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

506.    The herein described acts or omissions of Defendants were the moving force and

the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited

to non-economic damages, economic damages, the physical and mental pain and anguish

Plaintiffs suffered, and other compensatory and special damages. The intentional actions or

inactions of Defendants as described herein intentionally deprived Plaintiffs of due process and

of rights, privileges, liberties, and immunities secured by the Constitution of the United States of

America.

**SEVENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 7 — Unlawful Seizure**
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated,**
**against Defendants)**

507.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

508.    Defendant Robinson, Defendant Bronson, Defendant DPD Officers, and

Defendants John & Jane Boes 1-25 are "peace officers" under C.R.S. § 24-31-901(3) employed

by a local government and therefore subject to C.R.S. § 13-21-131. Plaintiffs only seek

declaratory and injunctive relief against the other Defendants as to this claim.

509.    Plaintiffs had a protected interest under Colo. Const. Art. II, Section 7 against unreasonable seizures.

510.    Plaintiffs' property was unabandoned and it was clear to Defendants that Plaintiffs property was unabandoned.

511.    By seizing and destroying Plaintiffs' property, Defendants meaningfully and permanently interfered with Plaintiffs' possessory interest in their property and unlawfully seized Plaintiffs' property.

512.    Defendants did not have a warrant to seize Plaintiffs' property.

513.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' constitutionally protected rights, and Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

514.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

515.    The herein described acts or omissions of Defendants are the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

**EIGHTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 15 — Unlawful Taking**
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated, against Defendants)**

516.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

517.    Defendant Robinson, Defendant Bronson, Defendant DPD Officers, and Defendants John & Jane Boes 1-25 are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131. Plaintiffs only seek declaratory and injunctive relief against the other Defendants as to this claim.

518.    Plaintiffs had a protected interest under Colo. Const. Art. II, Section 15 against unlawful takings as Colo. Const. Art. II, Section 15 states that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation."

519.    Plaintiffs had a property interest in their possessions.

520.    By seizing and destroying Plaintiffs' property, Defendants meaningfully and permanently interfered with Plaintiffs' possessory interest in their property and destroyed Plaintiffs' property without just compensation.

521.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' constitutionally protected rights, and Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

522.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

523.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish

Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

**NINTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 25 — Due Process**
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated,**
**against Defendants)**

524.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

525.    Defendant Robinson, Defendant Bronson, Defendant DPD Officers, and Defendants John & Jane Boes 1-25 are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131. Plaintiffs only seek declaratory and injunctive relief against the other Defendants as to this claim.

526.    Plaintiffs had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law.

527.    Plaintiffs had a property interest in their possessions.

528.    Defendants seized and destroyed Plaintiffs property without affording them adequate notice that their property would be seized and/or destroyed.

529.    Defendants seized and destroyed Plaintiffs property without affording them a pre-deprivation process for challenging the seizure of their property.

530.    Defendants seized and destroyed Plaintiffs property without affording them a post-deprivation process for challenging the seizure of their property.

531.    Defendants did not seize Plaintiffs property in connection with prosecution or investigation of any crime.

532.    By seizing and destroying Plaintiffs' property, Defendants meaningfully and permanently interfered with Plaintiffs' possessory interest in their property and destroyed

Plaintiffs' property without due process of law.

533.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' constitutionally protected rights, and Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

534.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

535.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

**TENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 25 — Danger Creation**
**(Plaintiffs, on behalf of themselves and those similarly situated, against Defendants)**

536.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

537.    Defendant Robinson, Defendant Bronson, Defendant DPD Officers, and Defendants John & Jane Boes 1-25 are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131. Plaintiffs only seek declaratory and injunctive relief against the other Defendants as to this claim.

538.    Plaintiffs had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law.

539.    Defendants created a danger to Plaintiffs of greater exposure to COVID-19 and/or

exposure to the elements by conducting the sweeps.

