**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-2985-WJM-SKC

DENVER HOMELESS OUT LOUD, *et al*.

     Plaintiffs,

v.

DENVER, COLORADO, *et al.*

     Defendants.

---

## DENVER'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

---

The City and County of Denver ("Denver"), through its counsel, submits the following Response in opposition to Plaintiffs' Motion for Preliminary Injunction and Expedited Hearing [Doc. #47] ("Motion").

## INTRODUCTION

Denver is in the midst of a pandemic. The Denver Department of Health and Environment (DDPHE), its local public health authority, must be able to take the steps it deems necessary to protect <u>all</u> Denver residents, including people who are experiencing homelessness, from disease and other hazards. And it needs to be able to take all lawful actions it deems to be appropriate without interference. The Denver Revised Municipal Code (D.R.M.C.) § 24-16(1) authorizes DDPHE to "take all measures necessary to promote the health and cleanliness of the city and its inhabitants and visitors." Pursuant to this authority, and after seeking specific clarification from the Centers for Disease Control and Prevention (CDC) regarding encampments during COVID-

19, DDPHE ordered temporary area restrictions for encampment areas it determined had significantly and dangerously deteriorated to the point where a significant public health or safety risk required immediate attention and remediation—including at Lincoln Park and near Morey Middle School.

Ignoring DDPHE's authority and the important public health function it serves, Plaintiffs' Motion attacks Denver's response to encampments of people experiencing homelessness during the COVID-19 emergency because they—and their expert—disagree with DDPHE's weighing of the risks and decision-making. Under the guise of constitutional claims, they present their own selection of general studies and surveys and improperly ask the court to impose their opinions concerning what Denver should be doing with respect to encampments upon DDPHE. They repeatedly—and without factual basis—accuse Denver of disregarding "CDC guidance," when in fact the CDC confirmed to Denver in May that its nonbinding guidance was designed to give cities discretion to meet ever-changing local circumstances, and that "*if encampments are unsafe or unsanitary, then alternate options need to be considered.*" [Exhibit 2 to Exhibit A, Declaration of Danica Lee (emphasis added)]. Plaintiffs go so far as to characterize DDPHE's public health response as a mere pretext for violating their constitutional rights and a prior settlement agreement. This characterization is remarkable given the COVID-19 pandemic Denver is facing and everything the City has done ensure its citizens are protected from harm, including those experiencing homelessness. It also could not be further from the truth.

Plaintiffs claim they will be irreparably harmed unless the Court enjoins Denver from exercising its public health authority to remediate the significant public health, environmental and safety hazards that have been found to exist in areas of large encampments. On the contrary, it is

Denver and its residents who will suffer irreparable harm from the proposed injunction. If Denver is forced to stand idle in the face of encampments with substantially deteriorating conditions, the risk of harm to Denver's citizens, including people experiencing homelessness, will be irreparable. One only need to consider the conditions of Lincoln Park and Morey Middle School that precipitated DDPHE's decision to order temporary area restrictions to see the harm that could result if Denver is unable to take steps to remediate such conditions. Granting an injunction that limits the ability of Denver's public health experts to combat public health, environmental, and safety risks—especially during the COVID-19 pandemic—would constitute irreparable harm.

Turning a blind eye to all of this, Plaintiffs ask this Court to substitute their vision of public health for that of Denver's duly authorized officials. And they ask for an injunction to prevent any Denver agency from cleaning any encampment for any reason "*at least* until … the COVID-19 pandemic is over." [Doc. #47 at 4 (emphasis added).] The Court should refuse and instead recognize that courts must be "particularly mindful of the complex interaction between constantly evolving scientific understanding and policymaking" and that the decisions being made by DDPHE—especially during this pandemic—are entitled to deference. *See*, *e.g.*, *Denver Bible Church v. Azar*, No. 1:20-cv-02362, 2020 WL 6128994, at *1 (Oct. 15, 2020).

As discussed in detail below, the facts are not as Plaintiffs portray them. For each incident challenged by Plaintiffs' Motion, the City provided notice, attempted to connect people in the encampment with services—often multiple times—provided storage for personal property, and only disposed of trash, property that was determined to pose a public health or safety risk, or property that people in the encampment indicated could be thrown away. Denver diligently ensured that the *Lyall* settlement agreement's requirements were met during encumbrance

ordinance enforcement and that notice, property storage, and an attempt to connect people to services were also provided when DDPHE determined that a temporary area restriction was necessary. Denver—through DDPHE—has carefully and thoughtfully responded to the public health emergency created by COVID-19, balanced the needs of all residents, including those experiencing homelessness, and consistently met its obligations under the *Lyall* settlement agreement. For all these reasons, Plaintiffs' Motion, including the request for an expedited hearing on the Motion, should be denied.

## FACTS

1.      Since early March, when both the State and Denver declared a state of emergency due to COVID-19, DDPHE has issued multiple public health orders implementing measures to stop its spread. [Ex. A ¶ 4.] This includes considerations and exceptions for people experiencing homelessness, as well as more than twenty guidance documents and other resources to meet the needs of those in homelessness, with person-first and harm reduction focus. [*Id*. ¶¶ 4, 6.]

2.      DDPHE has consistently remained informed of CDC guidance to inform DDPHE's actions to COVID-19. [*Id.* ¶ 5.] On May 12, 2020, the DDPHE Director reached out directly to the CDC to determine whether additional guidance was being developed regarding encampments in light of the continued deterioration of public health, environmental, and safety conditions in Denver. [*Id.* ¶ 15.] In response, the CDC acknowledged that the it meant for local jurisdictions to approach encampments with the goal of protecting people to the best of their ability, depending upon the local context. [*Id*.] The CDC recognized that while clearing encampments or moving people along with no plan for where those people will go is not ideal, those options need to be considered when encampments are unsafe or unsanitary. [*Id.*] Unsafe and unsanitary encampments

have existed at various areas in Denver, requiring intervention to ensure all members of the public—including people experiencing homelessness—are not subjected to the harms caused by such conditions. [*Id.*]

3.      Following that CDC guidance, DDPHE has continued to actively engage with people living in encampments, monitored conditions, and, at the beginning of the pandemic, allowed people who were living in encampments to remain where they were with only sporadic municipal cleaning of the impacted areas. [*Id.* ¶ 5.] The encampments were only disturbed when DDPHE determined that conditions had deteriorated to the point where a significant public health, environmental or safety risk existed, and immediate attention and remediation was required. [*Id.*]

