# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA CRUZ HOMELESS UNION, et al., Plaintiffs, v. MARTIN BERNAL, et al., Defendants. | Case No. 20-cv-09425-SVK **ORDER GRANTING PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND DIRECTING THE PARTIES TO FILE A STATUS REPORT ON MARCH 9, 2021** Re: Dkt. Nos. 1, 5, 12-15, 17, 19, 23 |

Plaintiffs Santa Cruz Homeless Union, Santa Cruz Food Not Bombs, Alicia Avalos ("Avalos"), Hannah Hegel ("Hegel"), Chris Ingersoll ("Ingersoll"), and Randolph Tolley ("Tolley") (collectively, "Plaintiffs") bring this Ex Parte Application for Emergency Temporary Restraining Order and Preliminary Injunction against Defendants Santa Cruz City Manager Martin Bernal ("Bernal"), Director of Parks & Recreation Tony Elliot ("Elliot"), Chief of Police for the City of Santa Cruz Andrew Mills ("Mills"), and the City of Santa Cruz ("City") (collectively, "Defendants"). Dkt. 1.

The Court granted Plaintiffs' temporary restraining order application on December 30, 2020. Dkt. 5. On January 6, 2021, the Court held a preliminary injunction hearing and, to allow time to evaluate the Parties' arguments, the Court extended the temporary restraining order to January 13, 2021. Dkt. 11; Dkt. 12. On January 11, 2021, Defendants filed an administrative motion to submit additional evidence. Dkt. 13. The Court granted this request, provided Plaintiffs an opportunity to respond to the new evidence, and extended the temporary restraining order to January 20, 2021. Dkt. 14.

As reasoned below, the City's Executive Order No. 2020-24 ("Executive Order") directing

1  the closure of San Lorenzo Park and the Benchlands at a time when the COVID-19 pandemic is
2  surging and the City's homeless shelters are full, would leave the homeless persons camping in
3  those locales more vulnerable to COVID-19 than if they were allowed to remain in the
4  encampments. Accordingly, the Court **GRANTS** the motion for preliminary injunction.
5  **However**, the keystone of the preliminary injunction is the current dire state of the COVID-19
6  pandemic. As vaccines roll out and the pandemic eases, dispersal of homeless persons from the
7  encampments may no longer put them at greater risk for COVID-19, and re-evaluation of the
8  injunction will be necessary. As it is possible, indeed highly desirable, that the pandemic eases
9  more quickly than this case proceeds to trial for injunctive relief, the Court directs the Parties to
10 keep a watchful eye on the situation and to submit periodic status reports to the Court as directed
11 below.

## I. BACKGROUND

The Court takes judicial notice of the nearly year long public health emergency due to COVID-19.[1] On December 3, 2020, the California Department of Public Health issued a "Regional Stay at Home Order" stating "all individuals living in the Region shall stay at home or at their place of residence" when intensive care unit capacity falls below 15%. Dkt. 1 ¶ 2, Exhibit ("Ex.") A. On December 16, 2020, the Health Services Agency of the County of Santa Cruz issued a press release stating that the Regional Stay-at-Home Order would commence on December 17, 2020. Dkt. 1 ¶ 3, Ex. B. Recently, Santa Cruz County has seen "the largest number [of new COVID cases] to be recorded in Santa Cruz since the pandemic began" and "[t]he absolute number of positive tests has also increased significantly, by about 25% since before Christmas." Dkt. 23, Exs. A, B.

The individual homeless Plaintiffs Avalos, Hegel, Ingersoll, and Tolley have been residing in the San Lorenzo Park and the Benchlands encampment ("Encampment") in Santa Cruz, California for the last several months. Dkt. 1 ¶¶ 15-18. The Encampment has grown to close to

---

[1] U.S. DEPT. OF HEALTH & HUMAN SERVICES, Determination that a Public Health Emergency Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx; Cal. Exec. Order N-33-20 (Mar. 19, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

1  200 homeless persons over the last six months. *Id.* at ¶ 1. Plaintiffs argue that the residents of the Encampment are fed and provided with survival services and items at that locale and will face separation from vital services if the City is allowed to carry out the Executive Order. *Id.* Plaintiffs support this assertion with declarations from Santa Cruz residents and homeless advocates, which are discussed in detail in Section III.A.2.b. below. Dkt. 7 Declaration of Alicia Kuhl ("Kuhl Decl.") ¶ 1; Dkt. 7 Declaration of Arista Bauer ("Bauer Decl.") ¶ 2; Dkt. 7 Declaration of Joy Schendlecker ("Schendlecker Decl.") ¶ 2; Dkt. 7 Declaration of Katayun Salehi ("Salehi Decl.") ¶ 2; Dkt. 7 Declaration of Reggie Meisler ("Meisler Decl.") ¶ 3.

