**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-2985-WJM-SKC

DENVER HOMELESS OUT LOUD, *et al.*, on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

DENVER, COLORADO,[1] *et al.*,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING**

---

This civil rights dispute is before the Court on Plaintiffs' Motion for Preliminary

Injunction and Expedited Hearing ("PI Motion").[2]  (ECF No. 47.)  The Denver

Defendants[3] and Governor Jared Polis (the "Governor") (jointly, "Defendants") filed

---

[1] Plaintiffs have incorrectly designated "The City and County of Denver, Colorado" as "Denver, Colorado."  (ECF No. 60 at 1 n.1.)

[2] Plaintiffs include: Denver Homeless Out Loud; Charles Davis; Michael Lamb; Sharron Meitzen; Rick Meitzen, Jr.; Tomasa Dogtrail; Steve Olsen; Gregory Costigan; Sean Martinez; Lisa Masaro; and Nathaniel Warner.  (ECF No. 46.)

[3] The Denver Defendants include: The City and County of Denver, Colorado; Mayor Michael Hancock, in his individual capacity; Bob McDonald, in his individual capacity; Murphy Robinson, in his individual and official capacities; Kristin Bronson, in her individual and official capacities; Lieutenant Mike Cody, in his individual capacity; Sergeant Anthony Martinez, in his individual capacity; Sergeant Brian Conover, in his individual capacity; Corporal Mark Moore, in his individual capacity; Officer Thanarat Phuvhapaisalkij, in his individual capacity; Officer Rop Monthathong, in his individual capacity; Officer Chris Randall, in his individual capacity; Officer David Hunter, in his individual capacity; Officer Toby Wilson, in his individual capacity; Officer Jon Udland, in his individual capacity; Officer David Martinez, in his individual capacity; Officer Wallace Sam, in his individual capacity; Officer James Harvey, in his individual capacity; Officer

1

responses.  (ECF Nos. 67, 68.)  Plaintiffs filed a reply.  (ECF No. 77.)  On December 15

and 16, 2020, and January 11, 2021, the Court held an evidentiary hearing on the PI

Motion ("Evidentiary Hearing"), the record of which is incorporated herein.[4]  (ECF Nos.

125, 128, 143.)  For the following reasons, the PI Motion is granted in part and denied in

part.

## I. BACKGROUND AND PROCEDURAL HISTORY

A.      **Background**[5]

On October 5, 2020, Plaintiffs Denver Homeless Out Loud ("DHOL") and several

people experiencing homelessness filed a putative class action against the City and

County of Denver ("Denver" or "the City") and several of its officials (including Mayor

Michael Hancock; Executive Director of Denver's Department of Public Health and

Environment ("DDPHE") Bob McDonald; Executive Director of Denver's Department of

Safety Murphy Robinson; and City Attorney for Denver Kristin Bronson), the Governor,

Environmental Hazmat Services ("EHS"), which is an environmental services company,

numerous Denver Police Department ("DPD") and Colorado State Patrol ("CSP") law

_____

Darren Ulrich, in his individual capacity; Officer Mallory Lutkin, in her individual capacity;
Corporal Andrew Gasparovic, in his individual capacity; John & Jane Boes 1-75; John & Jane
Does 1-75; John & Jane Foes 1-75; John & Jane Joes 1-75; and John & Jane Moes 1-75.  (ECF
No. 46.)
        The caption lists Officer Wallace Sam as a defendant, but paragraph 44 names Sam
Wallace; according to Plaintiffs' Second Status Report, the defendant's correct name is
"Wallace Sam."  (*Id.* ¶ 44; ECF No. 42.)  Plaintiffs name Defendant R. Manazanares as a
defendant in paragraph 40, but his name is not in the caption.  (ECF No. 46 ¶ 40.)

[4] As of the date of this Order, the parties have not requested an official copy of the Evidentiary
Hearing transcript.  Thus, in this Order, the Court will cite the three volumes of the Preliminary
Transcript prepared by the court reporter.

[5] The Court draws the Background predominantly from the Complaint (ECF No. 46) and the
parties' briefs and exhibits attached thereto (ECF Nos. 47, 67, 68, and 77).

enforcement officers, and hundreds of John and Jane Does.  (ECF No. 1.)  Plaintiffs

later filed an amended Class Action Complaint (the "Complaint"), alleging numerous

federal and state constitutional violations, breach of contract, and other common law

and statutory claims.[6]  (ECF No. 46.)  This is currently the operative complaint in this

action.

In the Complaint, Plaintiffs allege that Defendants have swept numerous

homeless encampments around Denver with either no or insufficient notice, and have

seized or disposed of homeless individuals' property without due process.  (*Id.* ¶¶ 1–3.)

Plaintiffs further contend Defendants have political motives for providing insufficient

notice, including not wanting to alert those who might want to protest the sweeps.  (ECF

No. 46 ¶¶ 1 n.1, 4, 200; ECF No. 47 at 22, 36.)  While Plaintiffs complain that

Defendants have made at least eleven sweeps during the pandemic (*see* ECF No. 47 at

24), they focus on three: the July 29, 2020 sweep of Lincoln Park—property of the State

of Colorado (*id.* at 17–22), the August 5, 2020 sweep near Morey Middle School

("Morey") (*id.* at 23–24), and the September 15, 2020 sweep near the South Platte River

---

[6] The claims alleged are: (1) 42 U.S.C. § 1983 - Fourth Amendment violation - unlawful seizure (against Defendants); (2) § 1983 - Fourteenth Amendment violation - unlawful taking (against Defendants); (3) § 1983 - Fourteenth Amendment violation - deprivation of property without due process (against Defendants); (4) § 1983 - Fourteenth Amendment violation - danger creation (against Defendants); (5) [Plaintiffs did not include a Fifth Claim]; (6) § 1983 - Fourteenth Amendment violation - D.R.M.C. § 49-246 (Encumbrance Removal Ordinance) void-for-vagueness (against Denver); (7) Colo. Rev. Stat. § 13-21-131, Colo. Con. Art. II, § 7 - unlawful seizure (against Defendants); (8) Colo. Rev. Stat. § 13-21-131, Colo. Con. Art. II, § 15 - unlawful taking (against Defendants); (9) Colo. Rev. Stat. § 13-21-131, Colo. Con. Art. II, § 25 - due process (against Defendants); (10) Colo. Rev. Stat. § 13-21-131, Colo. Con. Art. II, § 25 - danger creation (against Defendants); (11) Colo. Rev. Stat. § 13-21-131, Colo. Con. Art. II, § 3 - right to use public streets and facilities (against Defendants); (12) Colo. Rev. Stat. § 13-21-131, Colo. Con. Art. II, §§ 3, 25 - equal protection (against Defendants); (13) breach of contract (against Denver and Hancock); (14) conversion (against EHS and John & Jane Loes 1–75); and (15) trespass to chattels (against EHS and John & Jane Loes 1–75).  (ECF No. 46.)

("South Platte") (ECF No. 77 at 5).   All three of these encampment sites are located within the City and County of Denver.

According to Plaintiffs, the COVID-19 pandemic has exacerbated the detrimental effects of the sweeps and endangered the lives of these displaced individuals.  Instead of living in encampments, Plaintiffs allege the sweeps have forced many people experiencing homelessness to live into congregate shelters which, Plaintiffs contend, according to the Centers for Disease Control and Prevention ("CDC") guidance (*see* ECF No. 67-2), may increase the risk of contracting COVID-19 for people experiencing homelessness and the community.  (ECF No. 46 ¶ 7.)

Defendants point out that camping bans and encumbrance ordinances were not regularly enforced early in the pandemic.  (ECF No. 67 at 4; ECF No. 68 at 6.) However, as encampments grew, living conditions deteriorated, and significant health concerns arose.  (ECF No. 67 at 4).  In Lincoln Park, members of that encampment dismantled security cameras, street lighting, and the sprinkler system.  (*Id.*) Considerable amounts of food waste, trash, human waste, and used needles accumulated.  (*Id.*)  A pre-existing rat infestation became the worst rodent infestation in Denver's recent history, and there was wide-spread and open use and trade of drugs, and increasing incidents of violence.  (*Id.*)  On July 22, 2020, the DDPHE conducted voluntary COVID-19 testing and found a 2% positivity rate.  (ECF No. 68 at 9; ECF No. 68-1 ¶ 28.)  On July 23, 2020, one person was killed, and two others were seriously wounded in a shooting in Lincoln Park.  (ECF No. 67 at 4.)  Twice, Denver Parks & Recreation ("DPR") Park Rangers observed someone shooting a handgun in the air

from within Lincoln Park.  (ECF No. 68-13 ¶ 5.)  There was also a homicide in or very near the South Platte encampment.  (Tr. III at 25:25–26:5.)

The Denver Defendants state that they tried to strike a reasonable balance between being sensitive to the people experiencing homelessness in the encampments and the need to remediate the significant public health and safety risks.  (ECF No. 68 at 9.)  Beginning in mid to late March 2020, the DPD Homeless Outreach Team ("HOT") advised homeless individuals living in encampments about social distancing and symptom monitoring.  (ECF No. 68-9 ¶ 2.)  But as Sergeant Brian Conover, supervisor of DPD's HOT, describes, "people in the encampments did not listen, failing to socially distance or follow other COVID guidelines, including having their tents in very [close] proximity."  (*Id.*)  Thus, on July 27, 2020, Park Rangers, Denver Department of Housing Stability ("HOST") employees, and other outreach workers began to advise homeless individuals in the Lincoln Park encampment that a temporary closure of the location was imminent and offer connections to services, storage, shelter, and transportation.  (ECF No. 68 at 9; ECF No. 68-9 ¶ 5.)

