**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-2985-WJM-SKC

DENVER HOMELESS OUT LOUD, *et al*.

     Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, COLORADO, *et al*.

     Defendants.

---

**DENVER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
FIRST[1] AMENDED COMPLAINT AND JURY DEMAND [DOC. #160]**

---

Defendant City and County of Denver ("Denver" or "City") and the individually-named Denver Defendants Hancock, McDonald, Lee, Robinson, Bronson, Pitt, Hunholz, Cody, A. Martinez, Moore, Phuvhapaisalkij, Monthathong, Randall, Hunter, Wilson, Udland, D. Martinez, Sam, Harvey, Ulrich and Lutkin (jointly "Denver Defendants"), through counsel, hereby move to dismiss Plaintiffs' First Amended Class Action Complaint and Jury Demand [Doc. #160, hereafter "Complaint"] pursuant to Fed. R. Civ. P. 12(b)(1) and (6). In support, the Denver Defendants state:

**CERTIFICATE OF CONFERRAL**

On March 3, 2021, undersigned counsel telephonically conferred with Plaintiffs' counsel regarding this motion. As required by WJM Revised Practice Standard III.D.1, the parties discussed the basis for this motion and the possibility of Plaintiffs further amending the complaint

---

[1] Plaintiffs' have captioned the operative complaint as a "First Amended Complaint" but have previously filed a Complaint [Doc. #1] and an Amended Complaint [Doc. #46] in this matter.

to cure the deficiencies discussed below in order to state a viable claim for relief. Counsel for Plaintiffs disagreed that the claims were subject to dismissal on the specific grounds addressed in the conferral and articulated by this motion, and stated that Plaintiffs do not intend to amend the complaint in response to the conferral. This motion is opposed.

## INTRODUCTION

Plaintiffs here seek to relitigate alleged constitutional violations arising from Denver's cleaning of unsanctioned large-scale encampments throughout the City. Plaintiffs impermissibly attempt to reopen claims that were resolved or otherwise precluded by the final judgment in *Lyall* and challenge the same policies and procedures for encumbrance removal and property storage that were at issue in that suit.[2] Plaintiffs dispute Denver's compliance with that agreement, but those claims are precluded from this lawsuit, and their exclusive remedy is a state-law breach of contract suit for which this Court has no independent jurisdiction.

Further, to the extent that any of Plaintiffs' claims escape preclusion, those claims still fail. As more fully discussed below, the allegations of the Complaint do not establish a constitutional violation, let alone a clearly-established constitutional violation, entitling each and every individually named Denver Defendant to qualified immunity. Further, Plaintiffs have failed to plausibly plead municipal liability or a breach of contract claim against Denver, and their attempt

---

[2] On September 23, 2019, this Court approved the Stipulated Motion for Final Approval of Class Action Settlement, thereby ending the *Lyall* litigation. [Case No. 16-cv-2155-WJM-SKC, Docs. ## 224-1 (settlement), 225 (approval); *see also* Doc. #160 ¶ 152.] To argue res judicata, Defendants must necessarily refer to pleadings and orders in the *Lyall* lawsuit and request that this Court take judicial notice of such pleadings and orders. *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it."); *see also Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (facts subject to judicial notice do not convert a motion to dismiss into a motion for summary judgment).

to craft a First Amendment claim from an alleged lack of notice has no merit. Accordingly, their latest Complaint should be dismissed in its entirety.

## LEGAL STANDARDS

"To survive a motion to dismiss for failure to state a claim upon which relief can be given, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility means the plaintiff has pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility also refers "to the scope of the allegations in a complaint; if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012), (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). A court may also dismiss a complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994). Where, as here, a motion to dismiss for lack of subject matter jurisdiction raises a facial jurisdictional challenge to a complaint, a district court must accept the allegations in the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

## ARGUMENT

For purposes of this Motion, all facts alleged in the Complaint are presumed to be true. However, while Plaintiffs label a wide range of municipal conduct over multiple dates as simply "the sweeps," this Motion distinguishes between different types of enforcement actions. Plaintiffs' use of "sweeps" strategically conflates area restrictions imposed by Denver's Department of Public

Health and Environment (DDPHE) with large-scale encumbrance cleanups conducted by the Department of Transportation and Infrastructure (DOTI). DOTI conducts large-scale encumbrance removals pursuant to a Denver ordinance. These actions are separate from DDPHE's determination, pursuant to its public-health authority, that an area restriction is necessary to immediately remediate health risks. Keeping "area restrictions" distinct from "cleanups" or "encumbrance removals" is not mere semantics: the terms convey differences between these specific actions which are crucial to analyzing preclusion (as well as Plaintiffs' new First Amendment claim) but obscured by the pejorative term "sweep."

## I.   This Lawsuit is Precluded by the *Lyall* Lawsuit

Res judicata bars Plaintiffs' claims that were brought, or could have been brought, in the prior *Lyall* class-action litigation. [*See* Doc. #160 at 4, 8 (invoking *Lyall* and conceding "[t]he sweeps are not new.").] That litigation was settled, and the settlement approved by this Court. Plaintiffs' claims here related to encampment cleanups and property storage by DOTI collaterally attack that agreement, impermissibly seeking a new and different judgment that would impair all parties' rights under the *Lyall* settlement relating to the encampment cleanup process, including large-scale encumbrance cleanups, regular area cleanups, areas that are not within large-scale encumbrance cleanups or the areas designated as regular cleanups, and the decisions made regarding property storage. Plaintiffs' challenge here to DDPHE area restrictions—a process separate and distinct from a DOTI large-scale encumbrance cleanup—is no different because that determination is simply the triggering event that requires DOTI to complete the cleanup of the restricted area, with the same procedures for removal and disposal or storage of property established and governed by the *Lyall* settlement.

Res judicata is comprised of "two distinct doctrines regarding the preclusive effect of prior litigation," issue preclusion and claim preclusion. *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020). Issue preclusion "precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment," while claim preclusion "prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated." *Id.* Preclusion defenses are available to § 1983 defendants. *See Allen v. McCurry*, 449 U.S. 90, 105 (1980). Res judicata serves the fundamental social interests of "finality, judicial economy, preventing repetitive litigation and forum-shopping, and the interest in bringing litigation to an end." *Plotner v. AT & T Corp.,* 224 F.3d 1161, 1168 (10th Cir. 2000) (internal quotations omitted).[3]

Both forms of res judicata require: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (internal alterations and quotation marks omitted). Here, the first element is satisfied by the *Lyall* settlement agreement, because court-approved settlements have the same preclusive effect as litigated judgments. *See Hoxworth v. Blinder*, 74 F.3d 205, 207–08 (10th Cir. 1996).

### A.  Plaintiffs Here are in Privity with the *Lyall* Plaintiffs

While "[t]here is no definition of 'privity' which can be automatically applied in all cases involving the doctrines of Res judicata and collateral estoppel … [it] requires, at a minimum, a

---

[3] Where, as here, the Court considers a question which was previously ruled upon in federal court, the federal law of preclusion applies. *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992).

substantial identity between the issues in controversy and showing that the parties in the two actions are really and substantially in interest the same." *St. Louis Baptist Temple, Inc.*, 605 F.2d at 1174 (citation omitted); *see Pelt v. Utah*, 539 F.3d 1271, 1281–82 (10th Cir. 2008) (same) (identifying categories of privity); *see also Taylor v. Sturgell*, 553 U.S. 880, 894–95 (2008) (privity exists when a non-party was "adequately represented by someone with the same interests who [was] a party in the [earlier] suit" (internal citations omitted)).

Here, the proposed class consists of "all persons in Denver whose personal belongings may in the future be taken or destroyed without due process on account of Denver's, and/or its officials' and representatives', decision to clear away an encampment of homeless person(s) by seizing and/or discarding the property found there without adequate notice." [Doc. #160 ¶ 411(a).] As Plaintiffs themselves emphasize, [*see* Doc. #48 at 5], this is nearly identical to the *Lyall* class of "[a]ll persons in the City and County of Denver whose personal belongings may in the future be taken or destroyed without due process on account of the City and County of Denver's alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there." [Case No. 16-cv-2155-WJM-CBS, Doc. #106 at 26.] With the two classes so defined, there can be no reasonable argument that the classes, and the class representatives, are not substantially identical and thus in privity with each other.

### B. Plaintiffs' Claims Here Were Brought or Could Have Been Brought in *Lyall*

As to the third element, as noted above, the two forms of res judicata together forbid "parties or their privies from relitigating issues that were or *could have been raised* in a prior action." *Wilkes v. Wyo. Dep't of Emp't Div. of Labor Stds.*, 314 F.3d 501, 503–04 (10th Cir. 2002)

(emphasis in original). Here, some of Plaintiffs' claims are literally identical to those asserted in *Lyall*: both complaints assert claims for Fourth Amendment seizure; Fourteenth Amendment violation of due process; and denial of equal protection. [*Compare* 16-cv-2155-WJM-CBS, Doc. #54 (*Lyall* Amended Complaint) at 31–36, *with* Doc. #160 at 99–101, 103–05, 115–17, 121–23.] In *Lyall*, plaintiffs brought (but subsequently abandoned) a claim that Denver's "sweeps" forced class members into "dangerous areas," just as Plaintiffs here assert a similar theory of "danger creation." [*Compare Lyall* Amended Complaint at 18, 32–33, *with* Doc. #160 at 3, 24, 105–07.]

Plaintiffs' numerous additional claims—whether under the federal Constitution, Colorado Constitution, or other Colorado state law—are premised on the same underlying core of factual allegations and each could have been brought in the prior lawsuit. In short, both the instant case and the *Lyall* lawsuit involve the same alleged misconduct by Denver and its employees—namely the cleaning of homeless encampments around the City, the dispersal of homeless individuals as a result of the cleanups, and the alleged taking of personal property during the cleanups. As such, the present lawsuit involves the same fundamental municipal transactions as the *Lyall* lawsuit, namely the cleaning of homeless encampments. *See Wilkes*, 314 F.3d at 504 (when new lawsuit involves the same transaction as did a previous lawsuit, it is barred by res judicata).

