**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-2985-WJM-SKC

DENVER HOMELESS OUT LOUD, *et al.*, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO, *et al.*

      Defendants.

_____

**RESPONSE TO DENVER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND [DOC. #160]**

_____

## 1. INTRODUCTION

Plaintiffs brought this case to vindicate the violation of their constitutional rights stemming from a number of homeless sweeps that took place after the entry of the *Lyall* settlement agreement and during the COVID-19 pandemic. Specifically, Plaintiffs challenged Denver Defendants' customary, and individual, decisions to sweep Plaintiffs' encampments without notice, seize and destroy their property, and consciously place them in more dangerous situations. Denver Defendants took these actions to target Plaintiffs, as homeless individuals, and pursuant to a number of unconstitutional ordinances. Plaintiffs adequately alleged multiple, and ongoing, violations of their rights under the Colorado and United States Constitutions. Denver Defendants' motion to dismiss should be denied in its entirety.

## 2. STANDARD OF REVIEW

"There is a strong presumption against the dismissal of claims under [Fed.R.Civ.P. 12(b)(6)]." *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008). Courts

have *rejected* a heightened pleading standard for claims of municipal liability. Rather, a well-pleaded claim of municipal liability is one that simply "provide[s] fair notice to the defendant, [which] requires more than generically restating the elements of municipal liability." *Taylor v. RED Dev., LLC*, 2011 U.S. Dist. LEXIS 97985, at *9 (D. Kan. Aug. 31, 2011).

Importantly, when evaluating a Rule 12(b)(6) motion, a court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). Throughout its motion, Denver Defendants disregard this well-established authority and ask this Court to disregard Plaintiffs' allegations. [Doc. #176], pp. 21-22, 24-26, 46. This Court should disregard Denver Defendants' arguments that do not take Plaintiffs' allegations as true.

3. **ARGUMENT**

   3.1 **Plaintiffs' claims are not precluded by *res judicata*.**

   *Res judicata*, otherwise known as claim preclusion, is an affirmative defense and the burden is on Denver Defendants to prove it. *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008). "*Res judicata* generally 'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'" *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1596 (2020) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016)).[1] Simply put, "[a] claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim." *Frank v.*

---

[1] Denver Defendants acknowledge *Lucky Brand*, but claim that an exception outlined in that case applies here. First, the exception outlined in *Lucky Brands* does not apply here. The cited restatement provision in *Lucky Brands* is about defendants who fail to bring counterclaims in an earlier lawsuit, lose, and then are barred from bringing them as claims in a subsequent case against the original plaintiffs. Obviously, a completely different scenario is presented here. And, importantly, granting Plaintiffs relief in this case would not nullify the *Lyall* settlement agreement. Denver Defendants reading of the *Lyall* settlement as providing them the *right* to conduct sweeps, and not as simply providing Plaintiffs' process and protections should Denver decide to conduct sweeps is a misreading of the settlement agreement.

*United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000); *Mitchell v. City of Moore*, 218 F.3d 1190, 1202-03 (10th Cir. 2000).[2]

Given this precedent, it is clear that the lawsuit and settlement in *Lyall* is also not a basis for claim preclusion here. All of the events litigated in this lawsuit not only post-date the filing of the *Lyall* case, but also the entry of the settlement agreement in *Lyall*. It would have simply been impossible for Plaintiffs to litigate their claims in this case as part of the *Lyall* case. Moreover, the *Lyall* settlement agreement did not explicitly settle, or provide that it was releasing claims related to, *future* actions by Denver and its agents. It also did not release any claims relating to class-wide damages.[3] Simply put, under the Denver Defendants' interpretation of *res judicata* no homeless individual could ever again sue Denver for injunctive relief because every claim could have been brought as part of the *Lyall* case. Not only is this argument inconsistent with binding authority, *Whole Woman's Health*, 136 S. Ct. at 2305, but it is absurd on its face.

Although both *Lyall* and this case involve the violation of the Fourth and Fourteenth Amendments, the claimed violations here arise from a different set of events from those in *Lyall*, involve different individual Defendants and are brought by different named Plaintiffs. The constitutional violations happened on different days, in different years, at different locations, and implicate different types and degrees of impairments to Plaintiffs' rights. The *Lyall* case involved municipal custom, policy, and practice as of 2015 and 2016; this case concerns municipal custom,

---

[2] *See also Morgan v. Covington Twp.*, 648 F.3d 172, 177-78 (3d Cir. 2011); *Smith v. Potter*, 513 F.3d 781, 783 (7th Cir. 2008); *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 529 (6th Cir. 2006);  *Computer Assocs. Int'l, Inc. v. Altai, Inc*., 126 F.3d 365, 369-70 (2d Cir. 1997); *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992); *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 383 (2d Cir. 2003); *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010); *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1365 (Fed. Cir. 2017).

[3] Numerous courts have held that injunctive and declaratory class-wide settlements and judgments have no preclusive effect on individual damages claims. *See Wright v. Collins*, 766 F.2d 841, 847 (4th Cir. 1985); *Crowder v. Lash*, 687 F.2d 996, 1007 (7th Cir. 1982); *Bogard v. Cook*, 586 F.2d 399, 408-09 (5th Cir 1978); *Cotton v. Hutto*, 577 F.2d 453, 454 (8th Cir. 1978); *Jones-Bey v. Caso*, 535 F.2d 1360, 1361-62 (2d Cir. 1976).

policy, and practice as of 2019 and 2020. The sweeps litigated here deviated from the way that sweeps had been conducted prior to the *Lyall* settlement. Denver Defendants' decisions to provide no notice for the sweeps because of the First Amendment activity of Plaintiff Denver Homeless Out Loud were not at issue in *Lyall*. The COVID-19 pandemic did not underlie all of the facts and circumstances in *Lyall*, like it does here. The sweeps at issue in *Lyall* were different in kind, not just degree from those at issue here.

Even if the well-established rule that incidents that post-date the filing of a complaint are not barred by *res judicata* did not apply to this case (which it does), Supreme Court precedent dictates that where "important human values are at stake," such as those implicated in this lawsuit, "even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought[.]" *Whole Woman's Health*, 136 S. Ct. at 2304-09; *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 777 F. App'x 310, 320 (11th Cir. 2019). That is the case here. "[T]ime and experience" have shown that Denver Defendants are violating Plaintiffs constitutional rights in new ways. *Whole Woman's Health*, 136 S. Ct. at 2305.

Finally, there is simply no privity between the individual Plaintiffs here and those in *Lyall*, as none of the Plaintiffs in this case were party to *Lyall*. The proposed class in this case is markedly different than the class certified in *Lyall*. [Doc. #160], ¶ 411. And, there is certainly no privity between the individual Defendants here, and Defendant Denver, which is required if this Court is to apply *res judicata*. *Pelt v. Utah*, 539 F.3d 1271, 1281–82 (10th Cir. 2008). A government official sued in his personal capacity is not in privity with the municipality. *See Conner v. Reinhard*, 847 F.2d 384, 394-96 (7th Cir. 1988). For example, if Plaintiffs prevail against the Individual Defendants, the Individual Defendants must satisfy the judgment out of their own pockets, rather than having Denver pay the damages. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Different legal theories are necessary to prove liability in a personal-capacity, as

opposed to an official-capacity, case. *Id.* Also, different defenses are available to a defendant who is sued in his personal capacity, such as qualified immunity. *Id.* at 166-67. Therefore, courts do not generally consider an official sued in his personal capacity as being in privity with a municipality. *Conner*, 847 F.2d at 394-96.[4]

3.2 **Plaintiffs' claims are not precluded by collateral estoppel.**

Collateral estoppel, or issue preclusion, is an affirmative defense and the burden is on Denver Defendants to prove it. *Taylor,* 128 S. Ct. at 2179-80. Denver Defendants have not met this burden. Collateral estoppel only applies when each of the following are met: "the issue previously decided is identical with the one presented in the action in question [and] the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication[.]" *Matter of Lombard*, 739 F.2d 499, 502 (10th Cir. 1984). The settlement in *Lyall* is not a basis for issue preclusion in this suit because the issues litigated are not "identical" to the ones presented here and, as outlined *supra* **Section 3.1**, the parties are not in privity. *Lawlor* v. *National Screen Service Corp.*, 349 U.S. 322, 327-328 (1955) (holding that two suits were not "based on the same cause of action" because "[t]he conduct presently complained of was all subsequent to" the prior judgment and it "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case").

Further, the incidents being litigated in this case happened in late-2019 and 2020, and all occurred *after* entry of the settlement agreement in *Lyall*. This temporal difference alone is

---

[4] *See also Headley v. Bacon*, 828 F.2d 1272, 1279 (8th Cir. 1987); *Roy v. City of Augusta, Me.*, 712 F.2d 1517, 1521-22 (1st Cir. 1983); *Beard v. O'Neal*, 728 F.2d 894 (7th Cir.), *cert. denied*, 469 U.S. 825 (1984); *Kunzelman v. Thompson*, 799 F.2d 1172, 1178 (7th Cir. 1986); *see also* C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4458, at 508 (1981) ("[A] judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against the officials.")

sufficient to render collateral estoppel inapplicable *See Soc'y of Lloyd's v. Bennett*, 182 F. App'x 840, 844 (10th Cir. 2006); *United States v. Louisiana*, 196 F. Supp. 3d 612, 623 (M.D. La. 2016); *Goodson v. Lightfoot*, Civil Action No. 03-564, 2006 U.S. Dist. LEXIS 100092, at *17 n.2 (W.D. Pa. Mar. 7, 2006); *Romano v. SLS Residential, Inc.*, 298 F.R.D. 103, 108 (S.D.N.Y. 2014).

Moreover, the difference between *Lyall* and this litigation outlined *supra* **Section 3.1** have been held by courts to dictate that collateral estoppel does not apply. *Garza v. Henderson*, 779 F.2d 390 (7th Cir. 1985); *Richardson v. City of L.A.*, No. CV 10-02473 DDP (RZx), 2011 U.S. Dist. LEXIS 161514, at *6-8 (C.D. Cal. June 13, 2011).

Finally, "even when the traditional prerequisites for collateral estoppel are satisfied," a court retains "broad discretion" to decide whether it may be applied. *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007). When a lawsuit implicates important values, it militates against a finding of collateral estoppel, especially when there is "alleged ongoing noncompliance" with the constitution. *Louisiana*, 196 F. Supp. 3d at 656-57. That is certainly what is alleged here.

### 3.3 **Plaintiffs have sufficiently pled Defendants' personal participation.**

Plaintiffs' Amended Complaint provides clear and adequate notice of the claims against Denver Defendants and the grounds upon which they rest. Importantly, "the nature and specificity of the allegations required to state a plausible claim will vary based on context." *Khalik v. United Air Lines*, 617 F.3d 1188, 1191 (10th Cir. 2012). Whether a complaint states a plausible claim for relief "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Under Rule 8, "specific facts are not necessary; the statement need only give defendant fair notice of what the…claim is and the grounds upon which it rests." *Khalik*, 617 F.3d at 1192.

In *Bark v. Chacon*, this Court held that the plaintiff's allegations claiming constitutional violations by numerous law enforcement officer defendants were sufficient to survive a motion to

dismiss, despite the plaintiff's inability to identify exactly which defendant committed which particular act. Civil Action No. 10-cv-01570-WYD-MJW, 2011 U.S. Dist. LEXIS 53245, at *12-16 (D. Colo. May 18, 2011). The *Bark* plaintiff alleged that ten officers came to his door in the middle of the night, forced him on his knees in the snow with guns drawn, searched his home without a warrant or consent, and interrogated him in violation of his constitutional rights. *Id.* at *3-4. Like Denver Defendants here, the defendants argued that the plaintiff's claims should be dismissed because, pursuant to *Robbins*, the plaintiff could not identify which particular defendants committed the specific acts alleged. *Id.* at *12-13. The court disagreed, and found *Robbins* distinguishable in several important respects. Unlike in *Robbins*, the *Bark* plaintiff: (1) differentiated between the actions taken by the individual defendants and those taken by the City, (2) the allegations pertaining to the individual defendants related to a single incident, and (3) all of the individual defendants were alleged to have been present at the incident and to have acted in concert. *Id.* at *15. The court concluded, "[w]hile Plaintiff has not alleged which specific Defendant committed which specific act during this incident in question, it would be unfair to require Plaintiff to do so based on the circumstances alleged in this case." *Id.* at *15-16.