540.    Plaintiffs are members of a specifically definable group of homeless individuals.

541.    Defendants' actions put Plaintiffs at a substantial risk of serious, immediate, and proximate harm.

542.    The risk of greater exposure to COVID-19 and/or exposure to the elements was obvious and known to Defendants.

543.    Defendants acted recklessly in conscious disregard of the risk of greater exposure to COVID-19 and/or exposure to the elements.

544.    Defendants' conduct, when viewed in total, shocks the conscience.

545.    Plaintiffs' right to not to be exposed to greater danger by affirmative actions by public officials was clearly established, and a reasonable official in Defendants' position would have known that creating such danger violates the Fourteenth Amendment.

546.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' constitutionally protected rights, and Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

547.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

548.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

549.    The intentional actions or inactions of Defendants as described herein

intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities

secured by the Constitution of the United States of America.

**ELEVENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 3 — Right To Use Public Streets And Facilities**
**(Plaintiffs, on behalf of themselves and those similarly situated, against Defendants)**

550.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

551.    Defendant Robinson, Defendant Bronson, Defendant DPD Officers, and

Defendants John & Jane Boes 1-25 are "peace officers" under C.R.S. § 24-31-901(3) employed

by a local government and therefore subject to C.R.S. § 13-21-131. Plaintiffs only seek

declaratory and injunctive relief against the other Defendants as to this claim.

552.    Colo. Const. Art. II, Sec. 3 protects the fundamental rights of freedom of

movement and to use the public streets and facilities in a manner that does not interfere with the

liberty of others.

553.    Plaintiffs were using public streets and facilities in a manner that does not

interfere with the liberty of others.

554.    Defendants interfered with Plaintiffs' fundamental rights under Colo. Const. Art.

II, Sec. 3 through the sweeps and the enforcement of D.R.M.C. 38-86.2 (the Camping Ban) and

D.R.M.C. 49-246 (the Encumbrance Removal Ordinance).

555.    D.R.M.C. 38-86.2 and D.R.M.C. 49-246, and the sweeps, were not narrowly

tailored to any compelling or important governmental interest.

556.    Defendants' actions, as described herein, were motivated by malice and/or

involved reckless or callous indifference to Plaintiffs' constitutionally protected rights, and

Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly,
demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally
protected rights.

557.    As a direct and proximate cause and consequence of Defendants' unconstitutional
acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

558.    The herein described acts or omissions of Defendants were the moving force and
the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited
to non-economic damages, economic damages, the physical and mental pain and anguish
Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

559.    The intentional actions or inactions of Defendants as described herein
intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities
secured by the Constitution of the United States of America.

**TWELFTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 3 & Section 25 — Equal Protection**
**(Plaintiffs, on behalf of themselves and those similarly situated, against Defendants)**

560.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set
forth herein.

561.    Defendant Robinson, Defendant Bronson, Defendant DPD Officers, and
Defendants John & Jane Boes 1-25 are "peace officers" under C.R.S. § 24-31-901(3) employed
by a local government and therefore subject to C.R.S. § 13-21-131. Plaintiffs only seek
declaratory and injunctive relief against the other Defendants as to this claim.

562.    Colo. Const. Art. II, Sec. 3 and Colo. Const. Art. II, Sec. 25 provides that no
individual may be denied equal protection of the law based on a suspect classification and that all
individuals within the state are guaranteed the equal protection of the law.

563.     Defendants discriminated against Plaintiffs, targeted them, and denied them the

equal protection of the laws through the sweeps by seizing and destroying their property without

notice. Defendants regularly provide notice prior to seizing housed individuals' property, due

process of law prior to (and after) seizing housed individuals' property, and store housed

individuals' property that is seized.

564.     D.R.M.C. 38-86.2 and D.R.M.C. 49-246, and their enforcement, discriminate

against Plaintiffs and other homeless individuals.

565.     Plaintiffs are a part of a discrete and insular class of homeless individuals.

566.     Homeless individuals are marked by common attributes, characteristics, and life

circumstances.