4.      DDPHE took numerous measures to help stop the spread of COVID-19 among people experiencing homelessness, including installing handwashing stations at multiple locations in the City and distributing over 800 personal care kits, which included hand sanitizer, water, and other resources. [*Id.* ¶ 8; *see also* Exhibit 1 to Ex. A (map of handwashing stations).] DDPHE officials visited shelters daily to ensure compliance with COVID-19 health orders and performed (and continue to perform) COVID-19 testing in shelters, which has shown that cases have remained very low from late June through the present. [Ex. A ¶¶ 10, 12.] While DDPHE was not able to offer testing of people in encampments (as the initial testing was needed for those staying in shelters), in the last two to three months the positivity rate of COVID testing for people experiencing homelessness has been significantly lower than that of the general population. [*Id.* ¶ 16.]

5.      DDPHE also played a crucial role in ensuring that protective action and respite rooms were available to those experiencing homelessness who were considered either to be at-risk

for the disease either because of existing risk factors or a positive test for COVID-19. DDPHE worked with partner agencies to establish COVID-19 procedures, including safety procedures for staff working at the protective action and respite rooms and worked with local hospitals and issued bulletins to ensure medical providers were aware of the process to refer people experiencing homelessness who tested positive for COVID-19 to the activated respite rooms. [*Id.*]

6.     Since the pandemic started, individuals living in Denver encampments have repeatedly failed to follow the public health orders designed to prevent the spread of COVID-19, including failing to wear masks, gathering in numbers greater than 10, and refusing to maintain social distancing—despite being advised on the need to social distance and being provided with masks. [Exhibit B, Declaration of Brian Conover, ¶¶ 2, 4.]

7.     On April 29, 2020, DDPHE recommended to DOTI that its enforcement of the encumbrance ordinance be modified to not disrupt people living in encampments to the extent possible. [Ex. A ¶ 13.] However, because of the clear threat that some situations might present to overall public health, environmental health, and public safety, the DDPHE Executive Director acknowledged that actions would be taken in areas when a significant public health or safety risk exists that requires immediate attention and remediation, including areas presenting large volumes of litter, pests, rodents, fire hazards, human and animal waste and other biohazards. [*Id.*] Since March, DDPHE has seen the conditions of encampments in various locations in Denver deteriorate to the point that intervention was needed through a DDPHE temporary area closure, a DOTI encumbrance enforcement, or both. [*Id*. ¶ 19.]

8.     Before that recommendation was issued, on April 21, 2020, DOTI, DDPHE, and other City agencies conferred regarding conditions in the area bounded by 22nd to 23rd and Welton

to Curtis Streets. [Exhibit C, Declaration of Charlotte Pitt, ¶ 4.] DOTI asked DDPHE to evaluate the conditions of a large encampment located in that area. [Ex. A ¶ 14.] DDPHE agreed that due to conditions including accumulation of litter, open food, and inadequately maintained port-o-lets provided by private sources, the area had deteriorated to the point that DOTI should proceed with an encumbrance enforcement to clean the area to protect the health of those in the encampment and others. [*Id*. ¶ 19.] On April 23, 2020, DOTI posted notice of a large-scale encumbrance removal to begin on April 30, 2020. [Ex. C ¶ 4.] On April 30, DOTI conducted a cleanup of the posted area, ultimately removing 9,500 pounds of waste, 206 pounds of propane, one 5-gallon container of gasoline, one 5-gallon container of kerosene, a gas torch, and 52 used hypodermic needles. [*Id.*] Three loads of personal property were stored. [*Id.*] People were asked to move with their possessions so that each area within the notice could be cleaned but were allowed to return after the crews finished. [*Id.*]

9.      DOTI and its contractor stored property on January 15, April 30, May 7, May 19, May 20, May 27, July 29, August 5, August 17, August 18, August 19, August 25, and August 26. [*Id*. ¶ 8.] DOTI has posted notices at least seven days in advance of every large-scale encumbrance removal since Denver entered into the *Lyall* settlement and has consistently followed its property-storage protocol (including frequently storing items longer than the required 60 days), in compliance with the settlement. [*Id.* ¶ 11.] When cleaning any area in Denver, DOTI follows its protocols for distinguishing trash from personal property and offering 60-day storage of personal property that does not pose a public health or safety risk. [*See id*. ¶¶ 3, 9.]

10.     In early June, DDPHE became aware of a growing encampment located around Stout and 21st Street and determined that the extent of fire hazards, trash accumulation, human

feces and urine, biohazards, and rotten food required immediate action. [Ex. A ¶ 21.] Significant outreach was provided to people in the encampment prior to the area being restricted and the week before the temporary area restriction was implemented, fliers were handed out to people in the encampment and posted on vacant tents and unattended property. [*Id.*; Exhibit D, Photo of Posting.] DDPHE gave advance notice of the temporary area restriction since people in the encampments were familiar with DOTI encumbrance enforcement cleanups and being allowed to return to the area immediately after it was cleaned. [*Id.*] People in the encampment had also been offered voluntary COVID testing on June 8. [Ex. A ¶ 21.]

11.     On June 17, the area was posted and temporarily restricted pursuant to DDPHE's authority under D.R.M.C. §§ 24-16 and 24-24. [Ex. A ¶ 21.] However, when City employees arrived to post the order, enforce the area restriction, and clean the area, a large number of people (at least 30–40) who were present—who did not appear to be part of the encampment—began to cross the yellow tape that had been posted, yelling at the workers, and screaming with cameras pointed in employees' faces. [*Id.* ¶¶ 21–22; Ex. C ¶ 6.] Due to this interference and resulting safety concerns, the employees left the area without enforcing the area restriction or cleaning the area and the public health, environmental and safety issues remained, placing people unnecessarily at risk. [Ex. C ¶ 6; Ex. A ¶ 22; Video Exhibits 1–5 to Exhibit E, conventionally submitted.]