The City has allowed San Lorenzo Park to be used for encampments during the past 9 months of the COVID-19 pandemic. Dkt. 9 at 7, 9; Dkt. 9-8 Declaration of Lee Butler ("Butler Decl.") ¶ 9.[2] More particularly, in April 2020, the City and County of Santa Cruz[3] ("County") attempted to implement a "socially distant" encampment layout "in deference to the CDC guidance on encampments," and the City provided trash services and hygiene resources to the Encampment residents.[4] Dkt. 9 at 10; Butler Decl. ¶ 10. In July 2020, the City and County worked together to establish a managed camp at the Benchlands. Dkt. 9 at 11; Butler Decl. ¶ 10. The City has continued to provide trash service and hygiene resources to the Encampment residents, and at the hearing, defense counsel represented that the City continues to manage the trash on a daily basis. Dkt. 9 at 11; Butler Decl. ¶ 11. In addition to its efforts at the Encampment, the City has partnered with the County to add shelter capacity in the City at Veterans' Hall, the Golflands, the Pavilion, and several motels. Dkt. 9 at 8. Despite these efforts, shelters for homeless persons in the City and County of Santa Cruz are currently full. Dkt. 9 at 8,

---

[2] The evidence indicates that San Lorenzo Park and the Benchlands were the site of homeless encampments prior to the onset of the COVID pandemic as well. Dkt. 9 at 10; Dkt. 10 Declaration of Tony Elliot ("Elliot Decl.") ¶ 6.

[3] The County of Santa Cruz is not a defendant in this action. Defendants proffer that it is the County that receives significant funding to provide housing or other services to persons experiencing homelessness and operates all of the shelters within City limits. Dkt. 9 at 9; Dkt. 9-5 Declaration of Martin Bernal ("Bernal Decl.") ¶ 7; Dkt. 9-8 Declaration of Lee Butler ("Butler Decl.") ¶ 13.

[4] On its own motion, the Court takes judicial notice of Executive Order No. 2020-07, available online at https://www.cityofsantacruz.com/Home/ShowDocument?id=80108, because its contents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), (c)(1).

| | |
|---|---|
| 1 | 13; Dkt. 9-8 Butler Decl. ¶ 13. |
| 2 | On or around December 17, 2020, the City issued the Executive Order, which is the |
| 3 | catalyst for this action. Dkt. 1 ¶ 4, Ex. C; Dkt. 9 at 12; Dkt. 9-5 Declaration of Martin Bernal |
| 4 | ("Bernal Decl.") ¶ 12. Pursuant to the Executive Order, Defendants Bernal and Elliot authorized |
| 5 | and ordered the temporary closure of the San Lorenzo Park and the Benchlands, which would "be |
| 6 | accomplished in phases, with the goal of temporarily closing the entire park by January 6, 2021." |
| 7 | Dkt. 1, Ex. C. Further, "[t]he closure period will end on January 31, 2021, unless an extension of |
| 8 | the closure is authorized."[5] *Id.* The Executive Order notes that "[i]n recent weeks, the conditions |
| 9 | at San Lorenzo Park have deteriorated to the extent that we feel that a temporary park closure is |
| 10 | the City's best and only realistic option." *Id.* Conditions noted in the Executive Order include |
| 11 | vandalism, fire safety, criminal activity, tree damage, trash, and a lack of social-distancing or |
| 12 | wearing of masks. *Id.* The Executive Order further states that the City had "recently paid over |
| 13 | $140,000 to clean and start the rehabilitation process of areas within the Pogonip" and that |
| 14 | "[e]specially during this time of significant budgetary constraints, we have a duty to preserve the |
| 15 | park grounds and facilities and to prevent exorbitant rehabilitation expenses from becoming |
| 16 | necessary at San Lorenzo Park." *Id.* In response to Plaintiffs' motion, the City has provided |
| 17 | evidence of significant hazards at the Encampment relating to health, safety, fire, and property, all |
| 18 | against the backdrop of severe fiscal financial limitations brought on by the COVID-19 pandemic. |
| 19 | The City's proffer is supported by multiple declarations and is discussed in further detail in |
| 20 | Section III.C. On December 21, 2020, the City executed the first phase of the Executive Order, |
| 21 | vacating the areas around the playground in San Lorenzo Park. Dkt. 9 at 12; Dkt. 9-7 Declaration |
| 22 | of Andrew Mills ("Mills Decl.") ¶ 15. While the second phase was scheduled to occur on |
| 23 | December 28, 2020, the City paused its efforts after large and vocal community protests. Dkt. 9 at |
| 24 | 12; Mills Decl. ¶ 16. |
| 25 | It is against this backdrop that, as noted above, on December 30, 2020, Plaintiffs filed the |