Plaintiffs state there was no advance written notice of the sweep.  On the morning of the sweep, DDPHE posted a written area restriction notice stating Lincoln Park was being closed immediately due to a public health and safety emergency; significantly, however, the notice did not identify or describe the emergency, or provide clarity whether the emergency related to public health and safety.  (ECF No. 47 at 18–19; ECF No. 14-4 ¶¶ 27–45.)  The Denver Defendants state they stored three bins of unattended possessions.  (*Id.*)  By contrast, Terese Howard, lead organizer and founder

of DHOL, states she observed no efforts to offer to store property and no effort to identify property with apparent value.  (ECF No. 14-4 ¶ 42.)

At the Morey encampment, conditions deteriorated like those in Lincoln Park. (ECF No. 68 at 10.)  On July 14, 2020, DDPHE tested 125 individuals and five individuals tested positive for COVID-19—a 4% positivity rate.  (ECF No. 68-1 ¶ 29.)  In early August, conditions had deteriorated further, and additional concerns arose because Morey teachers and students planned to return for registration on August 6 and 7, 2020.  (ECF No. 68 at 10.)  The Denver Defendants state that, as in Lincoln Park, similar teams were sent onsite more than a week in advance to notify members of the encampment of the impending closure of the encampment and offer services.  (*Id.* at 11; ECF No. 68-9 ¶ 5.)  In the August 5, 2020 Morey sweep, hundreds of needles were collected, over ten tons of waste were removed, and Denver Department of Transportation and Infrastructure ("DOTI") stored items for eight individuals.  (ECF No. 68 at 11.)  In addition to outbreaks of COVID-19, there have been multiple outbreaks of contagious diseases at the encampments in question, such as trench fever, hepatitis A, and shigellosis.  (*Id.*)

## B.    Procedural History

The PI Motion does not encompass all of the claims asserted in the Complaint. (ECF No. 47.)  At issue in the PI Motion are Plaintiffs' claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), under the Fourteenth Amendment (substantive and procedural due process), under the Fourth Amendment, and for breach of contract.  (ECF No. 58 at 6.)  An in-person Evidentiary Hearing on the PI

6

Motion took place over three full days, December 15 and 16, 2020, and concluding on January 11, 2021.  (ECF Nos. 125, 128, 143.)

At the Evidentiary Hearing, the Court heard testimony from numerous witnesses. For Plaintiffs, the following individuals testified: Alexandra Binder (a reporter for independent news outlet *Unicorn Riot*); Jacob Wessley (expert witness on the issue of outreach to the homeless population and Director of Outreach at Colorado Coalition for the Homeless); Marisa Westbrook (expert witness in housing and its impact on health); Dr. Kathleen Van Voorhis (Director of Interfaith Alliance in Colorado); Candi CdeBaca (Denver City Council District 9 Representative); Steve Olsen (a homeless individual who lived near the South Platte River); Dr. Greg Whitman (expert witness in managing pandemics); Michael Lamb (a homeless individual who used to live in Lincoln Park); and Dr. Jamie Sorensen (expert witness in street psychiatry).

The Denver Defendants' witnesses included: Charlotte Pitt (Manager in the Division of Solid Waste Management, part of DOTI); Danica Lee (Denver's Director of Public Health Investigations Division, part of DDPHE); Dr. Bill Burman (Chief Medical Officer of the City and County of Denver, and Director of Denver Public Health); Bob McDonald (Executive Director of DDPHE); Eliza Hunholz (Assistant Director of Park Ranger Program for DPR); and Sergeant Brian Conover (supervisor of DPD's HOT). The Governor called Major Steve Garcia of the Colorado State Patrol.

Plaintiffs called two rebuttal witnesses: Marcos Sepulveda (a homeless individual who lived on property owned at least in part by the Colorado Department of

7

Transportation), and Tiley English (a homeless individual who was sleeping near Councilperson CdeBaca's office on August 19, 2020).

In ruling on the PI Motion, the Court has carefully considered all of these witnesses' testimony, in addition to the numerous exhibits admitted into evidence by all the parties, as well as supporting declarations and other documents.

## II. REQUESTED INJUNCTION

In the PI Motion, Plaintiffs ask that this Court:

- Enjoin Defendants from conducting sweeps, or other displacement of encampments of homeless individuals (whether those displacements are carried out through the enforcement of a public health order, the Camping Ban,[7] the Encumbrance Removal Ordinance,[8] or any other law), at least until public health authorities have determined that the COVID-19 pandemic is over;[9]

---

[7] The Camping Ban prohibits unauthorized camping on public or private property. *See* D.R.M.C. § 38-86.2. Relevant here, "It shall be unlawful for any person to camp upon any public property except in any location where camping has been expressly allowed by the officer or agency having the control, management, and supervision of the public property in question." *Id.* § 38-86.2(b). The law also describes requirements of law enforcement officers and defines relevant terms like "camp," "designated human service outreach worker," and "public property." *Id.* § 38-86.2(d).

Similarly, the Colorado Department of Personnel Administration ("DPA") promulgates rules prohibiting camping in Lincoln Park. (*See* Colo. Rev. Stat. § 18-9-117 (describing unlawful conduct on public property, including camping); ECF No. 67-1; *see also* 1 CCR 103-3:4.0 (providing for permitting of events in Lincoln Park and banning camping in Lincoln Park).)

[8] The Encumbrance Removal Ordinance provides that "The manager of transportation and infrastructure or the manager's designee . . . is authorized to remove or to order the removal of any article, vehicle or thing whatsoever encumbering any street, alley, sidewalk, parkway or other public way or place . . . . The manager may prescribe appropriate methods, specifications, placement and materials for encumbrances in the public right-of-way." D.R.M.C. § 49-246.

Although this Ordinance is not at issue in the PI Motion, in the Complaint, Plaintiffs challenge its constitutionality and claim it is void-for-vagueness.

[9] At the Evidentiary Hearing, Plaintiffs represented that the end of the pandemic is defined as "when the state of emergency ends in the State of Colorado as issued by Governor Polis." (Tr. III at 228:3–9.)

- Require Defendants [to] provide restrooms, sanitation services (including trash services), and personal hygiene facilities (including handwashing stations) to Plaintiffs;

- Enjoin Defendants from conducting sweeps without at least seven-days written notice;

- Enjoin Defendants from discarding and/or destroying Plaintiffs' unabandoned property; and

- Enjoin Defendants from violating the terms of the *Lyall v. Denver* settlement agreement [("*Lyall* Settlement")].[10]

(ECF No. 47 at 4.)

### III. LEGAL STANDARD[11]

To obtain a preliminary injunction, Plaintiffs, as the moving parties, must

establish that

> (1) a substantial likelihood that the movant eventually will prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

---

[10] Unhelpfully, Plaintiffs do not clarify what relief they request from which particular Defendants; instead, they broadly request relief as to all Defendants.

Plaintiffs seek a preliminary injunction against the Governor in his official capacity only. (Tr. III at 238:24–239:7.)

The Governor separately argues that Plaintiffs' requested injunction is not sufficiently specific regarding the relief sought from particular Defendants.  (ECF No. 67 at 6, 7, 19.)  For instance, the State of Colorado was not a party to the *Lyall* Settlement, so the Court clearly cannot enjoin the Governor from violating it.

[11] In the PI Motion, Plaintiffs attempt to invoke the sliding-scale rule that "where the moving party has established that the three 'harm' factors tip decidedly in its favor, the probability of success requirement' is relaxed."  (ECF No. 47 at 25 (citing *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 652–53 (10th Cir. 2004).)   However, the Tenth Circuit abrogated this standard in 2016, announcing that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).  Thus, Plaintiffs must make a strong showing on the likelihood of success on the merits requirement.

9

> (4) that the injunction, if issued, would not be adverse to the
> public interest."

*NRC Broad. Inc. v. Cool Radio, LLC*, 2009 WL 2965279, at *1 (D. Colo. Sept. 14, 2009).

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear

and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).  The

balance of the harms and public interest factors merge when the government is a party.

*See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Tenth Circuit applies a heightened standard for "[d]isfavored preliminary

injunctions," which do not

> merely preserve the parties' relative positions pending trial.
> Instead, a disfavored injunction may exhibit any of three
> characteristics: (1) it mandates action (rather than prohibiting
> it), (2) it changes the status quo, or (3) it grants all the relief
> that the moving party could expect from a trial win.  To get a
> disfavored injunction, the moving party faces a heavier
> burden on the likelihood-of-success-on-the-merits and the
> balance-of-harms factors: She must make a strong showing
> that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019)

(citations and internal quotation marks omitted).

Because Plaintiffs' request a preliminary injunction that mandates action and

changes the status quo, the Court finds that the heightened standard applies here.[12]

---

[12] At the Evidentiary Hearing, Plaintiffs asked the Court to examine the third footnote of *Free the Nipple*, arguing that it supports the proposition that the Court should not apply the heightened standard for disfavored injunctions here.  (Tr. III at 244:15–245:13).  By contrast, Defendants argue the heightened standard applies.  (Tr. III at 216:13–22).
   Nonetheless, Plaintiffs did not fully or clearly articulate at the Evidentiary Hearing or in their briefing why the heightened standard does not apply; as Plaintiffs request a preliminary injunction that seeks to alter the status quo and requires action, the Court concludes that the heightened standard applies.

# IV. ANALYSIS

**A.     The Denver Defendants**

1.     *Substantial Likelihood of Success on the Merits of Plaintiffs' Claims*

a.     <u>Fourteenth Amendment - Procedural Due Process</u>[13]

Among other things, the Fourteenth Amendment protects property: "No state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.  More particularly, under the doctrine known as "procedural due process," a court must ask two questions: first, "whether there exists a liberty or property interest which has been interfered with by the State"; and second, "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  Here, the existence of a property interest is not in question because Defendants do not challenge Plaintiffs' argument that they have a property interest in the sorts of items they fear will be seized in future sweeps. (ECF No. 67 at 17; ECF No. 68 at 21.)