The *Lyall* settlement agreement itself contains a broad and explicit preclusion of future claims and issues:

> Plaintiffs, as Certified Rule 23(b)(2) Class Representatives, hereby release, acquit, and forever discharge the Released Parties, of and from *any and all liabilities, claims, demands, rights, controversies, agreements, actions, causes of actions, and judgement, either in law or in equity, for injunctive or declaratory relief which might exist or might be in any way related to* or giving rise to the above-referenced Lawsuit, including, but not limited to, any and all claims arising out of the City's alleged custom or practice (written or unwritten) of sending ten or more employees

or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there.

[Doc. #14-2 at 3 ¶ 2 (emphasis added).] Although the specific encampments at issue here post-date those included in the *Lyall* lawsuit, the encampment cleanup protocol and notices for large-scale encumbrance cleanups are always conducted by DOTI and directly relate to the policies and protocols at issue in *Lyall* and resolved by the settlement. Even Plaintiffs' First Amendment theory "might in any way [be] related to" the policies requiring notice before large-scale encumbrance removals.

The settlement agreement is also explicitly forward-looking, establishing rights and obligations to guide future interactions related to DOTI large-scale encumbrance encampment cleanups, regular area cleanups, areas that are not within large-scale encumbrance cleanups or the areas designated as regular cleanups, and the procedures for property storage. [*Id.* at 15–16.] Plaintiffs could have challenged the unauthorized-camping ordinance, the encumbrance ordinance, or DDPHE public-health authority in *Lyall*, or sought to have them included as part of the negotiated settlement agreement, but they did not.[4] Because those claims were available in the earlier suit, they are also precluded.

## C. Exceptions to Preclusion Do Not Apply Here

In class action litigation, courts may refuse preclusion where the interests of the current class were not vigorously represented by the representatives of a previous class. But that is hardly the case here, where both classes were represented by the same well-known civil rights attorneys within a very short period of time. *See Pelt*, 539 F.3d at 1285; [*see also* Doc. #160 ¶ 429 ("Mr.

---

[4]Plaintiffs in *Lyall* explicitly articulated a challenge to Denver's camping ordinance but made a strategic decision not to pursue it. [Case No. 16-cv-2155-WJM-SKC, Doc. #1 at 3.]

McNulty litigated, and ultimately was instrumental in the settlement of, a class action on behalf of Denver's homeless population, *Lyall v. Denver*.").] Here, unlike in *Pelt*, there is no evidence that the *Lyall* plaintiffs and counsel were pursuing their own interests rather than the interests of the class. *Pelt*, 539 F.3d. at 1289. Adequate representation requires that "(1) the interests of the nonparty [class] and the [their] representative[s] are aligned, . . . and (2) either the party understood [itself] to be acting in a representative capacity or the original court took care to protect the interests of the non-party." *Taylor*, 553 U.S. at 900 (internal citations omitted). There cannot be any doubt that the parties intended the *Lyall* settlement agreement to run in favor of the members of the putative class and class representatives in the instant lawsuit and to finally dispose of all claims related to the cleaning of homeless encampments; or that this Court, in approving the settlement, did not act in the best interest of all homeless individuals, including the current putative class.

Plaintiffs may also argue that their claims cannot be precluded because the COVID-19 pandemic was not present in 2016 when the *Lyall* complaint was filed and DDPHE area restrictions were not specifically at issue, so the danger of the virus to the homeless population or other public health emergencies could have not been contemplated in 2019 when the *Lyall* settlement agreement was approved. Although the COVID-19 pandemic is indeed unexpected and unprecedented, not every change in external circumstances creates a new cause of action or invalidates the preclusive effect of a prior lawsuit. If this Court were to permit reopening of these claims due to the changed circumstances presented by COVID-19—or any public health risk such as those DDPHE has recently identified in existing encampments at Lincoln Park, Morey Middle School and the South Platte area—any change in external circumstances could result in a new cause of action and the doctrine of res judicata would be entirely compromised. For instance, were

a change in external circumstances a reason to relitigate the City's cleaning of encampment areas, new lawsuits could be brought every time there was an exceptionally cold winter, an exceptionally hot summer, an unusual rainy season, or a particularly bad flu season, just to name a few circumstances. [*See* Doc. #160 ¶ 406 (alleging "dangerous smoke from wildfires and massive temperature fluctuations.").] There is no exception to the doctrine of res judicata based on potential changes in the impact of conduct litigated in a previous lawsuit. *See Johnson v. Spencer*, 950 F.3d 680, 696 (10th Cir. 2020) (res judicata favors finality).

Plaintiffs may also appeal to the general rule that preclusion "does not bar claims that are predicated on events that postdate the filing of the initial complaint." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016). But this rule does not apply to cases such as this "that involve either judgment enforcement or a collateral attack on a prior judgment." *Lucky Brand,* 140 S. Ct. at 1597. Instead, whenever "a different outcome in the second action would nullify the initial judgment or would impair rights established in the initial action … courts simply apply claim preclusion or issue preclusion to prohibit a claim or defense that would attack a previously decided claim." *Id.* (citations and quotation omitted). Plaintiffs' fifteen non-contract claims for relief all collaterally attack the final settlement reached in *Lyall* which finally resolved the issue of the cleaning of homeless encampments and are precluded even though they are based on cleanups—as fully contemplated in that agreement—that took place after that settlement was entered. Allowing Plaintiffs' current causes of action to proceed would impermissibly impair the rights afforded Denver in the *Lyall* settlement agreement.

For all these reasons, Plaintiffs should be prohibited from relitigating whether Denver and its employees have violated constitutional rights in cleaning up large-scale encampments in the

City. To the extent they believe the *Lyall* settlement has been violated, their sole remedy is to file a lawsuit seeking to enforce the *Lyall* settlement agreement, which, for reasons stated below in Section III, is itself without merit.

## II.     Even Assuming this Lawsuit is not Precluded, Plaintiffs' Claims Nonetheless Fail

### A.     The Claims Against the Individual Denver Defendants Fail Because Plaintiffs Insufficiently Plead Personal Participation and/or Supervisory Liability

Each individually named Denver Defendant asserts qualified immunity to the federal constitutional claims brought against them in the Complaint. This places a heavy two-part burden on Plaintiffs to establish both a constitutional violation based upon the specific conduct of each individually named Defendant and that the law was clearly established at the time of the alleged violation. *See Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). The Complaint should be dismissed as to the individually named Denver Defendants because Plaintiffs have not asserted a clearly established constitutional violation or plausibly pled either personal participation or supervisory liability.

It is a fundamental rule of civil rights pleading that claims against individual defendants must reasonably specify the conduct of which that individual is being accused. "The need for individualized allegations is especially important where … each of the defendants had different powers and duties." *Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011) (citation and internal quotation marks omitted). Likewise, "it is particularly important in a § 1983 case brought against a number of government actors sued in their individual capacity that the complaint make clear exactly who is alleged to have done what to whom as distinguished from collective allegations." *Id.* (citation, alterations, and quotations omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (plaintiffs must "make clear exactly *who* is alleged to have done *what* to

*whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."). Plaintiffs have failed to adequately allege personal involvement by any individually named Denver Defendant.

Plaintiffs provide nothing but collective allegations against DPD officers Cody, A. Martinez, Moore, Phuvhapaisalkij, Monthathong, Randall, Hunter, Wilson, Udland, D. Martinez, Sam, Harvey, Ulrich, and Lutkin and Defendants Pitt and Hunholz. [*See, e.g.*, Doc. #160 ¶¶ 205, 208, 210, 212–17, 219–20, 234, 249–50 (lumping together DPD officers, Pitt, Hunholz, and various Johns & Janes in collective allegations); *id.* ¶¶ 211, 218, 231–32, 245 (lumping together DPD officers and various Johns and Janes in collective allegations); *id.* ¶¶ 282, 285, 295, 301, 304–06 (lumping together Pitt, Hunholz, and various Johns & Janes in collective allegations).] There are no allegations regarding what each individual did, and thus, the Complaint does not provide any of these Defendants with fair notice as to the basis of the claims against them. *Robbins*, 519 F.3d at 1250. Rather, Plaintiffs merely allege that each and every one of these individuals present at a cleanup or area restriction was responsible for all unconstitutional actions that allegedly occurred there, without regard to the different roles, powers, and duties exercised by these distinct Defendants. [*See, e.g.*, *id.*;] *Brown*, 662 F.3d at 1165. This type of collective pleading has been rejected by the Tenth Circuit as insufficient. *See Robbins*, 519 F.3d at 1250 (granting motion to dismiss because "the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom," made it "impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."); *see also Walker v. Mohuddin*, 947 F.3d 1244, 1250 (10th Cir. 2020) (allegations in a complaint that conduct was committed by

"defendants" does not adequately plead a § 1983 claim against an individually named defendant) (collecting cases). Thus, the claims against Defendants Cody, A. Martinez, Moore, Phuvhapaisalkij, Monthathong, Randall, Hunter, Wilson, Udland, D. Martinez, Sam, Harvey, Ulrich, Lutkin, Pitt, and Hunholz must be dismissed because Plaintiffs have failed to adequately plead their involvement in a constitutional violation.[5]

As to Mayor Hancock, Directors McDonald, Lee, Robinson, and Pitt, Assistant Director Hunholz, and City Attorney Bronson—Plaintiffs plead only *respondeat superior*, which does not state a viable constitutional violation. *See Iqbal*, 556 U.S. at 677. To the extent that Plaintiffs are attempting to allege supervisory liability under § 1983 against any of these individuals, Plaintiffs must establish not only that subordinate employees of each of these individuals violated the Constitution, but that each individually named supervisor, by his or her own actions, violated the Constitution as well. *Id.*; *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) ("[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement[,] (2) causation, and (3) state of mind.")).