Similarly, in *Mauchlin v. Davis*, this Court held that a plaintiff's allegations against seven individual officers were sufficient to survive a motion to dismiss his Eighth Amendment conditions of confinement claim, despite the plaintiff's inability to name exactly which defendant took which specific actions that caused the violation of his rights. Civil Action No. 12-cv-01449-RM-BNB, 2014 U.S. Dist. LEXIS 143873, at *15-21 (D. Colo. Oct. 9, 2014). The plaintiff alleged that "any of [the Seven Defendants] could have… ordered Plaintiff[']s removal from [the SHU] to a (vastly) cleaner and quieter area…" while also making specific allegations regarding each of the defendants' presence and knowledge of the plaintiff's complaints. The Court, indistinguishing *Robbins* (which, the Court noted involved "allegedly tortious acts committed" by certain

defendants that was "entirely different in character" from one another and therefore "mistakenly grouped in a single allegation," *id.*at *18-19 (citing *Robbins*, 519 F.3d at 1250)) held "[w]hen the general allegations as to all Seven Defendants and the specific allegations as to each of the Seven Defendants are read together, Plaintiff sufficiently pled facts to state a *Bivens* claim[.]" *Mauchlin*, 2014 U.S. Dist. LEXIS 143873, at *18.

Unlike in *Robbins*, the actions of the Denver Defendants are not "entirely different in character[.]" *Robbins*, 519 F.3d at 1250. Instead, like *Mauchlin* and *Bark*, Plaintiffs allege that Denver Defendants took actions that were functionally equivalent during the sweeps. [Doc. #160], ¶¶ 187-268, 272-354. And, like in *Mauchlin,* the Amended Complaint outlines the facts alleging the violations experienced by each Plaintiff, *id.*, ¶¶ 231-43, 249-57, 264-67, 290-306, 322-28, 329-36, 337-45, 346-66, coupled with the allegations against each Defendant *Id.*, ¶¶ 207-18, 219-23, 280-85. Critically, Plaintiffs allege the actions of each Defendant that violated their rights at each incident. *Id*. And, like in *Bark*, the Amended Complaint distinguishes between acts taken by Denver and those taken by the Individual Defendants. *Id.*, ¶¶ 187-268, 272-354.

Importantly, the Court must consider the context of the facts in determining the specificity of the allegations required to survive a motion to dismiss. *Mauchlin*, 2014 U.S. Dist. LEXIS, at *4 (citing *Khalik*, 617 F.3d at 1191). There were a large number of Individual Defendants who descended on Lincoln Park, Morey Middle School, and the South Platte River on the days of the sweeps outlined in the Amended Complaint and a number of the Defendants in this case were in full "riot gear." [Doc. #160], ¶ 245. Considering the sheer number of Individual Defendants present dressed in riot gear[5] it would be extremely difficult and highly unreasonable to require that Plaintiffs must identify exactly which Defendants committed the harms against each of them.

---

[5] Dismissing Plaintiffs' claims under these circumstances would greatly undermine public policy interests and create perverse incentives for law enforcement defendants to conceal their identities so as to avoid liability. *See Fogarty*, 523 F.3d at 1151 n.2.

Nonetheless, the Amended Complaint does in fact name each Defendant and their particular conduct, which, coupled with the facts alleged by each Plaintiff, *id.* ¶¶ 231-43, 249-57, 264-67, 290-306, 322-28, 329-36, 337-45, 346-66, gives Defendants fair notice of the claims against them and the grounds upon which they rest. *See Fogarty* v. Gallegos, 523 F.3d 1147 (10th Cir. 2008) (finding class plaintiffs' claims unaffected by inability to ascertain the identity of the officers who arrested and used force against them, even after voluminous discovery); *see also Bark*, 2011 U.S. Dist. LEXIS at *14; *Mauchlin*, 2014 U.S. Dist. LEXIS at *15-21. This is especially true considering the pre-discovery posture of this case.

Finally, Defendants acted in concert to commit the violations against Plaintiffs. "Where multiple forces are actively operating … plaintiffs may demonstrate that each defendant is a concurrent cause by showing that his or her conduct was a 'substantial factor in bringing [the injury] about.'" *Lippoldt v. Cole*, 468 U.S. 1204, 1219 (10th Cir. 2006)  (citing *Northington v. Marin*, 102 F.3d 1564, 1568-69 (10th Cir. 1996)). Defendants uniformly conducted the sweeps. [Doc. #160], ¶¶ 187-354. The Amended Complaint demonstrates that Denver Defendants collectively violated the constitution and that each was a substantial factor in injuring Plaintiffs.

### 3.4 **Plaintiffs have sufficiently pled Defendants Hancock's, McDonald's, Lee's, Robinson's, and Bronson's supervisory liability.**

To allege supervisory liability, Plaintiffs must simply show an "affirmative link" between the supervisor and the constitutional violation. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Supervisory liability "under § 1983 must be based on personal involvement in the alleged constitutional violation" but "[p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." *Fogarty*, 523 F.3d at 1162. Supervisory liability does not require direct participation because § 1983 states "[a]ny official who 'causes' a citizen to be deprived of her constitutional rights can also be held

liable." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008).

Plaintiffs' Amended Complaint alleges that Defendants Hancock, McDonald, Lee, Robinson, and Bronson coordinated the sweeps at Lincoln Park, Morey Middle School, and along the South Platte River. [Doc. #160], ¶¶ 189, 192, 195, 203, 224, 274, 311, 320. All of these sweeps were multi-agency, coordinated efforts that required deliberative planning by Defendants Hancock, McDonald, Lee, Robinson, and Bronson. *Id.,* ¶¶ 191, 273. The actions of those on the ground at the sweeps were planned and directed by Defendants Hancock, McDonald, Lee, Robinson, and Bronson. *Id.,* ¶¶ 192, 195, 203, 224, 274, 311, 320. Defendants Hancock, McDonald, Lee, Robinson, and Bronson consciously decided not to provide any specific notice whatsoever prior these sweeps despite having decided to conduct them on specific days and times weeks prior to the sweeps. *Id.,* ¶¶ 188, 189, 196, 197, 198, 275, 279, 288. Defendants Hancock, McDonald, Lee, Robinson, and Bronson decided not provide notice because of the possibility that protesters, including members of Plaintiff DHOL, would show up and voice disapproval of the sweeps. *Id.,* ¶¶190, 199, 200, 201, 276, 309. These allegations adequately state a claim of supervisory liability against Defendants Hancock, McDonald, Lee, Robinson, and Bronson for the violation of Plaintiffs' constitutional rights by those on the ground at the sweeps.

3.5 <u>**Plaintiffs have adequately alleged an unlawful taking under the Colorado Constitution.**</u>[6]

Under Colo. Const. Art. II, § 15, "property shall not be taken or damaged, for public or private use, without just compensation." This section "provide[s] a remedy in damages for injury to property, not common to the public, inflicted by the state or one of its political subdivisions." *Srb v. Bd. of Cnty. Comm'rs*, 601 P.2d 1082, 1085 (Colo. App. 1979). It "is not limited in application to condemnation proceedings," but "is remedial in nature and must be

---

[6] After significant consideration, Plaintiffs voluntarily agree to dismiss their unlawful takings claim brought pursuant to the United States Constitution.

liberally construed." *Id.*; *Game & Fish Com. v. Farmers Irrigation Co.*, 426 P.2d 562, 565-66 (Colo. 1967); *see also Harrison v. Denver City Tramway Co.*, 131 P. 409 (Colo. 1913); *Denver Circle R.R. v. Nester*, 15 P. 714 (Colo. 1887).

"[P]roof of specific intent is not necessary to establish a taking." *Scott v. Cty. of Custer*, 178 P.3d 1240, 1245 (Colo. App. 2007). "A taking can be effected by a legal interference with the physical use, possession, disposition, or enjoyment of the property, or by acts which translate to an exercise of dominion and control by a governmental entity." *Thompson v. City & Cty. of Denver*, 958 P.2d 525, 527 (Colo. App. 1998). "A taking also occurs if an owner is required to forego the economically beneficial use of his or her property." *Id.*; *City of Northglenn v. Grynberg*, 846 P.2d 175 (Colo. 1993).

> If property is destroyed under a mistaken belief that it is a nuisance, when in fact it is not a nuisance, it is taken for a "public use" within the meaning of the constitutional provision, and the loss to the owner should be made good.

*McMahon v. Telluride*, 244 P. 1017, 1018-19 (Colo. 1926). A claim for unlawful taking is properly instituted not only against the municipality responsible for the taking, but also against the individual government actors that participated in the taking. *Colo. ex rel. Watrous v. District Court of United States*, 207 F.2d 50 (10th Cir. 1953).[7]

Plaintiffs adequately alleged an unlawful taking of their property by Denver Defendants. [Doc. #160], ¶¶ 207-18, 219-23, 231-43, 249-57, 264-67, 280-85, 290-306, 322-28, 329-36, 337-45. Contrary to Denver Defendant's arguments, there is no requirement that a taking be affected pursuant to eminent domain for there to be an actionable claim under the Colorado Constitution,

---

[7] In some respects, "the Colorado Constitution affords an aggrieved property owner a greater measure of protection than does the Constitution of the United States." *Mosher v. Boulder*, 225 F. Supp. 32, 35 (D. Colo. 1964). For example, the Colorado Constitution's takings clause "prohibits not only the taking of property but also the *damaging* thereof, and whosoever damages the property of another, whether he be an individual or an agency of the state, must be held responsible in damages for the loss caused thereby." *Game & Fish Com.*, 426 P.2d at 565-66.

*Srb*, 601 P.2d at 1085; *Game & Fish Com.*, 426 P.2d at 565-66, or that the unlawful seizure of

property defeats a takings claim under the Colorado Constitution. *McMahon*, 244 P. at 1018-19.

3.6 **Plaintiffs have adequately alleged that Defendants violated their substantive due process rights.**

> There is no doubt that homelessness is a serious public health concern. Homeless individuals have higher rates of chronic physical and mental health conditions, increased rates of mortality, and related diseases and co-occurring disorders. With the lack of access to the most basic of human needs, including running water, toilets, and trash disposal, infectious diseases—like COVID-19—can spread quickly. Uprooting homeless individuals, without providing them with basic sanitation and waste disposal needs, does nothing more than shift a public health crisis from one location to another, potentially endangering the health of the public in both locations. This concern is particularly acute during the current COVID-19 pandemic.

*Blake v. City of Grants Pass*, No. 1:18-cv-01823-CL, 2020 U.S. Dist. LEXIS 129494, at *49-50

(D. Or. July 22, 2020). As alleged, Denver Defendants have responded to the dual significant

public health crises of homelessness and COVID-19 with conscience-shocking indifference to the

health and safety of Denver's homeless population.

The Due Process Clause protects against "deliberately wrongful government decisions[,]"

*Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995), when "a state actor affirmatively acts to

create, or increases a plaintiff's vulnerability to, or danger from private violence." *Currier v.*

*Doran*, 242 F.3d 905, 923 (10th Cir. 2001). Plaintiffs have adequately alleged the six elements of

danger-creation liability: (1) Defendants created the danger or increased plaintiff's vulnerability to

the danger in some way; (2) Plaintiffs are members of a limited and specifically definable group;

(3) Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate

harm; (4) the risk was obvious or known; (5) Defendants acted recklessly in conscious disregard

of that risk, and (6) Defendants' actions shock the judicial conscience. *Uhlrig*, 64 F.3d at 573.

Importantly, courts routinely hold that when government officials clear homeless

encampments in such a way as to put individuals "in an inherently more dangerous situation than

they had faced previously" there is danger-creation liability. *Cobine v. City of Eureka*, 250 F. Supp.3d 423, 433 (N.D. Cal. 2017); *Santa Cruz Homeless v. Bernal*, No. 20-cv-09425-SVK, 2021 U.S. Dist. LEXIS 13839 (N.D. Cal. Jan. 20, 2021); *Sausalito/Marin Cty. Chapter of the Cal. Homeless Union v. City of Sausalito*, No. 21-cv-01143-EMC, 2021 U.S. Dist. LEXIS 37806 (N.D. Cal. Mar. 1, 2021); *Phillips v. City of Cincinnati*, 479 F. Supp. 3d 611, 622, 648-650 (S.D. Ohio 2020); *Sanchez v. City of Fresno*, 914 F.Supp.2d 1079, 1099-1102 (E.D.Cal. 2012). That is exactly what is alleged in the Amended Complaint.

### 3.6.1 Plaintiffs have adequately alleged that Defendants violated their substantive due process rights by sweeping under the auspices of the Encumbrance Removal Ordinance, and enforcing the Camping Ban through move-along orders, during the COVID-19 pandemic.