567.     Homeless individuals are a class of individuals who have been subjected to a

history of purposeful unequal treatment with its attendant disabilities.

568.     Homeless individuals are a class of individuals who have been relegated to such a

position of political powerlessness as to command extraordinary protection from the majoritarian

political process.

569.     Defendants' actions violated Plaintiffs' fundamental right to the equal protection

of the laws under Colo. Const. Art. II, Sec. 3 and Colo. Const. Art. II, Sec. 25.

570.     Defendants' actions were not narrowly tailored to any compelling or important

governmental interest.

571.     Defendants' actions were not rationally related to any governmental interest.

572.     Defendants' actions, as described herein, were motivated by malice and/or

involved reckless or callous indifference to Plaintiffs' constitutionally protected rights, and

Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly,

demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally

protected rights.

573.    As a direct and proximate cause and consequence of Defendants' unconstitutional

acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

574.    The herein described acts or omissions of Defendants were the moving force and

the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited

to non-economic damages, economic damages, the physical and mental pain and anguish

Plaintiffs suffered before and during the sweeps, and other compensatory and special damages.

575.    The intentional actions or inactions of Defendants as described herein

intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities

secured by the Constitution of the United States of America.

**THIRTEENTH CLAIM FOR RELIEF**
**Breach Of Contract**
**(Plaintiffs Against Defendants Denver And Hancock)**

576.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

577.    In September of 2019, Plaintiffs, as members of a class, and Defendant Denver

entered into a contract, which settled Plaintiffs claims against Defendant Denver in the matter of

*Lyall, et al. v. Denver.* Pursuant to the Denver City Charter, Defendant Hancock is required to

"see that all contracts and agreements with the City and County are faithfully kept and fully

performed."

578.    In exchange for Plaintiffs dismissing their meritorious legal claims (which

Plaintiffs did upon entering into the contract) against Defendant Denver, the contract required,

with regard to the sweeps, that Defendant Denver "shall give at least seven days' notice prior to a

[sweep] and shall include such language in its written protocol for [sweeps]. The City may

conduct [sweeps] with less than seven days' notice only if the City determines that a public

health or safety risk exists which requires it. If a [sweep] is conducted with less than seven days'

notice, the City shall provide reasonable notice of the [sweep], with the determination of

reasonableness based upon the nature of the public health and safety risk present in the area."

579.    The contract also required that, during a sweep by Defendant Denver, "[a]ny items

of personal property that could reasonably be assumed to have value to any person will be

collected and stored. These items include: tents, sleeping bags, and any other camping

equipment; backpacks, suitcases, duffle bags, and any other containers of personal items;

clothing; bicycles; phones, electronic devices, and musical instruments; and other similar

identifiable items of personal property, including furniture." It specifies that Defendant Denver's

employees "will take particular care to identify, collect and store sensitive personal items and

documents, such as wallets and purses, prescription drugs, birth certificates, identification cards,

drivers' licenses, and health care documents." Additionally, the contract mandated that

"[p]ersonal property shall be stored for sixty days unless the property is determined by a City

employee or contractor, pursuant to the above protocol, to pose a public health or safety risk."

580.    Plaintiffs performed their contractual obligations by dismissing their lawsuit

against Denver.

581.    Defendant Denver failed to perform its contractual obligations. It did not provide

seven-days notice prior to the sweeps at least at Lincoln Park and the South Platte River. There

was no public health and safety risk that necessitated conducting a sweep without notice.

582.    Additionally, Defendant Denver did not store Plaintiffs personal property and,

instead, threw Plaintiffs' personal property into the trash.

583.    Plaintiffs were damaged by Defendant Denver's breach.

584.    The *Lyall v. Denver* settlement agreement mandates that "the party that has been

determined to have violated" the contract "shall be liable for reasonable attorney fees and costs

related to the filing of the enforcement action."