12.     In July 2020, DDPHE observed deteriorating conditions at a growing encampment in Lincoln Park, a park in Denver owned by the State of Colorado. Denver Park Rangers assisting with park maintenance picked up between 40–100 used hypodermic needles per day; observed buckets of human waste acting as portable toilets; observed people shooting up heroin or smoking methamphetamine in plain view; and observed rats running within the park. [Ex. A ¶ 24; Exhibit

F, Declaration of Eliza Hunholz, ¶ 5.] There were other serious safety concerns in Lincoln Park as well, including one fatality and multiple gunshot incidents. [Ex. F ¶ 5.] On July 22, 2020, DDPHE employees conducted voluntary COVID-19 testing at the encampment and determined that there was a 2% positivity rate. [Ex. A ¶ 28.]

13.     Attempting to strike a reasonable balance between being sensitive and helpful to people in the park and the need to remediate the significant public health and safety risks, around July 27, Park Rangers, HOST employees, and other outreach workers began to advise campers that a temporary closure of the location was imminent and offer connection to services, storage, shelter, and transportation. Approximately 20 to 30 people voluntarily left the park after contact. [Ex. F ¶ 5; Ex. A ¶ 24; Exhibit G, Declaration of Chris Conner, ¶ 6.]

14.     On July 29, 2020, DDPHE issued a temporary area restriction for Lincoln Park, and posted the Order early that morning, which closed the park to all public access until further notice. [Ex. A ¶ 25; Exhibit H, July 29, 2020 Order.] DOTI responded to support the temporary area restriction to help clean up the park, provide voluntary storage of attended items and storage of unattended items that did not pose a public health or safety risk, and dispose of any items that did. [Ex. C ¶ 9.] DOTI stored approximately three bins of unattended possessions including tents, clothes, blankets and other personal items and stored about three bins and several loose items for three people. [*Id.*] The Denver Police Department Homeless Outreach Team (HOT) was present to notify people in the encampment that the Park had been closed and they needed to pack up and leave, to assist with connecting people experiencing homelessness in the park to services, including storage for any items they did not want to take with them, and to offer transportation to shelters. [Ex. A ¶ 26; Video Exhibits 6, 9, 10 to Ex. E.] Officers gave people in the encampment over four

hours to pack up their belongings or store them at no charge. [Ex. A ¶ 26.] Throughout the day, Park Rangers also offered to connect individuals in the area with services. [Ex. F ¶ 8.] Professionals from the Mental Health Center of Denver (MHCD) were also present to provide mental health support and connection to services when necessary. [Ex. A ¶ 26.]

15.     Human feces, blood, rats, and used hypodermic needles were found throughout the park, especially in tents. [Ex. A ¶ 27; Exhibit 6 to Ex. A (photos of conditions in the park); Ex. C ¶ 9; Video Exhibits 7, 11, 12 to Ex. E.] 9.66 tons of waste and over 1,500 used hypodermic needles were disposed of (filling a total of 11 five-gallon buckets). [Ex. C ¶ 9; Ex. A ¶ 27.] The rat infestation was so pervasive that it was estimated to be the worst rodent infestation in Denver's recent history. [Ex. A ¶ 27.]

16.     In July, DDPHE was also made aware of an encampment by Morey Middle School. [*Id.* ¶ 29.] On July 14, DDPHE tested 125 individuals in the Morey encampment with five of those tests returning positive (a 4% positivity rate) and the COVID–positive individuals were directed to temporary housing to reduce the possibility of transmission. [*Id.*] DDPHE observed conditions continue to deteriorate and pose significant public health, environmental and safety concerns to people in the encampment and the public, and received numerous complaints, including from the school principal. [*Id.* ¶ 30.]

17.     DDPHE's observations of Morey in early August confirmed that the deteriorating conditions of the encampment had continued. [*Id.* ¶ 30.] Adding to these concerns was the fact that teachers and students were scheduled to return for registration on August 6 & 7. [*Id.* ¶ 31.]

18.     Prior to ordering a temporary area restriction for this encampment, DDPHE again attempted to strike a reasonable balance between being sensitive and helpful to people in the

encampment who were experiencing homelessness and the need to close the area to remediate the conditions. [*Id.* ¶ 31.] This resulted in Denver Park Rangers, HOST outreach teams, and behavioral health teams being onsite at the Morey encampment to notify campers of the impending closure and offer services to the campers for more than a week. [*Id.* ¶ 32.]

19.     Following this outreach, on August 5, DDPHE issued and posted notice of a public health order closing the area surrounding Morey Middle School. [*Id.* ¶ 32; Ex. F ¶¶ 11–12.] DOTI supported the temporary area restriction to clean up the area, to provide voluntary storage of attended items and storage of unattended items that did not pose a public health or safety risk, and to dispose of any items that did. [Ex. C ¶ 10.] Throughout the day, more than 200 used hypodermic needles were collected, 10.87 tons of waste were removed, and the area was cleaned. [*Id.*; *see also* Exhibit 7 to Ex. A (photos of conditions in the encampment near Morey Middle School).] Additionally, 93 tents and structures were removed, stored, or relocated, and DOTI voluntarily stored items for 8 individuals—who collectively stored about 12 carts and 24 bags or items along with 2 carts of unattended possessions. The HOT officers and Park Rangers were present to assist campers with storage and connect them with services or transportation to shelters. [Ex. A ¶ 32; Ex. F ¶¶ 8–9; Video Exhibits 13, 14, 15 to Ex. E.] Those present (or who returned to the area) were given several hours to gather belongings and leave. [Ex. A ¶ 32.]

20.     There have also been multiple outbreaks of serious, contagious diseases that have affected individuals experiencing homelessness, which DDPHE has worked to combat. [*Id.* ¶¶ 3, 4, 11.] Since March, DDPHE has seen a trend of people diagnosed with Trench Fever, hepatitis A, and Shigellosis associated with living or spending time in encampments. [*Id.* ¶ 19.]

21.     Throughout the period relevant to Plaintiff's Motion, including the dates of all the incidents described above, there was sufficient capacity every night for every person who wanted overnight shelter through the various options within the City. [Ex. G ¶¶ 8–11.]

### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy that is granted only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018) (citation omitted). It is "drastic relief," and the "exception rather than the rule." *United States v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888–89 (10th Cir. 1989). "[T]he moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). While Plaintiffs attempt to invoke the sliding-scale rule that "where the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success requirement' is relaxed," [*see* Doc. #47 at 25], the Tenth Circuit has explicitly rejected that standard where, as here, "a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation, citations omitted).