---

[5] The Executive Order describes the closure of the Encampment as "temporary." The City does not argue, and under the facts presented the Court would not agree, that the use of the word "temporary" mitigates the impact of the Executive Order on the Encampment's homeless population. Accordingly, the word does not factor into the Court's analysis.

4

1  Ex Parte Application for Emergency Temporary Restraining Order and Preliminary Injunction,

2  which this Court granted. Dkt. 1; Dkt. 5. Having received multiple rounds of evidence from the

3  Parties and having held a hearing, the Court now rules on the motion for preliminary injunction.

4  **II.    LEGAL STANDARD: PRELIMINARY INJUNCTION**

5  The substantive standard for issuing a temporary restraining order is identical to the

6  standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush

7  & Co. Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "To obtain a preliminary injunction, the

8  moving party 'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer

9  irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor;

10 and (4) an injunction is in the public interest.'" *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039,

11 1046 (9th Cir. 2015) (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir.

12 2014)). The Ninth Circuit has adopted a "sliding-scale approach" such that "serious questions

13 going to the merits and a balance of hardships that tips sharply towards the plaintiff can support

14 issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

15 irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v.

16 Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted). A temporary

17 restraining order or preliminary injunction is a matter of equitable discretion and is "an

18 extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

19 to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365,

20 172 L. Ed. 2d 249 (2008); *Earth Island Institute v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).

21 **III.   DISCUSSION**

22 **A.    Likelihood of Success on the Merits**

23 Plaintiffs allege that by authorizing the closure of San Lorenzo Park and the Benchlands at

24 the height of the COVID pandemic, Defendants are placing Plaintiffs in a position of danger in

25 violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and

26 Article I, Section 7 of the California Constitution. Dkt. 1 ¶¶ 39-48. More specifically, Plaintiffs

27 assert that by clearing the Encampment and failing to provide alternate safe housing, Defendants

28 are placing Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19

5

infection, injury, and death. *Id.* at ¶¶ 1, 43, 48.

### 1. Legal Standard: State Created Danger

There is no fundamental right to housing. *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972). However, the Ninth Circuit recognizes liability under substantive due process where a state or local official acts to place a person in a situation of known danger with deliberate indifference to their personal or physical safety. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). "In examining whether [the city] affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [does it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court must] examine whether [the city] left the person in a situation that was more dangerous than the one in which they found him." *Kennedy*, 439 F.3d at 1062 (citation omitted). Thus, the question before the Court is whether Plaintiffs are likely to succeed in demonstrating that the City's closure of the Encampment at this point in time will put the homeless persons living there at greater risk of contracting COVID-19.

### 2. Evidence Presented

#### a. The CDC Guidelines and Regional Stay at Home Order

The Centers for Disease Control and Prevention's (CDC) "Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials" ("CDC Guidelines"), states:

> [i]f individual housing options are not available, <u>allow people who are living unsheltered or in encampments to remain where they are</u>. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.

Dkt. 1 at 50 (emphasis added).[6]

Defendants argue that because the CDC Guidelines are not binding and do not set constitutional standards, this Court should not consider them in its analysis. Dkt. 9 at 23-24. In support, Defendants cite *Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), where the court found that in the context of a mandatory injunction directed at correctional and detention facilities, the CDC COVID-19 Guidelines "do not provide a workable standard for a preliminary injunction." *Id.* at 174. Specifically, the court noted that the CDC guidance document "spans 25 pages and makes hundreds of recommendations, many of which lack specificity" and contains key caveats that are fatally vague. *Id.* at 174-75.