As to the second question, individuals generally must receive, at a minimum, "notice and an opportunity to be heard before the Government deprives them of property." *Lyall v. City of Denver*, 2018 WL 1470197, at *14 (D. Colo. Mar. 26, 2018)

---

[13] The parties dispute how closely intertwined the Fourth Amendment and procedural due process claims are.  Plaintiffs argue that even if the Court finds the seizures of property were reasonable under the Fourth Amendment, Plaintiffs are still entitled to due process protections before the seizure of their property.  (ECF No. 47 at 34 n.69.)

On the other hand, Defendants argue that without an unreasonable seizure under the Fourth Amendment, there can be no due process violation under the Fourteenth Amendment. (ECF No. 68 at 20.)  Thus, according to Defendants, unless Plaintiffs show Defendants' actions were unreasonable under the Fourth Amendment, the Court need not address the procedural due process allegations.  (*Id.*)

Because the Court is not making a conclusive finding regarding the ultimate outcome of any particular claim at this stage of the litigation, it will not resolve this issue now.

(citing *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993)). The general rule may be disregarded in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* (citation omitted).  Either way, the Court must consider the following factors to determine whether the government's procedures provided the individual with due process:

- the interests of the individual in retaining their property and the injury threatened by the official action;

- the risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; and

- the costs and administrative burden of the additional process, and the interests of the government in efficient adjudication.

*Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Plaintiffs contend that when the Denver Defendants seized their property they violated Plaintiffs' procedural due process rights in three ways:

> (1) Defendants provided no (or deficient) notice prior to seizing their property, (2) Defendants summarily discarded (and destroyed) Plaintiffs' property without any process for challenging the destruction, and (3) post-deprivation, Defendants did not provide an adequate process for Plaintiffs to challenge the seizure of their property or retrieve their property.

(ECF No. 47 at 35.)  Plaintiffs argue that Defendants' underlying basis for the lack of notice was that people might come to the encampments and protest; Plaintiffs reject this as a valid rationale for Defendants' actions.  Plaintiffs contend that public scrutiny and the threat of First Amendment activity is not a reasonable basis for failing to adequately provide advance notice.  (ECF No. 77 at 17.)

12

The Denver Defendants dispute the lack of sufficiency of the notice provided, pointing out that in connection with the sweeps at Lincoln Park and Morey, Park Rangers warned homeless individuals of the impending sweeps and need to move. (ECF No. 68 at 22; ECF No. 68-1 ¶¶ 32–33; ECF No. 68-13 ¶¶ 6–10.)  Notices of the area restrictions were posted the morning of the sweeps, individuals were told they had to leave, and no one was rushed or intentionally denied re-entry to the area to collect personal property.  (ECF No. 68-1 ¶¶ 26, 32–33; *see also* ECF No. 68-12 video exhibits 6, 9, 13, 14.)  The Denver Defendants state that all non-hazardous, unattended personal belongings were stored, and to the extent they were inadvertently disposed of, property owners can file an on-line claim for reimbursement with Denver.[14]  (ECF No. 68-10 ¶¶ 3, 9–10.)

The Court addresses the three prongs of the *Mathews* test in turn.  First, Defendants do not dispute that Plaintiffs have a possessory interest in their personal property which is located at encampments.  (ECF No. 67 at 17 (adopting the Denver Defendants' Fourth Amendment arguments); ECF No. 68 at 21 ("Denver does not challenge Plaintiffs' asserted interest in their personal property, other than trash and hazardous materials, located at unauthorized homeless encampments.").)  As other courts have found, "[t]ents and non-contaminated blankets are necessary to protect individuals from rain and extreme weather."  *Mitchell v. City of Los Angeles*, 2016 WL 11519288, at *5 (C.D. Cal. Apr. 13, 2016).

---

[14] According to Denver, reimbursement claims may be filed at https://www.denvergov.org/content/denvergov/en/city-attorneys-office/file-a-claim.html.  (ECF No. 68 at 22 n.4.)

Second, Plaintiffs' declarations and the Evidentiary Hearing testimony establish that there is a significant risk that the Denver Defendants will erroneously deprive Plaintiffs of their property through their actions.  While the risk of erroneous deprivation exists within the context of large scale-encumbrance removals, for which DOTI provides seven days' notice, the risk is particularly pronounced in the context of the temporary area restrictions, for which DDPHE only provided written notice on the morning of the sweeps.

Specifically, the evidence shows that for the Lincoln Park, Morey, and South Platte temporary area restrictions, Plaintiffs only received notice of the sweeps early on the morning they occurred.  Michael Lamb, a homeless individual living at the Lincoln Park encampment, testified that he received no notice that a sweep was happening. (ECF No. 77-13 ¶ 4.)  On July 29, 2020, he woke up and saw Denver officials and trash trucks—the first notice he received that the area would be swept.  (*Id.*)  Similarly, Steve Olsen, a homeless individual living at the South Platte encampment, testified that before the day of the sweep, he "didn't know a thing about it."[15]  (Tr. I. at 225:22–25; ECF No. 77-3 ¶ 3.)  The Denver Defendants disposed of his unabandoned, uncontaminated property in the sweep.  (ECF No. 77-3 ¶¶ 6–9.)  Regarding Morey, Pitt testified that while DOTI had planned to give seven days' notice there, the health department deemed there were health and safety risks that required cleaning it sooner.  (Tr. II at 45:19–21; *see also* Tr. II at 64:3–17.)

---

[15] Olsen testified that there were notices posted on RVs at the encampment, but no one spoke to anyone who had tents at the encampment.  (Tr. I at 225:25–226:6.)

Defendants' procedures for providing notice of a DDPHE area restriction did not afford homeless individuals sufficient time to remove their property from designated areas such that they might avoid seizure.  With such limited notice as was provided for the DDPHE area restrictions—which for the Plaintiffs who testified amounted to effectively no notice whatsoever—Plaintiffs had little time to collect and remove their belongings prior to the commencement of the sweeps.  For homeless individuals like Lamb, even if they are present during a sweep, they may not be able to move all of their property quickly enough to avoid seizure.  Lamb gathered a small amount of his belongings, moved them a few blocks away, but by the time he was able to return to Lincoln Park, it was enclosed by the six-foot high fence, and Defendants refused to let him reenter.  He "watched from behind the fence as Denver officials took [his] property . . . threw it into a trash truck, and destroyed it."  (ECF No. 77-13 ¶¶ 6–9.)  Homeless individuals who are not physically present at an encampment during an area restriction, like Olsen, risk having all of their property seized.  (*See* ECF No. 77-3 ¶ 6.)

Moreover, Defendants' current procedures do not appear to afford homeless individuals a meaningful way to recover confiscated property.  While homeless individuals appear to have some recourse in finding their property in storage, or recovering its value through a claim reimbursement, this process carries serious risks.  For instance, after Olsen was told by a Denver official that his property might have been stored, he went to the storage facility, only to have EHS tell him they had stored no property on September 15, 2020.  (*See* ECF No. 77-3 ¶ 7.)  Marcos Sepulveda testified that after losing property in a sweep, he submitted a reimbursement claim, but was told

there was not enough evidence for reimbursement because "they didn't think . . . they're liable."  (Tr. III at 190:21–25.)

Under these circumstances, the Court finds that the limited process afforded by the Denver Defendants, particularly in conducting DDPHE-led area restrictions with only morning-of notice, carries a significant risk that homeless individuals have been and will be erroneously deprived of property.  *See Mitchell*, 2016 WL 11519288, at *5.  If Denver provided homeless individuals with additional advance notice of sweeps, it would allow Plaintiffs a better chance to protect the property critical to their survival.

Third, the Court examines the government's interest at stake in conducting these sweeps.  The government's overarching interest here—maintaining public health and safety—is unquestionably significant.  Not only must the Denver Defendants handle the extraordinary task of navigating the Denver community through the COVID-19 pandemic, but they must simultaneously address those challenges in the context of Denver's homeless population and the growth of encampments throughout the city. Despite these substantial challenges, however, as explained below, the Denver Defendants have not demonstrated that the government's interest—significant though it may be—justifies providing written notice no earlier than the morning of DDPHE area restriction sweeps.

DDPHE's Director of Public Health Investigations, Danica Lee, testified that numerous factors present environmental and public health considerations for each encampment, including the impact on the people living in the encampment, the broader community, and the environment and public health.  (Tr. II at 106:1–7.)  One area

16

restriction, attempted on June 17, 2020 at 21st Street and Stout Street, appears to have particularly influenced Lee and DDPHE's decisions regarding when to provide notice for area restrictions.  For the June 17 restriction, DDPHE provided advance notice, and a group of protestors, distinct from the people living in the encampment, came to the site. According to Lee, the protestors were aggressive, shouted, and tried to enter the areas secured by the police, which allegedly created security challenges and led to concerns for the safety of the team working to implement the area restriction.  Ultimately, DDPHE decided not to complete the area restriction due to these safety concerns.  (Tr. II at 116:23–117:14.)