To show personal involvement, a plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation," such as by plausibly pleading that the supervisor was responsible for, utilized or established a policy that caused a constitutional violation. *Id.* (citations omitted). The causation element requires a showing that the supervisor set "in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive

---

[5] This includes Claims One through Four and Seven through Twelve. (The Complaint does not contain a "Fifth Claim for Relief.")

the plaintiff of her constitutional rights." *Id.* (citing *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014)). Finally, to meet the state of mind element, the plaintiff must sufficiently allege that the individually named supervisor possessed the mental state required for the subordinate's alleged constitutional violation. *Id.*

The inadequacy of the supervisory liability claims asserted against Director Pitt and Assistant Director Hunholz is evident in that the entirety of such claims rests on just two paragraphs alleging that Pitt and Hunholz supervise a team of John and Jane Joes, Loes, Moes, and Does. [Doc. #160 ¶¶ 30–31.] All other allegations regarding these defendants again aggregate them with numerous other individual defendants in impermissible collective pleading. [*See, e.g.*, *id.* ¶¶ 282–285.] Thus, all three elements necessary to state a plausible § 1983 supervisory liability claim are missing from the operative complaint.

As for Defendants McDonald, Lee, Bronson and Robinson, Plaintiffs simply repeatedly allege that they "directed" the actions of their subordinates and "knew" that certain actions had been taken. [*Id.* ¶¶ 203, 224, 288, 320.] In turn, it is merely alleged that Defendant Mayor Hancock directed the actions of all Denver employees. [*Id.*] This is no more than alleging *respondeat superior* and because such conclusory allegations do not show personal involvement, causation, or state of mind by any of these individually named defendants, such allegations are insufficient to state a supervisory liability claim. *Burke*, 935 F.3d at 997.

Nor do any additional allegations included in the Complaint suffice. As to Defendants McDonald and Lee, the additional allegations in the Complaint are that they "coordinate[d], manage[d] and monitor[ed]" the restrictions at Lincoln Park, Morey Middle School, and the South Platte, and "coordinated" the seizure and destruction of property. [Doc. #160 ¶¶ 206, 279, 311.]

The 629-paragraph Complaint is completely devoid of any factual support or explanation for these conclusory allegations. Such allegations, lacking further factual enhancement, are "labels and conclusions" not entitled to the assumption of truth. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678, 681. Likewise, Plaintiffs' repeated allegation that "Defendants refused to provide notice for nakedly political reasons and to suppress the free speech rights of Plaintiff DHOL" pleads conclusions rather than specific facts. [Doc. #160 ¶¶ 199–201, 276, 309.] Plaintiffs have failed to plausibly plead Ms. Lee and Mr. McDonald's personal involvement in the cleanups or a causal connection between their actions and the constitutional violations alleged in the Complaint. *Schneider*, 717 F.3d at 768 (there must be a causal connection between supervisory conduct and the alleged constitutional violation).

The same is true of the allegations against City Attorney Bronson. Plaintiffs merely allege that the City Attorney's Office, "under the direction of Defendant Bronson," helped plan the Lincoln Park and Morey Middle School cleanups. [Doc. #160 ¶¶ 192, 274.] There is no allegation that City Attorney Bronson was personally involved in the planning. Plaintiffs impermissibly ask the Court to presume that simply because City Attorney Bronson is in charge of the City Attorney's Office, she is responsible for whatever constitutional violations alleged to have been committed by Denver employees in planning the respective cleanups. Such allegations amount to nothing more than *respondeat superior* liability, which does not give rise to an actionable constitutional violation.

With respect to Executive Director Robinson, Plaintiffs further allege that he stated in a news conference that the Lincoln Park cleanup had been in the "planning stages for over a week," [*id.* ¶ 196], and that officials would be meeting about the encampment surrounding Morey Middle

School soon after the Lincoln Park cleanup, [*id*. ¶ 272]. These allegations do not demonstrate the existence of a constitutional violation. Further, the term "planning" is so general that it cannot be determined what precise, unconstitutional behavior he is alleged to have engaged in. Since these allegations fail to push Plaintiffs' claims against Mr. Robinson from the realm of possibility to a plausible constitutional violation, they are insufficient to establish supervisory liability against Mr. Robinson. *See Iqbal*, 556 U.S. at 678, 680.

Finally, the allegations against Mayor Hancock fall far well short of a valid supervisory-liability claim. Such allegations contend that, after the Lincoln Park clean up, he "made clear" that Denver did not provide notice of the cleanup because of protestors, [Doc. #160 ¶¶ 4, 159, 199;] that his conversations with Councilman Brooks led to the implementation of the Camping Ban, [*id*. ¶ 133;] that the Mayor's Office, under Mayor Hancock's direction, planned the Lincoln Park and Morey Middle School cleanups, [*id*. ¶¶ 192, 274;] that he stated, at some unidentified time, that no notice would be given for the Morey Middle School or South Platte River cleanups, [*id*. ¶ 199;] and that he wished the campers to go into shelter space, [*id*. ¶¶ 223, 386.] Even assuming the truth of these allegations for the purpose of this Motion, without more, these allegations do not rise to the level of a constitutional violation as no specific personal participation by Mayor Hancock is alleged. The Complaint is also devoid of allegations sufficient to demonstrate causation or state of mind sufficient to state a supervisory liability claim. This is yet another impermissible attempt to state a claim based upon *respondeat superior*. Similarly, there is no recognized constitutional violation associated with wishing or wanting people experiencing homelessness to shelter indoors rather than outdoors, or that results from an alleged conversation with a councilperson that may have led to the enactment of a municipal ordinance—an ordinance which

has since been found to be constitutional. *Denver v. Burton*, 19CV34925 (Den. Dist. Ct. September 3, 2020) (unpublished, cert. pending) (Attached as Exhibit A). Moreover, the law was not clearly established under Tenth Circuit  law, nor based upon the weight of law in other circuits, such that these Defendants would have reason to believe that their alleged involvement in cleaning up homeless encampments would create a constitutional violation under the theory of supervisory liability.

Accordingly, for all these reasons, the allegations against the individually named Denver Defendants fail to state viable claims upon which relief may be granted and should be dismissed, in their entirety. Plaintiffs also sue Defendants Robinson and Bronson in their official capacities; however, the official capacity claims should also be dismissed as duplicative of the claims against Denver. *See Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988) ("A suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same.").

### B.       Plaintiffs Cannot State an Unlawful Takings Claim

Plaintiffs argue in their Second and Eighth Claims for Relief that the Denver Defendants seized and destroyed their property in violation of the Takings Clauses of the United States and the Colorado Constitutions. [Doc. #160 ¶¶ 461–73, 526–33.] Even if these claims were not precluded, they are subject to dismissal because Plaintiffs fail to allege that the Denver Defendants seized Plaintiffs' property pursuant to the power of eminent domain. *See Cooley v. City of Los Angeles*, No. 2:18-CV-09053-CAS-PLAX, 2019 WL 1936437, at *5 (C.D. Cal. May 1, 2019) (dismissing homeless plaintiffs' Fifth Amendment takings claim because City's alleged seizure of property was not pursuant to eminent domain); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079,

1106–07 (E.D. Cal. 2012) (dismissing takings claim after finding that the seizure and destruction of a homeless resident's personal property as part of the city's efforts to clean up homeless encampments did not trigger takings liability).[6]

Notably, Plaintiffs allege that Denver's seizure of their property violates the Fourth and Fourteenth Amendments. This is fatal to their claim because the Takings Clause only "requires compensation 'in the event of *otherwise proper* interference amounting to a taking.'" *Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 543 (2005) (emphasis added) (citation omitted). In other words, if Plaintiffs could demonstrate an unlawful seizure of their property, their takings claims would fail because "[t]he unlawful seizure of property [] does not constitute 'public use.'" *Sanchez*, 914 F. Supp. 2d at 1106. On the other hand, if Plaintiffs do not prevail on their Fourth or Fourteenth Amendment claims, then Denver would have lawfully seized the property under the exercise of governmental authority other than the power of eminent domain. *Id.* In either event, Plaintiffs are cannot state a viable takings claim and the Second and Eighth claims should be dismissed.

Additionally, the individual Denver Defendants are entitled to qualified immunity from the federal takings claim. *See, e.g.*, *Scull v. New Mexico*, 236 F.3d 558, 595 (10th Cir. 2000); *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). First, for the reasons discussed above, Plaintiffs have failed to demonstrate that the Defendants' actions violated the Takings Clause. Second, as demonstrated

---

[6] Colorado courts have not yet specifically addressed whether the seizure of homeless individuals' property by governments cleaning encampments is a taking, so this Motion refers to federal case law under the Fifth Amendment. The Colorado Supreme Court "has interpreted the Colorado takings clause as consistent with the federal clause" (with the exception of a specific provision involving damage to lands abutting public property). *Animas Valley Sand & Gravel, Inc. v. Bd. of Cty. Comm'rs*, 38 P.3d 59, 64 (Colo. 2001).

by the case law discussed above, the law was not clearly established in the Tenth Circuit, nor from the weight of law in other circuits, such that the Defendants would have reason to believe that their actions in cleaning up homeless encampments would result in an unconstitutional taking of property. For all these reasons, Plaintiffs' takings claims fail.

### C. Plaintiffs Fail to Allege Facts Sufficient to Demonstrate a Substantive Due Process Claim

In their Third and Ninth Claims for Relief, Plaintiffs argue that the Denver Defendants violated their due process rights under the Fourteenth Amendment and the Colorado Constitution, Article II, Section 25, under a theory of danger creation. Specifically, Plaintiffs allege that Denver Defendants increased Plaintiffs' danger to COVID-19 and "the elements." [Doc. #160 ¶¶ 474–91, 534–45.] Both claims fail.