Every Plaintiff in this case was exposed to a greater risk of COVID-19 by the sweeps, but what happened to two Plaintiffs in particular demonstrates the conscience-shocking behavior of Denver Defendants. Plaintiff Nathaniel Warner contracted COVID-19 in one of Denver's shelters after having been pushed into a congregate setting by the sweeps (and avoiding it for months on the streets). [Doc. #160], ¶¶ 355-66. Plaintiff Lisa Masaro, who was in the midst of treatment for cancer, was forced to pack up and move to a place that exposed her to substantially more people by one of the sweeps. *Id.*, ¶¶ 346-54. Denver Defendants actions violate the Fourteenth Amendment.

#### 3.6.1.1 Denver Defendants increased the danger to Plaintiffs by conducting the sweeps during the COVID-19 pandemic.

Contrary to Denver Defendants' arguments, Plaintiffs need not *prove* at this stage that the sweeps increased the danger of them contracting, and dying from, COVID-19. They must simply adequately allege that the sweeps have done so. A complaint will survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). And, the Amended Complaint certainly does this. [Doc. #160], ¶¶ 130, 144, 368-88.

Throughout the pandemic, Denver Defendants have used the Camping Ban and Encumbrance Removal Ordinance as a justification to displace homeless individuals. [Doc. #160], ¶¶ 142, 146. Defendants' actions in displacing Plaintiffs, and encampments, were in direct contravention of CDC guidance[8] that unequivocally stated that local officials should not displace encampment residents unless "individual housing options" are available. *Id.*, ¶¶ 368-76. Denver Defendants swept Plaintiffs without providing individual housing options. *Id.*, ¶¶ 142, 151.

Contrary to Denver Defendants arguments, courts across the country considering constitutional claims relating to the pandemic (in instances where injunctions were both granted and denied) have relied on CDC guidance in determining what is necessary to protect vulnerable populations, and whether governments had knowingly failed to do so.[9] This Court is not exempt from this consensus of courts. *Essien v. Barr*, Civil Action No. 20-cv-1034-WJM, 2020 U.S. Dist. LEXIS 72422, at *14 (D. Colo. Apr. 24, 2020). Relying on the COVID-19 experts at the CDC is proper. CDC guidance continues to counsel that sweeps are inherently dangerous. [Doc. #160], ¶¶

---

[8] This Court can, and should, take judicial notice of the CDC guidance regarding COVID-19. *See Wright v. Hayden*, No. 5:08CV-179-R, 2009 U.S. Dist. LEXIS 26399, at *7 n.1 (W.D. Ky. Mar. 31, 2009) (taking judicial notice of the CDC guidelines for the transmission of HIV); *Seddens v. McGinnis*, No. 91-1500, 1992 U.S. App. LEXIS 17945 (7th Cir. July 24, 1992) (taking judicial notice of "recent federal publications stating that AIDS cannot be transmitted through non-sexual social contact").

[9] *See e.g., Carranza v. Reams*, No. 20-cv-00977-PAB, 2020 U.S. Dist. LEXIS 82299, at *41 (D. Colo. May 11, 2020) (relying on CDC guidelines on COVID-19)*; Nellson v. Barnhart*, 454 F. Supp. 4d 1087, 1095 (D. Colo. 2020) (same); *Lucero-Gonzalez v. Kline*, No. CV-20-00901-PHX-DJH (DMF), 2020 U.S. Dist. LEXIS 99393, at *27 (D. Ariz. June 2, 2020) (same); *Savino v. Souza*, 459 F. Supp. 3d 317, 325 (D. Mass. 2020) (same); *Middleton v. Andino*, Civil Action No. 3:20-cv-01730-JMC, 2020 U.S. Dist. LEXIS 171431, at *4 (D.S.C. Sep. 18, 2020) (same); *Savino v. Souza*, 459 F. Supp. 3d 317, 325 (D. Mass. 2020) (same).

368-77.[10]

Additionally, as alleged, clearing encampments with the purpose of pushing homeless residents into shelters exposes them to a greater risk of contracting, and potentially dying from, COVID-19. [Doc. #160], 377-387. The fact that congregate settings are the most dangerous place for COVID-19 contraction is common sense (and courts have recognized this). *Malam v. Adducci*, No. 20-10829, 2020 U.S. Dist. LEXIS 59407, at *26-28 (E.D. Mich. Apr. 5, 2020) (noting that "a 'generalized risk' *is* a 'substantial risk' of catching the COVID-19 virus for any group of human beings in *highly confined conditions*") (emphasis added); *Denbow v. Me. Dep't of Corr.*, No. 1:20-cv-00175-JAW, 2020 U.S. Dist. LEXIS 100003, at *25 (D. Me. June 8, 2020) (declining to release incarcerated homeless individuals during the COVID-19 pandemic because release to "[h]omeless shelters [were] not appropriate because of documented outbreaks of COVID-19 in homeless shelters"); *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-cv-4062 (CM), 2020 U.S. Dist. LEXIS 115354, at *53 (S.D.N.Y. June 29, 2020) (upholding eviction moratorium because it served the substantial government interest in "avoid[ing] crowding in… homeless shelters during an ongoing public health emergency).[11]

---

[10] Coronavirus Disease 2019 (COVID-19): Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html.

[11] For example, in *Auracle Homes, LLC v. Lamont*, a federal court upheld Connecticut's eviction moratorium as constitutional because, in part, it served the substantial government interest in "prevent[ing] individuals from being evicted, becoming homeless and having to live in shelters, or having to double up on housing situations, which has a real or substantial relation to the public health crisis that has gripped our state and nation[.]"No. 3:20-cv-00829 (VAB), 2020 U.S. Dist. LEXIS 141500, at *22 (D. Conn. Aug. 7, 2020). In doing so, the Court also took into account the demonstrated fact that the eviction moratorium reduced "the exposure to the virus" because it prevented those evicted from "entering homeless shelters that lack the ability to house all their residents in a safe manner during a pandemic, and either exposing or being exposed to the coronavirus in that setting[.]" *Id.*, at *26. The Court also relied on the fact that "[t]he eviction moratorium has helped prevent a disastrous increase in homelessness and virus exposure that would disproportionately impact renters of color." *Id.*, at *54.

Moreover, as alleged, testing data[12] clearly demonstrated the prevalence rate of COVID-19 of those sheltering on the streets is much lower than the prevalence rate of the general population. [Doc. #160], ¶¶ 378-80. There were known outbreaks at Denver's homeless shelters, yet none at encampments. *Id.*, ¶¶ 381-83. The consensus of public health authority demonstrated in April that congregate settings, like shelters, were the most dangerous places for transmission of COVID-19. *Id.*, ¶ 387. It is indisputable "that the most effective way of preventing [COVID-19] infection is avoiding interaction with those who are infected—more specifically, not touching them or the things they touch, and not breathing the air they breathe." *Essien*, 2020 U.S. Dist. LEXIS 72422, at *14-15. As demonstrated by the allegations relating to the conditions of Denver's congregate shelters, it is clear that they provide no way to avoid interaction with those infected with COVID-19. [Doc. #160], ¶¶ 359-61.

Finally, forcing homeless individuals into shelters is only one of the ways that clearing encampments exposes homeless individuals to greater danger from COVID-19. Sweeps also sever lifelines to services that homeless individuals need in order to survive through displacement. *See Porter v. S. Nev. Adult Mental Health Servs.*, No. 16-cv-02949-APG-PAL, 2017 U.S. Dist. LEXIS 204740, at *31-33 (D. Nev. Dec. 13, 2017) (holding that homeless plaintiffs had stated a plausible substantive due process claim under the "danger creation doctrine" where they alleged that a city had bussed him out of town because "they faced enhanced danger when… left in unfamiliar cities without assistance or the provision of alternative care"). This includes losing out on potential individualized housing, missing doctors appointments, not receiving COVID-19 test results, and disconnection from myriad other health and mental health services. Additionally, clearing encampments results in cohorts of homeless individuals intermingling in new, larger

---

[12] Denver Defendants argue that the testing data does not show what is alleged in the Amended Complaint. Denver Defendants are wrong, as demonstrated at the preliminary injunction hearing. And, this Court must take Plaintiffs' allegations as true for purposes of this motion.

encampments, which results in an increased risk of spread of COVID-19. And, the destruction of personal property caused by clearing homeless encampments prevents homeless individuals from using their only (if rudimentary) shelter for social isolation. These increased dangers were clearly known by Defendants, as they are what the CDC warned of in its guidance.[13]

> ### 3.6.1.2 Plaintiffs are part of a limited and specifically definable group, homeless individuals, that were exposed to an increased risk of contracting COVID-19 by Defendants' actions.

The CDC has determined that homeless individuals are a limited and specifically definable group that is more susceptible to being infected with COVID-19.[14] Numerous courts have recognized this fact since the pandemic began. *See e.g., Diego A. A. v. Decker*, Civil Action No. 20-4337(MCA), 2020 U.S. Dist. LEXIS 123345, at *9 (D.N.J. July 14, 2020) (relying on CDC guidance on COVID-19 that certain populations are also at higher risk of contracting COVID-19 or developing severe symptoms, "including… those who are homeless"); *Doe v. Barr*, No. 20-cv-02141-LB, 2020 U.S. Dist. LEXIS 64459, at *2-4 (N.D. Cal. Apr. 12, 2020); *Renat T. v. Decker*, Civil Action No. 20-4658 (MCA), 2020 U.S. Dist. LEXIS 119444, at *6 (D.N.J. July 8, 2020). Denver itself routinely speaks about homeless individuals as though they are a specifically definable group.[15] The *Lyall* settlement agreement refers to homeless individuals as specifically

---

[13] Coronavirus Disease 2019 (COVID-19): Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html.

[14] Centers For Disease Control and Prevention, *Groups At Risk For Severe Illness* (April 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 10, 2020).

[15] *See, e.g., Denver Expands Strategies for Individuals Facing Homelessness* (December 4, 2019), available at: https://www.denvergov.org/Government/Departments/Department-of-Housing-Stability/News/Denver-Expands-Strategies-for-Individuals-Facing-Homelessness?BestBetMatch=homeless|95c94ae0-247e-4b0c-b511-f9439cc122bd|c4f1b630-3cf4-4ec1-8110-c4784b6aa32e|en-US; *Homelessness Resolution Funding Passed by Denver Voters* (November 5, 2020), available at: https://www.denvergov.org/Government/Departments/Department-of-Housing-

definable. [Doc. #3-2], p. 3. For Denver Defendants to now say that homeless individuals are not specifically definable lacks credibility.

### 3.6.1.3 Defendants consciously and recklessly put Plaintiffs at substantial risk of serious, obvious, immediate, known, and proximate harm.

Applying the Supreme Court's rubric of "society considers the risk . . . to be so grave[,]" *Helling v. McKinney*, 509 U.S. 25, 36 (1993), results in the inexorable conclusion that COVID-19 poses a serious risk of harm to Plaintiffs. To conclude that COVID-19 poses a risk of serious harm, the Court need look no further than the drastic way society has been reshaped in a matter of months. Businesses and schools have been periodically closed. Travel is restricted. Every level of government has declared a state of emergency. Even this Court's own operations have been dramatically changed by COVID-19 in response to the well-known fact that "gatherings of people pose a threat to public health and safety[.]"[16] For these and other reasons, courts have held that COVID-19 poses a risk of serious harm. *See Carranza v. Reams*, No. 20-cv-00977-PAB, 2020 U.S. Dist. LEXIS 82299, at *22-23 (D. Colo. May 11, 2020).[17]

Denver Defendants direct contradiction of CDC guidelines, that have been in place for months, demonstrates that the risk was obvious or known and Denver Defendants acted recklessly in conscious disregard of that risk. The Tenth Circuit, in *Mata v. Saiz*, relied on established

---

Stability/News/Homelessness-Resolution-Funding-Passed-by-Denver-Voters?BestBetMatch=homeless|95c94ae0-247e-4b0c-b511-f9439cc122bd|c4f1b630-3cf4-4ec1-8110-c4784b6aa32e|en-US.

[16] Court Operations Under The Exigent Circumstances Created By COVID-19, *District Court General Order 2020-16*, available at: http://www.cod.uscourts.gov/CourtOperations/COVID-19Guidance.aspx.