## FOURTEENTH CLAIM FOR RELIEF
### Conversion
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated,
against Defendant EHS and Defendants John & Jane Loes 1-75)**

585.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

586.    Plaintiffs were at all relevant times the owners of personal property confiscated

and/or destroyed by Defendants as alleged above. Plaintiffs remain entitled to the possession of

their personal property.

587.    Defendants' conduct deprived Plaintiffs of their possessions.

588.    Plaintiffs are entitled to damages for the destruction and loss of their property.

## FIFTEENTH CLAIM FOR RELIEF
### Trespass To Chattels
**(Plaintiffs, except Plaintiff Masaro, on behalf of themselves and those similarly situated,
against Defendant EHS and Defendants John & Jane Loes 1-75)**

589.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

590.    Plaintiffs were at all relevant times the owners of personal property confiscated by

Defendants as alleged above. Plaintiffs remain entitled to the possession of their personal

property.

591.    Defendants' conduct deprived Plaintiffs of their possessions.

592.    Plaintiffs are entitled to damages for the destruction and loss of their property.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their

favor and against each of the Defendants, and award them all relief allowed by law, including but

not limited to the following:

A.     All appropriate relief at law and equity;

B.     A declaration that D.R.M.C. 38-86.2 and D.R.M.C. 49-246 are unconstitutional,

         both facially and as-applied;

C.     An order certifying each class defined herein pursuant to the Federal Rules of

         civil Procedure 23(b)(2) and (3);

D.     An order appointing the named Plaintiffs as class representatives and their

         undersigned counsel as class counsel;

E.     Preliminary injunctive relief, including an order:

         a.   Enjoining Defendants from conducting sweeps, and taking other actions that
               cause the displacement, of homeless individuals during the COVID-19
               pandemic unless individual housing options are available for every member of
               the Plaintiff Class;
         b.   Enjoining Defendants from conducting sweeps of homeless individuals;
         c.   Enjoining Defendants from conducting sweeps of homeless individuals
               without notice;
         d.   Enjoining Defendants from summarily discarding Plaintiffs' personal
               property;
         e.   Enjoining Defendants from seizing Plaintiffs property without first allowing
               them an opportunity to be heard;
         f.   Enjoining Defendants Denver and Hancock from violating the *Lyall v. Denver*
               Settlement agreement;
         g.   Requiring Defendants provide restrooms, sanitation services (including trash
               services), and personal hygiene facilities (including handwashing stations) to
               Plaintiffs;

F.     Permanent injunctive relief, including an order:

         a.   Enjoining Defendants from conducting sweeps, and taking other actions that
               cause the displacement, of homeless individuals during the COVID-19

pandemic unless individual housing options are available for every member of the Plaintiff Class;

    b.   Enjoining Defendants from conducting sweeps of homeless individuals;

    c.   Enjoining Defendants from conducting sweeps of homeless individuals without notice;

    d.   Enjoining Defendants from summarily discarding Plaintiffs' personal property;

    e.   Enjoining Defendants from seizing Plaintiffs property without first allowing them an opportunity to be heard;

    f.   Enjoining Defendants Denver and Hancock from violating the *Lyall v. Denver* Settlement agreement;

    g.   Requiring Defendants provide restrooms, sanitation services (including trash services), and personal hygiene facilities (including handwashing stations) to Plaintiffs;

    h.   Enjoining enforcement of D.R.M.C. 38-86.2 and D.R.M.C. 49-246;

G.    Declaratory relief and other appropriate equitable relief;

H.    Economic losses on all claims as allowed by law;

I.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

J.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

K.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988 and C.R.S. § 13-21-131, including expert witness fees, on all claims allowed by law;

L.    Pre-and post-judgment interest at the lawful rate; and

M.    Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 5th day of October 2020.

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
David A. Lane
Darold W. Killmer
Andy McNulty
Reid Allison
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
dlane@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com
rallison@kln-law.com

COUNSEL FOR PLAINTIFFS