Instead, Plaintiffs must make a heightened showing because they request a disfavored mandatory injunction. *See Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (a plaintiff must make a "strong showing" in order to obtain an injunction that "mandates action"). "[A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action

(rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* (citations omitted). Here, Plaintiffs seek an injunction with all three characteristics, but cannot carry their heavy burden.

## ARGUMENT

### A. Plaintiffs Cannot Establish a Substantial Likelihood of Success on the Merits of their Claims

1. Plaintiffs' Attempt to State a Due Process Claim Based upon Danger Creation Fails

Plaintiffs argue throughout their Motion that Denver violated their due process rights by not following CDC Guidelines on COVID-19. [Doc. #47 at 3; *id.* at 24, 27, 29, 31.] But CDC Guidelines do not set constitutional standards. *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) ("[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."); *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) ("[P]ublished requirements for health care do not create constitutional rights."). Accordingly, courts should not use such guidelines as the basis for a preliminary injunction. *See, e.g.*, *Swain v. Junior*, 958 F.3d 1081, 1087 (11th Cir. 2020) (staying preliminary injunction where CDC guidelines for COVID-19 in jails formed the basis of the district court's order); *Leader v. Cnty. of Sacramento*, No. 2:20-CV-1086-JAM-EFB P, 2020 WL 4796250, at *1 (E.D. Cal. Aug. 18, 2020) ("[F]ailure to follow CDC guidelines [related to COVID-19] does not, standing alone, amount to a constitutional violation."); *Roman v. Wolf*, No. 20-55436, 2020 WL 5683233, at *6 (9th Cir. Sept. 23, 2020) (finding in the prison context that CDC COVID-19 Guidelines "do not provide a workable standard for preliminary injunction" due to lack of specificity and the fact that guidelines should be adapted to individual facilities.) Plaintiffs maintain that "[o]ne other court in this Circuit has

13

held that deliberately CDC guidance [sic] is persuasive evidence of deliberate indifference," but that vastly overstates the holding in that case. [Doc. #47 at 29 n.63 (citing *Ferguson v. Bd. of Cnty. Comm'rs*, No. CV 11-1001 WPL/CG, 2013 WL 12334214, at *8 (D.N.M. Apr. 2, 2013)).] The *Ferguson* court simply cited to a CDC website that described a disease, without any discussion of the value of CDC Guidelines in establishing deliberate indifference.[1]

CDC Guidelines are instructive but not mandatory because public officials must be allowed the flexibility to address all circumstances and the discretion to react to public health emergencies as they unfold. Far from disregarding CDC Guidelines, Denver's response to the pandemic has been informed by them. DDPHE even consulted with the CDC to see if additional guidance was going to be provided regarding encampments and the CDC's response confirmed and emphasized the importance of a local jurisdiction's discretion:

> Local jurisdictions are meant to approach encampments *with the goal of protecting people to the best of their ability. What that might look like will depend on the local context*, including resource availability. Clearing encampments or moving people along with no plan for where those people will go is not ideal. However, *if encampments are unsafe or unsanitary, then alternate options need to be considered.* I know that this response does not offer a concrete solution. However, we know that these situations are complex and acknowledge the challenges of weighing the myriad issues to optimize public health.

[Ex. 2 to Ex. A (emphasis added).] This correspondence reveals as baseless Plaintiffs' allegations that Denver "contravened," "contradicted," or "was deliberately indifferent to" CDC Guidelines.

---

[1] Similarly, Plaintiffs cite *Mata v. Saiz*, 427 F.3d at 757 [Doc. #47 at 28], but that court explicitly acknowledged that "published requirements for health care do not create constitutional rights." Further, *Mays v. Dart*, 974 F.3d 810, 814, 823 (7th Cir. 2020), held that "the [lower] court failed to afford proper deference to the Sheriff's judgment in adopting policies necessary to ensure safety and security in the Jail because while recommendations of various groups "simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.'" (internal citations omitted).

Plaintiffs also devote a substantial portion of their Motion to the unremarkable proposition that COVID-19 is an unprecedented emergency, contending that people experiencing homelessness are particularly at risk. [Doc. #47 at 1–8; *id.* at Ex. 1 at 2–7.] Denver agrees that the pandemic is a novel and emergent situation, which is why Denver has put forth monumental efforts to ensure the health and safety of the public to the extent reasonably possible, balancing often-conflicting life-and-death interests in the face of this extraordinary crisis.

But Plaintiffs go further. Specifically, Plaintiffs' substantive due process claim hangs entirely on their insistence that, by displacing Plaintiffs to clean encampments, Denver increases their risk of exposure to COVID-19. [Doc. #47 at 9–12, 25–30.] This is wrong as a matter of fact and untenable as a legal theory.

First, DDPHE data indicates that none of the encumbrance removals or area restrictions increased the rate of COVID-19 infection among people experiencing homelessness or that individuals experiencing homelessness were at a greater risk of COVID exposure in the shelters than they were in the encampments. [Ex. A ¶ 34.] In Denver, the prevalence rate of COVID-19 in people experiencing homelessness—including those accessing the shelters—has been far lower than that of the general public. [*Id.* ¶ 16.] Moreover, contrary to the general claims by Plaintiffs' expert witness Maria Westbrook, Denver's health experts have learned through their experience that, with respect to encampments in Denver, it is <u>not</u> the "safest, most effective way to reduce risk for homeless individuals and the general public, during the COVID-19 pandemic to allow homeless individuals to reside in encampments for the duration of the pandemic." [*Id.* ¶ 18.]

Second, Plaintiffs' argument that Denver "knew the increased risk to homeless individuals that being in congregate shelters posed," is unsupported by the studies on which Plaintiffs rely.

15

[Doc. #47 at 29.] Setting aside the variations in sample size and date of testing between the two studies, nothing can be gleaned from them about the difference between COVID-19 in sleeping in shelters versus sleeping on the street because both studies tested individuals utilizing shelters. Plaintiffs' claim that "there was mounting evidence, in the form of prevalence testing, that encampments were objectively safer for homeless individuals" is entirely unsupported, and incorrect. But even if it were assumed to have merit, Plaintiffs do not, and cannot, rely on these studies to show that Denver *knew* that there was a greater risk to individuals in shelters to contract COVID-19 compared to those living outside. This is fatal to Plaintiffs' danger-creation theory.