*Roman* is distinguishable from the case at bar in two critical aspects. First, the plaintiffs in *Roman* had been awarded a *mandatory* injunction requiring defendants to implement a series of protective measures to limit the spread of COVID-19 at the facilities, including the suspension of receipt of new detainees and reduction of the current detainee population. *Id.* at 168. In the case before this Court, Plaintiffs are seeking a *prohibitory* injunction, to maintain the status quo at the Encampment. While the legal standard for mandatory and prohibitory injunctions are the same, as the *Roman* court notes, "[i]njunctions that alter the status quo 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases.'" (citation omitted). *Id.* at 170. Second, in contrast to the guidelines discussed in *Roman*, the CDC Guidelines before this Court are clear and specific: if there is no alternative housing available, leave the encampments to remain where they are because clearing encampments may increase the potential for infectious disease spread. Dkt. 1 at 50.[7]

There is further support for considering the CDC guidelines in evaluating the relative COVID-19 risk to Plaintiffs. Cities and states routinely look to the CDC for guidance during this

---

[6] On its own motion, the Court takes judicial notice of the CDC Guidelines. *See* Fed. R. Evid. 201(c)(1).
[7] At least one other appellate court has held that the CDC Guidelines "provide the authoritative source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic global pandemic where the public health standards are emerging and changing." *Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020) (finding that "[t]he district court thus properly relied on these Guidelines in the course of its preliminary injunction analysis").

7

1  novel pandemic. Dkt. 23 at 3. This includes the City of Santa Cruz, who relied upon these same
2  CDC Guidelines in a previous Executive Order when creating and implementing an encampment
3  lay-out plan in San Lorenzo Park and the Benchlands in April 2020.[8] Dkt. 23 at 3. The CDC
4  guidelines are consistent with the California Department of Public Health's most recent Regional
5  Stay at Home Order, also adopted by the County of Santa Cruz, which states that "[a]ll
6  individuals living in the Region shall stay at home or *at their place of residence*." Dkt. 1 at 33
7  (emphasis added).[9] Finally, the Court notes that the City offers no alternative authority to that of
8  the CDC in managing the homeless population in this pandemic.

### b. Services and Survival Items at the Encampment

At the Encampment the homeless persons have shelter in the form of actual or make-shift tents. Dkt. 1, Ex. G; Dkt. 23 Declaration of Hannah Hegel ("Hegel Decl.") ¶ 7, Ex. B; Dkt. 23 Declaration of Keith McHenry ("McHenry Decl."), Ex. A. This obvious fact is significant in light of evidence that the first phase of Encampment closure led to people losing their tents and tarps. McHenry Decl. ¶ 10, Ex. A. At the Encampment, the homeless population has access to services and hygiene facilities. For example, multiple sources state that there are showers, portable toilets, hand washing stations, and sharps disposal containers at the Encampment. Bauer Decl. ¶ 2; Schendlecker Decl. ¶ 2; Salehi Decl. ¶ 2; Hegel Decl. ¶ 2; McHenry Decl. ¶ 5. Notably, one of the vital services is nurses from Homeless Persons Health Project coming to the park "every couple of days to check in with campers and offer medical assistance as needed."[10] Hegel Decl. ¶ 1;

United States District Court
Northern District of California

---

[8] City of Santa Cruz Executive Order No. 2020-07 (April 30, 2020), https://www.cityofsantacruz.com/Home/ShowDocument?id=80108.

[9] The City argues that the Regional Stay at Home Order does not support Plaintiffs' application because it expressly excepts "persons experiencing homelessness." Dkt. 9 at 25. Defendants' argument misses the mark. This state's Department of Public Health wisely excepted from an order to stay home those for whom compliance would be impossible because they do not have a home. To the extent the state directive instructs all persons to remain at their "place of residence," and to the extent the Encampment is a place of residence for the Plaintiffs and others, the Regional Stay at Home Order speaks directly to the dispute at hand.

[10] Defendants object to Ms. Hegel's statement regarding loss of vital services relating to the visits of HPHP to the Encampment. Dkt. 24 at 3; Order Re Requests for Judicial Notice and Evidentiary Objections. In its objection, Defendants make a proffer that "HPHP outreach workers go wherever homeless individuals are camping." Dkt. 24 at 3. Even accepting the proffer as true, it is reasonable to infer that the closure of the Encampment without any plan or direction as to where the current population will re-establish themselves will lead to a break in services of some duration. Given the current status of the COVID-19 pandemic, any break in services is

1 McHenry Decl. ¶ 3.  Plaintiffs also present evidence that the homeless persons receive donations

2 at the Encampment such as clothing, food, masks, and medical supplies.  Dkt. 1 ¶ 1; Salehi Decl. ¶

3 2; Meisler Decl. ¶ 3; Hegel Decl. ¶¶ 2, 4; McHenry Decl. ¶¶ 2-3, 6.