These safety concerns likewise influenced DDPHE's decisions regarding the timing of the notice provided for the Lincoln Park, Morey, and the South Platte area restrictions.  (Tr. II at 119:3–4.)  It is clear that DDPHE had overarching public health concerns leading to the decision to implement area restrictions at each of these locations.  For example, Lee testified, as did numerous witnesses, that conditions in Lincoln Park had deteriorated and included large amounts of trash and food waste, a rat infestation, improperly discarded syringes, and safety concerns for workers trying to clean the park.  (Tr. II at 118:1–10.)  However, when asked to articulate why the written notice of the Lincoln Park area restriction was posted no earlier than the morning of the day of the sweep, Lee could only offer that "we felt that it was safer to . . . provide notice the day of."  (Tr. II at 118:22–119:8, 201:15–205:13.)  Accordingly, written notice was posted early in the morning on July 29, 2020.

When asked why advance written notice was not posted for the Morey area restriction, Lee cited similar concerns: "the safety of everybody involved in consideration of all the current events and what had happened recently in June." (Tr. II at 122:4–16, 205:13–15.) Accordingly, written notice of the Morey sweep was posted early in the morning on August 5, 2020, and not before. When asked why advance written notice was not posted for the South Platte area restriction, Lee could only reiterate those same vague concerns: "in our estimation, [it] was the safest way of moving forward." (Tr. II at 123:1–124:2, 205:16–22.) Accordingly, written notice of the South Platte sweep was posted early in the morning on September 15, 2020, but not before.

DDPHE's Executive Director, Bob McDonald, in consultation with Lee and her team, authorized the posting of notice on the morning of, and for immediate action to be taken, at the three area restrictions. (Tr. II at 241:2–25.) As Executive Director and the final decisionmaker for DDPHE, he testified that there are times when DDPHE is unable to give advance notice due to the immediacy of the situation concerning public health and environmental risks; in those instances, DDPHE might need to post an area restriction and close an area immediately. (Tr. II at 228:15–229:8, 240:3–7.) Moreover, McDonald confirmed that the decision regarding whether to impose an area restriction is up to him; had he disagreed with such a decision, the area restriction would not have been posted under DDPHE's authority. (Tr. II at 232:6–11.)

The Tenth Circuit has "repeatedly emphasized the Supreme Court's admonition that the procedural due process analysis is not a technical conception with a fixed content unrelated to time, place and circumstances, but rather is flexible and calls for

18

such procedural protections as the particular situation demands." *Ward v. Anderson*, 494 F.3d 929, 935 (10th Cir. 2007) (citation and internal quotations omitted).

Here, given the totality of the evidence before the Court, it concludes that the area restriction sweeps demanded more procedural protections than the Denver Defendants afforded Plaintiffs. From the evidence adduced at the Evidentiary Hearing, the Court finds that Plaintiffs effectively received no advance notice of the Lincoln Park, Morey, and South Platte sweeps. Moreover, from this evidence, the Court also finds that the decision of DDPHE managers to conduct the sweeps at issue in the manner that they did were not based on actual, scientific, or evidence-based, public health concerns. While these indeed were the aspirational justifications articulated by Lee and McDonald, the Court finds that in fact the decision to conduct these area restrictions with effectively no advance notice to the residents of the affected encampments were actually based, as Plaintiffs' counsel has argued, on the possibility of additional (and vociferous) public scrutiny and the threat of First Amendment protected activity, and these managers' preference to avoid same.

Stated differently, the evidence in the record does not support the deprivation of Plaintiffs' procedural due process rights based on inchoate, vague, and potentially unwarranted fears for the safety of those implementing the sweeps arising out of possible, First Amendment-protected, protests. This is particularly the case where, as here, those fears are predicated solely on the *possibility* of future, constitutionally-protected activity by homeless advocates.

19

It must be stressed that the basis for the Court's conclusion does **not** turn on a minimization of the acknowledged importance of the Denver Defendants' governmental interest in preserving public health.  Indeed, had the Denver Defendants, and in particular Defendants Lee and McDonald, made such a showing, predicated on actual public health medical science, the Court would be reaching a very different conclusion today.  Instead, the hearing evidence, even as articulated through the testimony of these DDPHE managers, made it manifestly clear to the Court that the decision on how much (or actually, how nearly non-existent) advance notice was to be given to encampment residents prior to the area restriction sweeps was based on no such thing.

"In the context of the collection or destruction of the possessions of people experiencing homelessness that are left unattended in a public space, courts have found that minimally, the municipality must provide advance notice and a meaningful way to collect the property."  *Phillips v. City of Cincinnati*, 2020 WL 4698800, at *22 (S.D. Ohio Aug. 13, 2020) (citing *O'Callaghan v. City of Portland*, 2013 WL 5819097, at *4 (D. Or. Oct. 29, 2013) (finding sufficient due process where plaintiff cited for illegal camping was given 24 hours' notice and phone number to retrieve items); *Cobine v. City of Eureka*, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016) (due process likely adequate with advance notice and ability to reclaim property by calling to schedule an appointment within 90 days of removal); *Mitchell*, 2016 WL 11519288, at *5 (finding high likelihood of success on merits where confiscated property not stored in readily accessible facility); *De-Occupy Honolulu v. City & Cnty. of Honolulu*, 2013 WL 2285100, at *6–7 (D. Haw. May 21, 2013) (due process likely adequate where city provided 24

hours' notice and post-seizure notice describing the items and informing of location where they may be retrieved)).

Despite outreach workers' attempts to communicate with those living in the affected encampments before the sweeps, by their testimony at the Evidentiary Hearing, Plaintiffs made it quite plain that they remained to a very great degree unaware that the sweeps were imminent, thus leaving them without sufficient notice or time to gather their belongings and avoid seizure.  While the Denver Defendants may have articulated in broad terms the public health reasons for undertaking the area restrictions in the first instance, they have not demonstrated that the *timing* of their notice procedures had a basis in anything other than a bureaucratic pronouncement of DDPHE managers, one devoid of any basis in medical science.  More specifically, the Court concludes that the evidence does not support a finding that the public health situation in the Lincoln Park, Morey, or the South Platte encampments was so exigent that effectively no advance notice was required before depriving Plaintiffs of most, if not all, of the meager property in their possession.

Nothing in the record even approaches a showing by the Denver Defendants, for example, that they could not accomplish the same goal of remediating the encampments and the health threats they allegedly posed if DDPHE had instead given even 48 hours' advance notice to encampment residents.  Accordingly, on this record, Plaintiffs have met their burden of showing a substantial likelihood of success on the merits of their procedural due process claim.

Consistent with the above findings, Plaintiffs have also established a substantial likelihood of success on the merits of their *Monell* claim against Denver. To hold Denver liable for a procedural due process violation, Plaintiffs must work through the municipal liability framework established by the Supreme Court in *Monell*. 436 U.S. 658. *Monell* held that a municipality can be liable in 42 U.S.C. § 1983 for damages only when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694. Accordingly, Plaintiffs must prove a municipal custom, policy, or practice, which can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted; alterations incorporated).

Here, it is undisputed that as DDPHE's executive director, McDonald is a final policymaker for Denver who authorized the subject area restrictions, and the amount of advance notice of such area restrictions to be given to those encampment residents. Plaintiffs have demonstrated a substantial likelihood of showing that his decision, on the recommendations of Lee, to repeatedly impose area restrictions on encampments with

22

effectively no advance written notice, is a Denver municipal custom, policy or practice

which violates, in an ongoing and continuing manner, Plaintiffs' Fourteenth Amendment

right not to be deprived of their property without constitutionally adequate procedural

due process.

In sum, Plaintiffs have established a substantial likelihood of success on the

merits of their Fourteenth Amendment procedural due process claim.

b.    Breach of Contract[16]

Plaintiffs contend the Denver Defendants have breached the *Lyall* Settlement,

which provides that

> **Large-Scale Encumbrance Removal/Cleanups** - The City,
> to the extent reasonably possible, shall give at least seven
> days' notice prior to a large-scale encumbrance cleanup and
> shall include such language in its written protocol for large-
> scale encumbrance removal.  The City may conduct large-
> scale cleanups with less than seven days' notice only if the
> City determines that a public health or safety risk exists
> which requires it.  If a large-scale cleanup is conducted with
> less than seven days' notice, the City shall provide
> reasonable notice of the cleanup, with the determination of
> reasonableness based upon the nature of the public health
> and safety risk present in the area. . . .

(ECF No. 14-2 at 15.)  The *Lyall* Settlement also delineated how Denver would dispose

of unattended personal property, including whether it poses a public health or safety

risk, and how it should be disposed of or stored.  (*Id.* at 17.)  Critically, the parties in

*Lyall* did not seek or obtain a ruling by this Court to expressly retain jurisdiction over that

---

[16] While Plaintiffs' Fourth and Fourteenth Amendment claims are brought against all
Defendants, the Governor was not involved in the *Lyall* Settlement.  Thus, this claim can only be
brought against Denver and Mayor Hancock.  (ECF No. 46 ¶¶ 576–84.)  Plaintiffs bring the
breach of contract claim under the Court's supplemental jurisdiction.  28 U.S.C. § 1367.  (*See*
ECF No. 46 ¶ 12.)

litigation in order to adjudicate any future alleged breach of the Settlement agreement. (ECF No. 14-2.)

Plaintiffs argue the *Lyall* Settlement provided them with "certain substantive rights," including that Denver would not seize their property without notice or discard certain property if seized.  (ECF No. 47 at 37.)  Therefore, Plaintiffs bring a breach of contract claim—in other words, a motion to enforce the *Lyall* Settlement—against Denver and Mayor Hancock, alleging the Denver Defendants' actions during the sweeps violated Plaintiffs' Fourteenth Amendment rights and the *Lyall* Settlement.  (*Id.*)

The Supreme Court has spoken regarding federal courts' jurisdiction to enforce settlement agreements.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).  In short, enforcing a settlement agreement is usually a question of enforcing a contract under state law and creates no federal jurisdiction unless

> the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.  In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

*Id.* at 381.