#### 1. CDC Guidelines do not establish constitutional standards

Plaintiffs argue throughout the Complaint that Denver violated their due process rights by not following CDC Guidelines on COVID-19. [*Id.* at ¶¶ 7, 368–76.] But as Denver showed in its Response to Plaintiffs' Motion for Preliminary Injunction and testimony presented during the hearing on that Motion, CDC Guidelines do not set constitutional standards. [Doc. #68 at 13–14;] *see Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) ("[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."); *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) ("[P]ublished requirements for health care do not create constitutional rights."); *Roman v. Wolf*, No. 20-55436, 2020 WL 5683233, at *6 (9th Cir. Sept. 23, 2020) (CDC COVID-19 Guidelines "do not provide a workable standard" due to lack of specificity and the fact that guidelines should be adapted to individual prison facilities); *Leader v. Cty. of*

*Sacramento*, No. 2:20-CV-1086-JAM-EFB P, 2020 WL 4796250, at *1 (E.D. Cal. Aug. 18, 2020) ("[F]ailure to follow CDC guidelines [related to COVID-19] does not, standing alone, amount to a constitutional violation."); *see also Swain v. Junior*, 958 F.3d 1081, 1087 (11th Cir. 2020) (staying preliminary injunction where CDC guidelines for COVID-19 in jails formed the basis of the district court's order). CDC Guidelines are instructive, but not mandatory, because public officials must be allowed the flexibility to address all circumstances and the discretion to react to public health emergencies as they unfold.

2. <u>Plaintiffs have not alleged sufficient facts to meet the elements of a danger creation theory under the substantive due process clause of the U.S. or Colorado Constitutions</u>

A substantive due process claim based upon a danger creation theory is an exception to the rule that government actors are liable only for their own acts, not for injuries or conditions outside of their control, such as this pandemic. *See, e.g.*, *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–97 (1989) (failure to protect an individual against private violence does not constitute a constitutional violation).[7] To successfully plead such a claim, Plaintiffs must allege facts sufficient to demonstrate that: (1) the Denver Defendants created or increased Plaintiffs' vulnerability to the danger in question; (2) Plaintiffs are members of a limited and specifically definable group; (3) the Denver Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the Denver Defendants acted recklessly in conscious disregard of that risk; and (6) the conduct, when viewed in total,

---

[7] Because Colorado law is similar, this analysis should apply equally to Plaintiffs' substantive due process allegations based upon a danger creation theory whether brought under the Colorado or U.S. Constitution. Colorado also recognizes that there is no general duty to protect another. *Solano v. Goff*, 985 P.2d 53, 54 (Colo. App. 1999.

shocks the conscience. *Ruiz v. McDonnell*, 299 F.3d 1173, 1182–83 (10th Cir. 2002) (citation omitted).

As an initial matter, Plaintiffs cannot establish that they are members of a limited and specifically definable group (broadly identified by them as "all involuntarily homeless individuals living in Denver during the COVID-19 pandemic") on the bare assertion that "Plaintiffs are members of a specifically definable group of homeless individuals." [Doc. #160 ¶¶ 411(b), 496.] This fails to account for the majority of people experiencing homelessness in Denver who have indoor shelter each night—in congregate shelters or otherwise—and other significant variations in the circumstances of the people whom Plaintiffs claim to represent. *See also infra* § II.G.

More importantly, as to the additional elements, Plaintiffs emphasize that COVID-19 is an unprecedented emergency, contending that people experiencing homelessness are particularly at risk. [Doc. #160 ¶¶ 389–98.] Denver agrees that the pandemic is a novel and emergent situation, which is why Denver has put forth unprecedented efforts to ensure public health and safety and balance often-conflicting life-and-death interests. Plaintiffs' substantive due process claim hangs entirely on their insistence that, by displacing Plaintiffs to clean encampments and mitigate public health risk, Denver increases their exposure to COVID-19 and the elements. [*Id.* ¶¶ 495, 549.] However, the argument that Denver knew of an increased risk to homeless individuals from congregate shelters is false, unsupported by the studies on which Plaintiffs rely, and does not show that any of the Denver Defendants exposed Plaintiffs to an obvious or known risk, consciously discarded such risks, or that any specific conduct attributed to such risks was conscience shocking. [*Id.* ¶¶ 378–88, n.9, n.10.]

While Plaintiffs describe the studies, a look at the studies themselves indicate that

Plaintiffs' descriptions are not accurate. [*See id.*] Setting aside the variations in sample size and date of testing between the two studies, nothing can be gleaned from them about the difference between COVID-19 risks inherent to sleeping in shelters versus sleeping on the street because both studies tested individuals utilizing shelters (whether during the day or night). [*Id.*] Moreover, Plaintiffs cannot show that any of the individually named Denver Defendants were aware of such studies or that even if they were, each individually named Denver Defendant would have been aware of an obvious or known risk to individuals in shelters of contracting COVID-19 compared to those living in encampments.

Furthermore, a few anecdotal incidents of individuals allegedly exhibiting symptoms of COVID-19 while staying at homeless shelters does not demonstrate that the individuals in questions *caught* COVID-19 at the shelter, let alone that individuals at shelters are at an increased risk of contracting the disease. [*See, e.g.*, *id.* ¶¶ 228, 362.] The failure to allege facts sufficient to demonstrate Denver's knowledge and disregard of any risk let alone conscience-shocking conduct is fatal to Plaintiffs' ability to state a substantive due process claim based upon a danger-creation theory.

Courts elsewhere have refused to recognize danger-creation claims where a government temporarily or permanently moved homeless encampments housed on public property, unless the government's actions put individuals "in an inherently more dangerous situation than they had faced previously." *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (City's actions evicting homeless individuals from encampment and prohibiting homeless from camping on public lands, causing them to reside in unfamiliar areas and rendering them vulnerable to crime, was insufficient to demonstrate deliberate indifference under the danger creation theory because it

did not "place[ them] in an inherently more dangerous situation than they had faced previously"); *Hous. is a Human Right Orange Cty. v. Cty. of Orange*, No. SA CV 19-388 PA (JDEx), 2019 WL 6481311, at *12 (C.D. Cal. Aug. 12, 2019) (plaintiffs failed to state a claim for danger creation where "the difficulties the homeless individuals camping at the temporary campground may face are largely identical to those they would face while camping elsewhere in the [c]ity"). Plaintiffs have failed to show that Denver's actions in temporarily or permanently requiring people experiencing homelessness to leave encampments unnecessarily increased their danger of exposure to COVID-19 or other risks.

The Due Process clause does not protect against incorrect or ill-advised government decisions. *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1282 (10th Cir. 2003). Rather, the Constitution protects against "deliberately wrongful government decisions." *Id*. at 1281 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995)). Plaintiffs have not demonstrated that Denver, by cleaning and remediating significant public health risks while offering shelter space and COVID-19 testing to those in the encampments, knowingly and deliberately placed Plaintiffs in a more dangerous situation than being in the encampment. Instead, Plaintiffs merely insist—again relying on CDC Guidelines—that the risk was (or should have been) "obvious." [Doc. #160 ¶¶ 417, 498, 552.] This is insufficient to state a substantive due process claim.

Additionally, to show that any individually named Denver Defendant acted recklessly in conscious disregard of a known or obvious risk, the "defendant [must] recognize the unreasonable risk and *actually intend* to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Christiansen*, 332 F.3d at 1281 (emphasis original) (internal quotations and alterations omitted). It cannot be said that any of the actions by the individually named Denver

Defendants in temporarily or permanently requiring homeless individuals to leave encampments knowingly increased their danger of exposure to COVID-19 or other risks. As Plaintiffs themselves allege, [*see, e.g.*, Doc. #160 ¶ 404], the homeless population is a vulnerable group with a higher potential exposure to health-related issues, including COVID-19. Plaintiffs do not allege facts from which recklessness or indifference to the risk of COVID-19 can reasonably be inferred. *See Cobine*, 250 F. Supp. 3d at 433 ("In the absence of particular allegations that the state action put Plaintiffs in an inherently dangerous situation, the Court is bound to find that the generalized dangers of living on the street preexisted Plaintiffs' relocation."); *Hous. is a Human Right Orange Cty.*, 2019 WL 6481311, at *12.

Finally, only exceptional circumstances, not mere negligence, satisfy the "shocks the conscience" element of a danger creation claim. *Ruiz*, 299 F.3d at 1183–84. "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000). Before finding its conscience shocked, a court must consider three factors: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." *Eckert v. Town of Silverthorne*, 25 F. App'x 679, 689 (10th Cir. 2001) (quotation omitted). "These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances." *Id.* Furthermore, the inquiry should be informed by whether the public officials faced an emergency situation. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850–54 (1998).

Plaintiffs make no allegations that clear this high bar. Rather, they only gesture towards all the circumstances alleged in the Complaint and conclude that "Defendants' conduct when viewed

in total, shocks the conscience." [Doc. #160 ¶¶ 500, 554.] Such allegations are not entitled to the assumption of truth and—even were it not precluded—Plaintiffs' danger-creation claim must fail. *See Murray v. City of Philadelphia*, No. CV 20-04018, 2020 WL 5006046, at *8 (E.D. Pa. Aug. 25, 2020) (plaintiffs not likely to succeed on claim that shelter "conditions are so pervasive and severe that Defendants' decision to dissolve the encampments and encourage Plaintiffs to accept available beds in City shelters 'shocks the conscience' and leads to 'foreseeable and fairly direct' harm, as required to succeed on a state-created danger claim.").

Moreover, the law was not clearly established under Tenth Circuit decisions or based upon the weight of law in other circuits, such that the Defendants would have reason to believe that their actions in cleaning up homeless encampments would create a substantive due process violation.

**D.     Plaintiffs have not Established that D.R.M.C. § 49-246 is Void for Vagueness**

Plaintiffs' Sixth Claim for Relief argues that D.R.M.C. § 49-246, Denver's encumbrance removal ordinance, is void for vagueness in violation of the Fourteenth Amendment. [Doc. #160 ¶¶ 509–16.] Specifically, Plaintiffs assert that "D.R.M.C. 49-246 offers no clear and measurable standard by which Plaintiffs and others could act lawfully" and "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they [*sic*] prohibited, and authorizes or encourages arbitrary and discriminatory enforcement, or both." [*Id.* ¶¶ 512–13.]