[17] This Court also need look no further than the consensus among federal courts that exposure to tuberculosis — a less severe disease, at least in terms of mortality rate — is a "serious harm." *See, e.g., Jeffries v. Block*, 940 F. Supp. 1509, 1514 (C.D. Cal. 1996) (citing the determination of the California Legislature that "tuberculosis is a serious contagious disease, which presents a serious risk to inmate health"); *cf. Brown v. District of Columbia*, 514 F.3d 1279, 1285 (D.C. Cir. 2008) (concluding, under the slightly different deliberate indifference to "serious medical needs" test, that gallstones were "easily" in the "category of serious medical needs," a point conceded by the District of Columbia)

medical guidelines in holding that plaintiff had demonstrated evidence of reckless and conscious disregard of an obvious or known risk. 427 F.3d 745, 757-59 (10th Cir. 2005) (noting that "[w]hile published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm"). Other courts have held that the CDC guidelines relating to COVID-19 "provide the authoritative source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic global pandemic where the public health standards are emerging and changing[.]" *Mays v. Dart*, No. 20-1792, 2020 U.S. App. LEXIS 28359, at *31 (7th Cir. Sep. 8, 2020); *see also Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 943 (N.D. Cal. 2015). Denver Defendants knew what the CDC guidelines counseled prior to deciding to conduct the sweeps outlined in the Amended Complaint. [Doc. #160], ¶ 374.[18]

Despite Denver Defendants arguments, courts across the country considering constitutional claims relating to the COVID-19 pandemic (in instances where injunctions were both granted and denied) have relied on CDC guidance in determining what is necessary to protect vulnerable populations, and whether governments had knowingly failed to do so.[19] This is not a case where

---

[18] *Full update from Mayor Hancock on Denver's COVID-19 response*, 9NEWS, 24:45-24:50, available at:https://www.9news.com/video/news/health/coronavirus/denver-mayor-hancock-full-update-coronavirus-july-31/73-73c2f1e2-5ed8-4a96-bbd7-2578a3e4fbf5.

[19] *See e.g., Carranza v. Reams*, No. 20-cv-00977-PAB, 2020 U.S. Dist. LEXIS 82299, at *41 (D. Colo. May 11, 2020) (relying on CDC guidelines on COVID-19)*; Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1095 (D. Colo. 2020) (same); *Lucero-Gonzalez v. Kline*, No. CV-20-00901-PHX-DJH (DMF), 2020 U.S. Dist. LEXIS 99393, at *27 (D. Ariz. June 2, 2020) (same); *Savino v. Souza*, 459 F. Supp. 3d 317, 325 (D. Mass. 2020) (same); *Middleton v. Andino*, Civil Action No. 3:20-cv-01730-JMC, 2020 U.S. Dist. LEXIS 171431, at *4 (D.S.C. Sep. 18, 2020) (same); *Savino v. Souza*, 459 F. Supp. 3d 317, 325 (D. Mass. 2020) (same); *People First of Ala. v. Merrill*, No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 180038, at *16 (N.D. Ala. Sep. 30, 2020) (same); *Gomes v. US Dep't of Homeland Sec.*, Civil No. 20-cv-453-LM, 2020 U.S. Dist. LEXIS 85081, *8 (D.N.H. May 14, 2020) (same); *Am. Coll. of Obstetricians & Gynecologists v. United States FDA*, Civil Action No. TDC-20-1320, 2020 U.S. Dist. LEXIS 122017, at *19 (D. Md. July 13, 2020) (same); *C.G.B. v. Wolf*, No. 20-cv-1072 (CRC), 2020 U.S. Dist. LEXIS 96482, at *6 (D.D.C. June 2, 2020) (same); *Diego A.*, 2020 U.S. Dist. LEXIS 123345, at *28 (same).

Defendants have simply failed to act. It is a case where they affirmatively took actions that go against the guidance of the single most relied-upon authority in this country as to how to respond to the COVID-19 pandemic.

In addition to the CDC guidance, there was mounting evidence, in the form of prevalence testing, that encampments were objectively safer for homeless individuals, in that their likelihood of contracting COVID-19 was significantly less in an encampment versus a congregate shelter. [Doc. #160], ¶¶ 378-88. Denver itself, through its public health department, had conducted this prevalence testing and, therefore, knew the increased risk to homeless individuals that being in congregate shelters posed. *Id.*[20] The outbreaks that had already occurred at shelters like the National Western shelter (and had not occurred at encampments) put Defendants on notice of the extremely heightened risks of congregate shelters. *Id.*, ¶ 382; Roman v. Wolf, 829 F. App'x 165, 172 (9th Cir. 2020) (holding that the government was aware of the risks of inadequate measures to prevent COVID-19 "especially in light of high-profile outbreaks at other carceral facilities that had already occurred at the time"). The consensus of public health authority demonstrated as early as April that congregate settings, like shelters, were the most dangerous places for transmission of COVID-19. [Doc. #160], ¶ 388.

Denver Defendants knew about the testing data and outbreaks. *Id.*, ¶ 384. Despite this knowledge, Denver Defendants explicitly conducted the sweeps to force Plaintiffs, and others similarly situated, into congregate facilities where they knew Plaintiffs were significantly more likely to contract COVID-19. *Id.*, ¶ 223, 287, 385, 386. This is textbook reckless and conscious

---

[20] *Surveillance Testing Pilot To Establish Potential COVID-19 Prevalence Among People Experiencing Homelessness In Denver*, COLORADO COALITION FOR THE HOMELESS, available at: https://www.coloradocoalition.org/sites/default/files/2020-05/Prevalence%20of%20COVID-19.pdf; *Surveillance Testing Pilot To Establish Potential COVID-19 Prevalence Among People Experiencing Homelessness Who Utilize Denver Shelters*, COLORADO COALITION FOR THE HOMELESS, available at: https://www.coloradocoalition.org/sites/default/files/2020-06/shelter%20testing_final_0.pdf.

disregard of a known risk.

### 3.6.1.4 Denver Defendants' actions shock the judicial conscience.

Denver Defendants' actions in sweeping Plaintiffs in direct contravention of public health guidelines is a "course of proceeding by agents of government... [that] is bound to offend even hardened sensibilities." *Rochin v. California*, 342 U.S. 165, 172 (1952). It is conduct that "[affords] brutality the cloak of law." *Id.* at 173. It certainly "shocks the conscience" and is so "brutal" and "offensive" that it does not comport with traditional ideas of decency. *Id.* at 172; *see also Breithaupt v. Abram*, 352 U.S. 432, 435 (1957). Defendants, after deliberation, actively chose to disregard CDC guidance and displace encampments through mass sweeps. This is judicial conscience-shocking behavior. *Perez v. Unified Gov't of Wyandotte Cty./Kan. City*, 432 F.3d 1163, 1166 (10th Cir. 2005) (holding that "when a government official has enough time to engage in 'actual deliberation,' conduct that shows 'deliberate indifference' to a person's life or security will shock the conscience and thereby violate the Fourteenth Amendment" ).

Defendants' actions are not merely incorrect or ill-advised government decisions. Defendants' decision to clear encampments was *deliberately* wrong. This is not a case where Defendants swept Plaintiffs one time, a day or two after the CDC guidance was issued. Defendants have continued to clear encampment after encampment for months and months after it was clear and obvious that public health authorities definitively stated that encampments should not be cleared during the COVID-19 pandemic.[21] "[W]hen a government official has enough time to engage in 'actual deliberation,' conduct that shows 'deliberate indifference' to a person's life or security will shock the conscience and thereby violate the Fourteenth Amendment." *Perez v. Unified Gov't of Wyandotte Cty./Kan. City*, 432 F.3d 1163, 1166 (10th Cir. 2005).

---

[21] And, Defendant Polis urged Denver Defendants to clear the Lincoln Park encampment despite the CDC guidance having been clear about the risks and issued two months prior.

### 3.6.2 **Plaintiffs have adequately alleged that Defendants violated their substantive due process rights.**

Plaintiffs in this case have stated a Fourteenth Amendment danger-creation claim by alleging that Denver Defendants force "the homeless to vacate well-lit and high-traffic public land… [by] taking and destroying their tents, tarps, blankets, clothing, and other property." *Phillips v. City of Cincinnati*, 479 F. Supp. 3d 611, 622, 648-650 (S.D. Ohio 2020). The Amended Complaint alleges that, as a result of the sweeps, Plaintiffs were forced to scatter throughout Denver to objectively more dangerous locations, such as the median of streets, near highways, more isolated and less trafficked areas, and darker locations and that moving to these locations made Plaintiffs more susceptible to victimization. [Doc. #160], ¶¶ 226, 289, 321. As an egregious example, after the Lincoln Park sweep, Plaintiff Charles Davis was forced to sleep on the streets without a tent, which was his only available private shelter option during the COVID-19 pandemic. *Id.*, ¶ 246. He slept unsheltered on the median of Colfax Avenue (near the intersection of Broadway) for multiple nights because he was afraid of being swept again. *Id.* Plaintiff Davis knew that sleeping outside without a tent, and on the median, is more dangerous than sleeping outside with a tent in a park, but he felt as though he had no choice but to sleep unsheltered on a median after the Lincoln Park sweep. *Id.*, ¶ 247

For example, in *La All. for Human Rights v. City of L.A.*, the court held that Los Angeles had violated its homeless resident's Fourteenth Amendment rights by failing to provide adequate shelter or alternative housing options and "essentially" forcing homeless individuals to camp under dangerously polluted highway overpasses. No. LA CV 20-02291-DOC-KES, 2020 U.S. Dist. LEXIS 90979, at *12-15 (C.D. Cal. May 22, 2020) (vacated on other grounds). The Court held that indifference to the obvious health problems associated with the location of these encampments, particularly during the COVID-19 pandemic, demonstrated the City's deliberate

indifference and that such indifference was judicial conscience-shocking. *Id.* Here, Denver

Defendants' behavior is similar to that of Los Angeles: they forced Plaintiff Davis to the median

of a busy roadway and exposed him to significant danger that he did not face while safely in the

Lincoln Park encampment. [Doc. #160], ¶¶ 246-47.

Moreover, the sweeps have contributed to increased vulnerability of homeless residents by

breaking up groups of homeless people living downtown. *Id.*, ¶ 400. In response to the sweeps and

Camping Ban enforcement, homeless residents commonly choose sleeping locations with an aim

to avoiding contact with the police in remote and dangerous locations within Denver. *Id.* Of all

those who choose sleeping locations to avoid police contact, most of those do so frequently. *Id.*

Denver's homeless residents who move often to avoid police contact from the sweeps and

Camping Ban enforcement experience much higher rates of sexual assault, physical assault,

robbery and violent threats than those who do not feel forced to move. *Id.*, ¶ 401. For example,

women who feel forced to move often to avoid police are 60% more likely to be sexually

assaulted, and 247% more likely to be physically assaulted, than women who do not move often.

*Id.* Courts have consistently held that government action that exposes individuals to great risk of

victimization from others violates the Fourteenth Amendment's substantive due process clause.

*See Phillips*, 479 F. Supp. 3d at 622, 648-650; *L. W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992);

*Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989).

Additionally, the sweeps have devastating effects on Denver's homeless population's

mental and physical health through the interruption of their sleep. [Doc. #160], ¶ 402. Sleep

deprivation is linked to a cascade of health problems, such as increased rates of mental illness,

diabetes, hypertension, drug abuse, and violence. *Id.* Schizophrenia-like symptoms are associated

with lack of sleep, as are increases in anxiety, memory loss, and depression. *Id.* And, police

contact, and the fear of police contact, substantially undermines the sleeping-related health of

Denver's homeless residents. *Id.* Placing individuals at risk of serious danger to their mental and emotional health violates the Fourteenth Amendment's and the Colorado Constitution's substantive due process clauses. *See Chase v. County of Nev.*, 81 Fed. Appx. 92, 93 (9th Cir. 2003).

The danger created for homeless individuals by the seizure and destruction of their property, including the most basic necessities like medications, clothing, shoes, tents, tarps, and blankets, is exacerbated by the weather. [Doc. #160], ¶ 406. It is also obvious that there is a significant danger to not using blankets, tents, and other items to shelter from the elements so as to avoid criminalization under the Camping Ban, and that exposure, frostbite, and even death may result. Multiple homeless residents of Denver have died of hypothermia in the past few years.[22] *Id.* The problem of exposure is not only a cold weather challenge. *Id.* During the hot summer months, the inability to shelter oneself from the elements (either due to police directive, or fear of attracting police contact) has lead to significantly higher rates of heat stroke and dehydration. *Id.* Protection from the elements is a basic human need; exposure risks illness and death. *Id.*, ¶ 407. Defendants are well aware of the dangers that individuals living outside face, yet they knowingly maintain a practice of seizing and destroying property critical to the health and shelter of homeless persons and exposing them to an elevated risk of serious harm as a result. *Id.* Courts have consistently found that forcing individuals into serious danger that results from the elements violence violates the Fourteenth Amendment's substantive due process clause. *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1084-87 (9th Cir. 2000); *Kneipp v. Tedder*, 95 F.3d 1199, 1201-08 (3d Cir. 1996). For these reasons, Plaintiffs have adequately stated a danger-creation claim.

---

[22] *We Will Remember 2018: Homeless Death Review, Denver, Colorado*, COLORADO COALITION FOR THE HOMELESS, https://www.coloradocoalition.org/sites/default/files/2018-12/Death%20Review%202018_FINAL%20%282%29.pdf.