Plaintiffs rely on the "danger creation" exception to the general rule that government actors may only be held liable for their own acts, not for injuries or conditions outside of their control, such as health crises like this pandemic. *See e.g.*, *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195–97 (1989) (failure to protect an individual against private violence does not constitute a constitutional violation). To succeed, Plaintiffs must make a strong showing that: (1) Denver created or increased Plaintiffs' vulnerability to the danger in question; (2) Plaintiffs are members of a limited and specifically definable group; (3) Denver's conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) Denver acted recklessly in conscious disregard of that risk;[2] and (6) the conduct, when viewed in total, shocks the conscience. *Ruiz v. McDonnell*, 299 F.3d 1173, 1182–83 (10th Cir. 2002) (citation omitted).

---

[2] Plaintiffs' formulation of the danger-creation standard as requiring merely "deliberate indifference" is incorrect. [Doc. #47 at 25, 28.] *See Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995).

Courts elsewhere have refused to recognize such danger-creation claims where a government temporarily or permanently moves homeless encampments housed on public property, unless the government's actions put individuals "in an inherently more dangerous situation than they had faced previously." *Cobine v. City of Eureka*, 250 F. Supp.3d 423, 433 (N.D. Cal. 2017); *Housing is a Human Right Orange Cnty. v. Cnty. of Orange*, No. SA CV 19-388 PA (JDEx), 2019 WL 6481311, at *12 (C.D. Cal. Aug. 12, 2019). There is no evidence that Denver's actions in temporarily or permanently requiring people experiencing homelessness to leave encampments unnecessarily increased their danger of exposure to COVID-19. [Ex. A ¶ 34.]

The Due Process clause does not protect against incorrect or ill-advised government decisions. *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1282 (10th Cir. 2003). Rather, the Constitution protects against "*deliberately* wrongful government decisions." *Id.* at 1281 (quoting *Uhlrig,* 64 F.3d at 573) (emphasis added). Plaintiffs cannot show that Denver, by cleaning and remediating significant public health risks while offering shelter space and COVID testing to those in the encampments, knowingly and deliberately placed Plaintiffs in a more dangerous situation than being in the encampment. Nor was Denver reckless as to prove recklessness, the "defendant [must] recognize the unreasonable risk and *actually intend* to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* (emphasis in original) (internal quotations and alterations omitted).

Finally, only exceptional circumstances will suffice to meet the "shocks the conscience" element of the danger creation theory—not mere negligence. *Ruiz*, 299 F.3d at 1183–84. "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *DeAnzona v. City & Cnty. of Denver,* 222 F.3d 1229, 1235 (10th Cir. 2000).

Before finding its conscience to be shocked, a court must consider three factors: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." *Eckert v. Town of Silverthorne*, 25 F. App'x 679, 689 (10th Cir. 2001) (quotation omitted). "These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances." *Id.* Furthermore, the inquiry should be informed by whether the public officials faced an emergency situation. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850–54 (1998).

Denver's actions in cleaning up encampments and offering services are anything but outrageous. In a recent similar case, the plaintiffs' motion for preliminary injunction was denied because they did not persuade "the Court that they are likely to succeed on a claim that [dangerous and subpar homeless shelter] conditions are so pervasive and severe that Defendants' decision to dissolve the encampments and encourage Plaintiffs to accept available beds in City shelters 'shocks the conscience' and leads to 'foreseeable and fairly direct' harm, as required to succeed on a state-created danger claim." *Murray v. City of Philadelphia*, No. CV 20-04018, 2020 WL 5006046, at *8 (E.D. Pa. Aug. 25, 2020).

Plaintiffs rely on *La All. for Human Rights v. City of Los Angeles*, No. LACV2002291DOCKES, 2020 WL 2615741 (C.D. Cal. May 22, 2020), *vacated*, 2020 WL 3421782 (C.D. Cal. June 18, 2020). [Doc. #47 at 30.] But the court's holding that "*by failing to provide adequate shelter or alternative housing options*, the City and County of Los Angeles have essentially forced individuals experiencing homelessness to camp in these dangerously polluted locations" is easily distinguishable. 2020 WL 3421782 at *4 (emphasis added). Here, adequate shelter options are available, and Plaintiffs do not contend they are "forced" to live in

encampments. On the contrary, they specifically maintain that the encampments are preferable to the shelter spaces offered to them. [Doc. #47 at Ex. 1 at 16.] For all these reasons, Plaintiffs are not likely to succeed on their danger creation claim.

2.      Plaintiffs are not likely to prevail on their Fourth or Fourteenth Amendment Claims

Plaintiffs generally allege that unidentified Defendants seized and destroyed their personal property over the past several months. However, the only specific example given in the Motion is from Nathaniel Warner and is wholly anecdotal in nature and not supported by declaration or affidavit.[3] [Doc. #47 at 27–29].

Because reasonableness is the "ultimate touchstone of the Fourth Amendment," to succeed on this claim Plaintiffs will have to prove that Denver acted unreasonably in handling Plaintiffs' property. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). If Plaintiffs can prove that any property was destroyed, they must also prove that the destruction was unreasonable under the circumstances. *United States v. Jacobsen*, 466 U.S. 109, 125 (1984). This reasonableness determination requires that the "nature and quality of the intrusion on the individual's Fourth Amendment interests" be weighed "against the importance of the governmental interests alleged to justify the intrusion." *Id.*

There is no Fourth Amendment protection for trash or garbage located in a public area. *United States v. Long*, 176 F.3d 1304, 1308–09 (10th Cir. 1999). An individual has no right to trespass on public lands or to store personal property on public lands. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994). To find a Fourth Amendment violation here, the Court must

---

[3] In her Declaration, Terese Howard states that she "personally know[s]" Mr. Warner, but gives no facts supporting the allegations of property loss. [Doc. #47 at Ex. 4 at 12.]

determine that the intrusion into any possessory interest the Plaintiffs may have had in their private property located on public land outweighed the government interest in public health and ensuring the cleanliness, sanitation, and security of the encampment areas.