### c. No Alternative Housing Options

5 There is no disagreement between Plaintiffs and Defendants that there are no alternative

6 shelters or individual housing options available for the people residing in the Encampment.  Dkt. 1

7 ¶ 28; Dkt. 9 at 9, 13; Bernal Decl. ¶ 9.  Despite efforts by the City and County to accommodate the

8 homeless persons during the COVID-19 pandemic, including expanding shelter capacity at

9 multiple locations (Dkt. 9 at 8-9; Butler Decl. ¶¶ 6-8), the longer-term shelters are generally full.

10 Dkt. 9 at 13; Butler Decl. ¶ 13.  Further, the County has a prioritized referral pool from which

11 vacant shelter beds are quickly filled, and the individuals encamped at San Lorenzo Park do not

12 have priority within that system.[11]  Dkt. 9 at 13; Butler Decl. ¶ 14.

### 3. Plaintiffs' Likelihood of Success on the Merits

14 The Court finds that the Plaintiffs' are likely to succeed in demonstrating that the City's

15 dispersal of the homeless persons during the current dire situation of the COVID-19 pandemic

16 puts them at greater risk for COVID-19 than if they remain in the Encampment.  The CDC

17 Guidelines are clear and direct, stating that, as here, where there is no alternative housing

18 available, leave the encampments to remain where they are to prevent the potential for infectious

19 disease spread.  The CDC Guidelines and the Regional Stay at Home Order are instructive in

20 evaluating the risk and danger when analyzing the factors for a preliminary injunction.  The CDC

21 Guidelines discuss sanitation, hygiene materials, and handwashing facilities, and Plaintiffs present

22 unrefuted evidence of the services the homeless persons have access to at the Encampment.  Dkt.

23 1, Ex. F.

24 The Defendants' counter-arguments are unavailing.  At the hearing and in a supplemental

---

significant.

[11] The City did recently identify a portion of its limited CDBG CARES Act funding to potentially fund short-term hotel room vouchers for individuals encamped at San Lorenzo Park. Dkt. 9 at 13; Butler Decl. ¶ 15. However, as the length of stay would be only 2-5 days, the Court does not find this fact to be significant. Dkt. 9 at 13; Butler Decl. ¶ 15.

submission, Defendants suggest that following previous dispersals of homeless encampments in the COVID-era, the County did not observe an increase in positive COVID-19 cases among the dispersed populations. Dkt. 15 at 2. Defendants' evidence on this point is inconclusive and unpersuasive. In his declaration, City of Santa Cruz Fire Chief Jason Hajduk ("Chief Hajduk") states that as a result of the CZU Lightening Complex fires in August 2020, there were 50 homeless persons evacuated from an encampment, in a total evacuation that exceeded 35,000 persons. Dkt. 19 Supplemental Declaration of Jason Hajduk ("Supplemental Hajduk Decl.") ¶¶ 10, 11. Chief Hajduk then states that there was no significant COVID increase attributed to this large-scale evacuation. *Id.* ¶ 12. The declaration is silent as to any COVID increase among the 50 homeless persons in particular. Further, although Chief Hajduk attests to the overall absence of an increase in COVID cases in the August-October time frame (*Id.*), this statement is not tied to any additional dispersals of homeless encampments.[12] Consequently, the evidence presented does not support Defendants' argument that dispersal of the Encampment homeless population will not lead to an increase in the risk of COVID-19 infection.