Given the clear procedural history of the *Lyall* litigation, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their breach of contract claim.  In fact, the opposite is true.  As previously noted, this Court in *Lyall* did not retain jurisdiction over the litigation post-judgment, nor did it incorporate the terms of the *Lyall* Settlement into the Final Judgment that dismissed the

case.  (ECF No. 14-2); *see Lyall v. City of Denver*, Case No. 16-cv-2155-WJM-SKC,

ECF No. 226 (D. Colo. Sept. 23, 2019).  Thus, no federal jurisdiction exists to enforce

the *Lyall* Settlement simply because it led to dismissal of the lawsuit.  In these

circumstances, in order to enforce any alleged breach of the *Lyall* Settlement, Plaintiffs

have no alternative but to file an independent breach of contract action in the

appropriate state court.

      c.   <u>Fourth Amendment</u>

The Fourth Amendment protects "persons, houses, papers, and effects, against

unreasonable searches and seizures."  U.S. Const., amend. IV.  This prohibition against

unreasonable seizures extends both to civil and criminal seizures.  *Marshall v. Barlow's,

Inc.*, 436 U.S. 307, 312–13 (1978).  "A 'seizure' of property occurs when there is some

meaningful interference with an individual's possessory interests in that property."

*United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  If "meaningful interference" took

place, the question is whether such interference was reasonable, judged by "balanc[ing]

the nature and quality of the intrusion on the individual's Fourth Amendment interests

against the importance of the governmental interests alleged to justify the intrusion."  *Id.*

at 125 (internal quotation marks omitted).  It is possible for a seizure to be "lawful at its

inception" but become unreasonable through "its manner of execution," such as by

destroying the seized property.  *Id.* at 124.  However, destruction of seized property is

not a per se Fourth Amendment violation—it may nonetheless be reasonable under the

circumstances.  *Id.* at 125.

The Supreme Court has held that personal property located in a public area is protected by the Fourth Amendment, despite its physical location in a public space. *Mitchell*, 2016 WL 11519288, at *3 (citing *Soldal v. Cook Cnty.*, 506 U.S. 56, 68 (1992)). As a preliminary matter, as discussed above, Defendants do not dispute that Plaintiffs have a possessory interest in their personal property which is located at encampments. (ECF No. 67 at 18; ECF No. 68 at 21).  Thus, the viability of Plaintiffs' Fourth Amendment claim turns on whether they have demonstrated they will likely succeed in showing Defendants' seizure and destruction of their property was unreasonable.

Plaintiffs contend that seizing homeless individuals' unabandoned property, whether attended or unattended, without notice and discarding (or destroying) it is unreasonable and violates the Fourth Amendment.  (ECF No. 47 at 33; ECF No. 77 at 13 (collecting cases[17]).)  Essentially, Plaintiffs state that Defendants customarily and summarily discarded unabandoned property in the sweeps without distinguishing between clean property and property that might have been valuable but comingled with waste, blood, or other material.  In addition, Plaintiffs state that Defendants prevented them from returning to the areas to collect their property (*see, e.g.*, ECF Nos. 77-12 ¶ 7, 77-13 ¶ 8), particularly at Lincoln Park, where a fence was erected and now remains.

---

[17] *See, e.g.*, *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1029 (9th Cir. 2012); *Acosta v. City of Salinas*, 2016 U.S. Dist. LEXIS 50515, at *5 (N.D. Cal. Apr. 13, 2016); *See  v. City of Fort Wayne*, 2016 U.S. Dist. LEXIS 185598, at *21 (N.D. Ind. June 16, 2016); *Pottinger v. Miami*, 810 F. Supp. 1551, 1570-73 (S.D. Fla. 1992); *Kincaid v. City of Fresno*, 2006 U.S. Dist. LEXIS 93464, at *94 (E.D. Cal. Dec. 8, 2006); *Lehr v. City of Sacramento*, 2011 U.S. Dist. LEXIS 90473, at *7 (E.D. Cal. Aug. 15, 2011).
  None of the cases Plaintiffs cite are from the Tenth Circuit, except *Lyall*, where this Court found a genuine issue of material fact precluded summary judgment regarding "giving affected persons only minimal time to gather what they can carry, and failure to discriminate between what should be preserved and what should be thrown away."  *Lyall*, 2018 WL 1470197, at *16.

Some homeless individuals indicate they were told (in some cases by EHS) that their property might have been stored (ECF No. 77-3 ¶ 7); in other cases EHS said no property had been stored, such as in the South Platte sweep (ECF No. 77-11 ¶ 7).

In her declaration, Howard states that on numerous dates between January and August 2020, DOTI officials, EHS employees, and Denver Solid Waste Management ("DSWM") officials seized and discarded all of the homeless individuals' property, including "clearly unabandoned tents and other unabandoned property of apparent value" at numerous sweeps.  (ECF No. 14-4 ¶¶ 16–21.)  During the Lincoln Park sweep, Howard observed no efforts to offer to store unabandoned property and no effort to identify property with apparent value; instead, she observed that nearly all property that was left in the park was summarily discarded.  (*Id.* ¶ 42.)

In addition, Plaintiffs submit the declarations of numerous homeless individuals, who state their belongings were discarded in various sweeps, seemingly with no offer to store them.  (*See, e.g.*, ECF Nos. 77-3, 77-11, 77-12, 77-13, 77-14.)  The declarations recount these individuals' experiences in various sweeps and describe waking up to a sweep without notice and trying to gather as many belongings as possible before they were discarded; other individuals recount leaving their campsites to apply for work, sleep in a motel, or under other circumstances, only to return to their campsites and find their unabandoned property, which was clean and not contaminated with hypodermic needles, blood, or rodents, had been thrown away in the sweeps.  In addition, Plaintiffs state the Denver Defendants admit to only storing six persons' worth of belongings in the Lincoln Park sweep, and that the Denver Defendants make no claim they stored

property seized during the South Platte sweep.  (ECF No. 77 at 13 (citing ECF No. 68-10 ¶ 9); *see also* Tr. II at 60:9–62:20.)  Plaintiffs also state the Denver Defendants' website detailing property storage[18] contradicts their claim that they stored any property in the Lincoln Park, Morey, and South Platte sweeps.  *Id.*

At the Evidentiary Hearing, various people experiencing homelessness testified about their experiences during sweeps.  Olsen, whose property including several tents, sleeping bags, bicycles, coolers, and other personal possessions was seized and destroyed in the South Platte sweep, testified that his property was not contaminated.  (Tr. I at 224:24–225:7.)  He stated that he tried to "keep [his] place cleaned up," "there wasn't any . . . waste needles, drugs, or anything just laying around," and he "kept it all pretty much cleaned up the best [he] could."  (Tr. I at 225:7–11.)  Further, Olsen testified that it would have been clear to anyone that his property was not abandoned, and that he had no notice of the South Platte sweep.  (Tr. I at 225:15–25.)  When Olsen tried to retrieve his property from storage, he testified that it was not there, and that he was told it was taken to the dump.  (Tr. I at 226:7–227:3.)

Like Olsen, Lamb lost some of his property in a sweep.  Lamb, who was camping in Lincoln Park, testified that he had a dolly to take some property out of the park before the fence went up, but that he was not permitted to return to retrieve the rest of his property.  (Tr. II at 7:21–8:8.)  As Lamb watched through the fence, Defendants seized a couple of his tents and some belongings, including clothes and hygiene items, and threw them away.  (Tr. II at 8:9–19; ECF No. 77-13 ¶ 6.)  In his declaration, Lamb stated

---

[18] *See* Denver: Housing Stability, Property Storage, available at: https://www.denvergov.org/content/denvergov/en/housing-information/residentresources/property-removal-and-storage.html.

that his property was "clearly not trash and was not contaminated with any blood, hypodermic needles, or rodents."  (ECF No. 77-13 ¶ 10.)

Another homeless individual, Sepulveda, testified that he has camped on property owned by the State of Colorado.  One day, while living at an encampment in Bear Creek, he was given fifteen minutes to gather what belongings he could; he then watched as his remaining property was taken and dumped in a dump truck.[19]  (Tr. III at 177:25–178:7.)  He gave the property he retrieved to DPD Officer Chavez, who said he would have it stored.  When Sepulveda went to a Denver storage facility to look for his property from Bear Creek, he testified that his items were never found.  (Tr. III at 186:23–187:25.)  Given the foregoing, Plaintiffs argue Defendants' actions were unreasonable, such that they have a substantial likelihood of success on the merits of their Fourth Amendment claim.

In response, the Denver Defendants argue that to find a Fourth Amendment violation, the Court must determine that the intrusion into any possessory interest Plaintiffs may have had in their private property located on public land outweighed the government's interest in public health and ensuring the cleanliness, sanitation, and security of the encampments.  (ECF No. 68 at 19.)  The Denver Defendants argue Plaintiffs have no right to trespass on public land or store property there.  *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) ("The Constitution does not confer the right to trespass on public lands.  Nor is there any constitutional right to store one's personal belongings on public lands."); *but see Lavan*, 693 F.3d at 1029 ("Violation of a

---

[19] Sepulveda's testimony regarding whether a Denver entity or the Colorado Department of Transportation seized his property is unclear.  (Tr. III at 188:1–24.)

City ordinance does not vitiate the Fourth Amendment's protection of one's property. Were it otherwise, the government could seize and destroy any illegally parked car or unlawfully unattended dog without implicating the Fourth Amendment.").