D.R.M.C. § 49-246 is not a penal statute. The void-for-vagueness doctrine only applies to laws that define criminal offenses or fix the permissible sentences for criminal offenses. *See Beckles v. United States*, 137 S. Ct. 886, 892 (2017); *Johnson v. United States*, 576 U.S. 591, 595–96 (2015). There is no mechanism for criminal prosecution to enforce D.R.M.C. § 49-246, nor do Plaintiffs allege that they were ever subjected to the application of costs for encumbrance removal,

or the administrative penalties available under D.R.M.C. § 49-249 for parties who fail to remove an encumbrance. Accordingly, the void-for-vagueness doctrine does not create a cause of action under the Fourteenth Amendment under the facts alleged here.

To the extent the Court might apply the doctrine to D.R.M.C § 49-246, Plaintiffs still fail to state a claim because the ordinance is not unconstitutional on its face. A law is unconstitutionally vague only when the "criminal law [is] so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595 (citing *Kolender v. Lawson,* 461 U.S. 352, 357–58 (1983)). Plaintiffs track this language with the conclusory allegation that "D.R.M.C. 49-246 offers no clear and measurable standard by which Plaintiffs and others could act lawfully" and "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorizes or encourages arbitrary and discriminatory enforcement, or both." [Doc. #160 ¶¶ 512–13.] But there is no factual support for this proposition.

As to the first prong, the plain language of D.R.M.C. § 49-246 provides that the manager of transportation and infrastructure or the manager's designee "is authorized to remove or to order the removal of any article, vehicle or thing whatsoever encumbering any street, alley, sidewalk, parkway or other public way or place." Accordingly, any impediment to the right-of-way delineated in the ordinance is subject to removal or an order of removal. Citizens are on notice of this clear and measurable standard: no such encumbrances may obstruct the specified rights of way. For the second prong, Plaintiffs baldly state without further factual enhancement that "[t]he only time the Encumbrance Removal Ordinance is enforced is against homeless individuals"—but it strains credulity to give that factually unsupported conclusion any weight. [Doc. #160 ¶ 150.]

Nothing in the language of the ordinance demonstrates any such targeted enforcement of the law and nothing in practice supports such a finding. *See, e.g.*, *Verlo v. City & Cty. of Denver*, No. 15-CV-1775-WJM-MJW, 2015 WL 5159146, at *6 (D. Colo. Sept. 3, 2015) (addressing Denver's enforcement of encumbrance ordinances during protests on the Lindsay-Flanigan Courthouse Plaza). Therefore, Plaintiffs' Sixth Claim for Relief should be dismissed.

### E. Plaintiffs Cannot Establish the Retroactive Applicability of C.R.S. § 13-21-131

In their Seventh through Twelfth Claims for Relief, Plaintiffs assert that the Law Enforcement Integrity Act, C.R.S. § 13-21-131 *et seq.*, applies to all incidents identified in the Complaint. But the Act, which became effective on June 19, 2020, is not retroactive. Colorado law presumes a statute is "prospective in its operation." C.R.S. § 2–4–202. "The General Assembly may override this presumption by clearly expressing a contrary intent." *People v. Summers*, 208 P.3d 251, 256 (Colo. 2009) (citation omitted). Because the Act specifically states that it takes effect upon passage and does not otherwise express an intent of retroactivity, it does not apply to the incidents in the Complaint occurring before June 19, 2020. *See* C.R.S. § 13-21-131; s*ee also* *Summers*, 208 P.3d at 257. Upon conferral, Plaintiffs' counsel indicated that Plaintiffs do not argue that C.R.S. § 13-21-131 applies retroactively. Accordingly, Plaintiffs' Seventh through Twelfth Claims for Relief should be dismissed to the extent they rely on incidents prior to June 19, 2020. [Doc. #160 ¶¶ 161–80 (describing incidents on Jan. 15, Apr. 30, May 7, May 14, May 19, May 20, and May 27, 2020).]

### F.     Plaintiffs have Failed to Implicate a Violation of their Fundamental Right to Travel

Plaintiffs bring their inscrutable Eleventh Claim for Relief—also pursuant to C.R.S. § 13-21-131—against all Denver Defendants.[8] They allege that Defendants interfered with their fundamental right to travel under Colo. Const. Art. II, Section 3 by carrying out cleanups and area restrictions and by enforcing D.R.M.C. § 38-86.2 (prohibiting unauthorized camping on public or private property) and D.R.M.C. § 49-246 (the encumbrance removal ordinance). [Doc. #160 ¶¶ 564–65.] The fundamental right to intrastate travel is not implicated here; Defendants' actions and ordinances do not impede the travel of any Plaintiffs because they do not seek to *travel* the public streets, they seek to *stay* on them and sleep.

The right to travel generally addresses two types of state action: that which directly inhibits interstate or intrastate travel, and that which indirectly inhibits travel by restricting or withholding basic necessities of life based upon an individual's residency. *See Mayo v. Nat'l Farmers Union Prop. & Cas. Co.,* 833 P.2d 54, 58 (Colo. 1992) (collecting cases). Importantly, the right to travel is seemingly only implicated where the law or state action draws a distinction based on residency.

---

[8] This claim as to Defendants Denver, Hancock, McDonald, Robinson, Bronson, Lee, Pitt, and Hunholz must be dismissed because they are not "peace officers" as required for liability under this Act. *See* C.R.S. § 24-31-901(3). C.R.S. § 13-21-131(1) references C.R.S. § 24-31-90 which, in turn, defines "peace officer" as "any person employed by a political subdivision of the state required to be certified by the P.O.S.T. board pursuant to section 16-2.5-102,  a Colorado state patrol officer as described in section 16-2.5-114, and any noncertified deputy sheriff as described in section 16-2.5-103 (2)." The positions of Mayor, City Attorney, Executive Director of Safety, Executive or Deputy Director of DDPHE, Parks manager or DOTI manager do not fall within any of these categories; nor, of course, can the City and County of Denver be "a peace officer." Therefore, the provisions of the Act do not apply to Defendants Hancock, McDonald, Bronson, Robinson, Lee, Pitt, Hunholz, or the City, and thus Claims Eleven and Twelve must be dismissed as to these Defendants.

*See Jeffrey v. Colo. State Dep't of Soc. Servs.*, 198 Colo. 265, 271 (1979) (holding that a durational requirement on necessary social services, or the denial of those services, based on a residency must be justified by a compelling governmental interest). Furthermore, several courts have found that the right to travel is not implicated when, as here, a person seeks not to travel the public streets but, rather, to stay put on them. *See, e.g.*, *Aitken v. City of Aberdeen*, 393 F. Supp. 3d 1075, 1084 (W.D. Wash. July 2, 2019) ("Courts in this circuit agree that the right to travel is not a right to remain indefinitely wherever one pleases."); *Miralle v. City of Oakland*, No. 18-cv-06823-HSG, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018) ("*Martin* [*v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018)] does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option."); *Davison v. City of Tucson*, 924 F. Supp. 989, 993 (D. Ariz. Mar. 13, 1996) (declining to find that a camping ordinance violated the plaintiffs' right to travel because "[t]he Defendants' action does not impede the travel of any of the named plaintiffs because they do not seek to *travel* anywhere; they seek only to remain." (emphasis in original)).

In sum, the right to travel is only implicated when a state action (1) inhibits travel directly or indirectly, (2) limits any service or draws any distinction based on residency, and (3) interferes with a person's ability to travel in public, but not when they seek to stay in one place. Plaintiffs fail to allege the presence of any of those three circumstances here. First, Plaintiffs have not shown that Denver Defendants' actions nor the subject ordinances discourage travel from residents outside of Denver. And, to the extent that Denver Defendants' actions or the two ordinances might indirectly discourage travel, courts have held that such an indirect effect is not sufficient to implicate the Due Process Clause. *See, e.g.*, *Allen v. City of Sacramento*, 183 Cal. Rptr. 3d 654, 672 (Cal. Ct. App. 2015) (holding that complaint "does not state a cause of action based on the

infringement of plaintiffs' right to travel because the ordinance has only an indirect impact on the right to travel."); *Tobe v. City of Santa Ana*, 892 P.2d 1145, 1164 (Cal. 1995) (holding that "[a]n ordinance that bans camping and storing personal possessions on public property does not directly impede the right to travel" and is "not constitutionally invalid because it may have an incidental impact on the right of some persons to interstate or intrastate travel.").

Second, Plaintiffs have not alleged that the Defendants or the ordinances distinguish on the basis of residency. Indeed, multiple courts have held that ordinances like D.R.M.C. § 38-86.2 do not violate the right to travel either because they draw no distinction based on residency or because the impacts are only incidental. *See, e.g.*, *State v. Barrett*, 460 P.3d 93, 98 (Or. Ct. App. 2020) (ordinance did not facially violate the right to travel because it addressed all persons alike); *Nishi v. Cty. of Marin*, No. C11-0438 PJH, 2012 WL 566408, at *5 (N.D. Cal. Feb. 21, 2012) (ordinance did not draw distinction based on residency and impact on travel was incidental); *Joyce v. City & Cty. of San Francisco*, 846 F. Supp. 843, 860 (N.D. Cal. 1994) (ordinance was not facially discriminatory based on residency); *Johnson v. City of Dallas*, 860 F. Supp. 344, 354 (N.D. Tex. 1994) (no distinction based on residency; no evidence of deterred travel); *Fitzgerald v. People of City of Boulder*, No. 10CV0927 (Boulder. Dist. Ct. Apr. 11, 2011), *cert denied* 2011 WL 4448984 (Colo. Sept. 26, 2011). And D.R.M.C. § 49-246 plainly does not distinguish on the basis of residency; it applies equally to all persons who find themselves present in the City. Plaintiffs do not even allege facts tending to show that residency played any part in determining where to conduct cleanups or to post temporary area restrictions.