3.7 **Plaintiffs have adequately alleged that D.R.M.C. 49-246 is void-for-vagueness.**

Contrary to Denver Defendants' assertions, the void-for-vagueness doctrine applies in the civil context as well as the criminal context. *See, e.g., Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989).[23] "A regulation is vague on its face when it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Flanagan*, 890 F.2d at 1569 (cleaned up). "The rule should comport with a rough idea of fairness and provide fair warning that certain kinds of conduct are prohibited." *Id.* (cleaned up).

D.R.M.C. 49-246 (the "Encumbrance Removal Ordinance") states:

> The manager of transportation and infrastructure or the manager's designee (hereinafter in this article, "manager") is authorized to remove or to order the removal of any article, vehicle or thing whatsoever encumbering any street, alley, sidewalk, parkway or other public way or place (any such thing hereinafter in this article to be called an "encumbrance"). The manager may prescribe appropriate methods, specifications, placement and materials for encumbrances in the public right-of-way.

The Encumbrance Removal Ordinance, when read in conjunction with D.R.M.C. 49-247, allows "the manager" to "immediately remove any non-permitted, illegal encumbrance without notice to the owner."[24] On its face, the Encumbrance Removal Ordinance is an obviously vague law. It allows any designee of the manager of Denver's department of transportation and infrastructure to remove any "thing" at any time, from any place, without any notice that the designee determines is "encumbering" any public place. Encumbering, thing, and place are not defined. And, there is no

---

[23] *See also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603–04 (1967); *Vorbeck v. Schnicker*, 660 F.2d 1260, 1262 (8th Cir. 1981).

[24] D.R.M.C. 49-249 provides a penalty for those who violate D.R.M.C. 49-246 and D.R.M.C. 49-247: "The owner of any non-permitted encumbrance removed under the provisions of this article, or the owner of a permitted encumbrance who fails to remove it as required by section 49-247(a), above, shall pay the costs of such removal and shall forfeit an administrative penalty of not more than nine hundred ninety-nine dollars ($999.00) in addition to the costs of such removal."

scienter requirement. *See Goldman v. Knecht*, 295 F. Supp. 897, 904 (D. Colo. 1969). So written, the Encumbrance Removal Ordinance neither provides fair notice of the conduct it proscribes nor any standard that would guard against its arbitrary or discriminatory enforcement. *See Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018).

Instead, the Encumbrance Removal Ordinance "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure[.]'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972). In *Papchristou*, the Supreme Court declared vagrancy laws anachronistic and past their time. The law struck down in *Papachristou* "failed to give a person of ordinary intelligence fair notice that his contemplated conduct [was] forbidden by the statute and encouraged arbitrary and erratic arrests and convictions." 405 U.S. at 162 (cleaned up). Many people, particularly the poor, could not avoid violating this law. *Id.* The Encumbrance Removal Ordinance casts a similarly wide net, making it easy for Denver to target "so-called undesirables," *id.* at 170, who, in this case, are homeless and are forced to store their property at public places. Lacking guidelines to define encumbering, thing, and place, the Encumbrance Removal Ordinance "necessarily entrusts lawmaking to the moment to moment judgment of" the manager or her designee. *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999); *see also Goldman*, 295 F. Supp. at 906. It targets innocent acts and makes it impossible for homeless persons to avoid violating the law. And, this is demonstrated by the allegations in the Amended Complaint (which must be taken as true, *Kerber*, 647 F.3d at 959) that the Encumbrance Removal Ordinance is only used to target Plaintiffs and other homeless individuals. [Doc. #160], ¶ 150.

### 3.8 **Plaintiffs have adequately alleged a violation of the fundamental right to travel under the United States Constitution.**

D.R.M.C. 38-86.2 (the "Camping Ban") and sweeps impermissibly penalize the

fundamental right of indigent homeless persons to travel to or remain in Denver, by prohibiting them from conducting the basic necessities of life (including eating, sleeping, and sitting) and storing personal belongings in any public areas. The United States Supreme Court has expressly recognized a fundamental constitutional right to travel. *See Shapiro v. Thompson*, 394 U.S. 618, 628, 629 (1969). The right of travel is a basic constitutional right. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254 (1974). People have a constitutional right to move from one place to another as they wish. *Morales*, 527 U.S. at 53; *Edwards v. California*, 314 U.S. 160 (1941). A law implicates the constitutional right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification that serves to penalize the exercise of that right. *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986).

The Supreme Court of the United States has repeatedly rejected statutes designed to exclude the indigent from a particular municipality or state. *Edwards*, 314 U.S. at 174; *Shapiro*, 394 U.S. at 629; *Memorial Hospital*, 415 U.S. 250. Additionally, the Supreme Court has held that the right to travel includes the right to stay as well as the right to go. *Kent v. Dulles*, 357 U.S. 116, 126 (1958); *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972); *Soto-Lopez*, 476 U.S. at 903; *Papachristou*, 405 U.S. at 156. "Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage.'" *Morales*, 527 U.S. at 55 (quoting *Kent* v. *Dulles,* 357 U.S. 116, 126 (1958)).

Additionally, it is clear that the Camping Ban and sweeps use the auspices of "camping" and "public health" to penalize homeless individuals who would immigrate to Denver. Multiple City Councilmembers explicitly stated that the Camping Ban was passed to force homeless individuals out of Denver. [Doc. #160], ¶ 134-36. And, criminalizing the harmless acts of sleeping, eating, lying, and storing property in a public place (when the vast majority of homeless

persons in Denver have no legal alternative to doing so) on its face forbids a necessity of life and thereby effectively penalizes migration. *See Memorial Hospital*, 415 U.S. at 258-259 (holding that laws penalize travel when they deny a person a "necessity of life"). Arresting or citing the homeless for sleeping, eating, and storing possessions in public also burdens their freedom of movement, because they must either forgo sleeping, eating, and possessing property, or leave Denver altogether to avoid criminal penalty. They also deter homeless individuals from traveling to Denver. The Camping Ban and sweeps encourage an unhealthy and ultimately futile competition among cities to impose comparable restrictions in order to avoid becoming a refuge for homeless persons driven out by other cities.[25]

Multiple courts have held that allegations substantially similar to those in Plaintiffs' Amended Complaint state a violation of the right to travel. *See Phillips*, 479 F. Supp. 3d at 657 (; *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1270-71 (11th Cir. 2011); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 949 (E.D. Mo. 2004); *Johnson v. Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002). And, one case is particularly instructive. In *Pottinger*, a class of homeless individuals alleged that the City of Miami had a "custom, practice and policy of arresting, harassing and otherwise interfering with homeless people for engaging in basic activities of daily life — including sleeping and eating — in public places where they are forced to live." 810 F. Supp. at 1554. There, Miami criminalized "thousands of homeless people for such life-sustaining conduct under various City of Miami ordinances and Florida Statutes." *Id*. The court concluded that the City's enforcement practices, which "prevent homeless individuals who have no place to go from sleeping, lying down, eating and performing other harmless life-sustaining activities"

---

[25] In a salient example of this domino effect: in response to the Denver ordinance, surrounding communities quickly enacted similar measures to protect themselves from an influx of Denver's homeless. *See* Andrew Villegas, *Centennial, Like Denver And Boulder Before It, Has Banned Urban Camping*¸ CPR NEWSAvailable at: https://www.cpr.org/2019/07/09/centennial-like-denver-and-boulder-before-it-has-banned-urban-camping/.

burdened their right to travel, because this denies a "necessity of life." *Id.* at 1580. Here, like in *Pottinger*, Denver criminalizes, through the Camping Ban and sweeps, homeless individuals' engagement in the most basic of life's functions: eating, sleeping, and possessing property.

That this case involves intrastate travel does not change the analysis. Courts have repeatedly concluded that the right to travel encompasses intrastate travel. *See, e.g., Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990); *Lutz v. City of York, PA*, 899 F.2d 255, 268 (3d Cir. 1990); *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 648-649 (2d Cir. 1971); *Johnson*, 310 F.3d at 498; *Catron*, 658 F.3d at 1270-71. As the Second Circuit recognized in *King*, "[i]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not acknowledge a correlative constitutional right to travel within a state." 442 F.2d at p. 648.[26]

In sum, in striking down a law that aimed to exclude the indigent of an earlier era, the Supreme Court observed:

> The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division. . . [I]n not inconsiderable measure the relief of the needy has become the common responsibility and concern of the whole nation.

*Edwards*, 314 U.S. at 173-174. The same principle requires this Court to invalidate the Camping Ban and sweeps: Denver cannot dump its homeless residents on neighboring towns' (and states') doorsteps. Because the Camping Ban and sweeps impair the right to travel of homeless persons, they are subject to strict scrutiny. *See Dunn*, 405 U.S. 339-342; *Shapiro*, 394 U.S. at 634. As outlined *infra* **Section 3.12**, they do not meet this exacting standard.

---

[26] *See also Kolender v. Lawson* 461 U.S. 352, 358 (1983) (emphasizing that a law prohibiting wandering the streets at night without identification implicated "consideration of the constitutional right to freedom of movement"); *Papachristou*, 405 U.S. at 164 (stating that "wandering or strolling" are "historically part of the amenities of life as we have known them").

3.9 **Plaintiffs have adequately alleged a violation of the fundamental right to travel under the Colorado Constitution.**

"[T]he rights of freedom of movement and to use the public streets and facilities in a manner that does not interfere with the liberty of others are basic values inherent in a free society and are thus protected by article II, section 3 of the Colorado Constitution." *People in Interest of J.M.*, 768 P.2d 219, 220-21 (Colo. 1989). In *People in Interest of J.M.*, the Colorado Supreme Court held that the Colorado Constitution protects every citizen's fundamental right to "stroll, loiter, loaf, and use the public streets and facilities in a way that does not interfere with the personal liberties of others[.]" *Id.* at 221. The plain language of the Camping Ban impermissibly infringes on this fundamental right by prohibiting activities that equate to loitering and loafing (sleeping and eating), and the use of public property in a way that does not interfere with others. And, the sweeps, as they have been conducted, have prohibited Plaintiffs from using public streets and facilities in a way that does not interfere with the personal liberties of others.

Because the Camping Ban and sweeps impairs the rights to stroll, loiter, loaf, and use the public streets and facilities in a way that does not interfere with the personal liberties of others, a right that is "fundamental" under the Colorado Constitution, "the state must establish a compelling interest before it may curtail the exercise of such rights[.]" *People in Interest of J.M.*, 768 P.2d at 221. As demonstrated *infra* **Section 3.12**, it does not meet this exacting standard.

3.10 **Plaintiffs have adequately alleged an equal protection violation under both the United States and Colorado constitutions.**

3.10.1 **The sweeps, Camping Ban, and Encumbrance Removal Ordinance violate the United States and Colorado Constitutions' equal protection clauses because they target homeless individuals.**

The Colorado Constitution provides that all individuals within the state are guaranteed the equal protection of the law. *Lujan*, 649 P.2d at 1014; Colo. Const. Art. II, Sec. 3; Colo. Const. Art. II, Sec. 25. Similarly, the United States Constitution guarantees equal protection. U.S. Const.

amend. XIV. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534–535 (1973); *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011).[27] Even when a law is nondiscriminatory on its face, equal protection is violated if the law's purpose is to discriminate against a particular group. *See Moreno*, 413 U.S. at 534–535.

This Court must look beyond the face of a law or action to its underlying purpose and its impact on particular groups. For example, in *Shapiro*, the Supreme Court examined the legislative history of the statutes challenged and rendered its decision that they violated the Fourteenth Amendment based, in part, on the "weighty evidence that exclusion from the jurisdiction of the poor who need or may need relief was the specific object of these provisions." 394 U.S. at 628; *see also Arlington Heights v. Metropolitan Housing Corp*, 429 U.S. 252, 265-266 (1977) (recognizing the relevance of discriminatory purpose in assessing the validity of a rezoning decision).[28] As alleged in the Amended Complaint, the history of the Camping Ban's enactment, and legislative history, demonstrates that it specifically targets and discriminates against homeless individuals. [Doc. #160], ¶¶ 132-137. Therefore, because the Camping Ban was enacted "at least

---

[27] *Moreno* and *Lawrence* clearly establish that animus against a disfavored group violates the Fourteenth Amendment and, therefore, the Individual Defendants are not entitled to qualified immunity.