DOTI and its contractor only disposed of trash and items determined to pose a public health or safety risk. [*See* Ex. C ¶¶ 3–4, 9–10; Ex. 6 to Ex. A; Ex. 7 to Ex. A; Video Exhibits 7, 11, 12 to Ex. E.] Contrary to Ms. Howards' claims, all unattended nonhazardous personal property was stored. [*See* Ex. C ¶¶ 3–4, 8–10]. Trash and hazardous items were disposed of. [*See id.* ¶¶ 3–4, 9–10; Ex. A ¶ 27; Ex. 6 to Ex. A; Ex. 7 to Ex. A; Video Exhibits 7, 11, 12 to Ex. E.] In both the Lincoln Park and Morey Middle School temporary area restriction actions, DOTI found extensive numbers of used hypodermic needles and some human waste inside of tents. [*See* Ex. C ¶¶ 9–10; Ex. A ¶ 27; Ex. 6 to Ex. A; Ex. 7 to Ex. A; Video Exhibits 7, 11, 12 to Ex. E.] Tents or other property containing hazardous waste was disposed of, under DOTI's normal procedures, to ensure the safety of DOTI employees and contractors. [*See, e.g.*, Ex. C ¶¶ 3–4.] This does not offend the Constitution: when, as here, property "becomes contaminated when it is comingled with items that are contaminated or hazardous" on public land, it may be disposed of without violating the Fourth Amendment. *Peery v. City of Miami*, 977 F.3d 1061, 1061 (11th Cir. 2020).

Plaintiffs' Fourth Amendment and Fourteenth Amendment procedural due process claims are closely intertwined. Without an unreasonable seizure under the Fourth Amendment, there can be no due process violation under the Fourteenth Amendment. *See Santana v. City of Tulsa,* 359 F.3d 1241, 1245 (10th Cir. 2004). Accordingly, unless Plaintiffs can show that Denver's actions were unreasonable under Fourth Amendment analysis (they cannot), this Court need not address the Fourteenth Amendment allegations.

As to the procedural due process allegations related to the alleged seizure and destruction of certain property, this Court must address two factors: first, whether the individual possessed a protected interest to which due process applies, and second, whether the individual was afforded the appropriate process. *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). For purposes of this Motion only, Denver does not challenge Plaintiffs' asserted interest in their personal property, other than trash and hazardous materials, located at unauthorized homeless encampments. However, Denver strongly contests that there were insufficient procedures in place to protect the Plaintiffs' property interests.

To determine the process due, courts weigh three factors: the private interest affected; the risk of an erroneous deprivation and the value of any additional safeguards; and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Alternately, a court can employ the "straightforward test of reasonableness under the circumstances." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). Importantly, the Tenth Circuit has emphasized that this analysis "is flexible and calls for such procedural protections as the particular situation demands." *Ward v. Anderson*, 494 F.3d 929, 935 (10th Cir. 2007) (quotations omitted, citing cases). Furthermore, it is well settled that a "state may cure a procedural deprivation by providing a later procedural remedy." *McKinney v. Pate,* 20 F.3d 1550, 1557 (11th Cir. 1994). And "[i]f adequate state remedies were available, but the plaintiff failed to take advantage of them, the plaintiff cannot rely on the failure to claim that the state deprived him of procedural due process." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000); *Edmundson v. City of Tulsa*, 152 F. App'x 694, 697 (10th Cir. 2005).

At Lincoln Park and Morey Middle School, Park Rangers conducted outreach at the locations prior to the DDPHE area restrictions, handed out literature, warned of the impending

area restriction and need to move, and attempted to connect the campers with services, including shelter. [Ex. F ¶¶ 6–10.] Notice of the Orders for the area restrictions were posted and individuals were informed that they needed to leave. [*See id.*; Ex. A ¶ 26, 32–33.] No one was rushed or intentionally denied re-entry to the area to collect personal belongings. [*See* Ex. A ¶¶ 26, 33; *see also, e.g*, Video Exhibits 6, 9, 13, 14 to Ex. E.] All non-hazardous unattended personal belongings were stored. [*See* Ex. C ¶¶ 3, 9–10]. To the extent that any non-hazardous personal items were inadvertently disposed of, Denver has a claims procedure in place whereby the property owners can file an on-line claim for reimbursement with the City of Denver.[4] Accordingly, Plaintiffs do not have a reasonable likelihood of success on their Fourth or Fourteenth Amendment claims.

   3.   <u>Plaintiffs are not likely to succeed on their municipal liability claims</u>

Plaintiffs also cannot make the required strong showing that they are likely to succeed on their municipal liability claims. First, they are unable to show a violation of their constitutional rights. *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (a municipality may not be held liable when there is no underlying constitutional violation by any of its officers). Second, Plaintiffs' claims that Denver's final policymakers—Defendants Mayor Hancock, Executive Director of DDPHE Bob McDonald, and Executive Director of Safety Murphy Robinson—acted unconstitutionally or ratified unconstitutional conduct and that Denver has unconstitutional practices and customs of "sweeping" homeless individuals and seizing their property without notice or storage, [Doc. #47 at 39–40], are blatantly contradicted by the video and photographic evidence Denver has submitted with this Motion. To the extent any remaining factual issues exist,

---

[4] *https://www.denvergov.org/content/denvergov/en/city-attorneys-office/file-a-claim.html*

their resolution is more properly reserved for trial. *See Royal Crown Bottling Co. v. Royal Crown Cola Co.*, 358 F. Supp. 290, 297 (D. Colo. 1972)

> 5.   Plaintiffs are not likely to succeed on their breach of settlement claim

The *Lyall* settlement agreement is a creature of state contract law. The parties did not bargain for continued jurisdiction or enforcement by federal courts. Nevertheless, Plaintiffs ask this Court to "[e]njoin Defendants from violating the terms of the *Lyall v. Denver* settlement agreement." The Court should refuse to endorse this jurisdictional sleight-of-hand.

Where, as here, a "suit involves a claim for breach of a contract, part of the consideration for which was dismissal of an earlier federal suit," as a general rule "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994); *Morris v. City of Hobart*, 39 F.3d 1105, 1110–11 (10th Cir. 1994) ("[A]ncillary jurisdiction is unavailable to enforce a settlement agreement; there must be an independent basis for federal jurisdiction.").