Defendants further urge that within or without the Encampment, the risk of infection is mitigated by wearing face masks, avoiding crowds and social distancing. Dkt. 15 at 2. Defendants also proffer evidence of homeless persons in the Encampment gathering in crowds and not wearing face masks. Dkt. 9-10 Declaration of Cynthia Crossley ("Crossley Decl.") ¶ 4; Dkt. 9-11 Declaration of Cynthia McCusker ("McCusker Decl.") ¶ 2; Dkt. 10 Declaration of Tony Elliot ("Elliot Decl.") ¶ 17; Dkt. 15-1 Declaration of Tony Elliot ("Supplemental Elliot Decl.") ¶ 14; Dkt. 15-2 Declaration of Eric Grodberg ("Supplemental Grodberg Decl.") ¶¶ 3, 4, 6. Defendants' point as to the wearing of face masks and social distancing is well taken. However, how carefully these practices are followed in the Encampment is disputed with dueling declarations and photographs submitted by both sides. Crossley Decl. ¶ 4; McCusker Decl. ¶ 2; Elliot Decl. ¶ 17; Supplemental Elliot Decl. ¶ 14; Supplemental Grodberg Decl. ¶¶ 3, 4, 6, Ex. A-

---

[12] The Court takes judicial notice of the fact that the entire state of California enjoyed an all too brief respite from the virus in the late summer and early fall of 2020. Tracking COVID-19 in California (Jan. 18, 2021, 11:00 AM), https://covid19.ca.gov/state-dashboard/; s*ee* Fed. R. Evid. 201(c)(1)**.**

1, A-2, A-6; Schendlecker Decl. ¶ 2; Salehi Decl. ¶ 1; Dkt. 7 Declaration of Maria Solis Kennedy ("Kennedy Decl.") ¶ 2; Dkt. 7 Declaration of Thomas Landes ("Landes Decl."); Hegel Decl. ¶ 3, Ex. B; McHenry Decl. ¶ 11, Ex. A. Finally, Defendants argue that the large Encampment itself presents a heightened risk of COVID-19 transmission. Dkt. 9 at 18; Supplemental Hajduk Decl. ¶ 7. While COVID-19 transmission is a legitimate risk to any co-habitation setting, here it is outweighed by the risk of dispersing the homeless persons against the CDC Guidelines and the Regional Stay at Home Order, particularly when there are no safe, alternate housing options available. Dkt. 1 at 50.

In sum, the CDC Guidelines, the Regional Stay at Home Order, and common sense dictate that at what one can only hope is the height of the COVID-19 pandemic, the homeless persons would be placed in a more vulnerable situation and in greater danger without access to shelter or services, particularly medical services, showers, and handwashing stations, that they have been receiving at this central location. *See Jeremiah v. Sutter Cty.*, 18-cv-00522-TLN-KJN, 2018 WL 1367541, at *5 (E.D. Cal. Mar. 16, 2018) (finding that Defendants would "knowingly place the homeless at increased risk of harm if it confiscates and seizes Plaintiffs' shelters and possessions" during "the recent wind, rain, and cold weather"); *see also Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012) (finding that Plaintiffs sufficiently alleged enough facts to support a substantive due process claim based on the danger creation doctrine when Defendants timed the demolitions of plaintiff's shelter and property during the onset of the winter months). Accordingly, the Court finds that Plaintiffs have shown a likelihood of success on the merits of their due process claim if the City cleans and clears the Encampment.

### B. Irreparable Harm

The Ninth Circuit has held that "an alleged constitutional infringement will often alone constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (citation omitted). Plaintiffs have shown the likelihood of being placed in a position of danger in violation of their substantive due process rights during the COVID-19 pandemic. Accordingly, the Court finds that Plaintiffs have demonstrated that irreparable harm will result in the absence of a preliminary injunction at this

time.