The Denver Defendants also argue the Fourth Amendment provides no protection for garbage in a public area. *United States v. Long*, 176 F.3d 1304, 1308–09 (10th Cir. 1999). This argument seems to miss the point; Plaintiffs are not arguing trash should be stored. Rather, Plaintiffs state that, for example, Defendants "cannot simply throw away an entire tent, and all of its contents, simply because there is waste within it." (ECF No. 77 at 14.) However, with this broad statement, Plaintiffs are somewhat ignoring the reality of the very difficult situation Defendants face. *See Mitchell,* 2016 WL 11519288, at *3 n.4 ("The Court recognizes that in many instances, separating property that is contaminated from property that is not is, at best, difficult."). The Denver Defendants essentially argue that much of the property at the encampments is so comingled with trash and hazardous materials that it becomes unreasonable to expect them to sort through it to determine what should be stored versus discarded. Such an expectation unreasonably threatens the safety of DOTI and other Denver personnel who must dispose of items comingled with hazards like used needles and human waste.

The Denver Defendants submit the Declaration of Charlotte Pitt, Manager of the DOTI's SWMD. (ECF No. 68-10.) Pitt is involved in planning large-scale encumbrance removals and tracks personal property storage by DSWM and its contractor; she maintains records dating back to 2018 of property stored during cleanups. (*Id.* at ¶ 2.) Pitt reviewed Howard's declaration and states that it is "incorrect," and that DOTI and its

contractor stored property on numerous dates.  (*Id.* ¶ 8.)  Pitt describes DOTI's responsibilities at the Lincoln Park sweep, which included cleaning, providing voluntary storage of attended items, and storage of unattended items that did not pose a public health or safety risk, and disposal of items that did pose such risks.  (*Id.* ¶ 9.)

At the Evidentiary Hearing, Pitt and other witnesses testified as to the alarming conditions in the encampments, which heavily contributed to the decisions to conduct several large-scale encumbrance removals and the three area restrictions at Lincoln Park, Morey, and South Platte.  Pitt explained the process for storage and that DOTI will not store unattended property that is comingled with certain hazards, including needles, human waste, urine, feces, vomit, blood, rodents, and rotten food.  (Tr. II at 30:5–15.)  In fact, the Court heard testimony that during sweeps, some people experiencing homelessness *request* that the Denver Defendants throw away their property, contaminated or otherwise.

Further, the Denver Defendants submitted photographs and DPD HOT officers' body worn camera footage showing the conditions of the encampments, including countless piles of trash, numerous discarded needles on the ground, blood, human waste, and rotting food in and around tents.  (*See, e.g.*, Def. Exs. B, D, E, L, M, S, T, V.)  In the videos, the DPD HOT officers speak to people living in encampments and ask them whether they would like help accessing services, such as health services, mental health services, storage for their property, transportation to shelters arranged at the Denver Coliseum or National Western Complex, among other services that Denver provides.

Eliza Hunholz, Assistant Director for Denver's Park Rangers, testified that it would be a "disaster" and a "terrible idea" if Denver and its counterparts were prohibited from cleaning encampments.  (Tr. III at 31:23–33:2.)  Warning of an increase in hazardous trash, bedding, clothing, toilets, feces, urine, garbage, perishable food that would build up if cleanups ceased, Hunholz also emphasized that parks are "public spaces for everyone," and "when you don't clean the park and when the park isn't safe, it's not a park that everyone can use."  (Tr. III at 32:16–20.)  Hunholz's testimony goes to the heart of "the governmental interest alleged to justify the intrusion" on Plaintiffs' Fourth Amendment rights.

Considering the foregoing evidence, the Court concludes that a clear factual dispute precludes a finding in Plaintiffs' favor at this juncture of the case on Plaintiffs' Fourth Amendment claim.  *See Goodman v. Dell Publ'g Co.*, 1995 WL 301380, at *2 (E.D. La. May 15, 1995) (courts have consistently held that preliminary injunctions are not appropriate in cases permeated with factual disputes).  As explained above, Plaintiffs have presented credible testimony and documentary evidence that Defendants' disposal of Plaintiffs' property without sufficient notice may be unreasonable under the Fourth Amendment.  However, in stark contrast, Defendants have presented substantial evidence of conditions of rodent infestation, discarded sharps, overwhelming amounts of trash, waste, including human feces and urine, and other health hazards present in the encampments that arguably necessitate seizure and disposal of property to maintain public health and safety.

Given the factual disputes regarding whether the Denver Defendants complied with property storage requirements, as well as the Denver Defendants' legitimate interest in removing property that contributes to unsafe and hazardous conditions, the Court cannot find at this stage of the litigation that Plaintiffs have established a substantial likelihood of success on the merits of their Fourth Amendment claim.  *See Murray v. City of Philadelphia*, 2020 WL 5006046, at *5 (E.D. Pa. Aug. 25, 2020) (finding plaintiffs failed to establish that they were likely to prevail on their Fourth Amendment claim); *see also Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 116 (D.D.C. 2018) (finding no likelihood of success on the merits of a Fourth Amendment claim where "the District of Columbia provides [encampment] residents with notice of the specific date, time, and place of a scheduled cleanup, allowing them two weeks to move their possessions or pack them for storage" and "tries to help the owners not only by providing them containers to store or move their belongings but also by seeking to arrange housing and provide other services"); *Hooper v. City of Seattle*, 2017 WL 591112, at *7 (W.D. Wash. Feb. 14, 2017) (allegations that officials destroyed homeless individuals' personal property without providing required notice or opportunity to retrieve seized items insufficient to establish likelihood of success on Fourth Amendment claim, as defendants' declarations indicated that officials provided notice and followed procedural safeguards); *Martin v. City & Cnty. of Honolulu*, 2015 WL 5826822, at *7 (D. Haw. Oct. 1, 2015) (finding no likelihood of success on the merits of Fourth Amendment claim where city policy required officials to "only dispose[ ] of items that pose a risk to public health or safety").

d.   <u>Fourteenth Amendment - Substantive Due Process</u>

The Due Process Clause protects against "deliberately wrongful government decisions[,]" *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995), when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). The danger creation doctrine is an exception to the general rule that government actors may only be held liable for their own acts, not for injuries or conditions outside of their control. *See, e.g., DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–97 (1989) (failure to protect individual against private violence not a constitutional violation).

To state a *prima facie* case under the danger creation exception, Plaintiffs must demonstrate that: (1) Defendants created or increased Plaintiffs' vulnerability to the danger in question; (2) Plaintiffs are members of a limited and specifically definable group; (3) Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) Defendants acted recklessly in conscious disregard of that risk;[20] and (6) such conduct, when viewed in total, is conscience shocking. *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002).

To satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. *Uhlrig*, 64 F.3d at 574. That is, the plaintiff

---

[20] The Denver Defendants point out (ECF No. 68 at 16 n.2) that Plaintiffs misstate the fourth element of the danger creation doctrine in the PI Motion. (*See* ECF No. 47 at 26.) Plaintiffs state they must establish that "Defendants were *deliberately indifferent* to that substantial risk of serious harm," not the standard set out in *Uhlrig*, which requires that Defendants "acted recklessly in conscious disregard of that risk."

must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.[21]  *Id.*

Here, there is a factual dispute about the core proposition underlying Plaintiffs' substantive due process claim: that displacement from encampments, presumably with the intent that Plaintiffs go to congregate shelters, increases their risk of exposure to COVID-19.  The parties also treat the CDC guidance on unsheltered homelessness and COVID-19 differently, with Plaintiffs using the guidance as a bright-line rule to state that "if individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are."  (ECF No. 47 at 8 (citing Coronavirus Disease 2019 (COVID-19): Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unshelteredhomelessness.html).)  Plaintiffs emphasized at the Evidentiary Hearing that other courts have concluded that the "basis for finding a constitutional

---

[21] The Supreme Court has explained that the "standard for judging a substantive due process claim is whether the challenged government action would shock the conscience of federal judges."  *See Uhlrig*, 64 F.3d at 573 (quoting *Collins v. City of Harker Heights Tex.*, 503 U.S. 115, 126 (1992) (finding no substantive due process violation by city under § 1983 for providing an unsafe workplace where a worker entered a sewer without adequate ventilation and died) (internal quotation marks omitted)).

To discern whether particular facts shock the conscience and rise to the level of a substantive due process violation, a court must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.  Id. (citations omitted).  Applying *Collins*, the Tenth Circuit has explained that a § 1983 violation must be predicated on a state action manifesting one of two traditional forms of wrongful intent—that is, either: (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm, which is defined as "when a state actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences."  *Id.* at 573–74.

violation has been violating one line in CDC guidance because the CDC guidance is the best medical authority we have right now for responding to the pandemic." (Tr. III at 229:10–13.)

By contrast, Defendants argue that the CDC guidance does not set constitutional standards, and regardless, it is not nearly as definitive as Plaintiffs claim (ECF No. 67 at 16; ECF No. 68 at 13), *see Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) (recommendations of various groups may be instructive but do not establish constitutional minima; rather, they establish goals recommended by the organization in question). Instead, the Denver Defendants assert that the CDC guidance is just that— guidance that is not mandatory, and certainly not mandated as a constitutional matter. Rather, it is "meant to be interpreted by the local health authorities in light of the conditions existing in that specific locality." (Tr. III 217:10–14.)