And, ultimately, the travel right is not implicated here because Plaintiffs do not seek to *travel* the public streets, they seek to camp on them. "The right to travel does not . . . endow citizens

with a 'right to live or stay where one will' . . . and does not create a right to remain without regard to the ownership of the property on which he chooses to live or stay, be it public or privately-owned property." *Tobe*, 892 P.2d at 1165; *see, e.g.*, *Anderson v. City of Portland*, No. 08–1447–AA, 2009 WL 2386056, at *10 (D. Or. July 31, 2009) (right to travel claim failed where plaintiffs alleged "that police officers ha[d] told them to 'move along' when sleeping in public and conducted camp cleanups and seized their property" but did "not allege that the City ha[d] attempted to restrain their movement, prevented them from traveling to or from the City, or excluded them from certain areas of the City."); *Veterans for Peace Greater Seattle, Chapter 92 v. City of Seattle*, No. C09–1032 RSM, 2009 WL 2243796, at *4 (W.D. Wash. July 24, 2009) (on preliminary injunction motion, plaintiffs unlikely to succeed on the merits of right to travel claim where plaintiffs sought to remain in an area that the city had closed and cleaned due to public health, economic, and violent crime concerns, but, even if the right were implicated, those concerns constituted a compelling interest in closing down the area); *Aitken*, 393 F. Supp. 3d at 1084; *Miralle*, 2018 WL 6199929, at *2; *Davison*, 924 F. Supp. at 993.

In conferral, Plaintiffs' counsel maintained that the Colorado Supreme Court in *People in Interest of J.M.*, 768 P.2d 219 (Colo. 1989) identified a fundamental right to use the sidewalks protected by the Fourteenth Amendment and the Colorado Constitution that supports this cause of action. There, the Colorado Supreme Court stated in dicta that "the rights of freedom of movement and to use the public streets and facilities in a manner that does not interfere with the liberty of others are basic values inherent in a free society" and thus, "the state must establish a compelling interest before it may curtail the exercise of such rights by adults." *Id.* at 221. Plaintiffs' allegations appear to be tailored in an attempt to trigger that language. [Doc. #160 at ¶¶ 562–63.] However,

the municipal ordinances enforced by Denver and public health authority exercised by DDPHE at issue in this case (D.R.M.C. § 38-86.2, the Camping Ordinance; D.R.M.C. § 49-246, the Encumbrance Removal Ordinance; and D.R.M.C. § 24-16(1), the Public Health Area Restriction authority) are directly connected to compelling governmental interests to protect the liberty of others, including, the public at large who are not able to access public parks, sidewalks, rights-of-way, or public facilities by those who have occupied these spaces to the exclusion of others. Further, as noted above, the enforcement of these ordinances and authority have not inhibited anyone's freedom of movement and instead open up freedom of movement to all residents of Denver. Accordingly, although Plaintiffs want to be able to camp, sleep, and stay wherever they choose, their alleged dispute with the Denver Defendants' actions and Denver's ordinances is that they purportedly keep Plaintiffs on the move so that they cannot stay in one place. Such allegations are insufficient to adequately place their constitutional travel right at issue here. Moreover, there is no clearly established right to travel under the circumstances alleged, so the individually named Denver Defendants are also entitled to qualified immunity for this reason.

### G. Plaintiffs have Failed to Allege a Valid Equal Protection Claim

Plaintiffs' Twelfth and Seventeenth claims for relief are equal-protection claims brought under the Colorado Constitution purportedly under C.R.S. § 13-21-131 and under the Fourteenth Amendment of the U.S. Constitution via § 1983, respectively. As to the Fourteenth Amendment, federal courts have repeatedly and consistently rejected such claims on behalf of those experiencing homelessness. *See Lyall v. City of Denver*, No. 16-CV-2155-WJM-CBS, 2018 WL 1470197, at *19 (D. Colo. Mar. 26, 2018).

The Colorado Supreme Court has found no daylight between the substantive equal protection guarantees of the Colorado and U.S. Constitutions. "The Fourteenth Amendment to the United States Constitution declares that no state shall deny a person equal protection of the law. Although the Colorado Constitution does not contain an identical provision, it is well-established that a like guarantee exists within the constitution's due process clause, Colo. Const. Art. II, Sec. 25, and that its substantive application is the same insofar as equal protection analysis is concerned." *Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1014 (Colo. 1982) (emphasis added); *see id.* at 1022 (holding "that wealth alone is not a suspect classification in Colorado."); *see also Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901, 906 n.7 (Colo. 1993) ("The analytic framework used to evaluate the right to equal protection…is the same under both the Colorado and federal constitutions."); *Firelock Inc. v. Dist. Ct.*, 776 P.2d 1090, 1097 (Colo. 1989) ("In interpreting the equal protection guarantee under the Colorado Constitution, we have followed the analytical mode developed by the United States Supreme Court in construing the equal protection clause of the fourteenth amendment.").[9]

Here, Plaintiffs allege that "Defendants discriminated against Plaintiffs, targeted them, and denied them the equal protection of the laws through the sweeps by seizing and destroying their property without notice," even while providing notice, due process, and storage to "housed individuals." [Doc. #160 ¶ 573.] Framed this way, as a distinction between the housed and the homeless, Plaintiffs may bring this claim on behalf of only one of their four proposed "subclasses,"

---

[9] Colorado recognizes a limited exception to this rule (inapplicable here) in that "duplicative criminal statutes imposing different penalties for identical conduct irrationally discriminate against an accused in violation of equal protection," *People v. Marcy*, 628 P.2d 69, 74 (Colo. 1981), *disagreeing with United States v. Batchelder*, 442 U.S. 114 (1979).

since only one subclass definition turns on (or even mentions) housing status. [*Id.* ¶¶ 411–12.] Plaintiffs' proposed "Injunctive Relief Subclass 2 … is defined as all involuntarily homeless individuals living in Denver during the COVID-19 pandemic," but both damages classes, as well as the remaining injunctive subclass, include "all persons" without distinguishing between the housed and unhoused. [*Id.*] Worse, Plaintiffs' lengthy Complaint contains not a single statement of fact that might support the allegation that "Defendants regularly provide notice prior to seizing housed individuals' property, due process of law . . . and store housed individuals' property that is seized." [*Id.* ¶ 573.]

Even if limited to themselves and a specific subclass, Plaintiffs cannot state a viable equal protection claim. Specifically, Plaintiffs cannot establish that they are members of a suspect class. On the contrary, the overwhelming weight of authority in the Tenth Circuit and elsewhere holds that "[h]omeless persons are not a suspect class, nor is sleeping out-of-doors a fundamental right." *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) (collecting cases); *see Brown v. Cooke*, No. 06-CV-01092-MSK-CBS, 2009 WL 641301, at *18 (D. Colo. Mar. 9, 2009), *aff'd*, 362 F. App'x 897 (10th Cir. 2010) ("Plaintiff's … condition of homelessness do[es] not bring him within a suspect class."). [10] Accordingly, Denver's policies are presumptively valid and subject only to rational basis scrutiny. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993); *see also Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007) ("An equal protection claim will fail if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."

---

[10] The Supreme Court has held that classifications based on wealth or housing status are not suspect. *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450 (1988); *Lindsey v. Normet*, 405 U.S. 56 (1972).

(citation and quotation omitted)). There is no question that the ordinances at issue here, and Denver's procedures administering these ordinances, are rationally related to the legitimate government purpose of protecting public health and safety. *Teigen*, 511 F.3d at 1084 (whether government action has a rational basis "is a legal question which need not be based on any evidence or empirical data.").

As in *Lyall*, here "Plaintiffs' equal protection claim is, at bottom, a restatement of their Fourth Amendment and procedural due process claims." *Lyall*, 2018 WL 1470197, at *18. Plaintiffs do not allege "that a sweep conducted with sufficient notice, with sufficient discrimination between personal items and trash, and with adequate storage and retrieval procedures would still create an equal protection problem," *id.*; on the contrary, they allege that they are entitled to those protections, just as "housed individuals" are. [Doc. #160 ¶ 573.] Thus, as in *Lyall*, the equal protection claim fails even if the Court were to assume that homeless persons are a suspect class.

Attempting to circumvent this result, Plaintiffs now assert their federal equal-protection claim (the Seventeenth Claim for Relief) under a theory of "animus" based on *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). [Doc. #160 ¶ 624.] This theory fails for several reasons.

First, Plaintiffs couch their claim as a challenge to D.R.M.C. § 38-86.2, the unauthorized camping ordinance. [*Id.* ¶¶ 623–24.] But the Complaint contains no allegations showing that any of the encumbrance removals or area closures on any of the dates identified in the Complaint were

at all related to enforcement of that ordinance; on the contrary, Plaintiffs allege that the cleanups at issue were DDPHE area closures or large-scale encumbrance removals. Plaintiffs only state, in conclusory fashion, that "Denver, through enforcement of the Camping Ban [*sic*] has unconstitutionally swept [*sic*] Plaintiffs." [*Id.* ¶ 130; *see id.* ¶¶ 128, 564; *but see id.* at 76 (distinguishing between "the sweeps and Camping Ban move-on orders.").]

Second, the Supreme Court has recently clarified that a court may only invalidate a policy under *Moreno* when that policy is "divorced from any factual context from which we could discern a relationship to legitimate state interests, and its sheer breadth [is] so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (quoting *Romer v. Evans,* 517 U.S. 620, 632, 635, (1996)) (internal quotation marks omitted). Whenever "there is persuasive evidence that the [policy] has a legitimate grounding in [government] concerns, quite apart from any [animus], we must accept that independent justification." *Id.* at 2421. In short, Plaintiffs cannot escape rational basis review by relying on *Moreno*, and both equal protection claims fail for the same reasons.

Finally, as with all of Plaintiffs' purported constitutional claims, the law is not clearly established such that any of the individually named Denver Defendants would know that their alleged conduct would have violated Plaintiffs' Fourteenth Amendment rights. For this reason as well, they are entitled to qualified immunity.