[28] Further, the holding from last term's *Masterpiece Cakeshop* demonstrates that this Court should examine the legislative history of the Camping Ban to determine its underlying purpose. In *Masterpiece*, Justice Kennedy based his decision not on the facially neutral ruling by a panel of the Colorado Civil Rights Division finding that a cake baker had violated Colorado's public accommodations laws, but on the statements of a *single commissioner* that Justice Kennedy determined disparaged the cake baker's religion. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018). The lesson to be drawn from *Masterpiece Cakeshop* is that, even in the face of a facially neutral law or decision, courts must look at the comments of the decisionmakers in determining the true purpose of the law. *Id.* at 1730.

in part 'because of' . . . its adverse effects upon an identifiable group" it violates the Fourteenth Amendment. *Pers. Adm'r of Mass. V. Feeney*, 442 U.S. 256, 279 (1979).

The breadth of the Camping Ban, Encumbrance Removal Ordinance, and sweeps also illustrates that their true purpose is targeting homeless individuals. In *Romer v. Evans*, the Supreme Court of the United States overturned a Colorado constitutional amendment that denied gays and lesbians access to the protection of antidiscrimination laws. 517 U. S. 620, 632, 635 (1996). The amendment, the Supreme Court held, was "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus." *Id.*

Here, for example, the Camping Ban is so divorced from Denver's proffered justifications for it (*i.e.* preventing public health hazards) that the measure is inexplicable by anything other than animus. The Camping Ban not only criminalizes sleeping with shelter in public places, but also criminalizes eating and storage of personal possessions. *See* D.R.M.C. 38-86.2. And, "sheltered" includes, without limitation, protecting oneself while eating or sleeping by tent, tarpaulin, lean-to, sleeping bag, bedroll, blankets, or any form of cover or protection from the elements other than clothing. *Id.* The Encumbrance Removal Ordinance allows the manager of the department of transportation and infrastructure to seize any property that a homeless individual might have. And, the sweeps are constant. Importantly, there are a myriad of other laws that do in fact *directly* address the concerns that have been so far articulated by Denver as justification for the Camping Ban, Encumbrance Removal Ordinance, and sweeps, including laws banning open flames, public urination, defecation, littering, etc. The breadth of these laws and actions, in addition to how divorced they are from any legitimate government purpose, illustrates their true purpose: criminalizing the essential life necessities of homeless individuals.

Further, regardless of the statute's language or even legislative purpose, this Court must consider the unequal *effects* of the Camping Ban "because legislation may create impermissible classifications through its application though not by its language." *Lujan*, 649 P.2d at 1014; *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). Specifically, a court is required to look to objective evidence, *i.e.* statistical evidence, to establish discriminatory purpose because objective evidence can characterize violations of the equal protection guarantee even when the motive behind an action was entirely benign. *People v. Cerrone*, 854 P.2d 178, 194 n.27 (Colo. 1993); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo*, 118 U.S. 356.[29]

There is substantial statistical evidence alleged in the Amended Complaint that the Camping Ban, Encumbrance Removal Ordinance, and sweeps, like the laws in *Gomillion*, *Yick Wo*, and *Castaneda*, are only enforced against the homeless, thereby revealing their true purpose. Since its enactment, Denver has vigorously enforced the Camping Ban, but only against Denver's homeless residents. [Doc. #160], ¶ 138-40. Moreover, police officers only enforce the Camping Ban against homeless individuals, even when there are similarly situated housed individuals who are violating the Camping Ban. *Id.*, ¶ 141. And, the only time the Encumbrance Removal Ordinance is enforced is against homeless individuals. *Id.*, ¶ 150.

Even as a matter of common sense, the effects of the Camping Ban, Encumbrance Removal, and sweeps betray their true purpose: targeting homeless individuals. *See* Waldron,

---

[29] In both *Gomillion* and *Yick Wo*, which have been relied on previously by the Colorado Supreme Court, the Supreme Court of the United States found that statistical evidence established that a facially neutral law's purpose was discriminatory, in violation of the United States Constitution. In *Gomillion*, the Court held a state legislature violated the Fifteenth Amendment when it altered a city's boundaries "from a square to an uncouth twenty-eight-sided figure," thereby excluding 395 of 400 black voters without excluding a single white voter. 364 U.S. at 340-41. In *Yick Wo*, a California ordinance was found neutral on its face but prejudicial in practice when it required laundry operators to obtain a permit and all but one of the white applicants received permits while none of the over 200 Chinese applicants received permits. 118 U.S. at 373-74. Similarly, in *Castaneda v. Partida*, the Court found that a large disproportionate impact could not be justified by any legitimate reason after looking at statistical evidence. 430 U.S. 482 (1977).

*Homelessness & the Issue of Freedom*, 39 UCLA L.REV. 295, 313 (1991) (stating that anticamping ordinances "have and are known and even intended to have a specific effect on the homeless which is different from the effect they have on the rest of us…. [E]veryone is perfectly well aware of the point of passing these ordinances, and any attempt to defend them on the basis of their generality is quite disingenuous."). No one else, other than homeless individuals is affected by the Camping Ban, Encumbrance Removal Ordinance, and sweeps. [Doc. #160], ¶¶ 140-41, 150. There is no evidence that anyone other than homeless individuals were sleeping in public places in Denver prior to passage of the Camping Ban. And, practically speaking, it makes sense that ordinances and actions criminalizing the use of any form of shelter, or storing property, in all public areas are targeted at the only people who would use shelter in public areas: homeless individuals.

This Court need not hold that homeless persons are members of a "suspect class" in order to invalidate the ordinance on equal protection grounds. Even under the more lenient rational relationship test, discriminatory animus toward a group is not a valid state objective. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (holding that irrational prejudice against the "mentally retarded" was not a valid state objective); *Moreno*, 413 U.S. at 534–535 (holding that discrimination against "hippies" was not a valid state objective); *Goldman*, 295 F. Supp. at 904. The "practical effect of the law here in question [is] to impose a disadvantage, a separate status, and so a stigma upon" homeless individuals. *United States v. Windsor*, 570 U.S. 744, 770 (2013). This is not a rational basis for a law.

Ultimately, the California Supreme Court has stated it best when discussing a city ordinance that, facially, simply outlawed sitting and lying on public property but was enacted with the specific purpose of driving "hippies" out of the city:

we cannot be oblivious to the transparent, indeed the avowed, purpose and the

> inevitable effect of the ordinance in question: to discriminate against an ill-defined
> social caste whose members are deemed pariahs by the city fathers. This court has
> been consistently vigilant to protect racial groups from the effects of official
> prejudice, and we can be no less concerned because the human beings currently in
> disfavor are identifiable by dress and attitudes rather than by color.

*Parr v. Mun. Court for Monterey-Carmel Judicial Dist.*, 479 P.2d 353, 360 (Cal. 1971). That

vigilance is even more important now. Today's pariahs are no longer the relatively carefree

"hippies" considered by the Court in *Parr*, many of whom chose that lifestyle, but persons who

are homeless without choice.

### 3.10.2  The Camping Ban and sweeps violate the Colorado Constitution's equal protection clause because homeless individuals are a suspect or quasi-suspect class.

The Colorado Constitution provides that no individual may be denied equal protection of

the law based on a suspect classification. *Lujan*, 649 P.2d at 1014; Colo. Const. Art. II, Sec. 3;

Colo. Const. Art. II, Sec. 25. Under the Colorado Constitution, the "suspect class" inquiry is a

two-part test.[30] First, the Colorado Supreme Court has held that the "class" requirement is satisfied

if the group identified is "marked by common attributes or characteristics" and "distinct and

insular." *Id.* at 1020. Then, the Colorado Supreme Court has identified two ways that a class of

individuals satisfies the "suspectness" inquiry; a class of individuals is a suspect class if it either

---

[30] Contrary to Defendants' arguments, the Colorado Supreme Court independently determines whether a suspect class exists and does so using different criteria than the United States Supreme Court. *See Lujan*, 649 P.2d at 1019. The Colorado Constitution creates wholly separate rights than the United States Constitution and the Colorado Supreme Court has repeatedly held that rights under the Colorado Constitution are broader, and more protective, than corollary rights under the United States Constitution. *See, e.g., Bock v. Westminster Mall Co.*, 819 P.2d 55, 59-60 (Colo. 1991; *People v. Ford,* 773 P.2d 1059 (Colo. 1989); *Parrish v. Lamm,* 758 P.2d 1356, 1365 (Colo. 1988); *People v. Seven Thirty-Five East Colfax, Inc.,* 697 P.2d 348, 356 (Colo. 1985); *People v. Berger,* 521 P.2d 1244 (Colo. 1974); *In Re Hearings Concerning Canon 35,* 296 P.2d 465 (Colo. 1956); *Cooper v. People,* 13 Colo. 337, 22 P. 790 (1889); *People v. Oates,* 698 P.2d 811 (Colo. 1985); *People v. Sporleder,* 666 P.2d 135 (Colo. 1983); *Charnes v. DiGiacomo,*  612 P.2d 1117 (Colo. 1980) ; *People v. Paulsen,*  601 P.2d 634 (Colo. 1979); *People ex rel. Juhan v. Dist. Court for Cty. of Jefferson*, 439 P.2d 741 (Colo. 1968).

has been: (1) "subjected to a history of purposeful unequal treatment with its attendant disabilities[,]" *id.* at 1021, or (2) "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process[.]" *Id.* At least one court has noted that the homeless bear "traditional indicia of suspectness[.]" *Pottinger*, 810 F. Supp. at 1578.

First, homeless individuals in Denver (and Colorado) are a distinct and insular class. [Doc. #160], ¶ 124**.** The homeless population in Denver is .05% of the population. *Id.* Homeless individuals are unable to represent themselves adequately in the political process because there are significant barriers to their participation in the political process, including the requirement that they have an address to register to vote. *Id.* There is also a significant amount of majoritarian discrimination against homeless individuals through the use of fear unsupported by facts and the passage of legislation that targets homeless individuals, like the Camping Ban. *Id.*

Additionally, Denver's homeless population has the traditional *indicia* of suspectness as defined by the Colorado Supreme Court. Homeless individuals in Denver have been "subjected to a history of purposeful unequal treatment with its attendant disabilities[.]" *Lujan.*, 649 P.2d at 1021. Laws criminalizing homelessness predate the founding of this country, and have subjected homeless individuals to a long and unbroken history of discrimination and marginalization. [Doc. #160], ¶¶ 87, 88, 91; *see Papachristou*, 405 U.S. at 161-62.[31] For example, during the colonial period of the United States, colonies imposed vagrancy laws that limited the movement of poor people from town to town. *Id.*, ¶ 88. America's first constitution, the Articles of Confederation,

---

[31] *See also* Harry Simon, *Towns Without Pity: A Constitutional and Historical Analysis of Official Efforts to Drive Homeless Persons from American Cities,* 66 TUL. L. REV. 631, 635-45 (1992) (noting that between the seventh and beginning of the twentieth century, more than two-hundred statutes against vagrancy existed in England); Robert Teir, *Maintaining Safety And Civility In Public Spaces: A Constitutional Approach To Aggressive Begging,* 54 LA. L. REV. 292-300 (1993) (chronicling laws that criminalize the poor and homeless from classical Athens to modern times).

specifically exempted homeless individuals from the privileges and immunities of citizenship and relegated homeless individuals (then termed "vagabonds") to fugitive status. *Id.*, ¶ 89; Art. of Confed., Art. IV (denying "paupers" and "vagabonds" of "all privileges and immunities of free citizens"); *Goldman*, 295 F. Supp. at 903, n. 13. Homeless individuals were denied the franchise for centuries. [Doc. #160], ¶ 90; Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States*, 29 (2nd ed. 2009). More recently, cities and states, including Denver, have enacted "vagrancy" and "loitering" laws that specifically targeted homeless individuals. [Doc. #160], ¶¶ 92-49; *Goldman*, 295 F. Supp. at 903; *Papachristou*, 405 U.S. at 161-62. While these laws were struck down as unconstitutional, Denver has pivoted to targeting homeless individuals through the Camping Ban and sweeps. [Doc. #160], ¶¶ 94-99. Further evidence that homeless individuals have been subjected to a history of purposeful unequal treatment is that Denver's homeless are also likely to be segregated because of their condition into "remote, stigmatizing institutions," *Cleburne Living Ctr. v. Cleburne*, 726 F.2d 191, 197 (5th Cir. 1984), like "public shelters." *Johnson v. City of Dall.*, 860 F. Supp. 344, 356 (N.D. Tex. 1994) *rev. on other grounds Johnson v. City of Dall.*, 61 F.3d 442 (5th Cir. 1995). In fact, that is exactly what the Camping Ban and sweep aim to do: warehouse homeless individuals in remote, stigmatizing shelters. It is nearly indisputable that homeless individuals, both in Denver and across the state, have certainly been subjected to a history of purposeful unequal treatment with its attendant disabilities. *Johnson*, 860 F. Supp. at 356 (noting that "discrimination against the homeless is likely to be a function of deep-seated prejudice").