Plaintiffs attempt to circumvent this rule with a circular chain of reasoning. First, they assert that they and their entire purported class are beneficiaries of the *Lyall* settlement agreement.[5] [Doc. #47 at 37.] Next, they claim that the settlement agreement created a new property interest by "provid[ing] Plaintiffs with substantive rights." [*Id.*] Finally, echoing their separate Fourteenth Amendment claim, they allege that Denver violated this property interest "without providing Plaintiffs without [*sic*] notice or an opportunity to be heard." [*Id.*]

---

[5] Plaintiffs state without support that "as class members of the *Lyall v. Denver* case, [they] had a contract with Defendants," and that "in performance of the contract, Plaintiffs dismissed their claims in the *Lyall v. Denver* case." [Doc. #47 at 37.] But none of the individual plaintiffs here were plaintiffs in *Lyall*, nor could have taken any action to perform under the settlement. Plaintiffs do not even offer facts showing they were part of the *Lyall* class at the time of settlement.

Even assuming *arguendo* that these Plaintiffs have standing to enforce the *Lyall* settlement, their logic fails at the second step. The settlement agreement created no new substantive rights. Rather, the agreement provided specific *procedures* to protect the Fourth and Fourteenth Amendment rights asserted by the *Lyall* plaintiffs. Even Plaintiffs' cited cases make clear that this is not enough: "it is well established that an entitlement to nothing but procedure cannot be the basis for a property interest." *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006) (quotations, citations omitted).

Put another way, the settlement agreement neither created nor guaranteed any "definite liberty or property interest" beyond what is already contained in the Fourth and Fourteenth Amendments. *S. Disposal, Inc. v. Texas Waste Mgmt.*, 161 F.3d 1259, 1265 (10th Cir. 1998) (quotations, citations omitted). Violation of the settlement could support a state-law breach of contract claim—but not a distinct constitutional claim, or any other independent basis for federal jurisdiction. Accordingly, Plaintiffs are left with only this Court's supplemental jurisdiction (an argument absent from their Motion). *But see* [Doc. #1 ¶ 12 (invoking 28 U.S.C. § 1367).] The Court has supplemental jurisdiction over the breach-of-contract claim only to the extent that it is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy...." *See* 28 U.S.C. § 1367(a). "A claim is part of the same case or controversy if it 'derive[s] from a common nucleus of operative fact.'" *Price v. Wolford*, 608 F.3d 698, 702–03 (10th Cir. 2010) (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997)).

Here the very "nucleus of operative fact" upon which Plaintiffs rely also establishes the futility of their contract claim. The only operative facts that Plaintiffs allege are that Denver "did

not provide seven-days [*sic*] notice prior to the sweeps at least at Lincoln Park and the South Platte River" and that "[t]here was no public health and safety risk that necessitated conducting a sweep without notice." [Doc. #1 ¶ 581.] But the settlement agreement itself gives Denver absolute discretion to make that determination: "The City may conduct large-scale cleanups with less than seven days' notice only if *the City determines* that a public health or safety risk exists which requires it." [Doc. #47 at Ex. 2 at 15 (emphasis added).] Plaintiffs' own allegations establish no breach of the agreement and they are unlikely to succeed on the merits of their contract claim.

Most importantly, the equitable relief Plaintiffs seek would itself breach the *Lyall* settlement. Plaintiffs agreed there that Denver would continue its policy of large-scale encumbrance cleanups, subject to certain procedures. Here, they ask the Court to completely "[e]njoin Defendants from conducting sweeps [*sic*]" at all. [Doc. #47 at 3.] Plaintiffs agreed in the settlement that the 7-day notice requirement could be shortened or even eliminated when Denver determined that it was necessary for the public health. Now they ask this Court to wipe away that discretion and "[e]njoin Defendants from conducting sweeps without at least seven-days written notice" in all circumstances, without exception. The parties never bargained to have Plaintiffs determine public health policy for Denver, nor are Plaintiffs entitled to such relief in the guise of enforcing the settlement. Plaintiffs' requested relief would nullify the *Lyall* settlement, not preserve it.[6]

---

[6] To the extent Plaintiffs' request for relief may be construed as an injunction for specific performance of the settlement agreement, Denver notes that under Colorado law, "courts in this jurisdiction lack the authority to compel the exercise of core governmental powers that rest within the discretion of a coordinate branch of government, regardless of binding contractual obligations to do so." *Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 745 (Colo. 2007).

**B.      Plaintiffs cannot show a likelihood of irreparable harm**

Not only have Plaintiffs not demonstrated that they will suffer a likelihood of irreparable harm if the preliminary injunction is not granted, but if Denver's health experts are prohibited from making decisions related to encampments during the COVID-19 pandemic, all of Denver's residents, including people experiencing homelessness, will be placed at grave risk. Among the preliminary injunction elements, courts have consistently held that "a showing of probable irreparable harm is the single most important prerequisite." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). To satisfy the irreparable harm element, Plaintiffs must "show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman*, 348 F.3d at 1189 (emphasis in original) (internal quotation marks omitted). "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003). It is important to note that the question is not whether COVID-19 poses a risk of harm, but whether Plaintiffs have shown that they will suffer irreparable harm that they would not otherwise suffer absent an injunction. *See, e.g.*, *Swain*, 958 F.3d at 1090–91.

Plaintiffs glancingly rely on "the constitutional-violation-as-irreparable-injury principle," *Free the Nipple*, 916 F.3d at 806, to collapse this analysis into the likelihood-of-success determination. [Doc. #47 at 41.] This argument fails because they cannot show that they are likely to succeed on their constitutional claims. *See supra*.

Plaintiffs also maintain "that risk of contracting COVID-19 constitutes irreparable harm" and that their requested relief "would require Defendants to cease taking actions that increase

spread of COVID[-]19." [Doc. #47 at 41.] But Plaintiffs cannot establish that their requested injunction will prevent, rather than cause, irreparable harm. Namely, they have not shown, and cannot show, that an order forbidding Denver from clearing and cleaning homeless encampments during the COVID-19 pandemic will somehow reduce health risks to those experiencing homelessness—or the public in general. To the contrary, common sense dictates the opposite. Tying Denver's hands and preventing Denver's health experts from making decisions to combat the spread of disease and the deterioration of public health, environmental and safety conditions would constitute irreparable harm—especially when Denver is facing a pandemic with constantly evolving scientific understanding and policymaking. *See, e.g.*, *Swain*, 958 F.3d at 1090 (irreparable harm to government exists when, in detention facility setting, an "injunction hamstrings [] officials with years of experience …, and the elected officials they report to, from acting with dispatch to respond to this unprecedented pandemic. They cannot respond to the rapidly evolving circumstances on the ground without first seeking 'a permission slip from the district court.' … Such a prohibition amounts to an irreparable harm." (internal citations and alterations omitted)); *Azar*, 2020 WL 6128994, at *1 (Oct. 15, 2020).