### C. Balance of Equities

The balancing of the equities in the evidence before the Court presents a closer call. Plaintiffs argue that the balance tips heavily in their favor, as many of Defendants' representations are "a product of the City's own negligence" and could be remedied without forcing the homeless persons out during the COVID-19 pandemic. Dkt. 1 ¶¶ 35-36. On the other hand, the Court recognizes the significant efforts and burden the City has taken on during the pandemic, including coordinating with the County to add shelter capacity at multiple sites and allowing encampments at San Lorenzo Park for the last nine months. Dkt. 9 at 8-9. Further, Defendants present compelling evidence of numerous concerns regarding the Encampment. The degree and severity of these issues are debated by the Parties and are the subject of competing declarations. Defendants contend that there are major public safety concerns, including drug use and major crimes and safety incidents, including two deaths, one attempted murder, and two cases of assault with a deadly weapon. Dkt. 9 at 14-15; Mills Decl. ¶¶ 6-8, 10-13. Defendants also raise serious safety concerns regarding fire hazards, which poses a threat to the health and safety of the encamped individuals, as well as the general public. Dkt. 9 at 16; Dkt. 9-4 Declaration of Jason Hajduk ("Hajduk Decl.") ¶¶ 6-16. Defendants reference public nuisances, including human and animal waste, needles, vandalism, theft of City and County property, and damage to the City's trees, plantings, and grass. Dkt. 9 ¶¶ 16-17; Elliot Decl. ¶¶ 20-25; Supplemental Elliot Decl. ¶ 14. Defendants' recent submissions evidence that since the date of the hearing, there have been additional incidents of violence, retaliation, and vandalism at San Lorenzo Park, although whether these incidents are properly attributed to the homeless persons living in the park is less clear. Supplemental Elliot Decl. ¶¶ 8-12; Dkt. 23 at 4. Numerous community members have also expressed their concerns regarding the Encampment. Dkt. 9-9 Declaration of Blanche Williams ("Williams Decl.") ¶¶ 3-7; Crossley Decl. ¶¶ 1-6; McCusker Decl. ¶¶ 2-4; Dkt. 9-12 Declaration of David Sievert ("Sievert Decl.") ¶¶ 1-3; Dkt. 9-13 Declaration of Eric Grodberg ("Grodberg Decl.") ¶¶ 3-6; Dkt. 9-14 Declaration of Jeffrey Stonehill ("Stonehill Decl.") ¶¶ 3-6, 8-9; Dkt. 9-15 Declaration of Louanne Hill ("Hill Decl.") ¶¶ 1-2; Dkt. 9-16 Declaration of Carrie Haake

("Haake Decl.") ¶¶ 1-2; Dkt. 9-17 Declaration of Karen Dixon-Santos ("Dixon-Santos Decl.") ¶¶ 2-5; Supplemental Grodberg Decl. ¶¶ 2-6.

The Court recognizes that the City currently faces multiple crises arising from the pandemic. However, the City's interest in cleaning and clearing the Encampment in San Lorenzo Park and the Benchlands at this moment in time is outweighed by Plaintiffs' interest in their constitutional rights during what the Court can only hope is the peak of the COVID-19 pandemic. Accordingly, this factor also weighs in favor of Plaintiffs.

### D. Public Interest

The Court recognizes the legitimate public interest of protecting the public health and safety as well as the need to protect and preserve San Lorenzo Park and the Benchlands. However, the Court also recognizes the public interest in "maintaining the protections afforded by the Constitution to those most in need of such protection." *Cobine v. City of Eureka*, No. C 16-02239 JSW, 2016 WL 1730084, at *7 (N.D. Cal. May 2, 2016). The Court finds that this preliminary injunction, tightly tied to the current phase of the COVID crisis, will benefit public health at large. Ensuring that the homeless persons have access to shelter and vital services during the COVID-19 pandemic is imperative to help stop the spread of COVID-19 amongst the population impacted by this injunction. Further, it will also help reduce the likelihood that COVID-19 will spread throughout the greater Santa Cruz community, as suggested by the CDC Guidelines. Accordingly, the Court finds that the public interest also weighs in favor of a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiffs have met their burden to show that a preliminary injunction should issue to enjoin the City from clearing San Lorenzo Park and the Benchlands during the current phase of the COVID crisis. There is no dispute that the current phase of the COVID-19 pandemic is one of an unprecedented rise in the rate of increase in COVID-19 cases, hospitalizations, and test positivity rates throughout California and specifically in Santa Cruz County. The Court recognizes the significant hardship on the City to allow the Encampment to remain, but with the COVID-19 pandemic still raging, the balance of hardships

tips in favor of the Plaintiffs. The situation is fluid and the length of the COVID-19 pandemic is unknown. However, the administration of vaccines is now underway.[13] As the COVID-19 crises recedes, the preliminary injunction will need to be revisited. Accordingly, Plaintiffs' application for preliminary injunction is **GRANTED**. The Court **ORDERS** the Parties to meet and confer regarding a case schedule, to be submitted to the Court by **January 29, 2021**. The Court further **ORDERS** the Parties to file a joint status report due **March 9, 2021** and sets a status hearing for **March 16, 2021** to review the conditions of San Lorenzo Park and the Benchlands and the homeless persons residing in the Encampment.

**SO ORDERED.**

Dated: January 20, 2021

*Susan van Keulen*
SUSAN VAN KEULEN
United States Magistrate Judge

---

[13] CDC COVID Data Tracker, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jan. 15, 2021, 6:00 AM), https://covid.cdc.gov/covid-data-tracker/#vaccinations.