Nonetheless, Plaintiffs argue that the sweeps—imposed in contravention of CDC guidance—put them in an inherently more dangerous situation than they previously faced, establishing danger creation liability. (ECF No. 47 at 26–27; ECF No. 77 at 6); *see Santa Cruz Homeless Union v. Bernal*, 2021 WL 222005, at *5–6 (N.D. Cal. Jan. 20, 2021) (finding plaintiffs were likely to succeed in demonstrating that the City of Santa Cruz's closure of the encampment at San Lorenzo Park and the Benchlands will put the homeless persons living there at greater risk of contracting COVID-19); *and Phillips*, 2020 WL 4698800, at *2 (denying motion to dismiss danger creation substantive due process claim, reasoning if "the City is requiring the homeless to vacate well-lit and high-traffic public land, or go to jail, when housing is not available for some

36

specific unhoused people, nor for all, and taking and destroying their tents, tarps, blankets, clothing, and other property, then the City may be creating an unlawful state-created danger for the homeless").[22]

Among other evidence, Plaintiffs rely on the Declaration and Rebuttal Expert Declaration of Marisa Westbrook, an expert in the field of housing impacts on health (Tr. I at 90:22–25), and the Expert Declaration of Gregory Whitman, an expert in the field of pandemic management (Tr. I at 252:19–24), which explain that CDC guidance says sweeping encampments exposes homeless individuals to greater danger from COVID-19. (*See* ECF Nos. 14-1, 77-1 ¶¶ 34–51; 77-5 ¶¶ 23–25, 27–31.) According to Plaintiffs' experts, unless Denver can house all homeless individuals in individual housing options, sweeps should cease. (ECF No. 77-1 ¶ 24.) Instead, Defendants should increase access to bathrooms, handwashing stations, and other sanitary measures. (ECF No. 77-1 ¶¶ 40, 50.)

Both Westbrook and Dr. Whitman reiterated these positions at the Evidentiary Hearing. Westbrook stated that leading health and homeless researchers have found that sweeps can lead to negative health and safety consequences. (Tr. I at 103:4–11.) Specifically, she testified that data and evidence-based literature show that the spread of COVID-19 over the past months has been much lower in encampments than in congregate shelters (Tr. I at 103:11–15), and that congregate shelters expose homeless

---

[22] *Phillips* is distinguishable, as it was in the motion to dismiss phase, and based its opinion on the idea that housing might not be available. In addition, the opinion did not address the pandemic.

Here, it appears as though housing is available in the form of shelters, though it remains unclear whether there is shelter space available for every person who might be displaced from an encampment. Plaintiffs' position in this case is that they do not want to go to shelters for fear of increasing their risk of contracting COVID-19.

individuals to greater risk of exposure to COVID-19 than encampments, which are open-air settings (Tr. I at 110:12–25).  Likewise, Dr. Whitman testified that Defendants' actions in clearing homeless encampments during the COVID-19 pandemic increased homeless individuals' vulnerability to the COVID-19 infection and placed homeless individuals at substantial risk of serious harm.  (Tr. I at 254:3–8, 256:19–22.)

To the contrary, the Denver Defendants contend that Plaintiffs' central argument—that displacement from camps means an increased risk of COVID-19—is "wrong as a matter of fact and untenable as a legal theory."  (ECF No. 68 at 15.)  They submit the Declaration of Danica Lee, who states that DDPHE data indicates that none of the encumbrance removals or area restrictions increased the rate of COVID-19 infection among homeless individuals, or that these individuals were at a greater risk of COVID-19 exposure in shelters than camps.  (ECF No. 68-1 ¶ 34.)  Lee further states that contrary to Westbrook's claims, Denver health experts have found that permitting indefinite residence in camps is not the most effective way to reduce risk for homeless individuals and the general public.  (*Id.* ¶ 18.)  Lee explains that the deteriorated conditions in the camps lead to contagious diseases, infestations, biohazards, and other issues precipitating sweeps.[23]  (*Id.* ¶¶ 19–20.)

Further, the Denver Defendants dispute the validity of the studies Plaintiffs rely on (ECF No. 47 at 29 n.65), arguing that "nothing can be gleaned from them about the difference between COVID-19 in sleeping in shelters versus sleeping on the street because both studies tested individuals utilizing shelters."  (ECF No. 68 at 16.)

---

[23] In her rebuttal, Westbrook dissects Lee's declaration, contending Lee's "lay conclusions deviate significantly from public health guidance and best practice."  (ECF No. 77-1 ¶ 50.)

Accordingly, they contend Plaintiffs' claims about evidence in the form of prevalence testing and that camps are objectively safer for homeless individuals are "entirely unsupported, and incorrect." (*Id.*)

In addition, McDonald testified that he has not seen heightened levels of COVID-19 in congregate shelters versus encampments and expressed his surprise that COVID-19 cases in *both* venues have been *lower* than he anticipated at the beginning of the pandemic. (Tr. II at 230:14–24.) McDonald unequivocally stated that the encampments DDPHE acted upon presented "far more of a public health risk than what . . . people might be exposed to in a shelter." (Tr. II at 230:24–231:3.)

The Denver Defendants' expert witness, Dr. Bill Burman, is an expert in the field of the public health response to the COVID-19 pandemic, including Denver Public Health's response to the COVID-19 pandemic. (Tr. II at 138:24–139:3.) Dr. Burman's opinions conflict with Plaintiffs' experts' opinions regarding the risk of COVID-19 exposure associated with congregate shelters versus encampments. Dr. Burman disagreed with Westbrook's conclusion that Denver's congregate shelters are objectively more dangerous to public health during COVID-19 than encampments. (Tr. II at 139:24–140:5.) Instead, Dr. Burman stated that the risks in both settings are numerous and complex, and that he does not think there has been a conclusive demonstration, as a matter of medical science, that one is inherently more dangerous than the other. (Tr. II at 140:6–10.) Dr. Burman acknowledged that Westbrook relied on a study by Dr. Sarah Rowan, which involved COVID-19 testing in homeless shelters and encampments, for her conclusions on this topic. In fact, Dr. Burman participated in

39

that same study, which he testified had significant limitations, including that the samples tested were not random, and that the study was conducted during a relatively brief time period in a rapidly changing pandemic.  (Tr. II at 140:11–142:11.)  Based on the Rowan study, Dr. Burman testified that the results only suggest—"and do no more than that"—that COVID-19 transmission is more common among persons who are in a congregate setting.  (Tr. II at 142:25–143:3.)

Regarding CDC guidance, Dr. Burman—who has participated in writing CDC guidance in the past (though unrelated to COVID-19)—testified that CDC guidance is viewed very carefully and is an important resource for local public health officials to consult when making a range of decisions about public health programs.  (Tr. II at 145:15–146:10.)  However, Dr. Burman also clarified that the CDC guidance is "not regulation" and is "intended to be counsel, advice, which should be considered in the local context."  (Tr. II at 145:23–147:1.)  He testified that he has not seen in the data any evidence of an increase in COVID-19 exposure to homeless individuals or the general public from any encampment cleanup and does not know how that would be detected. (Tr. II at 155:18–21.)  Rather, he opined that, given the many factors not limited to COVID-19 that go into such a decision, Denver's public health decision to clean large encampments in the past several months was a "reasonable response" to the public health risks at those encampments.  (Tr. II at 156:8–16.)  Ultimately, Dr. Burman stated that he does not know whether allowing homeless individuals to reside in encampments for the duration of the pandemic is the safest and most effective way to reduce risks for the homeless individuals and the general public during the COVID-19 pandemic.  (Tr. II

at 155:7–13.)  Indeed, given the currently incomplete state and development of the relevant infectious disease data and information, he does not think the medical community yet knows the safest and most effective way for local public health officials to handle this nuanced situation.  (Tr. II at 155:14–17.)

This critical factual dispute among experts and public health officials touches almost all of the elements required to establish danger creation liability.  Moreover, the issue is a moving target, with COVID-19 testing and treatment, the number of homeless individuals in Denver, the availability of shelter (both congregate and individual), public funding, and other relevant factors changing almost daily.

In fact, on January 22, 2021, Plaintiffs submitted a Notice of Supplemental Authority, explaining that on January 21, 2021, President Joseph R. Biden issued a "Memorandum to Extend Federal Support to Governors' Use of the National Guard to Respond to COVID-19 and to Increase Reimbursement and Other Assistance Provided to States" that (under Section 2 of the memorandum) made emergency hotel rooms obtained by states and cities for homeless individuals 100% reimbursable through the Federal Emergency Management Agency ("FEMA") during the COVID-19 pandemic. (*See* ECF Nos. 149, 149-1.)  While Plaintiffs likely provided this supplemental authority as evidence that individual hotel rooms are safer than shelters and that the basis for this memorandum is consistent with CDC guidance, the potential availability of a significant number of additional individual hotel rooms for people experiencing homelessness, apparently to be funded in great part by the federal government, in fact weakens Plaintiffs' argument.  Under President Biden's new (and to be sure, much welcomed)

41

initiative, more alternative housing options will be available, making future sweeps less likely to endanger members of encampments and undercutting Plaintiffs' likelihood of success on the merits of their substantive due process claim. The conflicting evidence before the Court, described above, reflects as much.

Considering the critical factual disputes regarding whether homeless encampment sweeps in fact increase Plaintiffs' risk of contracting COVID-19, the Court finds that Plaintiffs have failed to establish a substantial likelihood of success on the merits of their Fourteenth Amendment substantive due process claim.

2.   *Irreparable Harm[24] – Plaintiffs' Fourteenth Amendment Procedural Due Process Claim*

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).  The moving party "must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."  *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Id.* at 752 (citations omitted).