### H. Plaintiffs Fail to Allege a First Amendment Violation

In their Sixteenth Claim for Relief, Plaintiff DHOL "on behalf of themselves and those similarly situated" alleges that Defendants Denver, Hancock, Lee, McDonald, Robinson, and Bronson violated their First Amendment right to "Freedom of Speech and Assembly." [Doc. #160

at 119–20.] The gravamen of Plaintiffs' theory is that "providing no notice for sweeps so that [DHOL] could not show up at sweeps to engage in First Amendment protected activity" amounted to "a prior restraint on Plaintiff's speech." [*Id.* ¶ 607.] This novel theory has no merit.

A claim of prior restraint "is based on a restriction that chills potential speech before it happens, rather than an adverse action taken in response to actual speech." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010) (internal quotations and citations omitted). "Prior restraints generally take one of two classic forms: judicial injunctions and administrative licensing schemes." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013). Plaintiffs here can point to nothing like an injunction or license. Instead, they allege that Denver's failure to tell them the time and place of upcoming cleanups or area restrictions restrained their ability to protest those actions.

Plaintiffs cite no case endorsing such an expansive prior-restraint theory, and Denver Defendants are aware of no court that has held that the First Amendment requires governments to provide advance notice of any and all actions which some citizens might wish to protest. The claim is subject to dismissal on that ground alone.

To have standing to assert a claim of unlawful prior restraint, a plaintiff must show "that the restraint 'actually chilled [the plaintiff's] speech...and... [that this] chilling effect was caused by an objectively justified fear of real consequences.'" *Carpenter v. Sch. Dist. No. 1, City & Cty. of Denver*, No. 16-CV-01706-RBJ, 2017 WL 1407041, at *7 (D. Colo. Apr. 20, 2017) (quoting *Brammer-Hoelter*, 602 F.3d at 1183) (alterations original). Plaintiffs allege no facts that could support any inference that their speech was chilled at all, much less by a failure to receive notice of upcoming DDPHE area restrictions. The Complaint does repeatedly allege that "Defendants

refused to provide notice for nakedly political reasons and to suppress the free speech rights of Plaintiff DHOL." [*See* Doc. #160 ¶¶ 199–201, 276, 309.] But even if such conclusory allegations are credited, they provide no basis to infer that DHOL's speech was ultimately suppressed or chilled, or that DHOL was unable to protest at the area restrictions. On the contrary, the Complaint attaches the declaration of Ms. Howard ("lead organizer and founder of Denver Homeless Out Loud"), which establishes that she (and thus DHOL) was able to attend and was in fact present at each of the incidents in question. [Doc. #3-4.]

In conferral, Plaintiffs maintained that Denver's alleged failure to provide notice also constituted an unconstitutional time, place, and manner restriction of Plaintiffs' speech. It is not obvious how an absence of notice might operate as a time, place, and manner regulation. Even if it could, such allegations are incompatible with a prior-restraint claim. Plaintiffs either were subject to a prior restraint and thus were prevented from speaking, or they engaged in speech that was subject to regulation; it cannot be both. This is why "[t]he Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints." *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 12 (1st Cir. 2004) ("If content-neutral prohibitions on speech at certain places were deemed prior restraints, the intermediate standard of review prescribed in the time-place-manner jurisprudence would be eviscerated.").

Plaintiffs assert meritless and contradictory First Amendment theories unsupported by factual allegations. With respect to the individually named Denver Defendants against which this claim has been alleged, the law is also not sufficiently clearly established so they are entitled to qualified immunity on this basis as well. For all of these reasons, this claim should be dismissed.

## I.       There is No Private Right of Action Under the Colorado Constitution

Plaintiffs Eleventh and Twelfth claims for relief are asserted pursuant to C.R.S. § 13-21-131 and several sections in the Colorado Constitution. The Eleventh cause of action alleges that the Denver Defendants deprived them of their right to use public streets and facilities in violation of Colo. Const. Art. II Sec. 3. [Doc. #160 ¶¶ 560–69.] The Twelfth cause of action alleges that the Denver Defendants violated their right to equal protection under Colo. Const. Art. II, Secs. 3 and 25. [*Id.* ¶¶ 570–85.]

In contrast to an alleged violation of the United States Constitution actionable under § 1983, there is no express or implied private cause of action for money damages available under the Colorado Constitution. *See Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 964–65 (10th Cir. 2018); *Bd. of Cty. Comm'rs of Douglas Cty. v. Sundheim*, 926 P.2d 545, 549–53 (Colo. 1996). Additionally, "'where other adequate remedies exist' the Colorado Supreme Court has held that there is 'no implied remedy' for a violation of the Colorado Constitution." *Sandberg*, 727 F. App'x at 965 (citing *Sundheim*, 926 P.2d at 553). Accordingly, based upon the Complaint's allegations there is neither an express nor implied right available for damages under the Colorado Constitution. *See Arndt v. Koby*, 309 F.3d 1247, 1255 (10th Cir. 2002); *see also Uecker v. United States Forest Serv.*, No. 17-CV-02879-RM-KLM, 2019 WL 979105, at *20 (D. Colo. Feb. 28, 2019). Further, no language exists in either Article II, Section 3 or Article II, Section 25 that would otherwise create a right of action for damages. *See Sundheim,* 926 P.2d at 550. Accordingly, Plaintiff's Eleventh and Twelfth Claims for Relief are not viable and should be dismissed.

**J. Plaintiffs Have Failed to Allege Facts Sufficient to Demonstrate a Plausible Federal or State Municipal Liability Claim**

1. Plaintiffs'§ 1983 Municipal Liability Claims are Without Merit

Plaintiffs' municipal-liability claims here rest on allegations that Denver's customs, policies, or practices, and the decisions of its final policymakers, were the moving force behind the Defendants' violation of Plaintiffs' constitutional rights. Specifically, Plaintiffs appear to allege three separate Denver policies, customs, or practices:

1) a custom or policy of destroying property belonging to homeless individuals [Doc. #160 ¶¶ 1, 407;]

2) a "practice" of delegating to low level officials the authority to declare an encumbrance [*Id*. ¶ 149;] and

3) a practice of creating a danger to Plaintiffs of greater exposure to COVID-19 and/or exposure to the elements by cleaning homeless encampments. [*Id*. ¶ 504.]

At the threshold, unless Plaintiffs plausibly allege that individual Denver employees violated their constitutional rights, each of their claims fail. *Ellis ex. rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099, 1104 (10th Cir. 2009). This they have not done. *Supra* § II, A–H.

Likewise, as to the allegations regarding a custom or policy of destroying personal property during the cleaning of homeless encampments, there can be no argument but that this issue is encompassed in (and precluded by) the *Lyall* settlement. [Doc. #14-2.] The settlement agreement specifies a procedure to be followed regarding storage and destruction of personal property during the cleaning of homeless encampments. [*Id.* at Exhibit A.] Plaintiffs maintain that Denver has violated the terms of the *Lyall* settlement, but the exclusive remedy for those assertions is a state suit to enforce the terms of the agreement. Plaintiffs can point to no case law where the breach of

a settlement agreement has resulted in a new § 1983 claim against a municipality, because a breach of contract is not a constitutional violation.

The second effort at establishing municipal liability, also an echo of the *Lyall* litigation, is the alleged practice of delegating to low-level officials the authority of declaring an encumbrance. [*See* Case No. 16-cv-2155-WJM-SKC, Doc. #124 at 25 ("Denver has a custom, policy, and practice of … leaving the discretion as to what property should be destroyed and what property should be stored up to low-level officials.").] Even were such a claim not precluded, this allegation is without factual support or any specific example of Denver delegating such authority to a low-level official, and for this reason alone fails the pleading requirements of *Twombly* and *Iqbal*. Second, even could this allegation be assumed true, the delegation of authority by a municipality to an employee, low-level or otherwise, is simply not a stand-alone constitutional violation.

This leaves only the alleged custom of creating a danger of exposure to COVID-19, which Plaintiffs also brought in a different format in *Lyall*, there alleging exposure to "dangerous areas." [Case No. 16-cv-2155-WJM-CBS, Doc. #44-1 at 18, 32–33.] But, even if this claim is not itself precluded, Plaintiffs have not adequately pled a substantive due process claim based upon a danger creation theory or that Denver had a custom, policy or practice of violating Plaintiffs' rights, that a final policymaker ratified such violations, or that Denver acted with deliberate indifference to a substantial risk of such violations.

Even if Plaintiffs could show a violation of their constitutional rights, for Denver to be held liable under § 1983 Plaintiffs must properly allege that an official policy or custom was the moving force behind these alleged constitutional violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "That is, a plaintiff must show that the municipal action was taken with the requisite

degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 404 (1997); *see also Schneider*, 717 F.3d at 767–69. A policy or custom is established by showing the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and alterations omitted).

> a. Plaintiffs have not established that Denver has a formal policy or informal custom of conducting "sweeps" that create a danger of greater exposure to COVID-19 or the elements, or unconstitutionally delegating the authority to remove an encumbrance

An official policy can be shown through an official decision or statement or through "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quotations omitted). The Tenth Circuit has established a three-part test for determining when a municipality may be liable for an informal custom, which requires proof of: (1) a "continuing, persistent and widespread practice of unconstitutional misconduct"; (2) "[d]eliberate indifference or tacit approval of such misconduct"; and (3) "[t]hat the plaintiff was injured by virtue of the unconstitutional acts pursuant to [the city's] custom and that the custom was the moving force behind the unconstitutional

acts." *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). Plaintiffs have

not demonstrated, nor could they, that any official Denver policy exists to remove homeless

individuals from encampments and force them into shelters, thereby increasing their risk of

contracting COVID-19. Plaintiffs point to Colorado laws and Denver ordinances that ban camping,

food-sharing, and loitering, but have alleged no facts demonstrating that any of these create an

increased risk of contracting COVID-19. [Doc. #160 ¶¶ 94–95, 130.] While Plaintiffs state in

conclusory fashion that Denver's ordinances and policies increase their risk of contracting

COVID-19, there are no factual allegations to support this bald conclusion. [*See, e.g.*, *id*. ¶¶ 143–

44, 151, 172.]