Second, homeless individuals lack political power to "adequately protect themselves from the discriminatory wishes of the majoritarian public." *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) *aff'd*, 133 S. Ct. 2675 (2013). There are a number of reasons why homeless individuals are politically powerless, including that homeless individuals lack resources that

would allow them to access their rights. [Doc. #160], ¶¶ 93, 125. This includes monetary resources and access to representation. *Id.* Homeless individuals' inability to demonstrate that they provide tax resources to Denver makes them even more politically powerless. *Id.,* ¶ 125. There have also been a number of salient examples of homeless individuals' political powerlessness, including the failure of Initiative 300 and the Right to Rest Act, along with the passage of the Camping Ban itself. *Id.,* ¶ 126. And, finally, further demonstrating homeless individuals political powerlessness, they are not represented at any level of government: there is currently no elected or appointed official in Denver or the state of Colorado who is homeless. *Id.*, ¶ 127.[32]

Classifications based on a suspect class demand strict scrutiny. And, as outlined *infra* **Section 3.12**, the Camping Ban is not narrowly tailored to a compelling government interest. Therefore, it is unconstitutional.

### 3.11 **Plaintiffs have adequately alleged a First Amendment violation.**

#### 3.11.1 **Plaintiffs have adequately alleged an unconstitutional prior restrain.**

"The clearest definition of prior restraint is as an administrative system or a judicial order that prevents speech from occurring[.]" Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 11.2.3.1, at 949-50 (3d ed. 2006). In this case, as alleged in the Amended Complaint, Denver's decision to provide no notice prior to the sweeps, which was an administrative system that prevented Plaintiff Denver Homeless Out Loud ("DHOL") from being able to attend the

---

[32] If the limited successes homeless people have had in the political arena (*i.e.* gathering enough signatures to place Initiative 300 to a vote) were sufficient to disqualify a group from the protection of heightened scrutiny, then the Supreme Court of the United States would not have applied such scrutiny to sex-based classifications in 1973. By then, Congress had already passed Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963 to protect women from discrimination in the workplace. *Frontiero v. Richardson*, 411 U.S. 677, 687-88 (1973). Yet, a plurality of the Supreme Court of the United States applied heightened scrutiny in *Frontiero*.

sweeps[33] and speak, instituted a prior restraint on. [Doc. #160], ¶¶ 199-201, 276, 309; *see Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1046 (9th Cir. 2006); *Cmty. for Creative Non-Violence v. Turner*, 714 F. Supp. 29, 33 (D.D.C. 1989).

"[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *N.Y. Times v. United States*, 403 U.S. 713, 714 (1971). There are only two government interests that the Supreme Court has elaborated are important enough to justify a prior restraint: national security and the fairness of criminal trials; and, even these strong interests are not powerful enough to overcome the presumption against prior restraints in all circumstances. There is no such strong and important governmental interest here, as alleged in the Amended Complaint. [Doc. #160], ¶¶ 199-201, 276, 309.  And, "[prior restraints] must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). Denver had available to it many options other than completely foreclosing expression by failing to give notice if it feared a public safety threat by protests, including increasing the police presence at sweeps or cordoning off certain areas near the sweeps. The failure to take these steps demonstrates that its actions were not narrowly tailored. *See McCullen v. Coakley*, 573 U.S. 464, 493 (2014).

### 3.11.2  Plaintiffs have adequately alleged that Defendants' restriction of Plaintiff Denver Homeless Out Loud's speech was viewpoint based.[34]

---

[33] While it is true that Ms. Howard was able to attend *one* of the sweeps, Plaintiff DHOL is a multi-member organization.

[34] Plaintiffs' counsel never conveyed to counsel for Denver Defendants, Geoffrey Klingsporn, during conferral that "Plaintiffs maintained that Denver's alleged failure to provide notice also constituted an unconstitutional time, place, and manner restriction of Plaintiffs' speech." Plaintiffs' counsel stated, as argued here, that Denver Defendants' actions were a viewpoint-based

39

No matter the context or location, viewpoint-based restrictions on speech violate the First Amendment. *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, (1993); *Cornelius v. NAACP Legal Defense and Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985). As alleged in the Amended Complaint, Defendants Denver, Hancock, Lee, McDonald, Robinson, and Bronson made the decision to provide no notice, and foreclose the expression of Plaintiff DHOL, because members of that group had been critical of the sweeps on prior occasions. [Doc. #160], 199-201, 276, 309. This was a viewpoint-based restriction of Plaintiff DHOL's speech. *Mesa v. White*, 197 F.3d 1041, 1045 n.4 (10th Cir. 1999).

The Supreme Court long ago explained that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 508, (1969). And, "[l]isteners' reaction to speech is not a content-neutral basis for regulation . . . . Speech cannot be . . . banned[] simply because it might offend" a Denver official. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992). Denver Defendants should have known that the government may never suppress viewpoints it does not like. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Therefore, Plaintiffs have adequately alleged a clearly established First Amendment violation.

### 3.12 **The Camping Ban, Encumbrance Removal Ordinance, and sweeps are not narrowly tailored to a compelling government interest.**

Given that the Amended Complaint adequately alleges that the Camping Ban, Encumbrance Removal Ordinance, and sweeps violate fundamental and express rights under the Colorado and United States Constitutions, Denver Defendants have "the burden of showing that

restriction of Plaintiff DHOL's First Amendment rights. As was alleged in the Amended Complaint.

the act is necessarily related to a compelling governmental interest, and, when applicable, of showing that the classification is specifically fashioned and narrowly tailored to further its legitimate objective." *Lujan*, 649 P.2d at 1016. They cannot meet this burden. The restriction on homeless individuals' fundamental rights must be "actually necessary" to achieve the government interest. *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729, 2738 (2011). In other words, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012).

Denver Defendants seemingly only advance one governmental interest that is served by the Camping Ban: public health and safety. [Doc. #176], p. 47. While public health and safety is certainly a legitimate and important government interest, there is no evidence that the Camping Ban, Encumbrance Removal Ordinance, and sweeps serve this interest, let alone are narrowly tailored to advancing it. The Camping Ban, Encumbrance Removal Ordinance, and sweeps actually jeopardize homeless individuals' health and safety by forcing them to sleep outside without shelter or risk having their property taken.

Additionally, Denver "has available to it a variety of approaches that appear capable of serving its interests" without violating Plaintiffs' fundamental rights. *McCullen*, 573 U.S. at 493. If Denver is concerned about the public accumulation of refuse, then it has a narrowly tailored littering ordinance to address that issue. *See, e.g.,* D.R.M.C 48-44; D.R.M.C 48-44.5; D.R.M.C 48-93. If it would like to ensure that public urination and defecation does not occur, there is again an ordinance for that. *Id.*; D.R.M.C 38-99. Any concerns about open flames, hypodermic needles, or drug use are, again, addressed by other ordinances, the Denver fire code, and the Denver health code. D.R.M.C 38-173. And, civil codes prescribe, and more directly address, the alleged secondary effects. D.R.M.C 22; D.R.M.C 24.

Enjoining the Camping Ban, Encumbrance Removal Ordinance, and sweeps would have

no effect on Denver's ability to enforce these other criminal and civil ordinances. Fundamental rights require that less-burdensome restrictions be attempted before imposing such a wide proscription of the exercise of fundamental rights. *See McCullen*, 573 U.S. at 493. And, for equal protection purposes, the Camping Ban is "overinclusive because the benefit it confers on society could be achieved in a way less harmful to the discriminated-against group" and therefore is not narrowly tailored. *Baskin v. Bogan*, 766 F.3d 648, 655 (7th Cir. 2014). If the aim of the Camping Ban, Encumbrance Removal Ordinance, and sweeps is *truly* to address health and safety issues related to the above concerns, these interests are already served by existing ordinances.

### 3.13 Defendants' arguments relating to the Enhance Law Enforcement Integrity Act are plain just plain incorrect.

Pursuant to C.R.S. § 13-21-131,[35]

> A peace officer… employed by a local government who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

Therefore, contrary to Denver Defendants' arguments, there is an express private cause of action for money damages against peace officers available under the Colorado Constitution. Further, contrary to Denver Defendants' arguments throughout their motion, qualified immunity does not apply to any of Plaintiffs' state constitutional claims brought pursuant to this statute. *Id.* ("Qualified immunity is not a defense to liability pursuant to this section."). And, finally, contrary to Denver Defendants' arguments, Plaintiffs clearly assert no state constitutional causes of action for money damages against defendants who are not peace officers under § 13-21-131. *Compare* [Doc. #176], p. 45 *with* [Doc. #160], ¶¶ 561, 571 ("only seek[ing] declaratory and injunctive relief

---

[35] Plaintiffs alerted counsel for Denver Defendants of this statute, which created a private right of action, in their Amended Complaint. 561, 571.

against").[36]

### 3.14 **Plaintiffs have adequately alleged municipal liability.**

To ultimately prevail on their claim against Denver, Plaintiffs must simply allege, "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). Importantly,

> [w]here the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two.

*Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020).

As demonstrated, *supra*, Plaintiffs' have alleged that Denver Defendants violated Plaintiffs' constitutional rights. A policy or custom can be established in many ways, including through "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law" or "the decisions of employees with final policymaking authority[.]" *Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

#### 3.14.1 **Defendants Hancock, McDonald, and Robinson are final policymakers for Denver.**

A decision by a final municipal policymaker on a single occasion satisfies the "official policy" requirement of *Monell. Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Where action is directed by a "final policymaker," the municipality is equally responsible whether that action is

---

[36] The Colorado Supreme Court has repeatedly affirmed the availability of declaratory and injunctive relief in cases alleging violations of the Colorado Constitution against municipalities (including Denver). *See, e.g., Bock v. Westminster Mall*, 819 P.2d 55 (Colo. 1991); *Conrad v. City & Cnty. of Denver*, 656 P.2d 662 (Colo. 1982); *Taxpayers for Pub. Educ. v. Douglas Cnty. Sch. Dist.*, 351 P.3d 461 (Colo. 2015), *vacated on other grounds*,137 S. Ct. 2327 (2017); *see also Trinidad Sch. Dist. v. Lopez*, 963 P.2d 1095 (Colo. 1998); *Univ. of Colo. v. Derdeyn*, 863 P.2d 929 (Colo. 1993).

taken only once or repeatedly. *Id*. at 484-85. "[F]inal policymaking authority is a legal issue to be determined by the court based on local and state law." *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995).

Defendants Hancock, McDonald, and Robinson are final policymakers. Defendant Hancock is mayor of Denver. Denver is a strong-mayor city and affords Defendant Hancock "all the executive and administrative powers." Denver City Charter § 2.2.1-2. Defendant Hancock has the unfettered power to "appoint the heads of all administrative departments." Denver City Charter § 2.2.6, 2.3.2, 2.4.2, 2.6.1, 2.6.5, 2.12.1. Additionally, Defendants McDonald and Robinson are delegated final policymaking authority within their specific purviews of Denver's functioning. Defendant McDonald "administer[s] and exercise[s] control" over the "[i]nvestigation and control of communicable diseases"; the "[p]romulgation and enforcement of regulatory measures and rules necessary for protection of the health of the people" and the "[m]anagement and operation of environmental compliance and remediation programs[.]"Denver City Charter §§ 2.12.1, 2.12.2. Defendant Robinson is in "full charge and control of the departments of sheriff, fire and police[.]" Denver City Charter §§ 2.6.1, 2.6.2. Defendants Hancock, McDonald, and Robinson are not "meaningfully constrained by policies not of that official's own making," their decisions are "final -- i.e., are [not] subject to any meaningful review," and the decision in how to respond to the homeless encampments throughout Denver is "within the realm of [their] grant of authority" at law. *Randle*, 69 F.3d at 448.

The deliberate indifference exhibited by Defendants Hancock, McDonald, and Robinson in conducting the sweeps in direct violation of CDC guidance, and the property and due process rights of Plaintiffs, is obvious. Defendants Hancock, McDonald, and Robinson were on notice, by CDC guidance, that sweeping encampments would expose the inhabitants to a greater risk of contracting COVID-19. They were aware of the CDC guidance. And, they were certainly on

notice that sweeping Plaintiffs without notice, and seizing and destroying their property, was unconstitutional given the settlement agreement in *Lyall* and this Court's order on summary judgment in that case. *See Lyall*, 2018 U.S. Dist. LEXIS 48846.

Defendants Hancock, McDonald, and Robinson continued insistence on sweeping Plaintiffs, without notice, and seizing and destroying their property further demonstrates their deliberate indifference. The failure to remedy ongoing constitutional violations is "evidence of deliberate indifference on the part of a municipality." *Layton v. Bd. of Cty. Comm'rs*, 512 F. App'x 861, 870-72 (10th Cir. 2013); *see also Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); *City of Canton v. Harris*, 489 U.S. 378, 390, n.10 (1989). As final policymakers, Defendants Hancock, McDonald, and Robinson conscious disregard, alone is enough to support municipal liability. *Layton*, 512 F. App'x at 872.