Furthermore, Plaintiffs' argument focuses almost entirely on the risks posed by the COVID-19 pandemic and ignores the many, many other public health, environmental, and safety risks present at the homeless encampments in Denver. Specifically, Plaintiffs overlook the very significant health risks caused by discarding used sharps onto the ground, infestations of rats and other pests, human waste, rotting food, propane tanks and other fire hazards, and the like. Further, even if the focus remains exclusively on COVID-19, ignoring all other public health, safety, and environmental concerns of these encampments, Plaintiffs' evidence (as discussed above) is

insufficient to establish that that they are more vulnerable to COVID-19 in indoor shelter space, where officials test for and implement specific precautions to stop the spread of COVID, than in the unauthorized camp sites where no similar services are offered and social distancing and mask wearing cannot be enforced. Finally, they offer no support for their highly unlikely assertion that an injunction would result in "stopping the spread of COVID-19." [Doc. #47 at 41.] Simply put, Plaintiffs cannot establish that the element of irreparable harm weighs in their favor.

## C.    The Balance of Harms and the Public Interest Weigh in Denver's Favor

Plaintiffs must also make a strong showing that the balance of harms tips in their favor. *Free the Nipple*, 916 F.3d at 806. When balancing both parties' harms, the court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (2008) (quotation omitted). When the government is the target of the injunction, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, there can be no doubt that the public interest strongly disfavors an injunction. The right of local governmental officials to make necessary decisions to protect against unsafe and unsanitary conditions that may harm all residents, including those experiencing homelessness, necessarily outweighs Plaintiffs' desire to remain in such an encampment. Any alleged infringement on Plaintiffs' constitutional rights purportedly created by Denver's carefully-weighed decisions to clear certain encampment areas so that areas may be cleaned and, in many cases, remediated, is marginal when compared with the harm that could result to everyone by allowing such conditions to continue.

Further, while COVID-19 may not be the only consideration here, it cannot be disputed that Denver also has a compelling interest in ensuring that it is readily able to take measures that

it needs to be able to take to handle the pandemic, including addressing unsafe and unsanitary conditions resulting from the encampments. The harm to the public interest in this case is very high considering the life-and-death consequences of any injunction, while the harm to Plaintiffs from requiring them to move out of encampment areas which pose significant public health and safety risks is far less. DDPHE has carefully balanced the risks and the public has a strong interest in ensuring that DDPHE is granted the deference it is entitled to so that it may make difficult decisions regarding how to best protect the public health, environment and safety of everyone during this unprecedented health crisis. They, and only they, are equipped with the necessary skills, resources, and authority to navigate this ongoing health crisis. Accordingly, the balance of the harms and the public interest strongly weigh in Denver's favor.

**D.      The Court Should Deny Plaintiff's Request for Expedited Hearing**

Plaintiffs have also requested an evidentiary hearing. The decision to hold such a hearing is within the sound discretion of the Court. *Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. 1998) (unpublished table decision). The Court may hold a hearing to determine facts material to the preliminary-injunction analysis but need not decide the merits of the case and "is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Royal Crown Bottling Co.*, 358 F. Supp. at 295 (quoting *Dymo Indus. v. Tapeprinters, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)). A court may also deny an injunction where there are significant disputes of fact more properly determined at a full merits trial. *Id.* at 297 ("There are disputed factual issues and the Court is not bound to decide said issues on motion for preliminary injunction."); *Paradise Distrib., Inc. v. Evansville Brewing Co.*, 906 F. Supp. 619, 624 n.5 (N.D. Okla. 1995) ("[T]he record suggests numerous disputes of fact which

would require resolution before success on the merits could be determined."). In sum, "courts in the Tenth Circuit have declined to hold evidentiary hearings when there are no disputed material facts or where a plaintiff cannot supply sufficient evidence to justify granting the preliminary injunction." *Nellson v. Barnhart*, No. 20-CV-00756-PAB, 2020 WL 3000961, at *5 (D. Colo. June 4, 2020) (citations omitted).

Here, Plaintiffs' Motion primarily challenges DDPHE's authority to act with respect to encampments and, for this reason alone, no hearing should be granted, and the Motion should be denied. *See Edwards v. California*, 314 U.S. 160, 173 (1941) (judiciary should not second-guess the "wisdom, need, or appropriateness" of the measures taken by a state to protect the health of its people); *Jacobson v. Massachusetts*, 197 U.S. 11, 28, 30–35 (1905) ("It is no part of the function of a court ... to determine [what is] likely to be the most effective for the protection of the public against disease."). There has been no indication that DDPHE's actions exceed the confines of the Constitution and, when examined, Plaintiffs' remaining allegations of constitutional violations are really complaints that Denver's conduct violates the *Lyall* settlement agreement. As such, Plaintiffs have failed to justify the need for a hearing or preliminary injunction.

**WHEREFORE**, for all these reasons, Plaintiffs cannot meet their burden of showing their entitlement to a preliminary injunction and their Motion should be denied.

Respectfully submitted this 6th day of November 2020.

_s/ Wendy Shea_
Wendy J. Shea, Assistant City Attorney
Conor D. Farley, Assistant City Attorney
Michele A. Horn, Assistant City Attorney
Denver City Attorney's Office; Civil Litigation Section
201 W. Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3190
wendy.shea@denvergov.org
conor.farley@denvergov.org
michele.horn@denvergov.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of November 2020, I electronically filed the foregoing **DENVER'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

David A. Lane
Darold W. Killmer
Andy McNulty
Reid Allison
dlane@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com
rallison@kln-law.com

Kathleen Spalding
Stephanie Lindquist Scoville
Emely Garcia
kit.spalding@coag.gov
stephanie.scoville@coag.gov
emely.garcia@coag.gov

_s/ Wendy Shea_
Denver City Attorney's Office