Here, Plaintiffs have met their burden of establishing irreparable harm based on violations of their Fourteenth Amendment procedural due process rights.  The Court heard testimony from at least one homeless individual, Sepulveda, that following the

---

[24] Because Plaintiffs have not shown a substantial likelihood of success on the merits in connection with their breach of contract, Fourth Amendment, and Fourteenth Amendment substantive due process claims, the Court will only address the remaining elements of Rule 65, irreparable harm, balancing of the harms and public interest, and bond, in the context of Plaintiffs' Fourteenth Amendment procedural due process claim.

seizure of his property in a sweep, he had "nothing but the clothes on [his] back, . . . and [he] had to try to make a tree into a shelter because it started blizzarding that night. . . ." (Tr. III at 178:14–18.)  In addition, Charles Davis, a homeless individual whose property was seized and destroyed in the Lincoln Park sweep, submitted a declaration stating that after the sweep, he was forced to sleep on the streets without a tent.  (ECF No. 77-14 ¶ 18.)  Davis slept unsheltered on a median for multiple nights because he feared being swept again.  (*Id.*)

The Court concludes that in the absence of an injunction, the likelihood that Plaintiffs' vital possessions, such as tents, blankets, tarps, and other items necessary to survive outside in the elements—particularly during the winter in Colorado—will be seized and potentially destroyed without sufficient advance notice, constitutes irreparable harm for purposes of Plaintiffs' instant Motion.  *See Mitchell*, 2016 WL 11519288, at *6 (finding irreparable harm element satisfied where city continued arresting homeless individuals and confiscating their property even after lawsuit filed).

3. *Balance of the Harms and Public Interest – Plaintiffs' Fourteenth Amendment Procedural Due Process Claim*

In analyzing whether a preliminary injunction should issue against the government, the final two elements of the preliminary injunction test are treated together.  *Essien v. Barr*, 457 F. Supp. 3d 1008, 1020 (D. Colo. 2020) (citing *Nken*, 556 U.S. at 435).  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," as a preliminary injunction would do here. *Carranza v. Reams*, 2020 WL 2320174, at *11 (D. Colo. May 11, 2020) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

The Court is mindful of the Denver Defendants' argument that a preliminary injunction requiring a specific amount of notice before a sweep will to some degree limit "Denver's health experts from making decisions to combat the spread of disease and the deterioration of public health," "especially when the City is facing a pandemic with constantly evolving scientific understanding and policymaking."  (ECF No. 68 at 27.)  The Court here reiterates its finding, however, that based on the evidence adduced at the Evidentiary Hearing, as well as on other supporting declarations, that the Denver Defendants have not come close to demonstrating that a requirement of at least seven days' notice before an encampment sweep will preclude it from fulfilling its duty to protect public health and safety.  And, in any event, the preliminary injunction will provide for an exception to this seven day notice requirement in the event DDPHE is able to adequately articulate why protection of the public health and safety requires advance notice of a shorter duration.  Thus, the Court will issue the narrowest injunction possible so that Plaintiffs' procedural due process rights are protected, *and* the Denver Defendants are not unduly restrained in their ability to maintain the public health and safety.

      4.    *Bond*

Rule 65(c) states that this Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Although phrased as mandatory, in practice the Court has discretion under this Rule whether to require a bond, particularly in public

interest cases involving the fundamental rights of citizens.  *See* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2017 update) (citing public rights cases where the bond was excused or significantly reduced).

Plaintiffs ask that the Court waive bond in this case because Plaintiffs are indigent.  (ECF No. 47 at 41.)  Defendants are silent on whether the Court should require a bond.  (ECF Nos. 67, 68.)  The Court finds that waiving the bond is appropriate in this case.

**B.     The Governor**

Plaintiffs request preliminary injunctive relief in connection with their Fourth and Fourteenth Amendment claims against the Governor in his official capacity.  The Lincoln Park sweep is the only sweep in the Complaint which occurred on state-owned property.  Because the question of whether any encampments currently exist on other state-owned property arose at the Evidentiary Hearing, for the purposes of resolving the PI Motion, the Court assumes *arguendo* that people experiencing homelessness have formed encampments on other state-owned property, where future sweeps might occur. Because the Court's conclusions concerning the substantial likelihood of success on the merits are dispositive as to all claims against the Governor, the Court limits its analysis to that element.

1.     *Fourteenth Amendment - Procedural Due Process*

Plaintiffs have failed to offer any evidence that the Governor directed, planned, orchestrated—or was even involved in—the decisions to sweep Lincoln Park, when to provide notice, or whether to seize property.  Major Steve Garcia of the CSP testified

that the Governor did not direct the CSP to participate in the cleanup of Lincoln Park, and stated that members of the City of Denver decided what notice should be provided to members of the encampment.  (Tr. III at 153:8–13, 155:2–4.)  In addition, Garcia testified that members of Denver city government and DPD HOT officers decided which items of property should be stored and which should be disposed of at the Lincoln Park sweep.  (Tr. III at 155:15–22.)

Moreover, McDonald's testimony corroborates Garcia's.  McDonald testified that the decision to place a public health area restriction in Lincoln Park is ultimately up to him.  (Tr. II at 232:6–9.)  McDonald confirmed that the Governor did not influence his decision, and he never spoke with the Governor (or even Mayor Hancock) about Lincoln Park.  (Tr. II at 232:12–15.)  Based on the total lack of evidence that the Governor participated in the Lincoln Park sweep, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits of their claim that the Governor violated their Fourteenth Amendment right to procedural due process.

2.     *Fourth Amendment & Fourteenth Amendment - Substantive Due Process*

For the reasons explained above with respect to the same claims against the Denver Defendants, the Court finds Plaintiffs have not met their burden of demonstrating a substantial likelihood of success on the merits of their Fourth Amendment and Fourteenth Amendment substantive due process claims against the Governor.

Given the lack of evidence that the Governor participated in the events at issue in the PI Motion, the record does not support Plaintiffs' argument that a preliminary

injunction is necessary to prevent the Governor from violating their constitutional rights. Accordingly, the Court denies the PI Motion in full as to the Governor.  Given this ruling, the Governor's oral motion to keep the record open for additional evidence will be denied as moot.[25]

## V. PRELIMINARY INJUNCTION[26]

In light of the foregoing, the Court issues the following preliminary injunction:

The Denver Defendants, as well as their officers, managers, directors, agents, employees, successors and assigns, and all other persons in active concert or participation with them, are hereby IMMEDIATELY AND PRELIMINARLIY ORDERED AND RESTRAINED as follows:

1. The Denver Defendants shall provide to all residents of affected homeless encampments not less than seven days' advance written notice prior to initiating a large-scale encumbrance cleanup performed by DOTI, or a DDPHE-ordered temporary area restriction of such encampments.  The number, form and content of such notices shall comply in all respects with Items A.3 & A.4 of Exhibit A to the *Lyall* Settlement Agreement;

2. Not less than seven days prior to the commencement of any homeless encampment sweep referenced in Paragraph 1 of this Preliminary Injunction, the

---

[25] The Court declines to address the Governor's argument that he is entitled to Eleventh Amendment immunity at this time.  The Court will address this argument by way of separate order if it is raised again in future briefing.

[26] In a prior filing in this case, Defendants stated that "[s]hould a preliminary injunction issue, Defendants would be enjoined from certain identified actions and that relief would be a complete prohibition on conduct—not just limited to the named Plaintiffs."  (ECF No. 64 at n.2; ECF No. 73.)  Accordingly, this Preliminary Injunction is a complete prohibition on the Denver Defendants' conduct and is *not* limited solely to the named Plaintiffs.

Denver Defendants shall provide additional advance notice of such sweeps, by way of electronic mail, sent to Plaintiffs' counsel, as well as to the Denver City Council member representing the Denver city council district in which the encampment sweep subject to this Preliminary Injunction is expected to take place.  Said e-mail notice to counsel and City Council member shall, at a minimum, advise them of the imminent encampment sweep, including the date, time, place, and nature of the impending action, and the reasons why the Denver Defendants have decided that such action is necessary at that time.  The Denver Defendants shall permanently retain all copies of these e-mail messages;

3.    The Denver Defendants shall be permitted under this Preliminary Injunction to conduct a large-scale encumbrance cleanup sweep, or temporary area restriction sweep, with less than seven days' advance notice only in the event that the Colorado Department of Public Health and Environment, DDPHE, and/or Denver Public Health, singly or in combination, determine that there exists reasonable, evidence-based reasons to believe that a public health or safety risk exists which requires the undertaking of such encampment sweeps with less than seven days' advance notice to the residents of those encampments.  Such determination(s) must be in writing, must provide a reasonably detailed explanation of the public health basis(es) for the determination, and it/they must be published in the authoring agency(ies) official online website *prior* to the Denver Defendants undertaking any such homeless encampment sweep;

4.      In the event the requirements for an abbreviated advance notice as set forth in

Paragraph 3 of this Preliminary Injunction have been met, then the Denver

Defendants may cause a homeless encampment sweep to take place with less

than seven days' advance notice to the residents of those encampments.  In no

event, however, may any homeless encampment sweep take place with less

than **48 hours' advance notice** being given to the residents of the affected

encampments; and

5.      All requirements of the advance notice to be provided to encampment residents,

counsel, and Denver City Council members, and the retention of all electronic

records regarding same, as set forth in Paragraphs 1 and 2 of this Preliminary

Injunction, shall apply equally to the abbreviated advance notices allowed to be

issued under Paragraph 4 of this Preliminary Injunction, except that the advance

notice requirements of Paragraph 2 with regard to Plaintiffs' counsel and Denver

City Council member must be completed not less than 48 hours prior to such

abbreviated notice encampment sweeps.

## VI.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiffs' Motion for Preliminary Injunction and Expedited Hearing (ECF No. 47),

is GRANTED in part and DENIED in part;

2.      The Denver Defendants, and their officers, managers and employees, are

PRELIMINARILY ENJOINED as set forth above in Part V of this Order;

3.      The Motion for Preliminary Injunction is DENIED in all other respects as to all

Defendants against whom preliminary injunctive relief was sought; and

4.      The Governor's January 11, 2021 oral motion to keep the record open for the

introduction of additional evidence is DENIED as MOOT.


Dated this 25th day of January, 2021.

                                            BY THE COURT:



                                            _____
                                            William J. Martinez
                                            United States District Judge