> b. **Plaintiffs cannot show deliberate indifference or tacit approval of any unconstitutional conduct**

Plaintiffs' municipal liability claims also fail because they have not plausibly pled that

Denver displayed deliberate indifference to, or tacitly authorized, any alleged violation of their

constitutional rights. *See Gates*, 996 F.2d at 1041. "The deliberate indifference standard may be

satisfied when the municipality has actual or constructive notice that its action or failure to act is

substantially certain to result in a constitutional violation, and it consciously or deliberately

chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)

(citation omitted). "In most instances, notice can be established by proving the existence of a

pattern of tortious conduct." *Id.* Plaintiffs have failed to present sufficient facts demonstrating that

allegedly forcing homeless individuals into shelters increased their risk to COVID-19 or that any

high-ranking official mandated such actions with a conscious awareness of an increased risk of

exposure to COVID-19. Accordingly, Plaintiffs cannot show deliberate indifference by Denver.

      c.   Plaintiffs failed to allege facts sufficient to demonstrate municipal liability based upon a decision made by a final policymaker or under a theory of ratification

Plaintiffs also contend that Denver officials directed or ratified the alleged unconstitutional conduct set forth in the Complaint. When a municipal official who is "responsible for establishing final policy with respect to the subject matter in question" makes "a deliberate choice to follow a course of action...from among various alternatives," municipal liability will attach to that decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Further, a municipality will be found liable under a ratification theory only upon a showing that a final decisionmaker ratifies the employee's specific unconstitutional actions, as well as the basis for the actions. *Bryson*, 627 F.3d at 790. The allegations in this case are not sufficient to demonstrate municipal liability under either theory.

Plaintiffs claim, without factual support, that Defendants Hancock, McDonald, Lee, Robinson, Bronson, Pitt, and Hunholz "supervised" the individual Denver Defendants and "directed" unspecified actions during the "sweeps." [Doc. #160 ¶¶ 25–31, 192, 203, 224, 274, 288, 320, 455, 468, 486, 503.] Plaintiffs allege no facts showing that any of these officials established any final policy regarding the incidents set forth in Plaintiffs' Complaint, including establishing a policy of "sweeping" homeless individuals from encampments to shelters with an express purpose of increasing their risk of contracting COVID-19. Plaintiffs also do not allege any non-conclusory facts showing that any of these officials ratified the alleged unconstitutional conduct of any Denver employee.

d.  Plaintiffs have not plausibly pled causation

In addition to failing to show a custom or policy, Plaintiffs also have not alleged facts sufficient to demonstrate the required direct causal link between the alleged deprivation of their constitutional rights and any official policy or custom of the City or its final policymakers because Plaintiffs cannot show the existence of an unconstitutional policy or custom which is attributable to Denver. As such, they are unable to establish a causal link to the alleged conduct. Plaintiffs' inability to demonstrate causation also requires dismissal of their municipal liability claims against Denver. *See City of Canton v. Harris*, 489 U.S. 378, 385–86 (1989).

   2.  C.R.S. § 13-21-131 Does Not Provide for Municipal Liability

In their Eleventh and Twelfth Claims for Relief, Plaintiffs assert against Denver two state-law causes of action premised on an alleged violation of C.R.S. § 13-21-131. The specific language of the Act, however, makes it applicable to "peace officer[s]" who are "employed by a local government." C.R.S. § 13-21-131(1); *see supra* n. 8. The local government, in turn, is obligated to indemnify a law enforcement officer for any liability incurred for violating the statute. C.R.S. § 13-21-131(4). The Act contains no provision for a direct cause of action against a municipality, and no case law interprets the statute to provide for a cause of action directly against a municipality. To the contrary, given the mandatory indemnification provisions of the Act, the statutory language is best read to preclude the sort of direct municipal liability sought by Plaintiffs here. Accordingly, for this reason as well, Denver is entitled to dismissal of the Eleventh and Twelfth Claims for Relief against it.

### III.  Plaintiffs Fail to Allege a Breach of the *Lyall* Settlement Agreement

Plaintiffs' Thirteenth claim for relief is a breach-of-contract claim, alleging that Denver—and Mayor Hancock individually—are liable for violations of the *Lyall* settlement agreement. [Doc. #160 at 117–19.] The *Lyall* settlement agreement is governed by state contract law. Where a "suit involves a claim for breach of a contract, part of the consideration for which was dismissal of an earlier federal suit," as a general rule "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994); *Morris v. City of Hobart,* 39 F.3d 1105, 1110–11 (10th Cir. 1994) ("[A]ncillary jurisdiction is unavailable to enforce a settlement agreement; there must be an independent basis for federal jurisdiction." (citing *Kokkonen*)). But even if the Court were to consider this state-law claim, it must fail and should be dismissed.

The only operative facts that Plaintiffs allege to support their contract claim are that Denver "did not provide seven-days [sic] notice prior to the sweeps at least at Lincoln Park and the South Platte River," and that "[t]here was no public health and safety risk that necessitated conducting a sweep without notice." [Doc. #160 ¶ 591.] Again, Plaintiffs offer no factual allegations to support the highly questionable, conclusory allegation that large encampments pose "no public health and safety risk." [*Id.*] But, most importantly, the settlement agreement itself—incorporated by reference in the Complaint—gives Denver absolute discretion to make that determination: "The City may conduct large-scale cleanups with less than seven days' notice only if *the City determines* that a public health or safety risk exists which requires it." [Doc. #14-2 at 15 § A.1 (emphasis added).] Similarly, while the agreement calls for "reasonable notice" in such circumstances, the determination of reasonableness is likewise "based upon the nature of the public health and safety

risk present in the area," a risk which, again, is solely determined by the City. [*Id.*] Thus, Plaintiffs' own allegations, set against the plain language of the contract, can establish no violation of the agreement and their breach-of-contract claim fails as a matter of law.

Plaintiffs allege that no public health emergency existed at any of the encampments, and assert that "contrary to Denver's assertions, its own determination of what constitutes a 'public health and safety risk' is not unimpeachable." [*See* Doc. #77 at 19.] Far from it: public-health determinations necessarily require the weighing of important but irreconcilable interests (such as the risk of disease versus the economic and personal impact of public health measures), and any decision is likely to leave unsatisfied many who are affected. But those determinations, however "impeachable," must be (and in the *Lyall* settlement expressly are) left to public officials in the final instance. The parties did not bargain for Plaintiffs or their counsel to have any role in public-health determinations. It is not Plaintiffs' place, and "[i]t is no part of the function of a court . . . to determine [what is] likely to be the most effective for the protection of the public against disease." *Lawrence v. Colorado*, 455 F. Supp. 3d 1063, 1070–71 (D. Colo. 2020) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905)) "It is, rather, the role of the people's elected representatives to determine, in light of the available information, the best course to combat a public health threat, and courts must be careful not to usurp that role." *Id.* (collecting cases).

Finally, Plaintiffs' inexplicably attempt to hold Mayor Hancock personally liable for the alleged breach of the settlement agreement independently fails. Mayor Hancock, individually, is not a signatory of, nor party to, the settlement agreement, and thus could not breach it. [*See* Doc. #14-1 at 7–14.] Plaintiffs invoke § 2.2.3 of the Denver Charter, which instructs that "[t]he Mayor shall see that all contracts and agreements with the City and County are faithfully kept and fully

performed," but that language speaks only to a Mayor's official responsibilities, not his individual capacity. In other words, even if the Charter language could provide a basis to hold the Mayor personally liable for any breach of any contract involving the City (a doubtful proposition for which Plaintiffs offer no authority), such liability would apply to the Mayor only in his official capacity. Indeed, the only facts alleged in Plaintiffs' complaint regarding the Mayor involve his public duties—planning and public statements—and Plaintiffs themselves affirm that "[a]t *all times pertinent, Defendant Hancock was acting under color of state law in his capacity as Mayor* of Denver." [*Id*. at 8 ¶ 25 (emphasis added).] Since Plaintiffs have not alleged a plausible or viable contract claim against Mayor Hancock in his individual capacity, that claim should also be dismissed.

## CONCLUSION

Plaintiffs' claims here are precluded by the *Lyall* settlement. Even were they not, Plaintiffs' claims against the individually named Denver Defendants fail because the allegations do not state an actionable constitutional claim against them nor was the law with respect to any of these claims clearly established such that the individually named Denver Defendants should have known that their conduct would violate any of Plaintiffs' constitutional rights. As such, all the individually named Denver Defendants are entitled to qualified immunity and the Complaint against them should be dismissed in its entirety. Because the Complaint has not demonstrated any actionable constitutional violation, the municipal liability theories asserted against Denver also fail.

**WHEREFORE**, for all these reasons, the Denver Defendants respectfully request that the Court dismiss Plaintiffs' First Amended Complaint in its entirety, with prejudice.

Respectfully submitted this 4th day of March 2021.

*s/Geoffrey C. Klingsporn*
Wendy J. Shea, Assistant City Attorney
Geoffrey C. Klingsporn, Assistant City Attorney
Conor D. Farley, Assistant City Attorney
Denver City Attorney's Office; Civil Litigation Section
201 W. Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3190
wendy.shea@denvergov.org
geoffrey.klingsporn@denvergov.org
conor.farley@denvergov.org
*Attorneys for the Denver Defendants*

## CERTIFICATE OF SERVICE

I certify that on this 4th day of March 2021, I electronically filed the foregoing **DENVER DEFENDANTS' MOTION FOR DISMISSAL OF PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND [DOC. #160]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David A. Lane
Darold W. Killmer
Andy McNulty
Reid Allison
dlane@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com
rallison@kln-law.com

Timothy R. Gablehouse
Melanie J. Granberg
Evan C. Singleton
Ashley L. Zurkan
tgablehouse@gcgllc.com
mgranberg@gcgllc.com
esingleton@gcgllc.com
azurkan@gcgllc.com

Kathleen Spalding
Stephanie Lindquist Scoville
Emely Garcia
kit.spalding@coag.gov
stephanie.scoville@coag.gov
emely.garcia@coag.gov

*s/Geoffrey C. Klingsporn*
Denver City Attorney's Office