Further, Defendants Hancock's, McDonald's, and Robinson's decision to conduct the sweeps was the "moving force" behind the violation of Plaintiffs' constitutional rights. *Brown*, 520 U.S. at 404. Their actions demonstrate a "direct causal link," *see Brown*, 520 U.S. at 404, between Denver's decisions and the violation of Plaintiffs' constitutional rights through the sweeps. *Layton*, 512 F. App'x at 870-72.

Finally, this Court previously held that Plaintiffs adequately alleged that their constitutional rights were violated at the behest of Denver's final policymakers in granting the preliminary injunction in this case, *Denver Homeless Out Loud*, 2021 U.S. Dist. LEXIS 13027, at *30, and should, again, hold as much.

### 3.14.2  Denver's multiple unconstitutional customs and practices caused the violation of Plaintiffs' constitutional rights.

To show that a challenged practice is a "custom," the practice must be so "persistent and widespread" that it "constitutes the standard operating procedure of the local governmental

entity." *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 672 (10th Cir. 2004). A municipal custom may also be comprised of "a series of decisions by a subordinate [governmental] official of which the supervisor [was] aware." *Id*. As alleged, Denver has multiple unconstitutional customs and practices. All of these customs and practices are evidenced by the ongoing sweeps outlined in the Amended Complaint.

First, Denver has a custom or practice of sweeping Plaintiffs during the COVID-19 pandemic, including fourteen sweeps since the CDC issues guidance that sweeps dramatically increased the risk to Plaintiffs of catching COVID-19. [Doc. #160], ¶¶ 172-268, 272-367.

Second, Denver has a custom and practice of seizing homeless individuals' unabandoned property and summarily (or subsequently) discarding (or destroying) it, as demonstrated by the more than fifteen sweeps outlined in the Amended Complaint. *Id.*, ¶¶ 161-268, 272-345.

Third, Denver has a custom and practice of seizing homeless individuals' property without adequate notice or a post-deprivation process for retrieving their property as demonstrated by the more than fifteen sweeps outlined in the Amended Complaint. *Id.*, ¶¶ 161-268, 272-345.

Fourth, Denver has a custom and practice of not providing notice to Plaintiffs, for nakedly political reasons and for the purpose of restraining and restricting Plaintiff DHOL's First Amendment rights, and this has happened on at least three occasions as outlined in the Amended Complaint. *Id.*, ¶¶ 161-268, 272-345.

Multiple courts in this District have held that three or more specific examples are sufficient to establish a custom at the motion to dismiss stage. *See Estate of Valverde v. Dodge*, Civil Action No. 16-CV-1703-MSK-MEH, 2017 U.S. Dist. LEXIS 131402 (D. Colo. Aug. 17, 2017) (relying on examples including "different individuals and span[ed] a significant time period" in holding that plaintiff had pled a widespread custom); *Sekerak v. City & County of Denver*, 1 F.Supp.2d 1191, 1199 (D. Colo. 1998). Plaintiffs easily meet this bar.

Further, Plaintiffs allege "the specific topic of the challenged policy or training inadequacy." *Arakji v. Hess*, Civil Action No. 15-cv-00681-CMA, 2015 U.S. Dist. LEXIS 161600 (D. Colo. Dec. 2, 2015). Specifically, Plaintiffs allege that "[s]ince its enactment, Denver, pursuant to its customs and practices, has vigorously enforced the Camping Ban, but only against Denver's homeless residents" and that "[t]he Camping Ban has been discriminatorily enforced only against homeless individuals. Its enforcement demonstrates that it specifically targets homeless individuals." [Doc. #160], ¶ 138. And, Plaintiffs also allege that "[p]ursuant to Denver's custom and practice, the authority to declare something an encumbrance has been delegated to the lowest level officials within the DOTI, DPD, and DSWM. These officials are given unfettered ability to determine what is an encumbrance and have used this law to seize and destroy Plaintiffs', and other homeless individuals', property." [Doc. #160], ¶ 149. Multiple courts have held that a plaintiff need only plead that the unconstitutional policy exists and that it caused the alleged constitutional violation, reasoning that the usual rule of pleading – that courts are to accept all allegations as true at the motion to dismiss stage – applies in the context of pleading a *Monell* policy, practice, or custom claim. *Walker v. Zepeda*, Civil Action No. 1:11-cv-01242-DME-CBS, 2012 U.S. Dist. LEXIS 74386, at *14 (D. Colo. May 29, 2012).[37]

Moreover, Plaintiffs allege that they were subjected to "multiple harms" during the sweeps, that the sweeps "occurred in the open," and that "multiple officials" were involved "in the misconduct." *Arakji*, 2015 U.S. Dist. LEXIS 161600, at *16-17. These allegations further demonstrate that the sweeps were undertaken pursuant to Denver's official customs and practices.

Finally, the Camping Ban and Encumbrance Removal Ordinance are formal policies, in

---

[37] *See also Taylor*, LLC, 2011 U.S. Dist. LEXIS 97985, at *4; *Gooding v. Ketcher*, 838 F. Supp. 2d 1231, 1240-41 (N.D. Okla. 2012); *Wilson v. City of Chi.*, No. 09 C 2477, 2009 U.S. Dist. LEXIS 93912, at *8 (N.D. Ill. Oct. 7, 2009); *Bartholomew v. Fischl*, 782 F.2d 1148, 1152-53 (3d Cir. 1986).

fact duly enacted laws, that violate the Constitution and direct officials, like Denver Defendants, to violate the Constitution. As the Supreme Court has explained, "[w]here a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). Because Plaintiffs allege they have had their constitutional rights violated due to two Denver ordinances, they have alleged municipal liability. *Clary v. City of Cape Girardeau*, 165 F. Supp. 3d 808, 829 (E.D. Mo. 2016).

### 3.14.3 The Lincoln Park, Morey, and Platte River sweeps alone demonstrate that Denver is liable.

Liability may be imposed on Denver based solely on the Lincoln Park, Morey, and South Platte River sweeps, even if this Court finds that the other sweeps were constitutional. During the Lincoln Park, Morey, and South Platte River sweeps over one hundred Defendants seized hundreds of items of property from Plaintiffs and summarily discarded them without providing Plaintiffs notice or an opportunity to contest the seizure in any way, which constitutes hundreds of constitutional violations. [Doc. #160], ¶¶ 202-268, 277-354. They were authorized by the highest echelons of Denver's government. *Id.*; *Pinder v. Commissioners of Cambridge*, 821 F. Supp. 376 (D. Md. 1993). Defendants continued seizures Plaintiffs' property, failure to provide any notice, and exposure of Plaintiffs' to an ongoing greater risk of harm during the Lincoln Park, Morey, and South Platte River sweeps shows that Denver's customs, policies, and practices resulted in the violation of Plaintiffs' constitutional rights. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1156–57 (1st Cir.), *cert. denied,* 493 U.S. 820 (1989); *Cady v. Cumberland Cty. Jail*, No. 2:10-cv-00512-NT, 2013 U.S. Dist. LEXIS 109195, at *112 (D. Me. Mar. 22, 2013); *Jacoby v. DuPage Cty. Ill.*, No. 12 CV 6539, 2013 U.S. Dist. LEXIS 89934, at *9 (N.D. Ill. June 26, 2013); *Rykard v. City of Dothan*, No. l:10-cv-868-MHT [wo], 2011 U.S. Dist. LEXIS 101135, at *9 (M.D. Ala. Aug. 9,

2011); *see also Smith v. Corr. Corp. of Am., Inc.*, 674 F. Supp. 2d 201, 206 (D.D.C. 2009); *Lavoie v. Town of Hudson*, 740 F. Supp. 88 (D.N.H. 1990); *Andujar v. City of Boston*, 760 F. Supp. 238 (D. Mass. 1991).[38] And, the egregiousness of Defendants' conduct during the Lincoln Park, Morey, and South Platte River sweeps is probative evidence that Denver is liable on the sole basis of those unconstitutional sweeps. *Grandstaff v. Borger*, 767 F.2d 161, 171-72 (5th Cir. 1985) (cited with approval in *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009); *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991); *Hodge v. Ruperto*, 739 F. Supp. 873 (S.D.N.Y. 1990).

### 3.15 **Plaintiffs have adequately alleged a breach of the *Lyall* settlement agreement.**

A claim for breach of contract has four elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). First, Plaintiffs, as class members of the *Lyall v. Denver* case, had a contract with Defendants. [Doc. #160], ¶¶ 151-57. Second, in performance of the contract, Plaintiffs dismissed their claims in the *Lyall v. Denver* case. *Id.* Third, Denver failed to perform a number of the provisions of the contract, including: (1) providing "at least seven days' notice prior to a [sweep] and shall include such language in its written protocol for [sweeps]"; (2) providing a "written notice" when property was seized; and (3) storing "any personal property that does not pose a public health or safety risk for at least 60 days." *Id.*, ¶¶ 153-60. These violations are outlined extensively in the Amended Complaint. *Id.*, ¶¶ 205, 208, 210, 212-17, 219, 220, 234, 239, 231-43, 249-57, 266-67, 282-85, 290-307, 314-15, 318-19, 322-66. Fourth, by Defendants seizing Plaintiffs property without seven days' notice, and discarding it,

---

[38] *See also Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) ("[D]eliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction.")

Denver and Hancock caused Plaintiffs damages. *Id.*[39]

Further, Plaintiffs have alleged that Defendant Hancock is personally liable for the breach of contract. As alleged, he directed the breach, both through a failure to provide notice and seizure and destruction of property. [Doc. #160], ¶¶ 159, 188-92, 203, 224, 274, 276, 288, 309. And, he is particularly individually liable given that he took these actions despite his responsibilities under Denver's City Charter to ensure all contract are faithfully executed. *Id.*, ¶ 587.

Finally, this Court has jurisdiction over Plaintiffs' breach of contract claim (just as it does over Plaintiffs' other state law, *i.e.* Colorado Constitutional, claims). Supplemental jurisdiction covers those claims "so related" to federal claims that they are "part of the same case or controversy under Article III[.]" 28 U. S. C. §1367(a). That is certainly the case here, where the facts underlying Plaintiffs constitutional claims are the same as those that underlie their breach of contract claims. Numerous courts have acknowledged that unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction when § 1367(a) is invoked and applicable.[40] None of the conditions in § 1367(c) exists in this case. *See Shultz v. Nomac Drilling, L.L.C.,* No. CIV-17-169-R, 2017 U.S. Dist. LEXIS 106564, at *6 (W.D. Okla. July 11, 2017).

4. **Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Denver Defendants' Motion To Dismiss Plaintiffs' First Amended Complaint And Jury Demand in its entirety.

DATED this 15th day of April 2021.

---

[39] Denver Defendants arguments fail to take Plaintiffs' allegations as true, which this Court must do. *Kerber*, 647 F.3d at 959; [Doc. #176], pp. 46-47.

[40] *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998); *McLaurin v. Prater*, 30 F.3d 982, 985 (8th Cir. 1994); *Palmer v. Hosp. Auth.*, 22 F.3d 1559, 1569 (11th Cir. 1994); *Bonadeo v. Lujan*, 2009 U.S. Dist. LEXIS 45672, 2009 WL 1324119, at *9 (D.N.M. Apr. 30, 2009); *Gudenkauf v. Stauffer Commc'ns, Inc.*, 896 F. Supp. 1082, 1084 (D. Kan. 1995).

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
David A. Lane
Darold W. Killmer
Andy McNulty
Reid Allison
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
dlane@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com
rallison@kln-law.com

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2021, I electronically filed the **RESPONSE TO DENVER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND [DOC. #160]** with the Clerk of the Court using the CM/ECF system which will send notification to the following counsel.

Kathleen Spalding
Stephanie Lindquist Scoville
Emely Garcia
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Kit.spalding@coag.gov
stephanie.scoville@coag.gov
emely.garcia@coag.gov

Wendy Shea
Michele Horn
Conor Farley
Geoffrey Klingsporn
Director Civil Litigation Section
City and County of Denver
Wendy.shea@denvergov.org
Michele.horn@denvergov.org
Conor.farley@denvergov.org
Geoffrey.klingsporn@denvergov.org

Timothy R. Gablehouse
Melanie J. Granberg
Evan C. Singleton
Gablehouse Granberg, LLC
410 17th Street, Suite 275
Denver, CO 80202
tgablehouse@gcgllc.com
mgranberg@gcgllc.com
esingleton@gcgllc.com

*/s/ Charlotte Bocquin Scull*
 Paralegal